## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IAN O'DONNELL AND DAVID JOLICOEUR, on behalf of themselves and others similarly situated | ) ) ) ) | |
| | ) | CIVIL ACTION NO. 04-CV-12719 NMG |
| Plaintiffs, | ) | |
| | ) ) | |
| v. | ) ) | |
| ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION | ) ) ) | |
| Defendants. | ) ) ) | |

### AFFIDAVIT OF KEN GITLIN

I, Ken Gitlin, being duly sworn, hereby depose and state as follows:

1. I am Executive Director of Operational Support for Robert Half International Inc. ("RHI" or the "Company"). I have held that position since June 1, 1999. My current position includes responsibility for multiple corporate departments that provide operational support to RHI's various business operations including: human resources, compensation and benefits, staff development and training, travel and meetings, real-estate and facilities, enterprise projects, process improvement, field automation, field administration, intranet services, and major accounts.

2. Before being promoted into my current position, I held positions at RHI that are now referred to as Regional Manager and District Director. In these roles, I had supervisory responsibility over many RHI branch offices over a wide geographic area, and was in a position to observe the activities and responsibilities of numerous Staffing Managers, Account Executives, and Account Managers working in the Company's various divisions.

3.      RHI provides specialized staffing services to its clients on a temporary, project, and full-time basis. The primary function of the Company's Staffing Managers, Account Executives, and Account Managers is to manage the flow of services from RHI to its clients. The Company is comprised of several divisions, each of which specializes in providing staffing services to clients in a particular field or industry. For example, the Robert Half Technology division provides information technology services on a project and full-time basis, and The Creative Group provides creative, web, marketing, and advertising services on a freelance basis.

4.      RHI has more than 260 branch offices throughout the United States, and has at least one office in 43 of the 50 states. These offices are grouped into 82 Regions, each overseen by a Regional Manager. The regions are combined in 14 Districts, each of which is managed by a District Director. The Districts are grouped into four Zones: an Eastern Zone, a Central Zone, a Western Zone, and an International Zone.

5.      In my capacity as RHI's Executive Director of Operational Support, I have occasion to review the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"). The pendency of the above-captioned action has been disclosed in such SEC filings repeatedly. In the Company's January 27, 2005 Form 8-K filing, RHI disclosed the fact that Ian O'Donnell and David Jolicoeur had brought suit against the Company; provided a summary of their claims on behalf of themselves and other Staffing Managers, Account Executives, and Account Managers for unpaid overtime under federal and Massachusetts law; and stated that the case was pending before this Court. A copy of this filing is attached hereto as Exhibit 1. The Company included similar disclosures regarding this case in its Annual Report on Form 10-K filing (filed with the SEC on February 23, 2005), and in its Quarterly Report on Form 10-Q (filed with the SEC on May 5, 2005). Excerpted copies of these filings are attached hereto

-2-

as Exhibits 2 and 3, respectively. Each of these filings is readily available to the general public through RHI's corporate website (www.rhi.com).

6.      RHI has not yet calculated the number of employees in the putative class described in the Amended Complaint filed in the above-captioned action. Because of the broad criteria the plaintiffs used to define the putative class, merely calculating the number of employees in the class would require the Company to expend substantial resources. Based on the Company's current size and its estimated turnover in the positions at issue, RHI estimates that the putative class may include thousands of people. RHI estimates that no more than a few hundred of these putative class members worked as Accountemps Staffing Managers in Massachusetts, like Ian O'Donnell and David Jolicoeur.

7.      The Staffing Managers, Account Executives, or Account Managers in each RHI division must each develop and maintain an expertise in the particular industries and fields on which they focus. The vast majority of Staffing Managers in RHI's Accountemps division have substantial education, training, and/or experience in the accounting and finance field. They use their knowledge of the accounting discipline and their connections in the industry in the day-to-day performance of their job duties, which require fluency in accounting terminology and a substantive understanding of the work performed by various classifications of employees in the accounting field.

8.      Other divisions of the Company work in different substantive fields, and the Staffing Managers, Account Executives, and Account Managers in those divisions must therefore develop and maintain an expertise in their unique respective fields. For example, Robert Half Technology Account Executives must develop and apply an in-depth understanding

-3-

of computer programming or database administration in order to match candidates to the orders that division receives from its clients.

9.     Accountemps Staffing Managers have three basic areas of responsibilities in managing the flow of services to Accountemps' clients: marketing and sales, desk, and recruiting.  In addition, Accountemps Staffing Managers have a fourth area of responsibility that involves dealing with human resource issues that arise during an assignment. Local market conditions, which vary by geographic location, dictate the amount of time they spend on each area of responsibility. They work in teams of varying sizes with other Staffing Managers, frequently sharing the responsibilities in a rotation. Implementation of this rotation varies, based on the local unemployment rate, the nature of the business territory, and the volume and complexity of orders from new and existing clients. For example, an Accountemps Staffing Manager in the Boston office may focus on his or her marketing and sales responsibilities for one week, followed by one week on desk duty, followed by one week of recruiting duty. A Staffing Manager in the Westborough office, however, may spend a greater portion of his or her time on recruiting if local market conditions have produced an excess of orders relative to the number of available candidates.

10.     Even the number of phases in the rotation varies from office-to-office and from time-to-time. The Accountemps divisions in some offices use a three-phase rotation, while divisions in other offices group the desk and recruiting functions and use a two-phase rotation. Some offices operate without any rotation of responsibilities.

11.     Accountemps Staffing Managers work together with other local managers to assess prevailing market conditions and allocate resources to best adapt to those conditions. As a result of such market assessments, the rotation implemented within a particular office may be

-4-

adjusted on a regular basis. Thus, the distribution of Accountemps Staffing Managers' job duties may vary within each office and between offices in a given region or district.

12.     While performing the marketing and sales responsibilities of their position, Accountemps Staffing Managers research and analyze the market and contact client company hiring authorities to secure orders for temporary accounting and finance services provided by RHI's service professionals ("candidates"). This process differs from the manner in which Staffing Managers, Account Executives, and Account Managers in other divisions may perform the same responsibilities, because each division tailors its sales and marketing efforts to the substantive field and market in which it operates. For example, Accountemps Staffing Managers may develop and cultivate clients by participating in accounting professional organizations. By contrast, Account Managers in The Creative Group often rely on specific candidates' portfolios of work to promote the division's marketing, advertising and creative services, and demonstrate how the Company can meet each individual client's needs.

13.     While on desk duty, Accountemps Staffing Managers use their knowledge and experience in the accounting field to identify the best candidate to fill each order for temporary accounting services in accordance with the client's unique requirements. Often, Accountemps' clients do not meet or interview the candidate before the assignment begins, but instead rely upon the Staffing Managers to make an appropriate selection based on their experience and expertise.

14.     The Staffing Managers, Account Executives, or Account Managers in RHI's other divisions must use the distinctions unique to the subject matter in which they specialize in matching candidates to clients' orders for services. These differences, in turn, may lead to different approaches to filling job orders. For example, some Account Executives in the Robert

-5-

Half Technology division will often arrange an Initial Client Meeting to ensure that the candidate's specialized skills match the client's specific needs.

15. The recruiting duty of the Accountemps Staffing Manager position involves interviewing and assessing prospective candidates who possess the appropriate professional skill sets and work experience for use in filling accounting assignments with client companies. When interviewing prospective candidates, they rely on their expertise and experience in the finance and accounting field to evaluate each prospective candidate's skills, determine the precise services he or she is qualified to perform, and, ultimately, decide whether to include each prospect in the Company's database of candidates.

16. The avenues by which Accountemps Staffing Managers pursue candidates and the techniques they use to interview candidates vary from office-to-office and from district-to-district, based on local customs, local management preferences, and market conditions.

17. The approach to recruiting also differs considerably from division-to-division because each division must use techniques appropriate to the industry or field in which it specializes. For example, some Account Executives in the Robert Half Technology division utilize a multi-dimensional "matrix" to catalogue and evaluate candidates' skills and experience in the highly-specialized technology field.

18. Each Accountemps Staffing Manager is also responsible on a continuing basis for managing the candidate assignments they have made and dealing with human resource issues that arise during an assignment. They regularly verify that the clients' expectations are being met and ensure the candidates' satisfaction with their assignments. Accountemps Staffing Managers also address issues such as attendance and tardiness, proper dress, failure to perform assigned tasks adequately, or excessive personal telephone calls.

-6-

19.     Accountemps Staffing Managers also intervene if candidates complain about harassment or discrimination, need a reasonable accommodation for a disability, or are asked to do something inappropriate.

20.     The amount of time Staffing Managers, Account Executives, and Account Managers spend managing candidates on assignment and performing human resources functions varies between the divisions and from office-to-office, based on the nature and number of clients and candidates managed by each individual. For example, a Staffing Manager who handles a single, large volume client may devote as much as 50% of his or her time to this task and less time to marketing activities. Another Staffing Manager who has a single candidate placed with a number of small employers for short-term assignments may need to devote less time to managing candidates' performance and human resources issues.

Signed under the pains and penalties of perjury this 24th day of June, 2005.

Ken Gitlin

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported) January 27, 2005**

# Robert Half International Inc.
#### (Exact name of registrant as specified in its charter)

| Delaware | 01-10427 | 94-1648752 |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 2884 Sand Hill Road, Menlo Park, CA | 94025 |
|:---:|:---:|
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code (650) 234-6000**

#### NO CHANGE
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02    Results of Operations and Financial Condition.**

On January 27, 2005, Robert Half International Inc. issued a press release reporting earnings for the fourth fiscal quarter of 2004. A copy of the press release is attached hereto as Exhibit 99.1.

The foregoing information in this Current Report on Form 8-K, including exhibit 99.1 attached hereto, is being "furnished" and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and shall not be incorporated by reference in any filing under the Securities Exchange Act of 1934, as amended, or the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such future filing.

**Item 8.01    Other Events**

On December 6, 2004, Plaintiffs Ian O'Donnell and David Jolicoeur, ("Plaintiffs"), on behalf of themselves and a putative class of salaried Staffing Managers, Account Executives and Account Managers, filed a complaint in Massachusetts Superior Court naming the Company and one of its wholly owned subsidiaries (collectively, "RHI") as Defendants. The complaint alleges that RHI's salaried Staffing Managers, Account Executives and Account Managers based in Massachusetts within the past two years have been misclassified under Massachusetts law as exempt employees and seeks an unspecified amount equal to three times their unpaid overtime compensation alleged to be due to them had they been paid as non-exempt, hourly employees, plus costs and legal fees. The complaint also makes similar allegations under the U.S. Fair Labor Standards Act on behalf of all Staffing Managers, Account Executives and Account Managers employed in any state other than Massachusetts and California within the past three years and seeks an unspecified amount for unpaid overtime pay alleged to be due to them had they been paid as non-exempt, hourly employees, plus an equal amount as liquidated damages.

This litigation is at a very early stage and discovery has not commenced. The case has been removed to the United States District Court for the District of Massachusetts. At this early phase of the litigation, it is not feasible to predict the outcome of this proceeding. Based on a preliminary review, the Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

**Item 9.01    Financial Statements and Exhibits.**

(c)    Exhibits

| Exhibit | Description |
| --- | --- |
| 99.1 | Robert Half International Inc. January 27, 2005, Press Release. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Robert Half International Inc.

Date: January 27, 2005

By:    /s/   M. Keith Waddell
Name:  M. Keith Waddell
Title:   Vice Chairman, President and Chief Financial Officer

**Exhibit 99.1**

<u>FOR IMMEDIATE RELEASE</u>

<u>Contact:</u>    M. Keith Waddell
Vice Chairman, President and
Chief Financial Officer
(650) 234-6000

<u>ROBERT HALF INTERNATIONAL INC. REPORTS RECORD REVENUES AND EARNINGS FOR THE
FOURTH QUARTER OF 2004</u>

MENLO PARK, California, January 27, 2005 – Robert Half International Inc. (NYSE symbol: RHI) today reported record revenues and earnings for the fourth quarter ended December 31, 2004.

For the quarter ended December 31, 2004, net income was $49.7 million or $.28 per share, on revenues of $754.2 million. Net income for the prior year's fourth quarter was $4.8 million or $.03 per share, on revenues of $517.7 million.

For the year ended December 31, 2004, net income was $140.6 million or $.79 per share, on revenues of $2.7 billion. For the year ended December 31, 2003, net income was $6.4 million or $.04 per share, on revenues of $2.0 billion.

"All of our operations performed well during the quarter," said Harold M. Messmer, Jr., chairman and CEO of Robert Half International Inc. "Overall revenues for the company rose 46 percent year over year and 7 percent sequentially, leading to record quarterly revenues and earnings.

"We estimate that 17 to 20 percent of our consolidated revenues related directly to Sarbanes-Oxley Act compliance work," Messmer said. "The balance of our revenues reflected organic growth of more than 20 percent on a year-over-year basis. This broad-based improvement was particularly noteworthy in our Accountemps and OfficeTeam staffing divisions."

The company's Protiviti subsidiary, which specializes in internal audit and business and technology risk consulting, achieved sequential revenue growth in excess of 20 percent in every quarter in 2004. "Fourth-quarter revenues for Protiviti were more than triple those of the same period in 2003," Messmer said. "Protiviti has been expanding its services steadily in areas such as forensic and fraud investigations, litigation consulting, information technology security, financial-process improvement, business continuity and enterprise-wide risk management."

Messmer continued: "We believe there also will be ongoing demand for Sarbanes-Oxley-related initiatives. This includes remediation efforts to improve controls, annual testing to support ongoing compliance, initial efforts by non-accelerated filers, and development of long-term compliance processes and programs."

Robert Half International management will conduct a conference call today at 5 p.m. EST to discuss the quarterly financial results. The dial-in number is 800-857-9600 (+1-773-756-4602 outside the United States) and the passcode is "Robert Half International." A taped recording of this call will be available for replay beginning at approximately 8 p.m. EST today and ending at 8 p.m. EST on February 2, 2005. The dial-in number for the replay is 800-262-5046 (+1-402-220-9715 outside the United States). The conference call will also be archived in audio format on the company's website at www.rhi.com.

Founded in 1948, Robert Half International Inc. (RHI) is the world's first and largest specialized staffing firm. RHI is a recognized leader in professional staffing and consulting services and is the parent company of Protiviti® (www.protiviti.com), a leading independent internal audit and risk consulting firm.

The company's specialized staffing divisions include Accountemps®, Robert Half® Finance & Accounting and Robert Half® Management Resources, for temporary, full-time and project professionals, respectively, in the

(more)

fields of accounting and finance; OfficeTeam®, for highly skilled temporary administrative support personnel; Robert Half® Technology, for information technology professionals; Robert Half® Legal, for legal personnel; and The Creative Group®, for advertising, marketing and web design professionals. RHI serves its clients and candidates through more than 330 offices worldwide and through online job search services at its divisional websites, all of which can be accessed at www.rhi.com.

Certain information contained in this press release may be deemed forward-looking statements regarding events and financial trends that may affect the company's future operating results or financial positions. These statements may be identified by words such as "estimate", "forecast", "project", "plan", "intend", "believe", "expect", "anticipate", or variations or negatives thereof, or by similar or comparable words or phrases. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements.

These risks and uncertainties include, but are not limited to, the following: changes in levels of unemployment and other economic conditions in the United States or foreign countries where the company does business, or in particular regions or industries; reduction in the supply of candidates for temporary employment or the company's ability to attract candidates; the entry of new competitors into the marketplace or expansion by existing competitors; the ability of the company to maintain existing client relationships and attract new clients in the context of changing economic or competitive conditions; the impact of competitive pressures, including any change in the demand for the company's services, on the company's ability to maintain its margins; the possibility of the company incurring liability for its activities, including the activities of its temporary employees, or for events impacting its temporary employees on clients' premises; the success of the company in attracting, training, and retaining qualified management personnel and other staff employees; whether governments will impose additional regulations or licensing requirements on personnel services businesses in particular or on employer/employee relationships in general; whether there will be ongoing demand for Sarbanes-Oxley or other regulatory compliance services; and litigation relating to prior or current transactions or activities, including litigation that may be disclosed from time to time in the company's SEC filings.

Additionally, with respect to Protiviti, other risks and uncertainties include the fact that future success will depend on its ability to retain employees and attract clients; significant costs and diversion of management time could be incurred in integrating key personnel into Protiviti; there can be no assurance that there will be ongoing demand for Sarbanes-Oxley or other regulatory compliance services; failure to produce projected revenues could adversely affect financial results; and possible involvement in litigation relating to prior or current transactions or activities.

Because long-term contracts are not a significant part of the company's business, future results cannot be reliably predicted by considering past trends or extrapolating past results. The company undertakes no obligation to update information contained in this release.

A copy of this release is available at www.rhi.com.

ATTACHED:    Summary of Operations

Supplemental Financial Information

2

**ROBERT HALF INTERNATIONAL INC. AND SUBSIDIARIES**
SUMMARY OF OPERATIONS
(in thousands, except per share amounts)

| | Quarter Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | **2004** | **2003** | **2004** | **2003** |
| | (Unaudited) | | (Unaudited) | |
| Net service revenues | $754,197 | $517,664 | $2,675,696 | $1,974,991 |
| Direct costs of services | 450,889 | 325,064 | 1,619,394 | 1,248,253 |
| Gross margin | 303,308 | 192,600 | 1,056,302 | 726,738 |
| Selling, general and administrative expenses | 222,119 | 183,342 | 824,382 | 707,349 |
| Amortization of intangible assets | 99 | 1,952 | 1,025 | 10,277 |
| Interest income | (1,265) | (642) | (3,770) | (2,603) |
| Income before income taxes | 82,355 | 7,948 | 234,665 | 11,715 |
| Provision for income taxes | 32,688 | 3,100 | 94,061 | 5,325 |
| Net income | $ 49,667 | $ 4,848 | $ 140,604 | $ 6,390 |
| **Diluted net income per share** | $ .28 | $ .03 | $ .79 | $ .04 |
| Shares: | | | | |
|     Basic | 169,828 | 169,119 | 169,742 | 168,719 |
|     Diluted | 176,769 | 174,866 | 176,866 | 173,175 |

3

**ROBERT HALF INTERNATIONAL INC. AND SUBSIDIARIES**
SUPPLEMENTAL FINANCIAL INFORMATION
(in thousands)

| | Quarter Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| | (Unaudited) | | (Unaudited) | |
| REVENUES: | | | | |
| Accountemps | $265,125 | $210,366 | $ 993,391 | $ 823,058 |
| OfficeTeam | 153,600 | 126,098 | 579,753 | 499,100 |
| Robert Half Technology | 70,230 | 58,240 | 265,561 | 214,534 |
| Robert Half Management Resources | 103,366 | 57,593 | 348,763 | 210,160 |
| Robert Half Finance & Accounting | 36,947 | 24,910 | 135,882 | 94,840 |
| Protiviti | 124,929 | 40,457 | 352,346 | 133,299 |
| Total | $754,197 | $517,664 | $2,675,696 | $1,974,991 |
| | | | | |
| GROSS MARGIN: | | | | |
| Temporary and consultant staffing | $216,701 | $156,654 | $ 787,077 | $ 610,248 |
| Permanent placement staffing | 36,947 | 24,910 | 135,882 | 94,840 |
| Risk consulting and internal audit services | 49,660 | 11,036 | 133,343 | 21,650 |
| Total | $303,308 | $192,600 | $1,056,302 | $ 726,738 |
| | | | | |
| OPERATING INCOME (LOSS): | | | | |
| Temporary and consultant staffing | $ 49,257 | $ 8,416 | $ 151,855 | $ 38,259 |
| Permanent placement staffing | 4,310 | 1,326 | 16,919 | 2,559 |
| Risk consulting and internal audit services | 27,622 | (484) | 63,146 | (21,429) |
| Total | $ 81,189 | $ 9,258 | $ 231,920 | $ 19,389 |
| | | | | |
| SELECTED CASH FLOW INFORMATION: | | | | |
| Amortization of intangible assets | $ 99 | $ 1,952 | $ 1,025 | $ 10,277 |
| Depreciation expense | $ 11,563 | $ 13,924 | $ 48,088 | $ 55,627 |
| Capital expenditures | $ 9,765 | $ 7,261 | $ 32,867 | $ 36,822 |
| Open market repurchases of common stock (shares) | 497 | 0 | 2,670 | 1,559 |

**ROBERT HALF INTERNATIONAL INC. AND SUBSIDIARIES**
SUPPLEMENTAL FINANCIAL INFORMATION
(in thousands)

|  | December 31, | |
| --- | --- | --- |
|  | **2004** | **2003** |
|  | (Unaudited) | |
| SELECTED BALANCE SHEET INFORMATION: | | |
| Cash and cash equivalents .......................................... | $   434,746 | $376,523 |
| Accounts receivable, less allowances ................................. | $   391,641 | $242,348 |
| Total assets ...................................................... | $1,196,594 | $985,647 |
| Current liabilities ................................................. | $   278,282 | $185,800 |
| Notes payable and other indebtedness, less current portion ................ | $     2,266 | $   2,343 |
| Total stockholders' equity .......................................... | $   911,870 | $788,661 |

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

For the fiscal year ended December 31, 2004

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

Commission file number 1-10427

# ROBERT HALF INTERNATIONAL INC.

(Exact name of registrant as specified in its charter)

| DELAWARE | 94-1648752 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 2884 Sand Hill Road, Menlo Park, California | 94025 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: (650) 234-6000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, Par Value $.001 per Share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ✓ No____

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ✓ No____

As of June 30, 2004, the aggregate market value of the Common Stock held by non-affiliates of the registrant was approximately $4,756,791,000 based on the closing sale price on that date. This amount excludes the market value of 12,519,016 shares of Common Stock directly or indirectly held by registrant's directors and officers and their affiliates.

As of January 31, 2005, there were outstanding 173,094,174 shares of the registrant's Common Stock.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement to be mailed to stockholders in connection with the registrant's annual meeting of stockholders, scheduled to be held in May 2005, are incorporated by reference in Part III of this report. Except as expressly incorporated by reference, the registrant's Proxy Statement shall not be deemed to be part of this report.

approvals or that the cost of compliance will not prove to be material. Any inability of the Company to comply with government regulation or licensing requirements could materially adversely affect the Company.

*Government Regulation of the Workplace.*   The Company's temporary services business entails employing individuals on a temporary basis and placing such individuals in clients' workplaces. Increased government regulation of the workplace or of the employer-employee relationship, or judicial or administrative proceedings related to such regulation, could materially adversely affect the Company.

*Reliance on Short-Term Contracts.*   Because long-term contracts are not a significant part of the Company's staffing services business, future results cannot be reliably predicted by considering past trends or extrapolating past results.

*Protiviti Operations.*   *Protiviti* began operations in 2002. It has only recently generated an operating profit, and there can be no assurance that the business will remain profitable in the future.

*Protiviti Dependence on Personnel.*   Protiviti is a services business, and is dependent upon its ability to attract and retain personnel. While Protiviti has retained its key personnel to date, there can be no assurance that it will continue to be able to do so.

*Protiviti Competition.*   *Protiviti* operates in a highly competitive business. As with the Company's staffing services business, the barriers to entry are quite low. There are many competitors, some of which have greater resources than *Protiviti* and many of which have been in operation far longer than *Protiviti*. In particular, *Protiviti* faces competition from the "big four" accounting firms, which have been in operation for a considerable period of time and have established reputations and client bases. Because the principal factors upon which competition is based are reputation, technology, tools, project methodologies, price of services and depth of skills of personnel, there can be no assurance that *Protiviti* will be successful in attracting and retaining clients.

*Demand for Services.*   In 2002, 2003 and 2004, the operations of *Protiviti* included services related to Sarbanes-Oxley and other regulatory compliance. There can be no assurance that there will be ongoing demand for these services.

*Potential Liability.*   The business of *Protiviti* consists of providing internal audit and business and technology risk consulting services. Liability could be incurred or litigation could be instituted against the Company or *Protiviti* for claims related to these activities or to prior transactions or activities. There can be no assurance that such liability or litigation will not have a material adverse impact on *Protiviti* or the Company.

## Item 2.   Properties

The Company's headquarters operations are located in Menlo Park and Pleasanton, California. Placement activities are conducted through more than 330 offices located in the United States, Canada, the United Kingdom, Belgium, France, the Netherlands, Germany, the Czech Republic, Ireland, Australia and New Zealand. *Protiviti* has more than 35 offices in the United States, Canada, Australia, China, France, Italy, Japan, Singapore and the United Kingdom. All of the offices are leased.

## Item 3.   Legal Proceedings

On September 10, 2004, Plaintiff Mark Lafitte, on behalf of a putative class of salaried Account Executives and Staffing Managers, filed a complaint in California Superior Court naming the Company and three of its wholly owned subsidiaries as Defendants. The complaint alleges that salaried Account Executives and Staffing Managers based in California have been misclassified under California law as exempt employees and seeks an unspecified amount for unpaid overtime pay alleged to be due to them had they been paid as non-exempt, hourly employees. In addition, the plaintiff seeks an unspecified amount for statutory penalties for alleged violations of the California Labor Code arising from the alleged misclassification of these employees as exempt employees.

6

This litigation is at a very early stage and discovery has not commenced. At this early stage of the litigation, it is not feasible to predict the outcome of this proceeding. Based on a preliminary review, the Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

On December 6, 2004, Plaintiffs Ian O'Donnell and David Jolicoeur, on behalf of themselves and a putative class of salaried Staffing Managers, Account Executives and Account Managers, filed a complaint in Massachusetts Superior Court naming the Company and one of its wholly owned subsidiaries as Defendants. The complaint alleges that salaried Staffing Managers, Account Executives and Account Managers based in Massachusetts within the past two years have been misclassified under Massachusetts law as exempt employees and seeks an unspecified amount equal to three times their unpaid overtime compensation alleged to be due to them had they been paid as non-exempt, hourly employees, plus costs and legal fees. The complaint also makes similar allegations under the U.S. Fair Labor Standards Act on behalf of all Staffing Managers, Account Executives and Account Managers employed in any state other than Massachusetts and California within the past three years and seeks an unspecified amount for unpaid overtime pay alleged to be due to them had they been paid as non-exempt, hourly employees, plus an equal amount as liquidated damages. This litigation is at a very early stage and discovery has not commenced. The case has been removed to the United States District Court for the District of Massachusetts. At this early phase of the litigation, it is not feasible to predict the outcome of this proceeding. Based on a preliminary review, the Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

## Item 4.    Submission of Matters to a Vote of Security Holders

No matter was submitted to a vote of the Company's security holders during the fourth quarter of the fiscal year covered by this report.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### Note I—Commitments and Contingencies

Rental expense, primarily for office premises, amounted to $74.6 million, $72.2 million and $69.7 million for the years ended December 31, 2004, 2003 and 2002, respectively. The approximate minimum rental commitments for 2005 and thereafter under non-cancelable leases in effect at December 31, 2004 were as follows (in thousands):

| | |
|---|---:|
| 2005 | $ 63,789 |
| 2006 | 50,687 |
| 2007 | 39,425 |
| 2008 | 30,211 |
| 2009 | 24,375 |
| Thereafter | 28,286 |
| | $236,773 |

Additionally, as of December 31, 2004, the Company had future purchase commitments of approximately $40.9 million over the next three years primarily related to telecom service agreements, software licenses and subscriptions, and computer hardware and software maintenance agreements.

The Company is involved in a number of lawsuits arising in the ordinary course of business. While management does not expect any of these matters to have a material adverse effect on the Company's results of operations, financial position or cash flows, litigation is subject to certain inherent uncertainties.

On September 10, 2004, Plaintiff Mark Lafitte, on behalf of a putative class of salaried Account Executives and Staffing Managers, filed a complaint in California Superior Court naming the Company and three of its wholly owned subsidiaries as Defendants. The complaint alleges that salaried Account Executives and Staffing Managers based in California have been misclassified under California law as exempt employees and seeks an unspecified amount for unpaid overtime pay alleged to be due to them had they been paid as non-exempt, hourly employees. In addition, the plaintiff seeks an unspecified amount for statutory penalties for alleged violations of the California Labor Code arising from the alleged misclassification of these employees as exempt employees. This litigation is at a very early stage and discovery has not commenced. At this early stage of the litigation, it is not feasible to predict the outcome of this proceeding, and accordingly, no amounts have been provided in the accompanying financial statements. Based on a preliminary review, the Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

On December 6, 2004, Plaintiffs Ian O'Donnell and David Jolicoeur, on behalf of themselves and a putative class of salaried Staffing Managers, Account Executives and Account Managers, filed a complaint in Massachusetts Superior Court naming the Company and one of its wholly owned subsidiaries as Defendants. The complaint alleges that salaried Staffing Managers, Account Executives and Account Managers based in Massachusetts within the past two years have been misclassified under Massachusetts law as exempt employees and seeks an unspecified amount equal to three times their unpaid overtime compensation alleged to be due to them had they been paid as non-exempt, hourly employees, plus costs and legal fees. The complaint also makes similar allegations under the U.S. Fair Labor Standards Act on behalf of all Staffing Managers, Account Executives and Account Managers employed in any state other than Massachusetts and California within the past three years and seeks an unspecified amount for unpaid overtime pay alleged to be due to them had they been paid as non-exempt, hourly employees, plus an equal amount as liquidated damages. This litigation is at a very early stage and discovery has not commenced. The case has been removed to the United States District Court for the District of Massachusetts. At this early phase of the litigation, it is not feasible to predict the outcome of this proceeding, and accordingly, no amounts have been provided in the accompanying financial statements. Based on a preliminary review, the Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2005

### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE TRANSITION PERIOD FROM _____ to _____.

---

### Commission File Number 1-10427

# ROBERT HALF INTERNATIONAL INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-1648752** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**2884 Sand Hill Road**
**Suite 200**
**Menlo Park, California** — **94025**
(Address of principal executive offices) — (zip-code)

Registrant's telephone number, including area code: (650) 234-6000

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).   Yes ☒   No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock as of April 30, 2005:

171,477,687 shares of $.001 par value Common Stock

**ROBERT HALF INTERNATIONAL INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)—(Continued)**

**March 31, 2005**

**Note G—Commitments and Contingencies (Continued)**

This litigation is at an early stage and it is not feasible to predict the outcome. Accordingly, no amounts have been provided in the accompanying financial statements. The Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

On December 6, 2004, Plaintiffs Ian O'Donnell and David Jolicoeur, on behalf of themselves and a putative class of salaried Staffing Managers, Account Executives and Account Managers, filed a complaint in Massachusetts Superior Court naming the Company and one of its wholly owned subsidiaries as Defendants. The complaint alleges that salaried Staffing Managers, Account Executives and Account Managers based in Massachusetts within the past two years have been misclassified under Massachusetts law as exempt employees and seeks an unspecified amount equal to three times their unpaid overtime compensation alleged to be due to them had they been paid as non-exempt, hourly employees, plus costs and legal fees. The complaint also makes similar allegations under the U.S. Fair Labor Standards Act on behalf of all Staffing Managers, Account Executives and Account Managers employed in any state other than Massachusetts and California within the past three years and seeks an unspecified amount for unpaid overtime pay alleged to be due to them had they been paid as non-exempt, hourly employees, plus an equal amount as liquidated damages. The case has been removed to the United States District Court for the District of Massachusetts. This litigation is at an early stage and it is not feasible to predict the outcome. Accordingly, no amounts have been provided in the accompanying financial statements. The Company believes it has meritorious defenses to the allegations, and the Company intends to vigorously defend against the litigation.

The Company is involved in a number of other lawsuits arising in the ordinary course of business. While management does not expect any of these matters to have a material adverse effect on the Company's results of operations, financial position or cash flows, litigation is subject to certain inherent uncertainties.

**Note H—Stock Plans**

Under various stock plans, officers, employees and outside directors have received grants of restricted stock or options to purchase common stock. Grants have been made at the discretion of a Committee of the Board of Directors. Grants generally vest in four years.

Options currently outstanding under the plans have an exercise price equal to the fair market value of the Company's common stock at the date of grant, may consist of both incentive stock options and nonstatutory stock options under the Internal Revenue Code, and generally have a term of 10 years.

Recipients of restricted stock do not pay any cash consideration to the Company for the shares, have the right to vote all shares subject to such grant, and receive all dividends with respect to such shares, whether or not the shares have vested. Vesting is accelerated upon the death or disability of the recipients. Compensation expense for restricted stock is recognized on a straight-line basis over the vesting period, using the stock's fair market value on the grant date, except for performance based grants where the measurement date is the date that the performance criteria is met.

The Company accounts for these plans under APB 25. Therefore, the intrinsic value of the options is used to record compensation expense and, as a result, no compensation expense has been recognized for its stock option plans. As required by SFAS No. 148, *Accounting for Stock-Based Compensation—Transition and Disclosure* ("SFAS 148"), calculations of pro forma net income and net income per share, computed in accordance with the method prescribed by SFAS 123, are set forth in Note A to the Financial Statements.

12