## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN O'DONNELL AND DAVID JOLICOEUR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION NO.: 04-12719 NMG

## PLAINTIFFS' RENEWED MOTION TO FACILITATE §216(b) NOTICE AND MEMORANDUM IN SUPPORT THEREOF

## I.    INTRODUCTION

In this renewed motion, Plaintiffs Ian O'Donnell and David Jolicoeur,[1] on behalf of

themselves and all others similarly situated ("Plaintiffs"), demonstrate that, based on

their allegation that Defendants Robert Half International, Inc., and Robert Half

Corporation ("Defendants") violate the "salary basis" test for all their salaried

employees, as set forth in Plaintiffs' Second Amended Complaint, they are entitled to

issuance of a Court-approved notice of the pending litigation to all Defendants' salaried

employees who were denied overtime wages.

---

[1] Plaintiffs have filed a Motion to Amend and a Second Amended Complaint which adds an additional lead plaintiff.

In their original motion, Plaintiffs alleged that they are entitled to notice based on their allegations that Defendants violate the "duties" test by failing to pay overtime to their Staffing Managers, Recruiting Managers, Account Executives, and Account Managers despite requiring employees in these positions to perform duties that do not qualify for any exemption from overtime pay.  In this renewed motion, Plaintiffs allege that Defendants' explicit written policies violate the "salary basis" test by requiring their salaried employees to take full-day deductions from paid leave for partial-day absences and requiring that negative paid-leave balances be deducted from salaried employees' final paychecks.  Since the class of Staffing Managers, Recruiting Managers, Account Executives, and Account Managers is included as a subset of the class of similarly situated salaried employees, this Court should approve a single notice to address both theories of liability under the FLSA, to be issued as soon as possible to all individuals employed by Defendants as salaried employees within the three years preceding the filing of this action.

Plaintiffs are entitled to such a notice if they have shown a reasonable basis for their allegation that a class of similarly situated persons may exist.  Plaintiffs can meet this burden by making a modest factual showing that Plaintiffs and the potential class members were victims of a common policy or plan that violated the law.  At the hearing in this matter on August 19, 2005, the Court expressed concern that Plaintiffs had not met this modest burden with respect to their allegations that Defendants' policies violate the "duties" test.  However, establishing a violation of the "duties" test requires evidence concerning the actual duties of Plaintiffs and similarly situated Staffing Managers,

Recruiting Managers, Account Executives, and Account Managers, while Plaintiffs'

allegations that Defendants' policies violate the "salary basis" test are based on explicit,

uniformly applied policies in Defendants' Employee Handbook.  Plaintiffs contend, as

explained below, that the evidence submitted with this motion is sufficient to

demonstrate that Defendants' policies violate the "salary basis" test on their face.

However, the focus of the inquiry at this stage is on whether the proposed plaintiffs are

"similarly situated," not on the merits of the plaintiffs' claims, and the evidentiary exhibits

attached to this motion need only – and clearly do – meet the Plaintiffs' modest burden

at the conditional certification stage.

## II.    BACKGROUND

### A.    Defendants and Their Policies

Defendants own and operate a large specialized staffing firm with over 300

offices worldwide and 5 offices in Massachusetts (http://www.rhi.com).  Each named

plaintiff worked for Robert Half as a Staffing Manager, Recruiting Manager, Account

Executive, or Account Manager within the past three years.  Second Amended

Complaint ¶¶ 11-13; O'Donnell Aff., ¶ 2 (attached as Exhibit A); Jolicoeur Aff., ¶ 2

(attached as Exhibit B); Moore Aff., ¶ 2 (attached as Exhibit C).  Robert Half regularly

required Plaintiffs to work in excess of forty (40) hours in a work week.  Second

Amended Complaint ¶ 18; O'Donnell Aff., ¶ 5; Jolicoeur Aff., ¶ 5; Moore Aff., ¶ 5.

Defendants classified Plaintiffs as exempt employees, paid them on a salary basis, and

did not pay them overtime wages.  Second Amended Complaint, ¶ 18; O'Donnell Aff., ¶

4; Jolicoeur Aff., ¶ 4; Moore Aff., ¶ 4.

Defendants maintain an Employee Handbook (attached as Exhibit D) to acquaint their employees with their policies and benefits, and they provide their employees with this employee handbook as a reference guide to their employment policies and practices.  Ex. D, p. 119, 123.  The Employee Handbook sets forth "Employee Classifications" "[f]or purposes of salary administration and eligibility for overtime payments and employee benefits," and one of these classifications is defined as follows: "Exempt Employees are employees in positions which are exempt from legal overtime pay requirements.  Exempt employees are expected to work whatever hours are necessary to do their jobs properly."  Ex. D, p. 129.

The Employee Handbook sets forth Defendants' "CHOICE Time Off (CTO)" policies, which provide "employees with paid time away from the job for such things as vacation, outside activities, illness, personal business and family matters" and which explicitly apply to both "Exempt and Non-Exempt" employees of Defendants.  Ex. D, p. 137.  Defendants' "policy is to record time off in full day increments for exempt employees."  Ex. D, pp. 147-48.  Pursuant to Defendants' CTO policies, "CTO may be taken before it is actually earned," but "[s]hould employment end before used CTO has been earned, that time will be owed back to [Defendants] and deducted from the final paycheck or other amounts payable to the employee."  Ex. D., p. 137.  Defendants' CTO policies also provide that "[t]o the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours, [Defendants'] practice is that the day will be considered a full day of CTO."  Ex. D., p. 148.  Defendants' CTO policies further provide that "[u]p to 5 days for exempt employees or

… may be taken in advance of earning the time off.  However, if [employees] terminate before [they] have earned the CHOICE Time Off [they] have taken, the amount [they] owe the company will be deducted from [their] final paycheck[s] or any other amounts payable to [them]."  Ex. D, p. 148.

Defendants' policy of deducting unearned CTO from exempt employees' final paychecks is unambiguous and clearly communicated to Defendants' exempt employees.  This policy is not only listed in the Employee Handbook, as quoted above, but also repeated on Defendants' "Corporate Employee Exempt Absence Record" (time sheet), which requires exempt employees to sign under the statement, "If your employment terminates while you have a negative CTO balance, the amount you owe the company will be deducted from your final paycheck or any other amounts payable to you," and "Exempt Employee Time Off Request" form, which requires exempt employees to sign under the affirmation, "I understand that if my employment terminates when I have negative CHOICE Time Off balance, the amount I owe the company will be deducted from my final paycheck."  See Defendants' Human Resources forms, attached as Exhibit E, pp. 105, 115.  Defendants also clearly have an actual practice of deducting negative CTO balances from employees' final paychecks, as their final paychecks and termination worksheets direct Defendants' payroll employees to make these deductions, and Plaintiff Ian O'Donnell's termination documents (attached as Exhibit F) show that his unearned CTO balance of 28 hours (equivalent to $484.62 in gross salary) was, in fact, deducted from the total amount due on his final paycheck.  Ex. F, pp. 32, 34, 42, 44.

**B.    Plaintiffs' Claims**

Plaintiffs claim entitlement to overtime wages because they were not subject to a bona fide exemption to the Fair Labor Standards Act (29 U.S.C. § 201 et seq.) or the Massachusetts Wage Act.  In order to qualify for such an exemption, "an employee must satisfy both a 'duties test' and a 'salary basis' test."  Scholtisek v. Eldre Corporation, 229 F.R.D. 381, 387 (W.D.N.Y. 2005) (citing 29 C.F.R. §§ 541.100, 541.200, 541.300); see also Auer v. Robbins, 519 U.S. 452, 456 (1997).  Plaintiffs allege that they, as well as all similarly situated Staffing Managers, Recruiting Managers, Account Executives, and Account Managers employed by Defendants, did not meet the "duties" test, and that they, as well as all employees of Defendants who were classified as exempt, did not meet the "salary basis" test.

**C.    Defendants' Violation of the "Duties" Test**

With respect to the "duties" test, Plaintiffs maintain their original allegation that they were not subject to the administrative exemption because their primary responsibility was to make sales calls, which is not related to the management or operations of Robert Half or its customers.  Each Plaintiff spent the day according to a regimented, prescribed schedule set by Defendants in which they spent most of each day making outbound sales calls, and exercised little to no discretion in the execution of their job responsibilities.  O'Donnell Aff., ¶¶ 6-12; Jolicoeur Aff., ¶¶ 6-12; Moore Aff., ¶¶ 6-13.  Therefore, Plaintiffs were production workers rather than administrators, and Defendants misclassified their exempt status.  Defendants' violation of the "duties" test is more thoroughly explained in Plaintiffs' original Motion to Facilitate 216(b) Notice and

their Reply to Defendants' Opposition to Plaintiffs' Motion to Facilitate 216(b) Notice, and it is supported by Plaintiffs' pleadings and affidavits and the exhibits attached to their original Motion and Reply.

###### D.    Defendants' Violation of the "Salary Basis" Test

Plaintiffs do not need to prove the merits of their claims at the outset, but in this motion, they provide more evidence and argument than is ordinarily required at the conditional certification stage in order to demonstrate to the Court the strength of their new theory of Defendants' FLSA liability, namely that a violation of the "salary basis" test is clear on the face of the policies set forth in Defendants' Employee Handbook. Plaintiffs allege that Defendants' employment policies and practices violate the "salary basis" test because they render Defendants' exempt employees subject to reductions in salary for partial-day absences.  29 CFR § 541.602(b)(1); see Caperci v. Rite Aid Corp., 43 F.Supp.2d 83, 86 (D. Mass. 1999) ("It is generally understood … that an employee is not paid on a salary basis if the employer has a policy or regular practice of reducing the amount of the employee's weekly or other periodic paycheck to reimburse the employer for partial day absences.") (citing Donovan v. Carls Drug Co., Inc., 703 F.2d 650, 652 (2d Cir. 1983)).  Specifically, as set forth above, Defendants' policies subject Defendants' exempt employees to reductions in salary for partial-day absences by requiring them to deduct time away from the office from their accrued paid leave in full-day increments only, even if they work for part of a day; requiring employees without sufficient accrued paid leave who take time off to "borrow" paid leave; and requiring

deductions from exempt employees' final paychecks for negative paid-leave balances. Id.

As set forth above, Defendants' policies requiring full-day deductions for partial-day absences and deductions for unearned CTO from exempt employees' final paychecks are unambiguous and clearly communicated to Defendants' salaried employees through Defendants' Employee Handbook and time-off request forms. See Ex. D, pp. 137, 147-48; Ex. E, pp. 105-06, 108, 115. Therefore, Defendants' policies render exempt employees' salary "subject to reduction" for partial-day absences, and such deductions violate the "salary basis" test. 29 CFR 541.602(a); Auer v. Robbins, 519 U.S. at 461. As the Department of Labor recently explained, "[r]ecovery of partial-day leave advances [from an employee's final pay] … essentially are deductions for personal absences and would constitute an impermissible deduction. Whether recovery for a full-day leave is permissible depends on whether such a leave is covered by one of the section 541.602(b) exceptions." Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, 69 FR 22122, 22178 (April 23, 2004). Section 541.602(b) lists exceptions to "[t]he prohibition against deductions from pay in the salary basis requirement," including "when an employee is absent from work for one or more full days for personal reasons." 29 CFR § 541.602(b)(1). However, the regulation does not list an exception for full-day deductions for partial-day absences, so Defendants' policies requiring such deductions and requiring recovery for full-day leave advances from exempt employees' final paychecks violate the "salary basis" test. Id.; 69 FR at 22178; see also DOL Opinion

Letter dated January 7, 2005, 2005 WL 330606 ("[p]ayment of the employee's guaranteed salary *must* be made, even if an employee has no accrued benefits in the leave plan and the account has a negative balance, where the employee's *absence* is for less than a full day") (emphasis added); DOL Opinion Letter dated April 9, 1993 ("[d]eductions from the salaries of otherwise exempt employees for partial day absences after they have exhausted their vacation or sick time benefits have never been permitted under the Regulations").

As discussed above, it is clearly illegal to make partial-day deductions for partial-day absences,[2] but Defendants purport to comply with the FLSA by instead making *full-day* deductions for partial-day absences, even though it is apparent that this is an even more egregious violation of the FLSA.  The FLSA regulations clearly state that the FLSA only permits "[d]eductions from pay … when an exempt employee *is absent* from work for one or more full days," 29 C.F.R. § 541.602(b)(1) (emphasis added), and "[i]t is generally understood … that an employee is not paid on a salary basis if the employer has a policy or regular practice of reducing the amount of the employee's weekly or other periodic paycheck to reimburse the employer for partial day *absences*." Caperci v. Rite Aid Corp., 43 F.Supp.2d at 86 (emphasis added); see also Spradling v. City of Tulsa, 95 F.3d 1492, 1501 (10th Cir. 1996) (holding that policy of reducing leave time for

---

[2] Plaintiffs recognize that, as discussed in the preceding paragraph, deductions from leave for partial-day absences may only be illegal where the employee's final paycheck is also "subject to reduction" for leave advances.  However, since Defendants do, in fact, maintain a policy and practice of deducting unearned CTO from their employees' final paychecks, Plaintiffs will occasionally, for the sake of brevity, refer to the prohibition against such partial-day deductions as if all partial-day deductions were *per se* illegal, instead of repeating the proviso, "where, as here, employees' salaries are also subject to reduction."

partial-day absences and subjecting pay to docking if employee lacked sufficient leave time was "inconsistent with the salary test"), cert. denied, 519 U.S. 1149 (1997); Kinney v. District of Columbia, 994 F.2d 6, 11 (D.C. Cir. 1993) ("Employees paid under a system that subjects them, even theoretically, to docking for absences by the hour lack one of the characteristics explicitly identified in the Department's regulation on salaried pay"); Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 615 (2d Cir. 1991) (holding that "an employee who can be docked pay for missing a fraction of a workday must be considered an hourly, rather than a salaried, employee"), cert. denied, 506 U.S. 905 (1992); 69 FR at 22178 ("partial day deductions generally are inconsistent with the salary basis requirement").

Defendants' CTO policies clearly require employees who are not absent from work for a full day – and are, in fact, present for part of the day – to be subject to a full-day reduction in salary nonetheless, and this violates the "salary basis" test's requirement that full-day deductions only be permitted "when an exempt employee *is absent* from work for one or more full days." 29 C.F.R. § 541.602(b)(1) (emphasis added). Defendants' policies could not be any plainer on this point. In response to the question, "What should an exempt employee who works less than a full day record as time off?", Defendants' Employee Handbook answers as follows:

> "To the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours our practice is that the day will be considered a full day of CTO. Eight hours of CTO should be recorded for payroll records."

See Ex. D, p. 148.

Defendants then state that "[a]s with any employee on CTO, there is no requirement that the employee be present in the office for any part of that day."  Id. However, if Defendants "suffer or permit" an employee to work on a given day, he or she is entitled to be paid for his or her work on that day.  See 29 U.S.C. § 203(g) (stating that "'[e]mploy' includes to suffer or permit to work").  On the other hand, if Defendants forbid salaried employees who take partial days off from working before or after their time off and then take full-day deductions for those days, they violate the "salary basis" test by making "deductions from the employee's predetermined compensation … for absences occasioned by the employer."  29 C.F.R. § 541.602(a). Therefore, Defendants' policies make it impossible for a salaried employee to so much as request a partial day off without causing Defendants to violate the "salary basis" test.

In the similar case of Sholtisek v. Eldre Corp., 229 F.R.D. 381 (W.D.N.Y. 2005), conditional certification was granted where the plaintiff alleged that the defendant's practices of "(1) docking salaried employees in partial-day increments when the employees have not worked a full day; (2) maintaining a policy that creates a significant likelihood of improper deductions from the pay of exempt employees; and (3) instructing exempt employees not to report to work for certain days … and then reducing those employees' weekly pay" violated the "salary basis" test.  229 F.R.D. at 388.  The defendant's employee handbook contained a provision which stated, under the heading, "Exempt Employees," "that if an employee who has used up all his sick, personal and vacation time is absent from work for more than three hours on any given day, 'the employee cannot and will not be allowed to come to work.  The employee will not be

paid for the entire day.'" Id., at 390.  There, as Plaintiffs allege of Defendants' policies in

the instant matter, the plaintiff alleged that this "policy violate[d] the regulatory provision

that salaried employees' pay cannot be docked for absences occasioned by the

employer." Id. (citing 29 CFR § 541.602(a); Baudin v. Courtesy Litho Arts, Inc., 24

F.Supp.2d 887, 890 (N.D. Ill. 1998) (employer "cannot dock a salaried employee's pay

'for absences occasioned by the employer'"); Thomas v. County of Fairfax, Va., 803

F.Supp. 1142, 1148 (E.D. Va. 1992) ("an FLSA-exempt executive's pay may not vary as

a function of the number of hours worked"), aff'd 16 F.3d 408 (4th Cir. 1994)).  Based on

the plaintiff's allegations and some limited discovery, the court granted conditional

certification of a class of all salaried employees employed by the defendant within the

previous three years, noting that "insofar as the policy is concerned, all employees

subject to it would be similarly situated regardless of whether their pay was actually

docked." Id. at 390 (citing Auer v. Robbins, 519 U.S. at 461; Hoffman, 982 F.Supp. at

262 ("plaintiffs need not have each suffered actual deductions to show that they and

other managers were 'subject to' improper reductions in compensation by virtue of a

common policy")).

     The following hypothetical example further illustrates the consequences of

Defendants' policies:  A salaried employee of Defendants wishes to take care of some

personal business on Wednesday morning.  As required by Defendants' policies, she

submits a "Time Off Request Form" to her manager, requesting permission to be absent

from work between 8:30 a.m. and 1:30 p.m. on Wednesday.  She does not need or

want to take the afternoon off, but wants to go to work after lunch on Wednesday to

fulfill her responsibilities and is ready, willing, and able to do so.  If Defendants permit

her to take the morning off and work for a few hours in the afternoon and then deduct a

full day of CTO, even though she was not absent for a full day, they violate the "salary

basis" test, as explained above.  If they forbid her from coming into the office after she

takes the morning off and then deduct a full day of CTO, they are making a full-day

deduction for a partial-day "absence occasioned by the employer," which violates the

"salary basis" test.  29 CFR § 541.602(a).

Furthermore, Plaintiffs have evidence showing that Defendants occasionally

make full-day deductions for two combined partial-day absences, which also violates

the "salary basis" test.  29 CFR § 541.602(b)(1); Caperci v. Rite Aid Corp., 43

F.Supp.2d at 86.  For example, Plaintiff Stacey Moore asked Defendants for permission

to take two afternoons off in July 2003, when she was moving to a new home, so that

she could work during the mornings and move in the afternoons.  Moore Aff., ¶ 23.  Her

supervisors urged her to "just take both days off," but Ms. Moore did not want to use

that much vacation time or be absent from work for that much of the week.  Even

though her supervisors strongly encouraged her to take both full days off, Ms. Moore

came in and worked in the mornings and took two half days off, and Defendants

deducted one full day from her accrued CTO for that pay period.  Moore Aff., ¶ 23.

In short, Defendants' CTO policies require salaried employees who work partial

days and are absent from work for more than two hours for personal reasons to take

full-day deductions from their accrued CTO and require any resulting shortfall in

accrued CTO to be deducted from salaried employees' final paychecks.  Therefore,

Defendants' salaried employees' salaries are "subject to reduction" for partial-day absences, in violation of the FLSA's "salary basis" test. 29 C.F.R. 541.602(a); Auer v. Robbins, 519 U.S. at 461. Therefore, Plaintiffs and all other exempt employees of Defendants were not paid on a salary basis, and Defendants misclassified their exempt status and violated the FLSA and the Massachusetts Wage Act by failing to pay them time and one-half for their hours worked in excess of forty (40) hours per week.

Furthermore, Defendants' CTO policies violate the "salary basis" test not only by subjecting their salaried employees to inappropriate deductions, but also by denying their employees the discretion to manage their time and plan their workweeks. As the Department of Labor recently explained, the practice of paying executive, administrative, and professional employees on a salary basis "reflects the widely-held understanding that employees with the requisite status to be bona fide executives, administrators or professionals have discretion to manage their time. Such employees are not paid by the hour or task, but for the general value of services performed." 69 FR at 22177 (citing Kinney v. D.C., 994 F.2d at 11; Brock v. Claridge Hotel & Casino, 846 F.2d 180, 184 (3d Cir.), cert. denied, 488 U.S. 925 (1988)). Defendants' CTO policies completely undermine this rationale by penalizing salaried employees who wish to exercise any "discretion to manage their time" that deviates from Defendants' predetermined office hours. Defendants do not pay overtime to their salaried employees for coming in early or working late, but they insist on being reimbursed for any absences during office hours through full-day deductions from salaried employees' CTO and corresponding deductions from their final paychecks, and they urge salaried

employees not to come to work at all if they want to take partial days off.  These policies

render it extremely difficult and undesirable for Defendants' salaried employees to plan

workweeks that involve any absences during Defendants' normal office hours, and this,

in turn, undermines their discretion to manage their time.  Thus, Defendants' policies

deny their salaried employees both the protection of the FLSA's overtime provisions and

the status and discretion that justify and form the basis for the exemption.  See 69 FR at

22177; Kinney v. D.C., 994 F.2d at 11 ("The [salary basis] regulation is intended, after

all, to divide employees into classes based on their status, not to identify employees

deserving compensation for individual losses.  Payment on salary basis … indicates

employees who are given discretion in managing their time and their activities and who

are not answerable merely for the number of hours worked or number of tasks

accomplished.").

III.    **ARGUMENT**

    A.    <u>**The District Court Is Authorized to Issue Notice to Potential Opt-Ins**</u>

    As set forth in Plaintiffs' original Motion to Facilitate 216(b) Notice, the FLSA

allows an employee to bring an action on his or her own behalf and on behalf of all

others "similarly situated."  29 U.S.C. §216(b).  However, putative participants in the

FLSA collective action must affirmatively "opt-in" to be covered by the suit.  Id.; Kane v.

Gage Merchandising Services, Inc., 138 F.Supp.2d 212, 214 (D. Mass. 2001); Hipp v.

Liberty National Life insurance Co., 252 F.3d 1208, 1217 (11th Cir. 2001).  The statute of

limitations for each putative potential class member is not tolled until he or she

individually opts into the litigation.  29 U.S.C. §216(b); Partlow v. Jewish Orphans'

Home of Southern California, Inc., 645 F.2d 757, 759 (9th Cir. 1981) (abrogated on other

grounds by Hoffman-La Roche Inc. v. Richard Sperling et al., 493 U.S. 165 (1989)).  To

address the problem of FLSA rights made stale through lack of knowledge, the

Supreme Court has held that courts may facilitate the issuance of a notice informing

potential opt-in plaintiffs of the pending FLSA collective action.  Kane v. Gage, 138

F.Supp.2d at 214 (citing Hoffman La Roche Inc., 493 U.S. at 170).  Court approval and

facilitation of notice serve the goals of "avoiding a multiplicity of duplicative suits and

setting cutoff dates to expedite disposition of the action."  Hoffman-La Roche, 493 U.S.

at 171.

    **B.**    **Issuance of Notice Is Appropriate, As Plaintiffs Meet the Similarly
Situated Standard**

        *i.*    *Plaintiffs need only make a modest factual showing that similarly
situated employees may exist.*

As discussed in Plaintiffs' original Motion, for an opt-in class to be created under

Section 216(b) and for notice to issue, Plaintiffs must demonstrate that similarly situated

potential class members may exist.  Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th

Cir. 1996), cert. denied, 519 U.S. 982 (1996); Reeves v. Alliant Techsystems, Inc., 77

F.Supp.2d 242 (D.R.I. 1999).  Neither the FLSA nor the applicable regulations define

the term "similarly situated."  However, the majority of courts, as well as recent

decisions in this circuit, agree that certification should be administered using the two-

step approach articulated by the Fifth Circuit in Mooney v. Aramco, 54 F.3d 1207 (5th

Cir. 1995).  See Kane v. Gage, 138 F.Supp.2d at 214.  Under this two-step approach,

the court first preliminarily certifies a collective action, orders notice to the potential opt-

ins based on a modest evidentiary showing, and permits an opt-in period.  During this

"'notice stage,' the court usually relies 'only on the pleadings and any affidavits which

have been submitted' … [and] some courts have held that, at the 'notice' stage, plaintiffs

need only make substantial allegations that the putative class members were subject to

a single decision, policy, or plan that violated the law." Id. (citing Mooney, 54 F.3d at

1214).  Second, after discovery, the court reviews the preliminary certification and

determines whether the case should proceed as a collective action. Id.  At both stages,

the court assesses whether plaintiffs and the potential opt-ins are similarly situated.  At

the first stage, however, "this determination is made using a fairly lenient standard, and

typically results in 'conditional certification' of a representative class." Mooney, 54 F.3d

at 1213-14.[3]  Plaintiffs need not be identical to the putative class members, but need

only be similar. Grayson, 79 F.3d at 1097.[4]  It is well-settled that the preliminary notice

motion is not a ruling on the merits of the Plaintiffs' claims, and that courts should not

inquire into the merits of the case at the "notice" stage.  Grayson, 79 F.3d at 1099 n.17;

Hyman v. First Union Corp., 982 F.Supp. 1, 3-5 (D.D.C. 1997); Eisen v. Carlisle &

Jacquelin, 417 U.S. 156, 177 (1974).

---

[3] The standard at the 'notice' stage "is considerably 'less stringent' than the proof required pursuant to
Fed. R. Civ. P. 20(a) for joinder or Fed. R. Civ. P. 23 for class certification." Grayson, 79 F.3d at 1096.

[4] Indeed, allowing early notice and full participation by the opt-ins "assures that the full 'similarly situated'
decision is informed, efficiently reached, and conclusive." Sperling v. Hoffman-LaRoche, 118 F.R.D. 392,
406 (D.N.J. 1998).  Once the notice and opt-in period is complete, the Court will have the benefit of
knowing the actual makeup of the collective action.  Thus, early notice will help the court to manage the
case because it can "ascertain the contours of the action at the outset." Hoffman-La Roche, 493 U.S. at
172-73.

       ii.    *Plaintiffs have easily met their lenient burden and made a modest factual showing to demonstrate that similarly situated class members may exist.*

As discussed in the original Motion, it is clear that Plaintiffs face only a "modest" or "lenient" burden at this early stage.  Although this Court previously expressed concern that Plaintiffs had not met this burden with respect to their allegation that Defendants' policies violate the "duties" test, Plaintiffs have since bolstered their evidentiary support for the "duties" test allegation.[5]  In this Renewed Motion to Facilitate 216(b) Notice, Plaintiffs advance the allegation that Defendants' policies violate the "salary basis" test, which is much more readily demonstrable, as Plaintiffs need only demonstrate that there may be other current and former employees of Defendants who are similarly situated in that they are or were (1) salaried, (2) not paid overtime, and (3) subject to Defendants' company-wide CTO policies, rather than having to demonstrate that Plaintiffs and other potential class members may have similar duties.  Plaintiffs may demonstrate that similarly situated class members may exist by making a "modest factual showing sufficient to demonstrate that [plaintiffs] and potential plaintiffs together were the victims of a common policy or plan that violated the law."  Hoffman v. Sbarro, Inc., 982 F.Supp. 249, 261 (S.D.N.Y. 1997).  All a plaintiff needs to show "is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA."  Ballaris v. Wacker

---

[5] See Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion to Facilitate 216(b) Notice and the evidentiary materials submitted with it.

Siltronic Corp., 2001 U.S. Dist. LEXIS 13354, 144 Lab. Case (CCH) P34351 (D. Or.

Aug. 24, 2001) (citing Wertheim v. State of Arizona, 1993 WL 603552 (D.Ariz. 1993)).

Here, the plaintiffs allege that Defendants' company-wide policies violate the

"salary basis" test with respect to all salaried employees of Defendants.  Although the

evidence submitted herewith is sufficient to demonstrate Defendants' violation of the

"salary basis" test, the merits of Plaintiffs' claims are not at issue here, as the focus at

the notice stage "is not on whether there has been an actual violation of law but rather

on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. 216(b) with

respect to their allegations that the law has been violated."  Young v. Cooper Cameron

Corp., 229 F.R.D. 50, 54 (S.D.N.Y. 2005).  On this decisive point, there can be no

question that Plaintiffs are "similarly situated" to all other exempt employees subject to

Defendants' policies:  Plaintiffs allege, and Defendants admit, that they are classified as

exempt and are not paid overtime (Second Amended Complaint ¶¶ 6-7, 18; O'Donnell

Aff., ¶ 4; Jolicoeur Aff., ¶ 4; Moore Aff., ¶ 4; Defendants' Answer, ¶ 15); Plaintiffs allege,

and Defendants admit through their employee handbook, that Defendants employ other

individuals classified as "Exempt Employees" who are not paid overtime (Second

Amended Complaint ¶¶ 6-7, 18; Ex. D, p. 129); and Plaintiffs allege that they and other

exempt employees of Defendants frequently worked more than 40 hours per week

(Second Amended Complaint ¶ 18; O'Donnell Aff., ¶ 4; Jolicoeur Aff., ¶ 4; Moore Aff., ¶

4), which is supported by Defendants' statements that Exempt Employees "are

expected to work whatever hours are necessary to do their jobs properly" (Ex. D, p.

129); that "[a]s a general rule, RHI offices are open Monday through Friday from 8:30

a.m. to 5:30 p.m. as normal operating hours and phones are answered from 7:30 a.m.

to 6:00 p.m.," i.e., that to be present for Defendants' normal operating hours would

require exempt employees to be present for 45 hours per week (Ex. D, p. 129), and that

"Defendants admit that RHI's Staffing Managers, Account Executives, and Account

Managers are paid a salary and that, as exempt employees, they worked as necessary

to perform their job duties" (Defendants' Answer, ¶ 15).  Furthermore, Defendants'

Employee Handbook makes clear that it applies to all regular employees and that the

policies therein – which Plaintiffs allege violate the "salary basis" test for the reasons set

forth above – apply to exempt as well as non-exempt employees.  Ex. D, pp. 119, 123,

137, 147-48.  Therefore, there can be no question that Plaintiffs have satisfied their

modest burden of showing that a class of similarly situated employees may exist.

Indeed, Defendants cannot plausibly deny that within the past three years, they have

employed individuals classified as exempt from overtime who were subject to the

company-wide policies set forth in Defendants' Employee Handbook, many of whom

may have worked more than 40 hours in a week.  Since the merits of the plaintiffs'

overtime claims are not at issue here, and their allegation that Defendants have

employed similarly situated salaried employees is so readily and conclusively

established herein, this Court should grant Plaintiffs' motion for leave to send an opt-in

notice to these similarly situated salaried employees.

     In another misclassification case quite similar to the instant action, Patton v.

Thomson Corp., 364 F.Supp.2d 263, 267 (E.D.N.Y. 2005), the sole plaintiff alleged a

nationwide class action on behalf of similarly situated Client Service Managers ("CSM"),

and notice was granted based on the plaintiff's allegations that she was not paid overtime, that she was misclassified as exempt, and "that all CSMs have the same job duties and assignments and that they are paid in the same manner"; the defendant's admission in its answer that CSMs were paid on a salary basis and classified as exempt (which Defendants in the instant case also admitted with respect to Plaintiffs in their Answer, at ¶ 15); and the plaintiff's job description.  Similarly, in Gjurovich v. Emmanuel's Marketplace, Inc., 282 F.Supp.2d 101 (S.D.N.Y. 2003), notice was approved based on the allegations in the complaint and the sworn declaration of the sole named plaintiff that he was not paid overtime, that he was misclassified as exempt, and that other employees were also misclassified and not paid overtime.

Many other recent cases have granted conditional certification at the notice stage based on the plaintiffs' allegations alone.  See, e.g., Dietrich v. Liberty Square, LLC, 230 F.R.D. 574 (N.D. Iowa 2005) (notice granted based on allegations in two affidavits); Clarke v. Convergys Customer Management Group, Inc., 370 F.Supp.2d 601 (S.D. Tex. 2005) (notice granted based on detailed allegations in pleadings and affidavits); Neagley v. Atascosa County EMS, 2005 WL 354085 (W.D. Tex. 2005) (notice granted based on allegations in complaint alone); Pendlebury v. Starbucks Coffee Co., 2005 WL 84500 (S.D. Fla. 2005) (notice granted in exemption case based on allegations in complaint and declarations of four former employees); Brown v. Money Tree Mortgages, Inc., 222 F.R.D. 676 (D. Kan. 2004) (notice granted based on complaint and two affidavits); Reeves v. Alliant Techsystems, Inc., 77 F.Supp.2d 242 (D.R.I. 1999) (notice

granted based solely on plaintiffs' "alleging that the putative class members were together the victims of a single decision, policy or plan").

In this case, Plaintiffs have provided detailed allegations in their pleadings and affidavits; cited Defendants' admissions in their responsive pleadings; and provided evidentiary support for their allegations concerning Defendants' policies by attaching evidentiary exhibits drawn from Defendants' website materials, Employee Handbook, and Human Resources forms, as well as from Plaintiff O'Donnell's employment records, to this Renewed Motion and their Reply to Defendants' opposition to their original motion. Such a showing more than satisfies the "lenient" standard for collective action notice.[6] See Kane v. Gage, 138 F.Supp.2d at 215; Mooney, 54 F.3d at 1213-14.

**C.     Notice Should Be Expedited Due to the Running of the Statute of Limitations**

Notice to the putative class should be expedited in this action in order to prevent the wasting of the employees' claims due to the running of the FLSA statute of limitations. The employees' claims are governed by a two-year statute of limitations, or in the case of "willful" violations, a three-year limitations period. 29 U.S.C. §256(a). The statute of limitations is generally not tolled for any individual class member until that

---

[6] With respect to Plaintiffs' allegations that Defendants violated the "duties" test and therefore misclassified its Staffing Managers, Recruiting Managers, Account Executives, and Account Managers as exempt, Plaintiffs rely upon their pleadings and affidavits, their earlier Motion to Facilitate 216(b) Notice and Reply to Defendants' Opposition to Plaintiffs' Motion to Facilitate 216(b) Notice, and the evidence submitted as exhibits in connection with the foregoing documents. As set forth in the earlier briefing on this issue, these alleged violations of the "duties" test arise from company-wide policies or practices of Defendants and were suffered by Plaintiffs as well as all other similarly situated Staffing Managers, Recruiting Managers, Account Executives, and Account Managers, regardless of their division, office location, and dates employed.

individual has filed a written consent form with the Court.  29 C.F.R. §790.21(b)(2);

Grayson, 79 F.3d at 1105-06.

　　　In this motion, the plaintiffs have set forth evidence and legal argument that more

than meets their modest burden for conditional certification, and Plaintiffs submit that

their allegation that there may be other employees of Defendants who are "similarly

situated" in that they are also exempt, not paid overtime, and subject to Defendants'

company-wide policies cannot seriously be denied.  Therefore, Plaintiffs' Renewed

Motion to Facilitate 216(b) Notice should be granted immediately, without need for

further discovery or briefing, in order to allow Defendants' salaried employees to opt in

as quickly as possible to protect their interests and prevent the statute of limitations

from potentially diminishing the value of their claims.  Since a grant of notice to the class

of similarly situated exempt employees subject to Defendants' alleged violations of the

"salary basis" test is appropriate at this time, and since the class of similarly situated

exempt Staffing Managers, Recruiting Managers, Account Executives, and Account

Managers is a subset of the class of all exempt employees, it would be most efficient for

this Court to approve Plaintiffs' proposed notice, which refers to Plaintiffs' allegations of

Defendants' violations of both the "duties" test and the "salary basis" test, at this time.

Permitting Defendants to engage in further discovery and briefing related to Plaintiffs'

allegations with respect to the "duties" test would be unnecessary and would lead to

further delay.

　　　Defendants have misclassified their salaried employees as exempt and denied

them overtime compensation for well over three years.  Consequently, the statute of

limitations is potentially diminishing the value of the employees' claims with each day

that passes.  The information contained in the proposed notice (attached as Exhibit G)

should therefore be issued as soon as possible to allow these non-exempt employees

to act to protect their interests.  Without notice, the potential class members are

unaware of the pendency of the action and their right to opt in, and are powerless to

prevent their claims from wasting away.  Moreover, as many of the potential class

members no longer work for Defendants, their whereabouts will be increasingly difficult

to track, and evidence may be lost with the passing of time.  Therefore, notice should be

expedited in this action to the maximum extent feasible, and should be sent to all

salaried employees employed by Defendants during the three-year potential liability

period.  See Belcher v. Shoney's, Inc, 927 F.Supp. 249, 252 (M.D. Tenn. 1996)

(ordering notice to all employees who were employed within three-year limitations

period); Herrera v. Unified Mgmt, 2000 U.S. Dist. LEXIS, 12406 (N.D. Ill. 2000).

### D.  The Proposed Notice is Fair and Adequate

A collective action depends "on employees' receiving accurate and timely notice

concerning the pendency of the collective action, so that they can make informed

decisions about whether to participate." Hoffman-La Roche Inc., 493 U.S. at 170.  Use

of a Court-approved notice prevents "misleading communications." Id. at 172.

Plaintiffs' proposed notice to potential opt-ins is "timely, accurate and informative," as

required. Id.; see the proposed notice and opt-in form attached as Exhibit G.  It

provides notice of the pendency of the action and of the opportunity to opt-in.  Plaintiffs'

legal claims are accurately described.  The proposed notice advises potential opt-ins

that the Court has made no finding as to the merits of the case and that they are not required to participate.  The notice also provides clear instructions on how to opt-in and accurately states the prohibitions against retaliation or discrimination for participation in an FLSA action.  See 29 U.S.C. §215(a)(3).

### E.    The Proposed Limited Discovery is Essential to Ensure Timely Notice

Discovery of a mailing list for class members is a routine component of notice in collective actions.  Hoffman-LaRoche, 493 U.S. at 1470 ("District Court was correct to permit discovery of the names and addresses…"); Grayson, 79 F.3d at 1111 (ordering production of mailing list); Belcher, 927 F.Supp. at 252 (same).  Indeed, such a mailing list is essential to timely notice.  Hoffman-LaRoche, 493 U.S. at 170 ("timely notice" required).  Therefore, this Court should order Defendants to produce a computer-readable data file containing the names, last known mailing and e-mail addresses, telephone numbers, and dates of employment for all salaried employees employed by Defendants anywhere in the United States within the three years preceding the filing of this action.[7]

---

[7] If this Court finds that the grant of notice to all Defendants' salaried employees should only refer to Defendants' alleged violation of the "salary basis" test, Plaintiffs will, after the Court is satisfied that notice regarding Defendants' alleged violation of the "duties" test is appropriate, request a separate data file providing the names and contact information for all Staffing Managers, Recruiting Managers, Account Executives, and Account Managers in order to provide notice to these employees of this separate claim.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Renewed Motion to

Facilitate 216(b) Notice.

Respectfully submitted,
IAN O'DONNELL and DAVID JOLICOEUR,
ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED,
By their attorneys,


_s/Shannon Liss-Riordan_____
Shannon Liss-Riordan, BBO #640716
Stephen Young, BBO #662914
PYLE, ROME, LICHTEN, EHRENBERG
    & LISS-RIORDAN, P.C.
18 Tremont Street, Ste. 500
Boston, MA 02108
Dated:  November 30, 2005              (617) 367-7200

# Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IAN O'DONNELL and DAVID JOLICOEUR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | CIVIL ACTION NO.: 04-12719 NMG |
| ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION ) ) ) | |
| Defendants. ) ) ) ) ) | |

## AFFIDAVIT OF IAN O'DONNELL

Pursuant to 28 U.S.C. § 1746, I, Ian O'Donnell, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.  My name is Ian O'Donnell. I reside at 27 Willow Drive, Easton, Pennsylvania. I am over the age of eighteen (18) and otherwise competent to testify. All statements in this declaration are made solely for use in this litigation. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2.  I worked as a staffing manager in Defendants' Danbury, Connecticut, and Westborough and Boston, Massachusetts, offices from January 2002 until August 2003.

3.  I make this affidavit in support of Plaintiffs' Motion to Facilitate 216(b) Notice.

4.   The Defendants classified staffing managers as exempt employees and paid them on a salary basis.  Thus, I did not receive overtime compensation for hours worked in excess of forty (40) hours in a work week.

5.   While employed by Defendants as a staffing manager, I regularly worked more than forty (40) hours in a work week.

6.   My primary duty as a staffing manager, known as the "sales function," was to sell the Company's staffing services.  I was required to make between 25 and 30 sales connections per day, and I regularly made approximately 100 outbound sales calls per day.

7.   I spent at least 85 percent of my time telephoning businesses at the direction of the Company to inquire about their staffing needs and make a sales pitch regarding the Company's personnel-placement service.  The Company gave me specific lists of companies to call in a specified geographic area.  The Company also told me to whom I should direct each call within each business (e.g., the human resources department, line manager, etc.).

8.   My branch manager also provided me with additional lists of companies to call that were not on my original Company-provided list.

9.   I exercised little, if any, discretion or independent judgment in making my sales calls.  I exercised little, if any, discretion with respect to how I chose to spend my time.

10.  The Company planned my day such that I arrived at the office at 7:45 a.m., planned my morning calls until 8 a.m., and made outbound sales calls non-stop from 8 a.m. until 11 a.m.  From 11 a.m. to 12 noon, I sent out marketing materials from the morning's calls and took a bathroom break.  From 12 noon

to 12:30 p.m., I ran out to get lunch, which I ate at my desk. From 1 p.m. to 4 p.m., I made outbound sales calls non-stop. From 4 p.m. to 5 p.m., I sent out marketing materials from the afternoon's calls and took a bathroom break. From 5 p.m. to 6 p.m., I planned out my next day's calls. From 6 p.m. to 7 p.m., I tried to call CFOs and other high-level managers at the Company's current and prospective clients.

11.  The Company instructed me as to what I should be working on at every moment of the day, on an hour-by-hour and sometimes minute-by-minute basis.

12.  The activities I performed during any given day were entirely prescribed by the Company. My division director, branch manager, and/or regional director planned my daily work activities. The Company held two daily and two weekly meetings and sent e-mails setting my daily activities, including the length of time of my breaks. I had no discretion to deviate from this schedule. Every afternoon, I was told to print out my daily activity report and report to the group how many calls and connects I made, as well as any success stories. Once a month, I would meet with my Division Director and branch manager to review my monthly activity. This meeting was known as a sales activity report. I was told whom to call in each company and asked why I did not get business from companies that I marketed on a regular basis. At the end of the meeting, I was given tasks to complete for the next meeting. The Company sent a detailed 2-3 page written sales report to all managers.

13.  I did not have the authority to formulate, affect, interpret, or implement management policies or operating practices.

3

14.   I did not carry out major assignments in conducting the operations of the business.

15.   I did not perform work that affected business operations to a substantial degree.

16.   I did not have the authority to waive or deviate from established policies and procedures.

17.   I did not provide consultation or expert advice to management.

18.   I was not involved in planning business objectives of any kind.

19.   I did not investigate or resolve matters of significance on behalf of management.

20.   I am familiar with other current and former employees of the Company who are not listed as named plaintiffs in this case but who have stated that they would be interested in participating in this litigation. These current and former employees work or worked in similar positions with similar duties and did not receive overtime compensation for hours worked in excess of forty (40) hours in a work week despite regularly working in excess of forty (40) hours in a work week.

21.   Throughout my employment with the Company, at each of the three offices of the Company where I worked, other employees in positions similar to mine stated that they were extremely dissatisfied with their level of compensation. Many of these employees stated that they believed that they should receive overtime pay because of the nature of their jobs and the long hours they worked. I believe that many of these current and former employees of the Company would be interested in participating in this litigation.

4

May-04-2005 09:09am  From-TAX AND TREASURY MM MARS                19736913777        T-240  P 006/006  F-867

Signed under pains and penalties of perjury, this 4th day of ___May___, 2005.

_____
Ian O'Donnell

Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IAN O'DONNELL and DAVID JOLICOEUR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, ) ) ) ) ) | |
| Plaintiffs, ) ) ) | CIVIL ACTION NO.: 04-12719 NMG |
| v. ) ) | |
| ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION ) ) ) | |
| Defendants. ) ) ) ) ) | |

## AFFIDAVIT OF DAVID JOLICOEUR

Pursuant to 28 U.S.C. § 1746, I, David Jolicoeur, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. My name is David Jolicoeur. I reside at 195 Park Ridge Drive in Easton, Pennsylvania. I am over the age of eighteen (18) and otherwise competent to testify. All statements in this declaration are made solely for use in this litigation. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2. I worked as a staffing manager in Defendants' Boston office from June 2002 until August 2003.

3. I make this affidavit in support of Plaintiffs' Motion to Facilitate 216(b) Notice.

4.   The Defendants classified staffing managers as exempt employees and paid
     them on a salary basis.  Thus, I did not receive overtime compensation for
     hours worked in excess of forty (40) hours in a work week.

5.   While employed by Defendants as a staffing manager, I regularly worked
     more than forty (40) hours in a work week.

6.   My primary duty as a staffing manager, known as the "sales function," was to
     sell the Company's staffing services.  I was required to make between 20 and
     25 sales connections per day, and I regularly made approximately 100
     outbound sales calls per day.

7.   I spent at least 85 percent of my time telephoning businesses at the direction
     of the Company to inquire about their staffing needs and make a sales pitch
     regarding the Company's personnel-placement service.  The Company gave
     me specific lists of companies to call in a specified geographic area.  The
     Company also told me to whom I should direct each call within each business
     (e.g., the human resources department, line manager, etc.).

8.   My branch manager also provided me with additional lists of companies to
     call that were not on my original Company-provided list.

9.   I exercised little, if any, discretion or independent judgment in making my
     sales calls.  I exercised little, if any, discretion with respect to how I chose to
     spend my time.

10.  The Company planned my day such that I arrived at the office at 7:45 a.m.,
     planned my morning calls until 8 a.m., and made outbound sales calls non-
     stop from 8 a.m. until 11 a.m. From 11 a.m. to 12 noon, I sent out marketing
     materials from the morning's calls and took a bathroom break.  From 12 noon

2

to 12:30 p.m., I ran out to get lunch, which I ate at my desk. From 1 p.m. to 4

p.m., I made outbound sales calls non-stop. From 4 p.m. to 5 p.m., I sent out

marketing materials from the afternoon's calls and took a bathroom break.

From 5 p.m. to 6 p.m., I planned out my next day's calls. From 6 p.m. to 7

p.m., I tried to call CFOs and other high-level managers at the Company's

current and prospective clients.

11.    The Company instructed me as to what I should be working on at every

moment of the day, on an hour-by-hour and sometimes minute-by-minute

basis.

12.    The activities I performed during any given day were entirely prescribed by

the Company. My division director, branch manager, and/or regional director

planned my daily work activities. The Company held at least one or two

weekly meetings and sent e-mails setting my daily activities, including the

length of time of my breaks. I had no discretion to deviate from this schedule.

Every afternoon, I was told to print out my daily activity report and report to

the group how many calls and connects I made, as well as any success stories.

Once a month, I would meet with my Division Director and branch manager

to review my monthly activity. This meeting was known as a sales activity

report. I was told whom to call in each company and asked why I did not get

business from companies that I marketed on a regular basis. At the end of the

meeting, I was given tasks to complete for the next meeting. The Company

sent a detailed 2-3 page written sales report to all managers.

13.    I did not have the authority to formulate, affect, interpret, or implement

management policies or operating practices.

3

14.  I did not carry out major assignments in conducting the operations of the business.

15.  I did not perform work that affected business operations to a substantial degree.

16.  I did not have the authority to waive or deviate from established policies and procedures.

17.  I did not provide consultation or expert advice to management.

18.  I was not involved in planning business objectives of any kind.

19.  I did not investigate or resolve matters of significance on behalf of management.

20.  I am familiar with other current and former employees of the Company who work or worked in similar positions with similar duties and regularly worked in excess of forty (40) hours in a work week. I believe that many of these individuals would be interested in participating in this litigation, because while I worked at the Company alongside many of these current and former employees, I frequently heard them complain that we were all working too many hours without being sufficiently compensated for them.

Signed under pains and penalties of perjury, this 10 day of May, 2005.

David Jolicoeur

4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IAN O'DONNELL and DAVID JOLICOEUR, )
ON BEHALF OF THEMSELVES AND ALL )
OTHERS SIMILARLY SITUATED, )
            )
           Plaintiffs, )
            )
v. )
            )
ROBERT HALF INTERNATIONAL INC. and )
ROBERT HALF CORPORATION )
            )
           Defendants. )
            )
            )
            )

NOV 21 2005

CIVIL ACTION NO.: 04-12719 NMG

### AFFIDAVIT OF STACEY MOORE

Pursuant to 28 U.S.C. § 1746, I, Stacey Moore, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. My name is Stacey Moore. I reside at 69-81 108th Street in Forest Hills, New York. I am over the age of eighteen (18) and otherwise competent to testify. All statements in this declaration are made solely for use in this litigation. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2. I worked as an Account Manager in the Creative Group division in Defendants' Boston office from May 2003 until February 2004.

3. I make this affidavit in support of Plaintiffs' Renewed Motion to Facilitate 216(b) Notice.

Post-it® Fax Note 7671 | Date 11/15/05 | # of pages ▶ 6
To Steve Young | From Stacey Moore
Co./Dept. | Co.
Phone # | Phone #
Fax # | Fax #

4.     Defendants classified Account Managers as exempt employees and paid them on

a salary basis. I did not receive overtime compensation for hours worked in

excess of forty (40) hours in a work week.

5.     While employed by Defendants as an Account Manager, I regularly worked more

than forty (40) hours in a work week.

6.     My primary duty as an Account Manager, known as the "sales function," was to

sell Defendants' staffing services. I was required to make between 20 and 25

sales connections per day, and I regularly made approximately 50 outbound sales

calls per day.

7.     Although my work day was supposedly between 8 a.m. and 6 p.m., I was

expected to "plan my sales calls for the day" between 7 a.m. and 7:30 a.m., and

then at around 8 a.m. and 5 p.m., the "Desk person" would lead our division (The

Creative Group) in daily board meetings, and I often stayed later than 6 p.m. to

fill jobs. These hours were typical for other Account Managers and similar

employees in other divisions in the Boston office, which I knew because the

employees from all divisions housed in the Boston office had to attend a daily

staff meeting each day at 8 a.m. I could also see that the other Account Managers

and similar employees in other divisions stayed as late as I did.

8.     I spent at least 85 percent of my time telephoning businesses at the direction of

Defendants to inquire about their staffing needs and make a sales pitch regarding

Defendants' personnel-placement service. Defendants gave me specific lists of

companies to call in a specified geographic area. Defendants also told me to

whom I should direct each call within each business (e.g., the human resources

department, line manager, etc.).

9.  My branch manager also provided me with additional names of companies to call that were not on the original list.

10. I exercised little, if any, discretion or independent judgment in making my sales calls. I exercised little, if any, discretion with respect to how I chose to spend my time.

11. Defendants planned my day such that I arrived at the office at or before 7:30 a.m., planned my morning calls until 8 a.m., attended the daily sales meeting at 8 a.m., and then made outbound sales calls non-stop until 11 a.m. From 11 a.m. to 12 noon, I sent out marketing materials from the morning's calls and took a bathroom break. From 12 noon to 12:30 p.m., I ran out to get lunch, which I ate at my desk. From 12:30 p.m. to 4 p.m., I made outbound sales calls or visited clients non-stop. From 4 p.m. to 5 p.m., I sent out marketing materials from the afternoon's calls and visits and took a bathroom break. From 5 p.m. to 6 p.m., I planned out my next day's calls. From 6 p.m. to 7 p.m., I tried to call CFOs and other high-level managers at Defendants' current and prospective clients.

12. Defendants instructed me as to what I should be working on at every moment of the day, on an hour-by-hour and sometimes minute-by-minute basis.

13. The activities I performed during any given day were entirely prescribed by the defendants. My division director, branch manager, and/or regional director planned my daily work activities. Defendants sent e-mails setting my daily activities, including the length of time of my breaks. I had no discretion to deviate from this schedule. My daily activity report of how many calls and connects I made, as well as any success stories, was monitored on Micro-J (software we used to track Account Managers' and other staffing employees'

3

sales activity) on a daily basis by my branch/division manager. Once a month, I would meet with my Division Director and branch manager to review my monthly activity. This meeting was known as a sales activity report. I was told whom to call in each company and asked why I did not get business from companies that I marketed on a regular basis. At the end of the meeting, I was given tasks to complete for the next meeting.

14. Our supervisors watched us very carefully to make sure that we were at our desks and working as much as possible. If I went and got a coffee and lingered in the kitchen or stopped on the way back to chat with someone, my division director or branch manager would notice and give me a verbal warning for not being at my desk. I often saw this happen with other Account Managers and employees in similar positions with other divisions.

15. I did not have the authority to formulate, affect, interpret, or implement management policies or operating practices.

16. I did not carry out major assignments in conducting the operations of the business.

17. I did not perform work that affected business operations to a substantial degree.

18. I did not have the authority to waive or deviate from established policies and procedures.

19. I did not provide consultation or expert advice to management.

20. I was not involved in planning business objectives of any kind.

21. I did not investigate or resolve matters of significance on behalf of management.

22. I am familiar with other current and former employees of Defendants who work or worked in similar positions with similar duties and regularly worked in excess of forty (40) hours in a work week. I could see that employees in similar

4

positions in other divisions were doing the same sort of work as I was. I believe

that some of these individuals would be interested in participating in this

litigation, because while I worked for Defendants alongside many of these current

and former employees, I frequently heard them complain that we were all

working too many hours without being sufficiently compensated for them.

23.     Whenever I would ask to take part of a day off, my supervisors would urge me to

take the whole day off, and this usually discouraged me from taking any time off

at all. In or about July 2003, I moved, and during the move, I wanted to work half

days for a couple of days, working in the morning and moving in the afternoons.

I requested this time off, and my supervisors said something to the effect that I

"should just take both days off" and charge them to my paid leave. I didn't want

to use that much vacation time, and I was ready, willing, and able to go to work in

the morning on those days. Even though my supervisors strongly insisted that I

take both whole days off, I recall that I took the two half days off and worked

during the mornings and that one full day of leave was subtracted from my

accrued paid leave for that pay period.


Signed under pains and penalties of perjury, this 15th day of November, 2005.


_____

Stacey Moore

5

<u>Exhibit D</u>



# EMPLOYEE HANDBOOK
## YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

**Robert Half International Inc.**
**Mission Statement:**

To be the premier provider of specialized staffing services in all markets we serve while adhering to the highest professional standards.

---

### IMPORTANT NOTICE OF DISCLAIMER CONCERNING THIS HANDBOOK

All employees of Robert Half International Inc. or its subsidiaries ("RHI" or "the Company") are employed "at-will," which means that either you or RHI may terminate your employment at any time, with or without cause and with or without prior notice or discipline.

RHI has provided you this Employee Handbook as a reference guide to its employment policies and procedures. The Employee Handbook is for informational purposes only and contains no promise of any kind. Except for the policy on at-will employment, RHI reserves the right to change, amend, delete, or adopt any employment policy, benefit or practice at any time with or without prior notice. RHI also reserves the right to depart from policies or procedures set forth in this Employee Handbook or elsewhere at its sole discretion. Nothing contained in the Employee Handbook or any other policy of RHI restricts the Company's absolute right to end your employment at any time, with or without cause and with or without prior notice.

No supervisor, department head or other employee has any authority to enter into individual agreements with employees of RHI or to make any representations or promises concerning the terms and conditions of employment that differ materially from RHI policies, benefits or practices.

This Employee Handbook, and the policies contained herein, supersede and replace any and all prior handbooks, policies, procedures and practices of RHI, whether documented or undocumented.

---

**Table of Contents**

RHI 0000119



# EMPLOYEE HANDBOOK
### YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

GENERAL · COMPENSATION · EMPLOYEE BENEFITS · SUPPLEMENT · FAQS · CHOICE BENEFITS
MAX MESSMER LETTER · INTRODUCTION · TABLE OF CONTENTS

## TABLE OF CONTENTS

**Max Messmer Letter**
Letter From Max Messmer

**Introduction**
Company Background

**General**
Equal Employment Opportunity
Disability Accommodations
Non-Discrimination Pledge
Policy Against Harassment
Policy Against Sexual Harassment
Corporate Compliance / Financial Controls Hotline
Professional Standards of Conduct
Conflicts of Interest/Vendor Gifts
Inside Information
Employee-Incurred Business Expenses
Substance Abuse
Smoking
Hours of Business
Employee Classifications
  • Regular Full-Time Employees
  • Regular Part-Time Employees
  • Temporary, Contract Employees and Consultants
  • Exempt Employees
  • Non-Exempt Employees
Service Date
Non-Competition and Trade Secret Agreements
Immigration Law
Performance Reviews
Discipline
Exit Interviews
Prohibited Items
Policy Against Workplace Violence
Safe Work Environment
Company Transfers
Employee Reference Requests
Media Calls
Open Door Policy
Personnel Records
Company Resources
E-mail and Internet Protocols

**Compensation**
Overtime
Salary Administration
Direct Deposit
Salary Review and Bonuses
Field Sales Compensation
  • Eligibility
  • Timing of Commission and Bonus Payments
  • Termination
  • Management Discretion

**Employee Benefits**
Health and Life Benefits
  • Employee Assistance Program (EAP)
  • Dependent Care Reimbursement Account (DCRA)
  • Adoption Assistance
  • Open Enrollment
  • Family Status Changes
  • Continuation of Health Benefits - COBRA
401(k) Plan
Deferred Savings Plan
StockPLUS Program
Time Away from Work Benefits
  • CHOICE Time Off (CTO)
  • Holidays
  • Bereavement
  • Leaves of Absence
  • Jury Duty and Court Summons
Employee Development
  • RHI University (RHIU)
  • Professional Memberships/Continuing Education

**Supplement**
CHOICE Time Off (CTO)
"Stars" Employee Referral
Tuition Assistance
Non-Standard Work Schedules
On-Call Pay
Domestic Violence Absence Policy

**Handbook FAQs**

**Choice Benefits**
CHOICE Time Off FAQs
Delayed Impact Explanation
Floating Holiday Schedule and Procedures
Holiday FAQs
Bereavement FAQs

RHI 0000120

Tuition Assistance FAQs
Non-Standard Work Schedules FAQs
On-Call Pay FAQs

**CHOICE Time Off Forms**
Exempt Employee Time Off Request
Non-Exempt Employee Time Off Request
Exempt Employee Absence Record
Non Exempt Employee Time Sheet

RHI 0000121



**EMPLOYEE HANDBOOK**
YOUR PRIMARY RESOURCE FOR RHI's PERSONNEL POLICIES

GENERAL | COMPENSATION | EMPLOYEE BENEFITS | SUPPLEMENT | FAQS | CHOICE BENEFITS

MAX MESSMER LETTER | INTRODUCTION | TABLE OF CONTENTS

## MAX MESSMER LETTER



As an employee of RHI, you are part of the world's first and largest specialized staffing firm. We're glad to have you as a member of our elite team!

Our company is built upon powerful principles: attract top talent, give them the tools to excel, provide opportunities for advancement and reward outstanding performance.

We've invested substantial resources into harnessing the tremendous power of technology and the Internet to our business advantage. This commitment extends to the hands-on tools you use on a daily basis. For example, we offer web access at every desktop and a state-of-the-art on-line corporate university, RHIU. In addition, our placement professionals use leading-edge technology to source candidates through the Internet and to tap into our extensive client and candidate database, while our Corporate Services employees also enjoy the benefits of state-of-the-art business systems.

RHI is known as the industry's employer of choice. As a result, job candidates and clients want to work with us, and we offer them superior service in return. But we also strive to be the employer of choice for each of you by providing the best possible work environment and career advancement opportunities.

I hope you'll take some time to consider your professional development within our organization and encourage you to take advantage of the many resources and programs available to you. A good starting point for your development is this handbook. Please read it and if you have any questions or need clarification, please contact your supervisor.

I wish you all the best in your career with us.

Sincerely,

Max Messmer
Chairman and Chief Executive Officer

RHI 0000122



## INTRODUCTION

Robert Half International Inc. and its subsidiaries ("RHI" or the "Company") have prepared this handbook to acquaint you with our policies and benefits. It is for informational purposes only, and is not intended to create or confer specific legal rights, nor should any of the statements be construed to be contractually binding. This handbook is a summary intended to highlight certain benefits and policies. Variations in some policies may occur if necessary to comply with state or local law. Many of the benefits described are provided by independent insurers or other providers. Therefore, RHI often cannot control the terms and conditions of those benefits. Should a question arise about group benefits, the actual contracts and plan provisions will govern. Since a booklet such as this cannot encompass all possible situations, questions regarding policies or procedures, or situations not covered by this handbook, should initially be referred to your supervisor.

**No permanent regular employment or employment for any term is intended or can be implied by any statement in this handbook. This employment at-will policy shall not be modified by any other employment handbook or other company materials or statements of a manager provided to our employees in connection with employment at RHI.**

**RHI reserves the right to change, modify or terminate any benefits or policies at any time, for any reason, without prior notice and without amending this handbook.**

**The policies in this handbook do not apply to temporary consultants, temporary employees, or contract employees employed by any division of RHI, unless otherwise stated. The information in this handbook supersedes all other handbooks, policies and related materials previously distributed.**

To the extent any policies or procedures contained in this handbook are contrary to applicable state or local law or regulation, the state or local law or regulation shall control. Changes to the handbook may be communicated via e-mail and posted on the RHI Intranet, BobNet. It is your responsibility to read and keep abreast of changes posted on BobNet.

All Full-Time Consultants and Salaried Financial Executives need to contact their supervisor for BobNet information (when necessary) as referenced in this handbook.

## COMPANY BACKGROUND

Founded in 1948, Robert Half International Inc. (NYSE symbol: RHI) is the world's leading specialized staffing firm and the first to provide placement services for accounting, finance and information technology professionals.

Robert Half International has several specialized business units, each serving distinct markets: **Accountemps®, Robert Half® Finance & Accounting and Robert Half® Management Resources,** for temporary, full-time and project professionals, respectively, in the fields of accounting and finance; **OfficeTeam®,** for highly-skilled temporary administrative support; **Robert Half® Technology** , for information technology professionals; **Robert Half® Legal,** for temporary, project and full-time staffing of attorneys and specialized support personnel within law firms and corporate legal departments; and **The Creative Group®,** for creative, advertising, marketing and web design professionals on a project basis.

RHI is the industry's leading resource on hiring and employment issues. Firms of all sizes look to us for

RHI 0000123

should consult the rules in place in their local office concerning smoking breaks and designated areas for smoking.

## Hours of Business

As a general rule, RHI offices are open Monday through Friday from 8:30 a.m. to 5:30 p.m. as normal operating hours and phones are answered from 7:30 a.m. to 6:00 p.m. Local managers may adjust the office hours to reflect the needs of the individual office. In those locations with non-traditional work schedules, the hours of work will be circulated to the staff and appropriate employee schedules developed.

## Employee Classifications

For purposes of salary administration and eligibility for overtime payments and employee benefits, RHI classifies its employees as follows:

- **Regular Full-Time Employees** are employees regularly scheduled to work 30 hours per week or more with the understanding that no specific time period has been established for the duration of their employment. Continued employment is always subject to RHI's at-will employment policy and contingent upon satisfactory performance and business needs. Such employees may be "exempt" or "non-exempt" as defined below.

- **Regular Part-Time Employees** are employees regularly scheduled to work fewer than 30 hours per week with the understanding that no specific time period has been established for the duration of their employment. Continued employment is always subject to RHI's at-will employment policy and contingent upon satisfactory performance and business needs. Such employees may be "exempt" or "non-exempt" as defined below.

- **Temporary, Contract Employees and Consultants** are employees engaged to work full-time or part-time on RHI's payroll (usually RHI's temporary payroll) with the understanding that their employment is temporary. Such employees may be "exempt" or "non-exempt" as defined below. If a temporary or contract employee or consultant becomes a regular employee of RHI, the employee's start of service date and benefits eligibility qualification period will begin on the date that their status changes from temporary to regular.

- **Exempt Employees** are employees in positions which are exempt from legal overtime pay requirements. Exempt employees are expected to work whatever hours are necessary to do their jobs properly.

- **Non-Exempt Employees** are employees in positions which are covered by legal overtime pay requirements. Non-exempt employees will, for the most part, be assigned to work during normal office hours. However, hours may be assigned which fall outside of these hours. If overtime is required, it will be paid according to governing laws.

At the time of hire, or if you should change positions, you will be informed of your classification.

## Service Date

Your service date is the date you first become a regular employee. Eligibility for certain Company benefits depends on the employee's "service date" and length of service thereafter. Service ceases under any of the following circumstances:

- Resignation
- Dismissal
- Retirement
- Failure to return from a leave

The service date of a rehired RHI employee for such benefits is the date of re-employment, unless reinstated within 30 days of termination, in which case the original hire date is used.

RHI 0000129

Benefit changes outside of Open Enrollment or initial new employee enrollment may be made only when a family status change occurs. A few examples of family status changes are marriage, birth or adoption of a child, divorce, death of a dependent, or when a dependent child reaches the maximum age limit of 25 years. A Benefits Enrollment Change Form must be received in the Benefits Operations Department within 31 days of the family status change event, in order for you to make a change in your benefits elections. Benefit changes must be consistent with the qualifying family status change event. For example, if your qualified family status change is the adoption of a child, you may add your newly adopted child to your medical coverage, but you cannot, for instance, drop medical coverage for your spouse or switch medical plans at the same time.

- **Continuation of Health Benefits – COBRA**
  If your employment terminates for any reason except gross misconduct, or if you reduce your work hours from regular full-time to regular part-time, you may continue your group health coverage for up to 18 months under the Consolidated Omnibus Budget Reconciliation Act (COBRA). Your dependents may also continue their coverage under certain circumstances if they also participated in your group health coverage. Should you elect to continue group health coverage, you will be responsible for the entire premium, including the portion which was previously Company paid, as well as a 2% administration fee.

# 401(k) Plan

All regular employees are eligible to participate in the RHI 401(k) Plan upon meeting eligibility requirements. See the Plan document for details about eligibility and the Plan. Employees can make pre-tax contributions to the Plan through payroll deductions. If your prior year's earnings with RHI exceed the IRS-defined amount for "highly compensated employees," you are not eligible to participate in the RHI 401(k) Plan. Instead, you may contribute pre-tax amounts to our Deferred Savings Plan.

# Deferred Savings Plan

If your prior year's earnings with RHI exceed the IRS defined amount for "highly compensated employees," you are eligible to participate in the Deferred Savings Plan for Highly Compensated Employees. You can elect to make pre-tax contributions to the Deferred Savings Plan through payroll deductions. See the Plan document for details about eligibility and the Plan.

# StockPLUS

The company offers a unique ownership opportunity to provide employees with stock ownership through the StockPLUS program. This innovative program provides you, our valued employees, the opportunity to benefit financially from the business you help build and develop. Details are included on BobNet and in the prospectus of the program.

# Time Away from Work Benefits

RHI recognizes that employees have different needs and priorities. Our generous time off benefits provide substantial choice and flexibility when you need or want time off from work.

- **CHOICE Time Off (CTO)**
  CHOICE Time Off (CTO) provides employees with paid time away from the job for such things as vacation, outside activities, illness, personal business and family matters. Instead of earning vacation, paid sick time and/or Paid Time Off separately, all regular full-time employees will earn CTO on a semi-monthly basis throughout the calendar year based on length of service.

  Time Off Requests (Exempt and Non-Exempt) for planned CTO must be in writing and submitted in advance to your supervisor for approval. Effort will be made to accommodate requests, subject to the business needs of RHI.

  If approved by the supervisor, CTO may be taken before it is actually earned. However, in no event may an employee borrow more than 5 days or 40 hours of CTO. Should employment end before used CTO has been earned, that time will be owed back to RHI and deducted from the final paycheck or other amounts payable to the employee. See the supplement in this

handbook for more details on the CTO program.

Unplanned absences may be disruptive to the work group. Accordingly, if you take CTO on an unplanned basis due to illness or other emergency, you must call the office prior to your normal start time and speak to your supervisor regarding the need for your absence. If an unplanned absence extends longer than one day you must remain in contact with your supervisor regarding your expected date for return to work.

CHOICE Time off FAQs

- **Holidays**
  All regular full-time employees are eligible to receive ten paid holidays per year. Holidays are a combination of scheduled and floating holidays. A schedule of holidays will be posted in December with the actual dates of observance for the coming year. All office locations will observe the following core holiday schedule:

  - New Year's Day
  - Memorial Day
  - Independence Day
  - Labor Day
  - Thanksgiving Day
  - Christmas Day

  Regular part-time employees are paid for holidays that fall on their regularly scheduled workdays. They will be paid for the number of hours they normally work on that day. If a regular schedule does not exist, the employee will be paid for the number of hours worked on an average work day for that individual.

  If an employee is required to work on a scheduled holiday, a substitute day of equivalent time will be given. If a holiday occurs during an employee's CHOICE Time Off, it will be considered a holiday and not counted against CHOICE Time Off.

  If an employee is absent from work and is not being paid during the absence, the employee will not be paid for a holiday that falls during the absence unless the employee receives pay on the working days immediately before and after the holiday.

  Both the Corporate and Field Offices may schedule additional office holidays at management's discretion. The schedule is announced annually and is available on BobNet. (See links below.) The remaining holidays will be floating holidays. Floating holidays may be taken at any time during the year, subject to management approval. Employees hired after the first of the year will receive an adjustment to their floating holidays. See prorated holiday schedule.

  For accounting purposes, apply your floating holidays to your paid time off records prior to recording CHOICE Time Off taken.

  Holiday FAQs
  Corporate Holiday Schedule
  Field Holiday Schedule

- **Bereavement**
  All regular employees may take up to two days paid time off as a result of a death in the family. For the purposes of this policy, the employee's family includes:

  - Parents
  - Spouse
  - Children
  - Grandchildren
  - Sister or Brother
  - Grandparents
  - In-laws (Mother, Father, Sister, Brother, Daughter and Son)

  The employee's supervisor must approve Bereavement Leave. If additional days are needed, you may apply other paid time off, such as CHOICE Time Off or floating holidays, and/or request an unpaid personal leave, subject to the approval of your supervisor.

RHI 0000138



**EMPLOYEE HANDBOOK**
YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

GENERAL · COMPENSATION · EMPLOYEE BENEFITS · SUPPLEMENT · FAQS · CHOICE BENEFITS
MAX MESSMER LETTER · INTRODUCTION · TABLE OF CONTENTS

# CHOICE BENEFITS

## CHOICE Time Off FAQs

### Earning CHOICE Time Off

1. **How is CHOICE Time Off earned?**
   CHOICE Time Off is earned in equal, pro-rata portions with each semi-monthly payroll period.
   The rate at which an employee earns CHOICE Time Off is determined by years of service to the
   Company. (See applicable CHOICE Time Off Earning Schedule)

   Examples:
   - An exempt employee who has completed three years of service would earn 23/24 day of
     CTO, resulting in a total of 23 days earned for working the full year between the third and
     fourth anniversaries.

   - A non-exempt employee who has completed three years of service would earn 6.33
     hours of CTO each semi-monthly pay period, resulting in a total of 152 hours earned for
     working the entire service year.

2. **What is the maximum CHOICE Time Off balance I can have before I stop earning
   additional time?**
   Accrual levels are capped at 1.5 times of each employee's respective CHOICE Time Off earning
   level. Once these amounts are reached, no additional CHOICE Time Off is earned. After some
   of the unused CHOICE Time Off is used, the employee will begin to earn CHOICE Time Off,
   subject to the foregoing limits.

3. **At what rate do full-time employees who work between 30 to 39 hours earn CTO?**
   Full-time employees who work less than 40 hours a week earn CTO on a prorated basis based
   upon their standard work schedule. For example, an employee with a standard work schedule of
   30 hours per week would earn 75 percent of the earnings rate of an employee with a standard
   work schedule of 40 hours per week.

### Tracking and Recording CHOICE Time Off

4. **How is CHOICE Time Off tracked?**
   It is each individual supervisor's responsibility to manage and track all paid time off. CHOICE
   Time Off is tracked by calendar year.

5. **Is there a form to complete when requesting CHOICE Time Off?**
   All time off requests should be made on a Time Off Request Form (Exempt or Non-Exempt),
   which is available on BobNet. Both the employee and manager should keep a signed copy for
   their records.

6. **How do I record CHOICE Time Off that I use?**
   Exempt employees record CHOICE Time Off on the Exempt Employee Absence Record. Non-
   exempt employees record CHOICE Time Off on the Non-Exempt Employee Time Sheet. Both
   forms are available on BobNet.

7. **Why do non-exempt employees record time off in 15-minute increments and exempt
   employees record time off in full day increments?**
   In adherence with governing laws, our policy is to record time off in full day increments for

exempt employees.

8. **What should an exempt employee who works less than a full day record as time off?**
Exempt employees who have personal business that can be accomplished in two hours or less in a standard eight-hour day may take the necessary time off without being charged for a day of CTO. Of course, time off must be approved by their manager and scheduled in such a way as to not interfere with ongoing business.

Managers need to look at the individual circumstances and apply judgment as to when to apply greater flexibility. The situation at hand and the employee's record of contribution and past use of time off all should be considered when determining if greater flexibility is needed.

To the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours our practice is that the day will be considered a full day of CTO. Eight hours of CTO should be recorded for payroll records. As with any employee on CTO, there is no requirement that the employee be present in the office for any part of that day. The employee can use the opportunity to address a variety of personal needs on that day

Employees who have questions on how to record their time should consult with their manager, who will look at the individual circumstances and apply judgment as to how to record the time.

9. **Do exempt employees have to record a full day of CTO if they leave work early due to illness?**
Generally, an exempt employee who works a substantial part of the day and then goes home ill is not required to use CTO for that time

## Unused CHOICE Time Off

10. **Can unused CHOICE Time Off be carried forward to the next calendar year?**
RHI encourages employees to use their CTO each year. Choice Time Off must be taken during the year it is earned. Except in certain states, as described below, unused CTO may not be carried over from one calendar year to the next. Such unused CTO expires without compensation to the employee. RHI's CTO policy complies with the state law of the state in which an employee works. In the states that require carryover of CTO [California, Illinois, Colorado, Tennessee, Oklahoma, South Carolina, Arkansas] accrual levels are capped at 1.5 times of the employees' respective CTO earning level. Once these amounts are reached, no more CTO is earned. After some of the unused CTO is used, the employee will begin to earn CTO, subject to the foregoing limits on accrual.

## CHOICE Time Off Before It is Earned

11. **Can CHOICE Time Off be taken in advance of actually earning the time?**
Yes. Up to 5 days for exempt employees or 40 hours for non-exempt employees, with manager approval, may be taken in advance of earning the time off. However, if you terminate before you have earned the CHOICE Time Off you have taken, the amount you owe the company will be deducted from your final paycheck or any other amounts payable to you.

## Exempt/Non-Exempt Differences

12. **Why is there a difference in the rate at which CHOICE Time Off is earned between exempt and non-exempt employees?**
We provide a comprehensive, market-driven package for all employees. In reviewing market practices, we found competitive practice is different across these two employee groups.

**Exempt Employees Earnings Schedule**

RHI 0000148

| Years of Service | Total Number of CTO Days That Would Be Earned by Working an Entire Year (A pro-rata portion earned with each semi-monthly pay period) | Days and Fractions Thereof Employee Earns of CTO Per Pay Period | Maximum CTO Accrual In Days |
| --- | --- | --- | --- |

Exhibit E

# ROBERT HALF INTERNATIONAL, INC.
## CORPORATE EMPLOYEE EXEMPT ABSENCE RECORD

☐ Employee on LOA
☐ Final Absence Record
☐ Revised Absence Record

| Last Name, First Name, MI | Dept. # | Empl. ID | Period Beginning | Period Ending |
|---|---|---|---|---|
|  |  |  |  | #N/A |

### **Staff Payroll Use Only**

| | ADJ | BER | CTO | FLT | CAL | AMT | |
|---|---|---|---|---|---|---|---|
|  | 0.00 | 0.00 | 0.00 | 0.00 | - | $ - |  |

*Only complete the days for which actual time off has been taken*

| Date | Day of Week | Desc. | Hours | Total | On Call | Amt |
|---|---|---|---|---|---|---|
| 01/00/00 | Saturday |  |  | 0.00 |  | $ - |
| 01/01/00 | Sunday |  |  | 0.00 |  | $ - |
| 01/02/00 | Monday |  |  | 0.00 |  | $ - |
| 01/03/00 | Tuesday |  |  | 0.00 |  | $ - |
| 01/04/00 | Wednesday |  |  | 0.00 |  | $ - |
| 01/05/00 | Thursday |  |  | 0.00 |  | $ - |
| 01/06/00 | Friday |  |  | 0.00 |  | $ - |
| 01/07/00 | Saturday |  |  | 0.00 |  | $ - |
| 01/08/00 | Sunday |  |  | 0.00 |  | $ - |
| 01/09/00 | Monday |  |  | 0.00 |  | $ - |
| 01/10/00 | Tuesday |  |  | 0.00 |  | $ - |
| 01/11/00 | Wednesday |  |  | 0.00 |  | $ - |
| 01/12/00 | Thursday |  |  | 0.00 |  | $ - |
| #N/A | #N/A |  |  | 0.00 |  | $ - |
| #N/A | #N/A |  |  | 0.00 |  | $ - |
| #N/A | #N/A |  |  | 0.00 |  | $ - |
|  |  |  |  | 0.00 |  |  |

*If your employment terminates while you have a negative CTO balance, the amount you owe the company will be deducted from your final paycheck or any other amounts payable to you. By signing this absence record, you authorize any such deductions.*

| Employee Signature | Date | Supervisor Signature | Date |
|---|---|---|---|
|  |  |  |  |

RHI 0000105

## Staff Payroll
## Corporate Employee-Exempt Absence Record

*Be sure that you obtain a new absence record each pay period from BOBNet to ensure that you are using the most recent version of the absence record.*

*Your absence record must be signed and submitted to your Manager no later than the 1st day after the end of the pay period. Absence records must be submitted each pay period time is taken and must not be held on to for any reason.*

1. Employee on LOA/Final Absence Record/Revised Absence Record check boxes
   a. Employee on LOA-If this is your last absence record before going out on LOA, check this box.
   b. Final Absence Record-If this is your final absence record before ending your employment with RHI, check this box.
   c. Revised Absence Record-If this absence record is going to replace one previously submitted due to corrections, check this box. *Be sure that the period beginning date you select is for the period of the time sheet you are revising.*
2. Last Name, First Name, MI-Type your name in the following order:
   a. Last Name
   b. First Name
   c. Middle Initial if applicable
3. Department ID-Enter the 5 digit ID of the office you work in.
4. Employee ID-Enter your 6 digit employee ID.
5. Period Beginning-Select the pay period beginning date for which you are completing the absence record. For example, you are completing your absence record for the period ending 04/15/2003; you will need to select the pay period beginning date of 04/01/2003.
6. Desc.-Use this column (column E) if you have taken time off from work. Select the applicable code from the drop down menu:
   a. BER-Select for bereavement time taken. See the Benefits section of your employee handbook for guidelines.
   b. CTO-Select for CTO time taken. See the Benefits section of your employee handbook for guidelines.
   c. FLT- Select for an approved floating holiday. See the Benefits section of your employee handbook for guidelines.
   d. JUR-Select to receive Jury Duty pay. See the Benefits section of your employee handbook for guidelines.
   e. MIL-Select for time away from work to serve your military duty. See the Benefits section of your employee handbook for guidelines.
   f. UTO-Select for Unpaid Time Off. This code is only to be used when you have exhausted all of your available CTO time. The days indicated here will be docked from your next check.
7. Hours-This field (column F) is to be used in conjunction with the "Desc." column outlined in step 6 above. For each code you select from the drop down menu in the "Desc." column, you must indicate the number of hours used for the code selected. Remember that you may only enter time in full day increments; in most cases, this will be 8.
8. On Call-This field (column H) is to be used by those employees who qualify for the On Call plan. For each day you are on call, enter a 1 in this column. If you are unsure if you qualify for this plan, see your
9. Print your absence record, sign and date it, and submit to your Manager for approval.

RHI 0000106

Revised 02/17/04

Microsoft Excel - Time Sheet Exempt-Corp.xls

Enter time taken in full day increments

Incorrect entry for time taken

Enter On Call Days in increments of 1

| Date | Day of Week | Desc. | Hours | Total | On Call | Amt |
|------|-------------|-------|-------|-------|---------|-----|
| 06/16/03 | Monday | CTO | 8.00 | 8.00 | | $ - |
| 06/17/03 | Tuesday | | | 0.00 | 1 | $ 50.00 |
| 06/18/03 | Wednesday | | | 0.00 | | $ - |
| 06/19/03 | Thursday | BER | 8.00 | 8.00 | | $ - |
| 06/20/03 | Friday | BER | 8.00 | 8.00 | | $ - |
| 06/21/03 | Saturday | | | 0.00 | | $ - |
| 06/22/03 | Sunday | | | 0.00 | | $ - |
| 06/23/03 | Monday | FLT | 8.00 | 8.00 | 1 | $ 50.00 |
| 06/24/03 | Tuesday | CTO | 4.00 | 4.00 | | $ - |
| 06/25/03 | Wednesday | | | 0.00 | | $ - |

Exempt Absence Record  Absence Record Instructions

RHI 0000108

Revised 02/17/04

# ROBERT HALF INTERNATIONAL INC.
## EXEMPT EMPLOYEE TIME OFF REQUEST

Name: _____    Department/Location: _____    Employee Number: _____    Date Submitted: _____

CTO Available [_____]

Floating Holiday Available [_____]

**Select:** Month and Pay Period ▼

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----| |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total |
| | | | | | | | | | | | | | | | | 0.0 |

**Select:** Type of Request ▼

Your request has been:  ☐ Approved  ☐ Denied

*Time off without pay is subject to management approved based on business needs, it is not a guarantee.*

**Select:** Month and Pay Period ▼

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----| |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total |
| | | | | | | | | | | | | | | | | 0.0 |

**Select:** Type of Request ▼

Your request has been:  ☐ Approved  ☐ Denied

*Time off without pay is subject to management approved based on business needs, it is not a guarantee.*

**Select:** Month and Pay Period ▼

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----| |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Total |
| | | | | | | | | | | | | | | | | 0.0 |

**Select:** Type of Request ▼

Your request has been:  ☐ Approved  ☐ Denied

*Time off without pay is subject to management approval based on business needs, it is not a guarantee.*

I understand that if my employment terminates when I have negative CHOICE Time Off balance, the amount I owe the company will be deducted from my final paycheck, bonus check or any other amounts payable to me. I authorize any such deductions at the time of my termination by signing this Time Off Request.

Employee's Signature _____    Date _____

Manager's Signature _____    Date _____

Robert Half International Inc. 2004, all rights reserved.

(rev. 02/04)

RHI 000115

# ROBERT HALF INTERNATIONAL INC.
## EXEMPT EMPLOYEE TIME OFF REQUEST

| Step: | Completed By: |
|---|---|
| Initiate Time Off Request by accessing form. | Employee |
| Fill in box identifying available CTO/Floating Holiday. | Employee |
| Fill in your name, department, ID number. | Employee |
| Select the specific Pay Period of the requested time off by using the Period Beginning drop-down menu. The Period Ending date will automatically populate. | Employee/Form |
| Select the type of time off requested and enter the number of hours to be taken for that specific pay period. (Note: only one type of request can be used per line. For example, if you are using a floating holiday and CTO each type of request requires a separate entry.) | Employee |
| Exempt time is recorded and tracked in full-day increments. | Employee |
| Form will automatically calculate totals for each line request. | Form |
| Submit form to your manager/supervisor for approval. | Employee |
| Manager/Supervisor approves request by checking the approved/denied box located at the bottom of the form (under the total time requested box). | Manager/Supervisor |
| Manager/Supervisor signs the form and returns to employee. | Manager/Supervisor |
| Employee retains form. When time off has been taken, employee completes Exempt Absence Record. | Employee |

Robert Half International Inc. 2004, all rights reserved.

RHI 0000116

Exhibit F

Robert Half International, Inc.
720 Stoneridge Drive, Suite 3
Pleasanton CA 94588

| | | |
|---|---|---|
| Pay Group: | SAL-Salaried Employees | Check #: 0053747 |
| Pay Begin Date: | 08/16/2003 | Check Date: 08/20/2003 |
| Pay End Date: | 08/31/2003 | • On-line Check • |

| | | | |
|---|---|---|---|
| Ian E O'Donnell | Employee ID: 100548 | TAX DATA: | Federal | MA State |
| 1521 Washington St Apt #7 | Department: 02100-Boston, MA | Marital Status: | Single | Single |
| Boston MA 02118 | Location: MA BOSTON | Allowances: | 2 | 0 |
| | Pay Rate: 336,000.00 Annual | Addl. Pct.: | | |
| SN: 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 | | Addl. Amt.: | | |

## HOURS AND EARNINGS

| | | Current | | YTD | | TAXES | | |
|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD |
| Choice Time Off Payout | 17.307692 | 28.00- | 484.62- | 28.00 | 484.62 | Fed Withholding | 73.61 | 3,428.22 |
| Salary | | | 553.85 | 1,072.00 | 19,061.55 | Fed MED/EE | 13.88 | 360.00 |
| Salary Continuation-Term Only | | | 946.15 | | 946.15 | Fed OASDI/EE | 59.35 | 1,624.83 |
| Expense | | | 81.21 | | 366.38 | MA Withholding | 46.86 | 1,327.69 |
| Floating Holiday | | | 0.00 | 16.00 | 276.92 | | | |
| Bonus-US Monthly Field | | | 0.00 | | 4,653.22 | | | |
| Choice Time Off | | | 0.00 | 128.00 | 3,215.38 | | | |
| Total: | | 28.00- | 1,096.59 | 1,188.00 | 27,031.98 | Total: | 193.70 | 6,760.74 |

## BEFORE-TAX DEDUCTIONS / AFTER-TAX DEDUCTIONS / TAXABLE BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Pre-Tax Med-HMO | 42.00 | 336.00 | | | | GTL Basic Life | 0.00 | 2.40 |
| Pre-Tax Dental | 14.00 | 112.00 | | | | | | |
| Pre-Tax Vision | 2.00 | 16.00 | | | | | | |
| Total: | 58.00 | 464.00 | Total: | 0.00 | 0.00 | Total: | 0.00 | 2.40 |

## TOTAL GROSS / FED TAXABLE GROSS / TOTAL TAXES / TOTAL DEDUCTIONS / NET PAY

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 1,096.59 | 957.38 | 193.70 | 58.00 | 844.89 |
| YTD: | 27,034.98 | 26,207.00 | 6,760.74 | 464.00 | 19,810.24 |

| NET PAY DISTRIBUTION | |
|---|---|
| Check #0053747 | 844.89 |
| Total: | 844.89 |

☒ THIS DOCUMENT HAS MULTIPLE SECURITY FEATURES TO DETER FRAUD AND COUNTERFEITING INCLUDING AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW ☒

Robert Half International, Inc.
720 Stoneridge Drive
Suite 3
Pleasanton CA 94588

64-1378/0611    BANK OF AMERICA
Bank of America Customer Connection
Bank of America, N.A.
Atlanta, DeKalb Co. GA

Check No.
53747

Date: 08/20/2003     Pay Amount: $844.89 *******

Pay    ****EIGHT HUNDRED FORTY-FOUR AND 89/100 DOLLARS****

To The
Order Of

Ian E O'Donnell
1521 Washington St Apt #7
Boston, MA 02118

Department ID: 02100 Boston, MA

Signature Required for Check Over $10,000.00

⑈053747⑈ ⑈061112788⑈ 299797045⑈

RHI 0000032

## Term Worksheet
### Final Check/Overpayment

**Personal Information**

| Emp ID | 100548 | | Hire Date | 01/03/02 |
|---|---|---|---|---|
| Name | IAN O'DONNELL | | Term Date | 08/15/03 |
| Annual Rate | $36,000.00 | | Last Day | 08/06/03 |
| Semi Monthly | $1,500.00 | | | |
| Hourly | $17.307692 | | | |
| Standard Weekly Hours | 40 | SCT | 7 | |

**Onetime Deductions**

| Type | Amount | | Type | Amount |
|---|---|---|---|---|
| Medical | $42.00 | | 401K | $0.00 |
| Dental | $14.00 | | 401KLOAN | |
| Vision | $2.00 | | ADVPMT | |
| VLIFE1 | | | HCLUB | |
| PAIA2 | | Deduction Totals | EARN | |
| | | $58.00 | | |

**Earnings**

**Salary**

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Worked | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 4 | $553.85 |
| | | $138.46 | | |
| Total Payline Entry for SAL------->> | | | | $553.85 |

**Salary Continuation/Severance**

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Covered | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 7 | $946.15 |
| | | $138.46 | 0 | $0.00 |
| Total Payline Entry for SCT/SEV------->> | | | | $946.15 |

**CPY Payouts**

| Payroll End Date | Description | Total Hours | Total Amount Due |
|---|---|---|---|
| 07/31/03 | P/S Leave Accrual | -34.67 | |
| 08/15/03 | Accrual Amount | 6.67 | |
| | Accrual Amount | | |
| | Hours on Final T/S | | |
| Total CPY Hours Due-------->> | | -28.00 | ($484.62) |

| PROCESSOR: | MADELINE |
|---|---|
| DATE: | 8/13/03 |

**Special Adjustments**

| Payroll End Date | Adjustment Code | Hours | Rate | Total Amount |
|---|---|---|---|---|
| | ADJ | | $17.31 | $0.00 |
| | FLT | | $17.31 | $0.00 |
| | OVT | | $25.96 | $0.00 |
| 08/15/03 | EXP | 81.21 | $34.62 | $0.00 |
| | B01 | | $17.31 | $0.00 |
| | | | Total | $1,018.38 |

1096·59

NOTES:

34

Online Check Results

Home > Compensate Employees > Manage Payroll Process > Inquire > Online Results

New Window

| Online Results |

O'Donnell, Ian E

| ID: 100548 | | Page: | 56 |

Company: 005          Earnings:        1,096.59       Empl Rcd#:  0       Line:    1

Pay Group: SAL          Taxes:             193.76        Check #:

Pay Period End Date: 08/15/2003   Deductions:    58.00         Form ID:

Net Pay:           844.83                              On-line

| Confirm & Print |    | Delete |    | Review/Print |    | Change Data |

**Earnings**                                          Find | View 1    |< ☐ 1-4 of 4

| Begin Date: | 08/01/2003 | | End Date: | 08/15/2003 | | Hourly Rate: | | 17.30769 |
| | Rate Code | Hours | | Rate | Earnings | FLSA Rate: | |
| Regular: | | | | | | Shift/Rate: | N  / |
| Overtime: | | | | | | State: | MA |
| Reg Earns: | | | | | | Locality: | |
| Rate Used: | Hourly Rate | | | | | | |

Other Earnings                              Find | View All    |< ☐ 1 of 1 >|

| Code | Description | | Rate Code | Hours | Comp Rate Used | Amount |
|------|-------------|--|-----------|-------|----------------|--------|
| SAL | Salary | | | | | 553.85 |

| | 08/01/2003 | | End Date: | 08/15/2003 | | Hourly Rate: | | 17.30769 |
| | Rate Code | Hours | | Rate | Earnings | FLSA Rate: | |
| Regular: | | | | | | Shift/Rate: | N  / |
| Overtime: | | | | | | State: | MA |
| Reg Earns: | | | | | | Locality: | |
| Rate Used: | Hourly Rate | | | | | | |

Other Earnings                              Find | View All    |< ☐ 1 of 1 >|

| Code | Description | | Rate Code | Hours | Comp Rate Used | Amount |
|------|-------------|--|-----------|-------|----------------|--------|
| CPY | Choice Time Off Payout | | | -28.00 | 17.307692 | -484.62 |

| | 08/01/2003 | | End Date: | 08/15/2003 | | Hourly Rate: | | 17.30769 |
| | Rate Code | Hours | | Rate | Earnings | FLSA Rate: | |
| Regular: | | | | | | Shift/Rate: | N  / |
| Overtime: | | | | | | State: | MA |
| Reg Earns: | | | | | | Locality: | |
| Rate Used: | Hourly Rate | | | | | | |

Other Earnings                              Find | View All    |< ☐ 1 of 1 >|

| Code | Description | | Rate Code | Hours | Comp Rate Used | Amount |
|------|-------------|--|-----------|-------|----------------|--------|
| EXP | Expense | | | | | 81.21 |

RHI 0000042

| | 08/01/2003 | | End Date: | 08/15/2003 |

# Term Worksheet
## Final Check/Overpayment

### Personal Information

| Emp ID | 100548 | Hire Date | 01/03/02 |
|---|---|---|---|
| Name | IAN O'DONNELL | Term Date | 08/15/03 |
| Annual Rate | $36,000.00 | Last Day | 08/06/03 |
| Semi Monthly | $1,500.00 | | |
| Hourly | $17.307692 | | |
| Standard Weekly Hours | 40 | SCT | 7 |

### One-Time Deductions

| Type | Amount | | Type | Amount |
|---|---|---|---|---|
| Medical | $21.00 | | 401K | $0.00 |
| Dental | $7.00 | | 401KLOAN | |
| Vision | $1.00 | | ADVPMT | |
| VLIFE1 | | | HCLUB | |
| PAIA2 | Deduction Totals $29.00 | | GARN | |

### Earnings

#### Salary

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Worked | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 4 | $553.85 |
| 08/15/03 | 11 | $138.46 | -11 | $1,500.00 |
| Total Payline Entry for SAL------->>> | | | | ($946.15) |

#### Salary Continuation Severance

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Covered | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 7 | $946.15 |
| | | $138.46 | 0 | $0.00 |
| Total Payline Entry for SCT/SEV------->>> | | | | $946.15 |

#### CPY Payouts

| Payroll End Date | Description | Total Hours | Total Amount Due |
|---|---|---|---|
| 07/31/03 | P/S Leave Accrual | -34.67 | |
| 08/15/03 | Accrual Amount | 6.67 | |
| | Accrual Amount | | |
| | Hours on Final T/S | | |
| Total CPY Hours Due------->>> | | -28.00 | ($484.62) |

#### Preset Adjustments

| Payroll End Date | Adjustment Code | Hours | Rate | Total Amount |
|---|---|---|---|---|
| | ADJ | | $17.31 | $0.00 |
| | FLT | | $17.31 | $0.00 |
| | OVT | | $25.96 | $0.00 |
| | EXP | | $34.62 | $0.00 |
| | B01 | | $17.31 | $0.00 |
| | Total | | | ($484.62) |

| PROCESSOR: | MADELINE |
|---|---|
| DATE: | 8/13/03 |

NOTES:

RHI 0000044

# Exhibit G

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

This is a court-authorized notice and is not a solicitation from a lawyer.
The Court has made no finding as to the merits of the case at this time.

If you are or were employed as a salaried employee (i.e., classified as exempt from overtime pay) by Robert Half International, Inc., and/or Robert Half Corp. (collectively, "Robert Half"), in any state except California, a collective action lawsuit may affect your rights.

Former employees (the "Plaintiffs") have sued Robert Half in federal court in Massachusetts, alleging that Robert Half improperly classified them as overtime-exempt employees and deprived them of overtime pay. The Plaintiffs claim that Robert Half owes them overtime pay at one and one-half times their normal hourly wage for all hours they worked in excess of forty (40) hours per week during their employment with Robert Half. The case name is Ian O'Donnell, et al., v. Robert Half International, Inc., and Robert Half Corp., Civil Action No. 04-12719-NMG.

The Court has permitted the Plaintiffs to send Notice to all similarly situated current and former employees so that they may be permitted to "opt in" to, or join, this lawsuit to assert their similar legal rights.

The Court has not yet decided whether Robert Half has done anything wrong. There is no money available now, and there are no guarantees that there will be. However, you have the choice to assert your legal rights in this case. If you do, federal law prohibits Robert Half from firing or discriminating against you for exercising your rights under the FLSA.

**YOUR LEGAL RIGHTS AND OPTIONS**

<u>Do Nothing</u>: Do Nothing. Lose Nothing (except resulting from the passage of time). By doing nothing, you retain your legal rights to bring a separate suit against Robert Half for unlawful failure to pay overtime. If money or benefits are later awarded in this case, you will not share in them.

---

<u>Ask to Be Included</u>: Complete the Opt-In Consent Form. By "opting in," you gain the possibility of getting money or benefits that may result from a trial or settlement, but you give up the right to sue Robert Half separately for the same claims brought in this lawsuit.

---

Your options are included in this Notice. To opt-in, you must complete the Opt-In Consent Form and forward it to the attorney designated in the Notice on or before _____. If you have any questions or concerns, please contact:

Shannon Liss-Riordan, Esq.
Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
617-367-7200
sliss@prle.com

OPT-IN CONSENT FORM

Ian O'Donnell, et al., v. Robert Half International, Inc., and Robert Half Corporation,
Civil Action No. 04-12719-NMG

Complete and Mail to:    Shannon Liss-Riordan, Esq.
Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108

Name: _____ S.S.# (optional): _____

Address: _____

Telephone: _____ (home) _____ (work) _____ (cell)

E-Mail: _____

CONSENT TO JOIN COLLECTIVE ACTION
Pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b)

1.    I consent and agree to pursue my claims arising out my employment at Robert Half in connection with the above-referenced lawsuit.

2.    I work/worked in the position(s) of _____ from on or about _____ (month, year) to on or about _____ (month, year).

3.    During the above time period, Robert Half paid me strictly on a salary basis and did not pay me overtime pay at one and one-half my usual hourly wage for my hours worked in excess of forty (40) hours per week.

4.    I understand that this lawsuit is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. I hereby consent, agree, and "opt in" to become a plaintiff herein and to be bound by any judgment by the Court or any settlement of this action.

5.    I hereby designate Shannon Liss-Riordan, Esq., of Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108 (Plaintiffs' Counsel), to represent me for all purposes in this action.

6.    I also designate the named plaintiffs in this action, the collective action representatives, as my agents to make decisions on my behalf concerning the litigation, including the method and manner of conducting this litigation, entering into settlement agreements, entering into an agreement with Plaintiffs' Counsel concerning attorneys' fees and costs (with the understanding that Plaintiffs' Counsel are being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fees), and all other matters pertaining to this lawsuit.

Signature: _____ Date Signed: _____
Print Name: _____

**NOTE**
Statute of limitations concerns mandate that you return this form
as soon as possible in order to preserve your rights.