## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
IAN O'DONNELL, DAVID JOLICOEUR,     )
AND STACEY MOORE, on behalf of      )
themselves and all others similarly situated,  )
                                    )
                    Plaintiffs,     )
                                    )      CIVIL ACTION NO.  04-CV-12719 NMG
v.                                  )
                                    )
ROBERT HALF INTERNATIONAL INC.      )
AND ROBERT HALF CORPORATION,        )
                                    )
                    Defendants.     )
                                    )
```

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFFS' RENEWED MOTION TO FACILITATE § 216(b) NOTICE

Defendants Robert Half International Inc. and Robert Half Corporation (together "RHI"

or the "Company") submit this memorandum in opposition to Plaintiffs' Renewed Motion to

Facilitate § 216(b) Notice ( "Renewed Motion").[1]  This Court denied Plaintiffs' <u>first</u> Motion to

Facilitate § 216(b) Notice ("Initial Motion") because Plaintiffs were unable to present any

evidence that members of the putative class were similarly situated or that any putative class

members were interested in participating in the litigation.  Having taken no additional discovery,

Plaintiffs now seek conditional certification of a much broader class of potentially several

---

[1] Plaintiffs filed their Renewed Motion prior to the Court's ruling on their initial Motion to Facilitate § 216(b) Notice ("Initial Motion").  While their Initial Motion sought certification of a single class based on the duties test of the Fair Labor Standards Act ("FLSA"), their Renewed Motion seeks to certify both a class based on the FLSA duties test and a class based on the FLSA's salary basis test.  On March 30, 2006, the Court denied Plaintiffs' Initial Motion in its entirety on the grounds that the evidence Plaintiffs proffered in support of their motion to certify a duties class was insufficient to show that members of the putative class were similarly situated.  Since the Court's ruling, Plaintiffs have offered no additional evidence in support of a class based on the duties test.  Therefore, this Opposition addresses only Plaintiffs' arguments regarding conditional certification of a class based on the salary basis test.

thousand employees including RHI's entire salaried exempt workforce, but still offer <u>no</u> evidence that members of the enlarged putative class are similarly situated or interested in participating in the litigation. Almost <u>seventeen</u> months into the case, only <u>one</u> putative class member has expressed interest in joining the litigation. Ignoring the standard articulated in this Court's March 6, 2006, Memorandum and Order, Plaintiffs again argue for the application of an overly lenient standard for conditional class certification, one which they claim permits them to offer unsupported allegations and virtually no evidence to satisfy their burden. Plaintiffs have failed to offer admissible evidence of any salary basis test violation that they could assert on their own behalf, much less a violation that they could pursue in a representative capacity. Pursuant to the standard articulated by this Court, RHI's evidence conclusively refutes the speculation and assumptions offered by Plaintiffs as "evidence" in support of their Renewed Motion, and compels denial of that Motion. Certification of such a massive class would impose a substantial burden on RHI and would be a pointless waste of economic and judicial resources. The Court should not sanction such an abuse of the judicial process.

## FACTUAL BACKGROUND

### I.    RHI and its Business

RHI is a specialized staffing company, providing services on a temporary, project, and full-time basis to its clients through several divisions. Accountemps, the only division in which Plaintiffs Ian O'Donnell ("O'Donnell") and David Jolicoeur ("Jolicoeur") worked, provides experienced accounting and finance services on a temporary basis to client companies.[2] The Creative Group, the only division in which Plaintiff Stacey Moore[3] ("Moore") worked, provides

---

[2] RHI has several other divisions, each of which provides staffing services in a different specialized industry or field. Affidavit of Ken Gitlin ("Gitlin Aff."), ¶ 3 (attached as Exhibit A).

[3] Moore was recently added as a plaintiff, pursuant to Plaintiffs' Second Amended Complaint.

2

creative, web, marketing, and advertising services on a freelance basis.

RHI has more than 260 offices throughout the United States.  Affidavit of Linda Blandford-Beringsmith ("Blandford-Beringsmith Aff."), ¶ 5 (attached as Exhibit B).  The Company's field branch offices are grouped into 82 Regions, each overseen by a Regional Manager.  Gitlin Aff., ¶ 4.  The Regions are organizationally combined into 14 Districts, each managed by a District Director.  *Id.*  RHI has grouped the Districts into four geographic zones: an Eastern Zone, a Central Zone, a Western Zone, and an International Zone.  *Id.*  Throughout their employment, each of the Plaintiffs worked in the New England District, within the Eastern Zone.  First Affidavit of William T. Hayes ("First Hayes Aff."), ¶ 4 (attached as Exhibit C).

## II.    Plaintiffs' Employment History with RHI

RHI hired O'Donnell as an Accountemps Staffing Manager, effective January 3, 2002.  First Hayes Aff, ¶ 2.  He initially worked in RHI's Danbury, Connecticut office, and transferred to the Westborough, Massachusetts office on or about July 1, 2002.  *Id.*  On February 1, 2003, he transferred to the Boston, Massachusetts office, and resigned from RHI on August 16, 2003.  *Id.*  He remained an Accountemps Staffing Manager throughout his employment.   The Westborough and Boston offices are overseen by the same Regional Manager.

RHI hired Jolicoeur as an Accountemps Staffing Manager on July 22, 2002.  First Hayes Aff., ¶ 3.  He was promoted to Senior Staffing Manager on July 16, 2003. *Id.*  He resigned his employment two months later, on September 20, 2003.  *Id.*  Throughout Jolicoeur's tenure with RHI, he worked in the Company's Accountemps division at its Boston office.

RHI hired Moore as a Creative Group Account Manager on May 19, 2003. Third Affidavit of William T. Hayes ("Third Hayes Aff."), ¶ 2 (attached as Exhibit D).   She resigned her employment less than ten months later, on February 2, 2004. *Id.*  Throughout Moore's tenure with RHI, she worked in the Company's Creative Group division at its Boston office. *Id.*

3

As exempt employees pursuant to the FLSA's administrative exemption, all Plaintiffs were paid a salary and were not eligible for overtime pay.

### III.    RHI's Choice Time Off Benefit

RHI's "CHOICE Time Off" ("CTO") benefit includes what employers commonly refer to as vacation days, sick days, and other personal days off. Blandford-Beringsmith Aff., ¶ 2. The Company maintains CTO "banks" for employees that track accrued days off. *Id.* RHI employees accrue CTO leave on an incremental basis throughout the year according to a schedule. *Id.*

Each employee's manager makes an individualized decision as to how the time off is recorded and whether any CTO is deducted from a particular employee's bank. Blandford-Beringsmith Aff., ¶ 3. In this way, each manager exercises his or her discretion in determining how to apply the CTO policy in individual circumstances. *Id.* For example, a manager may allow an employee to take time off for personal reasons without any deduction from his or her CTO bank. *Id.*

Partial-day deductions from CTO are not permitted under the policy. *Id.* Generally, an exempt employee who leaves work because of illness after working a substantial part of the day is not required to use CTO for that time. *Id.* If approved by the employee's individual supervisor, an exempt employee may borrow up to five days of CTO, which are only advanced in full-day increments, before the time is actually earned. Blandford-Beringsmith Aff., ¶ 4. If the Company allows an employee to borrow CTO time and the employee terminates before earning the CTO, the Company may deduct the amount owed from the employee's final paycheck, subject to the manager's discretion. *Id.*

### IV.    Plaintiffs' Class Allegations

Plaintiffs claim that (1) the CTO policy set forth in RHI's employee handbook might, in

some circumstances, give rise to a violation of the salary basis test if certain deductions were made from an employee's final pay after he or she took leave in excess of the accruals in his or her CTO bank, and (2) RHI's policy violates the salary basis test by creating an incentive for employees to take off a full day of work even if available to work a partial day.  *See* Second Amended Complaint ¶¶ 51, 52, 59, 60.  Plaintiffs argue in their Renewed Motion that the Court should conditionally certify this case as a collective action pursuant to 29 U.S.C. § 216(b) and issue notice of the pending action to a massive group including <u>all salaried employees</u> employed by RHI in the three years preceding the date on which they filed the Complaint.  RHI's exempt workforce includes a diverse group of employees including, *inter alia*, positions ranging from Division Directors and Branch Managers to corporate Vice Presidents and even high-level company officers. Blandford-Beringsmith Aff., ¶ 6.  Plaintiffs argue that they have met their burden of showing that they are similarly situated to the potential class members, in that they allegedly were subject to a common policy or plan that purportedly violated the law.  In support of their Motion, O'Donnell, Jolicoeur, and Moore submitted affidavits ("O'Donnell Aff.," "Jolicoeur Aff.," and "Moore Aff.") stating their unfounded <u>belief</u> that "many [other employees] would be interested in participating in this litigation."  O'Donnell and Jolicoeur Affs., ¶ 20; Moore Aff. ¶ 22.  The affidavits submitted by O'Donnell and Jolicoeur make no mention of the CTO policy, deductions from paychecks, or forced absences.  Moore's affidavit includes allegations that her supervisors urged her to take full days off as opposed to partial days, but her affidavit does not allege facts that would substantiate a claim of a violation of the FLSA's salary basis test. Moore Aff. ¶ 23.  Specifically, she does not claim there were ever any improper deductions from her paycheck or that she ever actually took a full day off when she was prepared to work part of that day.  None of the affidavits present any evidence that putative class members

5

were subject to unlawful pay deductions.

## ARGUMENT

The Court should deny Plaintiffs' Renewed Motion for several reasons. First, Plaintiffs have mischaracterized the legal standard applicable to conditional certification of FLSA collective actions, arguing in favor of an even more lenient standard than this Court applied in denying Plaintiffs' Initial Motion. Second, Plaintiffs have again failed to make any showing whatsoever that members of the putative class are similarly situated, an essential prerequisite to certifying any collective action. Third, just as in their Initial Motion, Plaintiffs have failed to show that any members of the vast putative class have any interest in joining this action, and the fact that they have managed to recruit only one individual to join this case since its inception seventeen months ago shows that there is no such interest. Finally, Plaintiffs' proposed notice is misleading and inappropriate.

**I.    Plaintiffs Have Not Shown that They Are Similarly Situated to Members of the Putative Class.**

Plaintiffs seek conditional certification of this matter as a collective action under the two-tiered approach to class certification in § 216(b) collective action cases.[4] This Court has adopted a two-tiered approach for determining whether an FLSA case is appropriate for class treatment that examines whether certification would facilitate efficient case management. *See* March 30, 2006, Memorandum & Order ("Order"), p. 4 ("In *Kane*, this Court endorsed a 'two-tiered' approach to determining whether named plaintiffs and putative class members are similarly situated"); *Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212 (D. Mass. 2001). In the first

---

[4] This Court recognized that Plaintiffs' Initial Motion was in fact a motion for conditional certification in its March 30, 2006, Memorandum & Order, pp. 4-6. *See also Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995) (referring to the conditional certification stage as the "notice stage") (citing *Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 352 (D. N.J. 1987).

BO1 15773099.4

step, often called the "notice stage," the Court decides whether to authorize notice of the pendency of the case to potential class members. *Bayles v. Am. Med. Response of Colorado, Inc.*, 950 F. Supp. 1053, 1066 (D. Colo. 1996). In the second step, the Court determines whether it is appropriate for the case to proceed as a collective action "after discovery is largely complete and the case is ready for trial." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir. 2001); *see also Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497 (D. N.J. 2000). This case remains at the "notice stage" of the process.

### A.    Plaintiffs misconstrue their burden of proof.

Plaintiffs argue that, in order to meet their burden in moving for conditional certification, they "need only demonstrate that there may be other current and former employees of Defendants who are similarly situated in that they are or were (1) salaried, (2) not paid overtime, and (3) subject to Defendants' company-wide CTO policies…." Renewed Motion, p. 18. This argument misconstrues the cases on which they rely and ignores this Court's earlier ruling, as well as a multitude of other cases, requiring Plaintiffs to make some substantial factual showing at the conditional certification stage.

Plaintiffs continue to argue that their burden is virtually nonexistent at this stage of certification, despite the fact that the Court has <u>repeatedly</u> attempted to disabuse them of this notion. At the Scheduling Conference held on August 19, 2005, the Court stated that "the standard that I adopt… in the *Kane* case… wasn't as lenient as you might imagine." Trans. 12: 2-5. In its Order denying Plaintiffs' Initial Motion, the Court also recognized that Plaintiffs' burden is more substantial than Plaintiffs suggest when it found that Plaintiffs had "overreached in their motion for conditional certification" because their arguments were based on assumptions

and unsubstantiated personal beliefs.[5] Order, pp. 5-8.  The Court also expanded upon the

standard it adopted in *Kane*, which Plaintiffs have cited and quoted extensively, explaining that

the *Kane* plaintiffs sought certification of a small, discrete class of specified individuals. By

contrast, in this case, Plaintiffs once again seek certification of a class that "would number in the

thousands, would include unidentified individuals in different departments and locations and

would involve those working under different management." Order, p. 7.  In essence, Plaintiffs

again argue that they are required to make no factual showing at all to support their claim that

members of the putative class are similarly situated, notwithstanding the substantial burden they

seek to impose on the Court and RHI.

    Many courts, including this Court, have consistently noted that plaintiffs can show that

putative class members are similarly situated by providing evidence that members of the putative

class "were subject to a single decision, policy, or plan *that violated the law*."  *Kane*, 138 F.

Supp. 2d at 214 (emphasis added) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14

(5th Cir. 1995)).  Plaintiffs' mere <u>allegation</u> that the CTO policy applies to all exempt employees

does not suffice.  Plaintiffs must provide some evidence that all salaried employees were *actually*

*subject* to a common policy and that the plan or policy *violated the law*.  Here, they fail to do so.[6]

---

[5] As this Court previously ruled, and consistent with a substantial body of case law, Plaintiffs must support a claim that the members of the group they seek to represent are similarly situated with a factual showing before they can prevail on a motion for conditional class certification. *See* Order, pp. 5-7; *see also Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004) (to justify conditional certification, plaintiffs "must make some rudimentary showing of commonality between the basis for [their] claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions.") (collecting authorities); *Levinson v. Primedia Inc.*, 2003 U.S. Dist. LEXIS 20010, *4-5 (S.D.N.Y.) (denying motion to notify potential class members where plaintiffs "failed to make a sufficient showing" of improper treatment of other employees); *Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 519-20 (D. Md. 2000) (holding plaintiffs are required to make a preliminary factual showing that a similarly situated group of potential plaintiffs exists); *Michaelson v. Arrow Transp. Co.*, 1997 U.S. Dist. LEXIS 23665, *2-3 (D. Ore.) (denying certification and notice to class members where plaintiff failed to provide supporting affidavits regarding challenged policy or practice).  Plaintiffs are therefore required to offer admissible evidence that they are similarly situated to members of the putative class in order to meet their burden of proof in moving for conditional certification of this case as a collective action.

[6] *See* discussion *infra* Part I.B.1.

**B.    Plaintiffs have offered no evidence that they are similarly situated to members of the putative class, under the legal standard applied by this Court.**

First, Plaintiffs cannot meet their burden of demonstrating that the putative class members are subject to a common policy or plan that violates the law because they offer no evidence to support their claim that the CTO policy, as applied to Plaintiffs, actually gave rise to a violation of the FLSA's salary basis test.  Second, even if Plaintiffs could show that the CTO policy as applied to them violated the law (and they cannot), they offer nothing more than rank speculation in support of their claim that members of the class they seek to represent were similarly subject to purported violations of the salary basis test.  As with their Initial Motion, Plaintiffs have failed to provide <u>any</u> evidence that the members of  the potentially massive and diverse group they seek to represent are similarly situated.

Plaintiffs claim that they meet their burden of demonstrating that similarly situated employees exist by merely alleging that the putative class members were all subject to RHI's CTO policy. Renewed Motion, p. 18.  Plaintiffs unconvincingly argue that the CTO policy violates the salary basis test because RHI's employees theoretically could work for partial days but have full-day deductions taken from their leave banks.  As further discussed below, to establish a putative violation of the salary basis test as to any individual on the theory they posit, Plaintiffs must show both that (1) deductions were taken from the individual's CTO leave banks for partial-day absences, <u>and</u> (2) that a deduction was taken from that individual's final pay.  None of the Plaintiffs can make such a showing.  They present no evidence to establish that even a single such deduction – from an individual's CTO bank or from that individual's final pay – occurred.

1.    **Plaintiffs offer no evidence to support their claim that the CTO policy, as applied to them, ever gave rise to a violation of the salary basis test.**

Plaintiffs offer O'Donnell's final paycheck, attached to their Renewed Motion, as evidence that an impermissible deduction was taken. Renewed Motion, Exhibit F. However, Plaintiffs offer no evidence (and do not allege) that O'Donnell ever had a full day deducted from his CTO bank when he worked a partial day.[7] Further, full-day deductions from leave banks for full-day absences are permissible under the FLSA. Plaintiffs themselves repeatedly cite language from the regulations and caselaw stating that deductions <u>are allowed</u> when taken from leave bank for absence for <u>one or more full days</u>. Renewed Motion, pp. 8-10. RHI's CTO policy clearly states that only full day deductions will be taken from an employee's leave bank. Plaintiffs' hypothetical scenarios and sheer speculation fall far short of establishing evidence of even a single instance in which any employee of RHI worked a partial day but had a full-day deduction taken from his or her CTO bank.

Moore cannot show that there was a deduction from her final pay because there was none. Her affidavit contains factual allegations that her "supervisors would urge [her] to take the whole day off" when she asked for "part of a day off" and that she was charged a full day of CTO for two half-day absences. Moore Aff., ¶ 23. However, even if true, these alleged facts do

---

[7] To the extent that Plaintiffs seek to argue that the deduction is *per se* evidence of a violation because RHI's policy of recouping "borrowed" CTO time from an employee's final paycheck (*i.e.*, where the employee had insufficient CTO time available and RHI advanced the time to the employee) violates the salary basis test, this argument fails. The FLSA's regulations permit recovery of full-day leave advances, where the leave is covered by Section 541.02(b) exceptions. *See* 69 Fed. Reg. 22,178 (2004) (recovery for full-day leave is permissible if such leave is covered by one of the § 541.602(b) exceptions); *see also* 29 C.F.R. § 541.602(b) (exceptions to prohibition against deductions for pay in salary basis requirement include, *inter alia*, absences for one or more full days due to personal reasons, sickness or disability, disciplinary suspensions for violations of work conduct rules, leave under the Family and Medical Leave Act, etc.). Here, because any deductions from the CTO bank are in full-day increments per RHI's policy, and an employee may utilize CTO time for personal, medical or other similar reasons, such deductions from the final paycheck would not violate the salary basis test. *See* CTO Policy, p. 11; *see also*, *U.S. Dept. of Labor Wage & Hour Opinion Letter FLSA2004-17NA, dated October 6, 2004*, 2004 WL 3177901 (negative leave balances can be recouped from employees if they have been informed of the unearned vacation time policy, since the amount of wages advanced as paid vacation is similar to a bona fide loan) (attached as Exhibit E).

10

not give rise to a violation of the salary basis test.  Even if RHI had made partial-day deductions

from Moore's or other employees' CTO banks, that practice would not violate the salary basis

test.  Plaintiffs cite *Caperci v. Rite Aid* for the proposition that partial-day deductions destroyed

exempt status, but *Caperci* deals with deductions from pay, and does not apply to deductions

from leave banks. 43 F.Supp.2d 83 (D. Mass. 1999).  The Department of Labor clearly

distinguishes between improper partial-day deductions from salary, and permissible partial-day

deductions from a leave bank.  *See U.S. Dept. of Labor Wage & Hour Opinion Letter FLSA2005-*

*7, dated January 7, 2005*, 2005 WL 330606 (partial-day or full-day deduction from leave banks

allowed because "the one or more full-day deduction requirement applies to deductions from an

employee's salary, as opposed to a leave bank.") (emphasis in original) (attached as Exhibit F).

　　　　As stated above, Moore alleges that she received one full-day deduction from her CTO

bank for two half-days off in July 2003.  However, regardless of any time off that Moore may

have taken or of any conversations that she may have had with her supervisors, the undisputed

evidence shows that no time was deducted from Moore's CTO bank in July 2003 as she claims.[8]

If she took the two half-days off as she claims, she received them for free, without any reduction

in her available paid leave.  In addition, RHI's documents conclusively show that, regardless of

what deductions were made from her leave bank, no deductions were taken from her final pay.[9]

*See* Moore's final paystub, dated February 3, 2004 (attached as Exhibit B to Pratt Aff.)  In fact,

in her final paycheck, Moore received payment for twelve hours of accrued CTO time. *Id.*  It is

clear, therefore, that there was no violation of the FLSA's salary basis test with regard to Moore.

---

[8] Moore states that she received the full-day deduction "in or about July 2003." Moore Aff., ¶ 23.  The undisputed evidence shows that no time was deducted from her CTO bank in June, July, or August. *See* Moore's paystubs from June through August 2003 (attached as Exhibit A to the Affidavit of Krista Green Pratt ("Pratt Aff.")).

[9] As noted above, Plaintiffs do not even allege that such deductions were taken from Moore's final pay.

Plaintiffs further allege that RHI's CTO policy violates the salary basis test by "forcing" employees like Moore, who would be willing and able to work a partial day, to be absent from work for the full day. According to Plaintiffs, "[t]hese full-day deductions from employees who would have worked for partial days constitute deductions from salary for 'absences occasioned by the employer,' and therefore, Salaried Employees subject to the CTO policy are 'not paid on a salary basis,' as required by the FLSA." Second Amended Complaint, ¶ 59. First, Plaintiffs present no evidence whatsoever that RHI imposes "forced" absences on any employee, including Moore.[10] Second, even if Plaintiffs could demonstrate such absences, they would not provide evidence of a violation of the FLSA's salary basis test because (1) the salary basis test only pertains to deductions from an employee's <u>salary</u> for absences occasioned by the employer; (2) an employer may require that employees debit their leave banks when they are absent from work regardless of whether the absence is employer-occasioned; and (3) an absence from work for personal reasons is not an employer-occasioned absence, and an employer may take deductions from an employee's salary or leave bank when the employee is absent for personal reasons. *See U.S. Dept. of Labor Wage & Hour Opinion Letter dated October 24, 2005*, 2005 WL 3308612 (even during office closures due to inclement weather, an employer may direct exempt staff to take leave bank deductions without jeopardizing the employees' exempt status, since "there is no prohibition on an employer giving vacation time and later requiring that such vacation time be taken on a specific day(s)") (attached as Exhibit G); *U.S. Dept. of Labor Wage & Hour Opinion*

---

[10] Moore makes several allegations in her affidavit that are apparently intended to evidence "forced" absences. They do nothing of the sort. Moore's affidavit states that "[w]henever I would ask to take part of a day off, my supervisors would urge me to take the whole day off, and this usually discouraged me from taking any time off at all" and that, when she wanted to take two half days off, "my supervisors said something to the effect that I 'should just take both days off' and charge them to my paid leave." Moore Aff. ¶ 23. Even if true, neither of these statements provides evidence of "forced" absences. To the contrary, Moore alleges that, despite her supervisors' suggestions that she take both days off when moving, she chose not to do so and worked for half-days regardless of RHI's CTO policy. *Id.* She similarly claims that, instead of "forcing" her to take time off, the policy usually resulted in her not taking any time off.

*Letter dated February 16, 2001*, 2001 WL 1558766 (when an employee is absent from work for personal reasons, employer may deduct full or partial day from leave bank; in addition, employer may deduct from salary for full day absences for personal reasons) (Exhibit H).

  2. **Plaintiffs offer no evidence to support their claim that members of the putative class were subject to a common plan or policy that violated the law.**

  Even if Plaintiffs were able to show that the CTO policy as applied to them violated the law, they would still fail to meet their evidentiary burden because they offer nothing more than speculation in support of their claim that members of the class they seek to represent were subject to alleged violations of the salary basis test. Plaintiffs cite no evidence that the CTO policy itself violates the salary basis test; they speculate that <u>if it were applied in a certain way</u>, it would violate the salary basis test. The policy is applied by local managers exercising their own judgment and discretion. *See* RHI Employee Handbook: CHOICE Time Off, attached as Exhibit D to Renewed Motion, p. 10 (bates labeled RHI 0000148). Even if Plaintiffs' speculation that the deduction from O'Donnell's paycheck constituted a violation of the salary basis test, that fact would establish at most one violation occasioned by one manager, in one location, and in one division. Moore's allegations that <u>her supervisors</u> urged her to take full days off instead of partial days also illustrates that the application of the policy depends on local management and does nothing to establish that the putative class members are similarly situated. *See* Moore Aff., ¶ 23. In the Order denying Plaintiffs' Initial Motion, this Court stated that "one cannot merely assume, as the plaintiffs have here, that RHI employees throughout the country and corporate structure were subject to same 'policy' of an allegedly improper exemption. Plaintiffs need to show more." Order, p. 7. Plaintiffs have done no better in their Renewed Motion. It is not enough for Plaintiffs to show that they had deductions taken from their final paychecks (which may or may not have given rise to a violation); they must demonstrate that other putative class

13

members were subject to similar violations of the salary basis test.

Plaintiffs present no evidence that violations of the salary basis test were widespread or numerous. Plaintiffs do not even allege, and have no basis for personal knowledge of, impermissible deductions from leave banks or paychecks of other putative class members. At all times pertinent to this case, all Plaintiffs worked for RHI exclusively in Massachusetts.[11] All of the offices in which O'Donnell, Jolicoeur, and Moore worked were in the same District under the supervision of the same District Director, William Hayes. First Hayes Aff., ¶ 1. In its Order denying Plaintiff's Initial Motion based on alleged duties test violations, this Court stated that Plaintiffs were "purporting to speak generally for all...employees, but offer no justification for doing so." Order, p. 6. The same statement applies with even greater force to Plaintiffs' salary basis test claims in their Renewed Motion. Plaintiffs purport to speak for an extremely large and diverse group of employees who are employed in different divisions, report to numerous different managers, and work in many locations throughout the nation, without any evidence that the CTO policy resulted in any violations of the salary basis test.

In arguing that RHI's CTO policy violates the FLSA's salary basis test and that the Court should, therefore, conditionally certify a class, Plaintiffs rely heavily on *Sholtisek v. Eldre Corp.* 229 F.R.D. 381 (W.D.N.Y. 2005). This case, however, is inapposite for several reasons. First, *Sholtisek* involved deductions from <u>pay</u>, not deductions from a leave bank. *Id*. at 388. Second, the plaintiff in that case demonstrated that other putative plaintiffs were interested in participating; fifteen opt-in notices had already been filed by the time the court certified a class. *Id*. at 389. Third, the plaintiff submitted evidence, in the form of affidavits and <u>numerous</u>

---

[11] O'Donnell worked in the Company's Danbury, Connecticut, office for a short period of time at the beginning of his tenure with RHI. *See* Supplemental Affidavit of William T. Hayes ("Second Hayes Aff."), ¶ 2 (attached as Exhibit I). However, the few months that he worked in Connecticut are outside the statute of limitations applicable to his claims.

timecards, indicating that the deductions in wages were widespread. *Id.* at 389-390. Plaintiffs

citations to *Sholtisek*, therefore, only serve to illustrate the degree of their own shortcomings in

failing to substantiate the basis for their Renewed Motion.

      In sum, Plaintiffs' unsupported allegations in their unsworn Second Amended Complaint

fail to meet even the most lenient burden of proof and fall far short of satisfying their burden as

established by this Court. As with Plaintiffs' failed Initial Motion, beliefs and speculation are

not sufficient to justify conditional class certification. *See Nisenbaum v. Milwaukee County,* 333

F.3d 804, 810 (7th Cir. 2003) ("Allegations in a complaint are not evidence."); *Horne v. United*

*Servs. Auto. Ass'n,* 279 F. Supp. 2d 1231 (M.D. Ala. 2003) (statement in affidavit in support of

certification that plaintiff "believes" that other similarly situated employees exist is not

sufficient); *Hall v. Burk, M.D.*, 2002 WL 413901, *2 (N.D. Tex.) ("Unsupported assertions of

widespread violations are not sufficient to meet Plaintiff's burden."); *Camper*, 200 F.R.D. at 519

(D. Md. 2000) ("Mere allegations in the complaint are not sufficient; some factual showing by

affidavit or otherwise must be made") (collecting authorities). Plaintiffs' unsupported

allegations are therefore insufficient to show that they are similarly situated to members of the

putative class they seek to represent.

**II.**    **Plaintiffs have not shown that putative class members are interested in joining this**
       **case.**

      In addition to showing that members of the putative class are similarly situated, Plaintiffs

must show that members of the putative class are interested in participating in the litigation to

justify conditional certification of a class.[12] This Court recognized the importance of this factor

---

[12] *See, e.g., Rodgers v. CVS Pharmacy Inc.*, No. 8:05-CV-770-T-27MSS, 2006 WL 752831, slip op. at 8 (M.D. Fla. March 23, 2006) ("Plaintiffs' unsupported beliefs and expectations that other *may* desire to opt in are insufficient to justify certification of a collective action and a notice to a potential class.") (emphasis in original) (attached as Exhibit J); *Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447, *31 (C.D. Cal.) (denying conditional certification of class in part because plaintiffs failed to show that any members of the putative class were likely to assert similar claims); *Horne*, 279 F. Supp. 2d at 1236 (holding that before conditionally certifying an FLSA

in its March 6, 2006, Memorandum & Order, stating that Plaintiffs "have failed to demonstrate that any of the putative class members are interested in joining the suit." Order, p. 8. This case has been pending for one and a half years, and Plaintiffs have presented no evidence that members of the class are interested in joining this case. Indeed, almost seventeen months into the case, only one additional plaintiff has expressed interest in joining the litigation.[13] Plaintiffs, therefore, still cannot meet their burden of showing an interest among the putative class members in participating in this litigation.

Plaintiffs have offered no evidence of interest in the salary basis test putative class. The Court denied in its entirety Plaintiffs' Initial Motion based on the FLSA duties test, and the allegations in Plaintiffs' affidavits are irrelevant to the issue of certification of a class based on the salary basis test. All three affidavits refer to employees "in similar positions with similar duties" who "regularly worked in excess of forty (40) hours in a work week" and who "complain[ed] that we were all working too many hours without being sufficiently compensated for them." O'Donnell and Jolicoeur Affs., ¶ 20; Moore Aff. ¶ 22. They do not allege knowledge of employees who had deductions taken from their CTO banks or final pay, or even that they heard other employees complain about such deductions. Plaintiffs do not even allege that they believe that such employees exist.[14]

---

collective action, "the court must at least satisfy itself that there are other persons who are similarly situated *and who desire to opt-into this case*.") (emphasis added) (citing *Dybach v. Florida Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991)).

[13] The Court was aware that Moore had joined this litigation when it issued its March 6, 2006, Memorandum & Order but seemed disinclined to view the addition of a single plaintiff as sufficient evidence of interest to justify class certification. Order, n 3.

[14] In their affidavits, each Plaintiff avers that he or she is "familiar with other current and former employees of the Company," and that he or she "believe[s]" many of these people would be interested in participating in this litigation. O'Donnell and Jolicoeur Affs., 20; Moore Aff. 22. Plaintiffs do not identify by name (or even a vague description) a single member of the putative class whom they believe desires to participate in the case. The Court should disregard the allegations in Plaintiffs' affidavits about their "beliefs," and find these "beliefs" insufficient as a matter of law to satisfy Plaintiffs' burden of proof. *Horne*, 279 F. Supp. 2d at 236-37 (holding that plaintiff's

The fact that only <u>one</u> person has opted into this case also belies Plaintiffs' claim that members of the putative class are interested in participating in the litigation.[15]  A lack of consents to become plaintiffs evidence of a lack of interest in the litigation among members of the putative class.  *See also Pfohl*, 2004 U.S. Dist. LEXIS 6447, *31-32 (holding that plaintiffs failed to meet burden of showing interest among putative class members where they had solicited opt-ins and "failed to come up with significant numbers of allegedly similarly situated employees who are likely to assert similar claims").  This inference is amplified by the fact that putative class members' claims are losing value as the statute of limitations continues to run, as Plaintiffs acknowledge.[16]  Renewed Motion at 22 (citing 29 C.F.R. § 790.21(b)(2)); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1105-06 (11th Cir. 1996)).  If Plaintiffs were in contact with members of the putative class who were interested in participating in this case, they would be acting in derogation of those individuals' interests by not encouraging them to file the consents necessary to preserve their claims at the earliest possible opportunity.  The lack of consents to join this action is further evidence that there is still no interest in joining this case among members of the putative class Plaintiffs seek to represent.

---

affidavit testimony that he "believes" other similarly situated putative class members exist and desire to opt into the case was insufficient to meet his burden in moving for conditional certification).  *See also, Pfaahler v. Consultants for Architects, Inc.*, 2000 U.S. Dist. LEXIS 1772 at *6 (N.D. Ill.); *H & R Block v. Housden*, 186 F.R.D 399, 400 (E.D. Tex. 1999).

[15] Members of the putative class may file a consent to join this case at any time, and need not wait until a collective action is certified.  *Kuhn v. Philadelphia Elec. Co.*, 475 F. Supp. 324, 327 (E.D. Pa. 1979) (holding that even consents that were filed before complaint was filed are valid).  *See also, Garner v. G.D. Searle Pharm. & Co.*, 802 F. Supp. 418, 422 (M.D. Ala. 1991) (holding that plaintiffs may gather consents to join before case is certified as collective action).

[16] The statute of limitations is generally tolled for a putative class member's FLSA claims as of the date he or she files a notice of consent to join the case, even if no class has been certified as of that date.  *See Kuhn*, 487 F. Supp. at 975-76 (holding statute of limitations tolled by filing of complaint and consent to join, even when case has not yet been certified as collective action).

**III.    Collective action treatment of this case would be inefficient.**

Plaintiffs seek certification of a massive class of potentially several thousand employees that encompasses a large segment of RHI's employees – including senior level officers of the Company.  Indeed, Plaintiffs' proposed class would even include the Company's highest level executives.  Such a result would be ludicrous.  Despite the fact that, in their Renewed Motion, Plaintiffs have greatly expanded the size of the class they seek to represent, they offer no new evidence to justify the detailed analysis and individualized assessment that the Court and RHI would have to conduct were the class to be certified.  Since the CTO policy is administered by local management, a detailed analysis of employees' absence records, CTO histories, and final paychecks would be necessary if this case were certified for collective treatment.  This would require the Court to conduct individualized damage assessments for each class member.  Plaintiffs themselves acknowledge that the hours they worked were subject to the discretion of local management.  *See* O'Donnell and Jolicoeur Affs., ¶12. Thus, the hours worked by putative class members – who worked in different offices in many states, held dramatically different jobs and reported to different local managers – varied substantially.  If all of RHI's salaried employees were deemed to be non-exempt, the Court would be required to examine the hours worked by each member of the putative class to determine whether he or she ever worked more than forty hours in a workweek during the statute of limitations period, and if so, the amount of damages due to each such employee.  Courts have recognized that cases requiring such individualized damages inquiries are not appropriate for collective treatment.  *England v. New Century Fin. Corp.*, 2005 U.S. Dist. LEXIS 8403, *19 (M.D. La.)  (where damages analysis required case-by-case inquiry, certification inappropriate). Accordingly, class treatment of this case is improper and does not further the interests of judicial economy underlying the collective action provisions of the FLSA.

BO1 15773099.4

IV.    **Plaintiffs' proposed notice is inappropriate.**

Even if the Court were to conditionally certify a class in this case, the notice Plaintiffs propose is inappropriate in several respects.[17] First, the means by which Plaintiffs propose to send notices to members of the putative class is improper because it unnecessarily impinges on the privacy interests of RHI's current and former employees. Second, the content of Plaintiffs' proposed notice misrepresents the nature of this case and the obligations that may be imposed on putative class members who opt into the case. Third, the notice ought to direct class members to promptly file a consent to join this action if they want to participate in it. Finally, the group to whom Plaintiffs propose to send notice is temporally overbroad.

A.    **Plaintiffs' proposed means of providing notice to putative class members is improper.**

Through their motion for conditional certification, Plaintiffs seek an order requiring RHI to produce a list containing the names and contact information of all current and former salaried employees employed by the Company "anywhere in the United States within the three years preceding the filing of this action." Such an order is both unnecessary and improper.

The list that Plaintiffs seek unduly jeopardizes the privacy interests of RHI's current and former employees. Plaintiffs seek a list of the names, addresses, e-mail address, and employment histories of RHI's current and former salaried employees. This information is protected by a panoply of state and federal laws.[18] *See, e.g.*, 18 U.S.C. §§ 2721-2725

---

[17] If this Court were to conditionally certify a class, Defendants propose that the Court permit the parties time to confer in an effort to agree upon an appropriate notice form.

[18] The order Plaintiffs seek here is unnecessary because there are less intrusive means available to notify members of the putative class of the pendency of this action. If the Court conditionally certifies a class in this matter, RHI would be willing to send any notice approved by the Court directly to the last known residential address of each member of any certified class at the Company's expense. Other courts have recognized that it is appropriate for the employer to send out notices to members of a conditionally certified class in an FLSA collective action. *See, e.g.*, *De Asencio v. Tyson Foods, Inc.*, 2002 WL 1805534, *2-3 (E.D. Pa.). In the alternative, RHI would be willing to absorb the cost of having a neutral third party provide court approved notice to members of any class the Court certifies. For example, RHI could provide a list of the names and last known addresses of each member of the certified class to a

(prohibiting disclosure of records constituting "personal information," including name and address, maintained by certain state agencies); Mass. Gen. Laws ch. 214, § 1B (affording citizens of the Commonwealth a general right to be free from interference with their privacy). Putative class members' names, addresses, and employment information therefore ought not be provided to Plaintiffs' counsel in the absence of a legitimate need for the information.[19]

> **B.      The form of Plaintiffs' proposed notice is improper.**

The form that Plaintiffs propose for providing notice to class members is improper in several respects. The Court therefore should require substantial revisions to the form before it is used to provide notice of the pendency of this case to the members of any class the Court may conditionally certify.

First, the proposed notice does not accurately inform putative class members of the consequences of opting in to the case as a party plaintiff. It states that "By 'opting in' you gain the possibility of getting money or benefits that may result from a trial or settlement, but you give up the right to sue Robert Half separately for the same claims brought in this lawsuit." Plaintiffs' Notice, p. 1. This statement does not accurately inform prospective class members of

---

vendor, who would be instructed to mail the Court-approved notice to each address on the list and certify to the Court that it had done so. Plaintiffs therefore have no legitimate need for a list of RHI's current and former employees.

[19] Further, any order that required RHI to provide Plaintiffs' counsel with contact information for its current and former employees also should limit communication between Plaintiffs or their counsel and members of the class to the notice itself, unless and until each class member files a consent to join the suit and selects Plaintiffs' counsel to represent him or her. The Court has a duty to protect members of the putative class from receiving unwelcome or inappropriate communications from Plaintiffs' counsel. *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 171 (1989) (noting potential for abuse in unsupervised communications between counsel for named plaintiffs in FLSA collective action and putative class members). *See also, Hipp v. Liberty Nat'l Life Ins. Co.*, 164 F.R.D. 574, 576 (M.D. Fla. 1996) (limiting communications between plaintiffs or their counsel and putative class members); *Tucker v. Labor Leasing, Inc.*, 872 F. Supp. 941, 949-50 (M.D. Fla. 1994) (ordering that no communications between plaintiffs' counsel and putative class members be made without leave of court). Though O'Donnell states that he has spoken to some putative class members whom he believes might be interested in participating in this case, there are doubtless other members of the putative class who do not desire to become party plaintiffs and who prefer not to be contacted by Plaintiffs' counsel.

the obligations of being an opt-in plaintiff.[20]  An accurate account of the implications of joining

the case as a plaintiff is essential to allow each potential opt-in plaintiff to make an informed

decision about whether to participate.

Plaintiffs' proposed notice is also misleading because it presents a one-sided view of the

case.  Any notice the Court issues should include a summary not only of Plaintiffs' claims

against RHI, but also of the Company's defenses.  *See, e.g., Belcher v. Shoney's, Inc.*, 927 F.

Supp. 249, 253 (M.D. Tenn. 1996) (authorizing notice that included statement of employer's

affirmative defenses); *Garza v. Chicago Transit Auth.*, 2001 WL 503036 (N.D. Ill.) (authorizing

notice including statement that, if the court rules in favor of defendant, opt-ins will be entitled to

nothing).  If the Court authorizes notice to any conditionally certified class, the content of the

notice form should be balanced with a statement of RHI's defenses in this matter.[21]

Finally, the Court should not authorize a notice that requires opt-in plaintiffs to select

Liss-Riordan as their counsel.[22]  Opt-in plaintiffs are not required to accept representation by

Plaintiffs' counsel in order to participate in this case.  *See, e.g., Schwed v. Gen. Elec.*, 159 F.R.D.

373, 380 (N.D.N.Y. 1995) (holding that each opt-in plaintiff is entitled to be represented by

---

[20] Among other things, any notice the Court approves should include a statement that, as opt-in plaintiffs, individuals who file consents to opt in will be subject to discovery obligations, which may include providing deposition or trial testimony under oath, responding to document requests, and/or responding to other requests for information.  *See, e.g., Rosen v. Reckitt & Colman, Inc.,* 77 Fair. Emp. Prac. Cas. (BNA) 370, 373 (S.D.N.Y. 1994) (authorizing defendant to take depositions of all opt-in plaintiffs in addition to propounding written discovery); *Kass v. Pratt & Whitney*, 1991 WL 158943, *5 (S.D. Fla.) (authorizing defendant to propound interrogatories, document requests, and deposition notices on opt-in plaintiffs).  Prospective opt-in plaintiffs should also be informed that they could be liable for RHI's costs of defending the case if the Company ultimately prevails in the matter.  *See* Fed.R.Civ.P. 54(d).

[21] If the Court were to conditionally certify a class, RHI requests that the Court allow a brief period of time for the Company to propose a form to be used to provide notice of the pendency of this action to members of the putative class and discuss the form with Plaintiffs' counsel in an attempt to narrow any disputes regarding the content of the notice.

[22] The form attached to Plaintiffs' proposed notice requires opt-in plaintiffs to sign a form stating "I hereby designate Shannon Liss-Riordan  . . . to represent me for all purposes in this action."  Plaintiffs' Notice, p. 2.

plaintiffs' attorneys or by an attorney of his or her own choosing); *King v. ITT Continental Baking Co.*, 1986 WL 2628, *6 (N.D. Ill.) (same); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438, 445 (N.D. Ill.) (same).  Any notice the Court approves should therefore clearly indicate that each opt-in plaintiff is entitled to representation by counsel of his or her choice, and is not required to enter into any arrangement with Plaintiffs' counsel.

### C.    Putative class members should be required to return their opt-in notices within a short period of time.

If the Court conditionally certifies any class in this case, it should limit the time period in which members of the class may file consents to join the suit.  A short window during which class members may opt into the case will allow the parties to conduct discovery and prepare the case for trial in a timely and efficient matter.[23]  The Court should therefore set a short and definite period of time in which members of the class may respond to the notice, and should order that any notice sent to class members contain a conspicuous statement that any class member who wishes to participate in the litigation must file a consent to join the lawsuit within that period.

### D.    Any notice the Court authorizes should be sent only to employees who have worked for RHI within two years of the date of the Court's order on Plaintiffs' Motion.

Plaintiffs seek to provide notice to a class of all salaried employees who have worked for RHI within three years of their filing of this action.  The temporal scope of the class Plaintiffs seek to notify is improper in two respects.  First, any class the Court certifies should be limited to

---

[23] Courts often afford members of a conditionally certified class 30 days or less from the date class is certified to file consents to join the litigation.  *See, e.g., King*, 1986 WL 2628, *6 (authorizing class members to file consents to join within thirty days from the date notice was mailed); *Held v. Nat'l R.R. Passenger Corp.*, 101 F.R.D. 420, 425 (D. D.C. 1984) (certifying class and authorizing class members to file consents to join "no later than thirty days from the entry of this order"); *Watkins v. Milliken & Co.*, 613 F. Supp. 408, 420 (W.D. N.C. 1984) (denying notice and ordering that all consent forms be filed within 30 days of order); *Johnson v. Am. Airlines, Inc.*, 531 F. Supp. 957, 961 (N.D. Tex. 1982) (authorizing notice to members of conditionally certified class and providing 21-day timeframe in which they may file consents to join).

22

salaried employees who worked for the Company in the last two years because Plaintiffs have made no showing that the FLSA violations they allege were willful. Second, the date used to define the temporal scope of any class the Court certifies should be the date of the Court's order conditionally certifying the case as a collective action, and not the date that this action was filed.

The Court should not allow notice to a class of employees who have worked for RHI in the past three years because Plaintiffs have presented no evidence indicating that RHI's alleged violation of the FLSA was willful. The statute of limitations under the FLSA is two years, unless the employer's violation was "willful," in which case it is three years. 29 U.S.C. § 255(a). A violation of the FLSA is willful where "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1998). The burden of showing that the employer's alleged violation of the FLSA was willful is on the plaintiff seeking to invoke the extended statute of limitations. *See, e.g., Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 308 (7th Cir. 1986); *Terwilliger v. Home of Hope*, 21 F. Supp. 2d 1305, 1308 (N.D. Okla. 1998); *Abbott v. United States*, 41 Fed. Cl. 553, 569 (Ct. Cl. 2000) (citing *Bankston v. State of Illinois*, 60 F.3d 1249, 1253 (7th Cir, 1995)). Plaintiffs' claims are based on a technicality in the application of RHI's CTO policy. They essentially argue not that the CTO policy itself violates the salary basis test, but that if it is applied a certain way, it violates the salary basis test. These allegations are highly technical in nature and necessarily depend on the application of the CTO policy by individual supervisors. As such, even if there is a violation of the salary basis test, it was clearly inadvertent. Plaintiffs have therefore provided no evidence that they have any reasonable expectation of proving that RHI's alleged violations of the FLSA were willful within the meaning of the statute. The group of people to whom Plaintiffs seek to provide notice of the pendency of this suit is therefore

23

overbroad.

Moreover, the time period for any notice the Court authorizes should be measured from the date of the Court's order.  As Plaintiffs point out in their memorandum, the statute of limitations is not tolled for putative class members' claims until they file consents to join the action with the Court, regardless of when the Complaint was filed.  Renewed Motion, p. 22.  It therefore would be pointless to send notice of the pendency of this action to former RHI staffing professionals whose employment with the Company terminated more than two years before the date on which notice is sent because those individuals are time barred from asserting FLSA claims against the Company.  Because it has been approximately seventeen months since Plaintiffs filed their Complaint, and because RHI employs thousands of salaried employees at any given time, measuring the temporal scope of the class from the date of the Complaint, rather than the date of the Court's order, would result in sending notices to a substantial number of individuals who are precluded from asserting claims against the Company.

## CONCLUSION

The Court should deny Plaintiff's Renewed Motion because, for the second time, Plaintiffs have made no showing whatsoever that they are similarly situated to any member of the extremely large putative class they seek to represent and again have provided no evidence that there are any putative class member who are interested in participating in this litigation. Even if Plaintiffs had met their burden of proof on these issues, conditional certification of this case as a collective action would be inappropriate because of the individualized fact-intensive inquiry that would be necessary to determine how the CTO policy was applied in the case of each member of the putative class, which in turn would create gross inefficiencies and intractable case management problems.  Finally, if the Court does conditionally certify some class in this

matter, it should refrain from providing notice to individuals who have no reasonable likelihood

of asserting colorable FLSA claims against RHI and should require that the content of the notice

form be accurate, balanced, and consistent with procedural standards established by the courts.

WHEREFORE, Defendants Robert Half International Inc. and Robert Half Corporation

respectfully request that this Court deny Plaintiffs' Renewed Motion to Facilitate § 216(b)

Notice.

Respectfully submitted,

ROBERT HALF INTERNATIONAL INC.
AND ROBERT HALF CORPORATION
By their Attorneys,

_/s/ Richard L. Alfred_____
Richard L. Alfred (BBO # 015000)
Krista G. Pratt (BBO # 644741)
Barry J. Miller (BBO # 661596 )
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800
DATED:  May 1, 2006            Telecopier:    (617) 946-4801

---

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically  to the registered participants as identified on the Notice of
Electronic Filing (NEF) and paper copies will be sent to those indicated as non
registered participants on May 1, 2006.
A true courtesy copy of the above document was served on Shannon Liss-
Riordan, an attorney for Plaintiffs, Pyle, Rome, Lichten, Ehrenberg, & Liss-
Riordan, 18 Tremont Street, Suite 500, Boston, MA 02109, by first class mail on
May 1, 2006.

_____/s/ Krista Green Pratt_____
Krista Green Pratt

---

BO1 15773099.4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                                       )
IAN O'DONNELL AND DAVID                  )
JOLICOEUR, on behalf of themselves and   )
others similarly situated                        )
                                                       )     CIVIL ACTION NO.  04-CV-12719 NMG
                                    Plaintiffs,     )
                                                       )
v.                                                     )
                                                       )
ROBERT HALF INTERNATIONAL INC.         )
AND ROBERT HALF CORPORATION          )
                                                       )
                                    Defendants.     )
_____)

## <u>AFFIDAVIT OF KEN GITLIN</u>

I, Ken Gitlin, being duly sworn, hereby depose and state as follows:

      1.      I am Executive Director of Operational Support for Robert Half International Inc.

("RHI" or the "Company").  I have held that position since June 1, 1999.  My current position

includes responsibility for multiple corporate departments that provide operational support to

RHI's various business operations including: human resources, compensation and benefits, staff

development and training, travel and meetings, real-estate and facilities, enterprise projects,

process improvement, field automation, field administration, intranet services, and major

accounts.

      2.      Before being promoted into my current position, I held positions at RHI that are

now referred to as Regional Manager and District Director.  In these roles, I had supervisory

responsibility over many RHI branch offices over a wide geographic area, and was in a position

to observe the activities and responsibilities of numerous Staffing Managers, Account

Executives, and Account Managers working in the Company's various divisions.

3.      RHI provides specialized staffing services to its clients on a temporary, project, and full-time basis.  The primary function of the Company's Staffing Managers, Account Executives, and Account Managers is to manage the flow of services from RHI to its clients. The Company is comprised of several divisions, each of which specializes in providing staffing services to clients in a particular field or industry.  For example, the Robert Half Technology division provides information technology services on a project and full-time basis, and The Creative Group provides creative, web, marketing, and advertising services on a freelance basis.

4.      RHI has more than 260 branch offices throughout the United States, and has at least one office in 43 of the 50 states.  These offices are grouped into 82 Regions, each overseen by a Regional Manager.  The regions are combined in 14 Districts, each of which is managed by a District Director.  The Districts are grouped into four Zones: an Eastern Zone, a Central Zone, a Western Zone, and an International Zone.

5.      In my capacity as RHI's Executive Director of Operational Support, I have occasion to review the Company's public filings with the U.S. Securities and Exchange Commission ("SEC").  The pendency of the above-captioned action has been disclosed in such SEC filings repeatedly.  In the Company's January 27, 2005 Form 8-K filing, RHI disclosed the fact that Ian O'Donnell and David Jolicoeur had brought suit against the Company; provided a summary of their claims on behalf of themselves and other Staffing Managers, Account Executives, and Account Managers for unpaid overtime under federal and Massachusetts law; and stated that the case was pending before this Court.  A copy of this filing is attached hereto as Exhibit 1.  The Company included similar disclosures regarding this case in its Annual Report on Form 10-K filing (filed with the SEC on February 23, 2005), and in its Quarterly Report on Form 10-Q (filed with the SEC on May 5, 2005).  Excerpted copies of these filings are attached hereto

as Exhibits 2 and 3, respectively.  Each of these filings is readily available to the general public through RHI's corporate website (www.rhi.com).

6.      RHI has not yet calculated the number of employees in the putative class described in the Amended Complaint filed in the above-captioned action.  Because of the broad criteria the plaintiffs used to define the putative class, merely calculating the number of employees in the class would require the Company to expend substantial resources.  Based on the Company's current size and its estimated turnover in the positions at issue, RHI estimates that the putative class may include thousands of people.  RHI estimates that no more than a few hundred of these putative class members worked as Accountemps Staffing Managers in Massachusetts, like Ian O'Donnell and David Jolicoeur.

7.      The Staffing Managers, Account Executives, or Account Managers in each RHI division must each develop and maintain an expertise in the particular industries and fields on which they focus.  The vast majority of Staffing Managers in RHI's Accountemps division have substantial education, training, and/or experience in the accounting and finance field.  They use their knowledge of the accounting discipline and their connections in the industry in the day-to-day performance of their job duties, which require fluency in accounting terminology and a substantive understanding of the work performed by various classifications of employees in the accounting field.

8.      Other divisions of the Company work in different substantive fields, and the Staffing Managers, Account Executives, and Account Managers in those divisions must therefore develop and maintain an expertise in their unique respective fields.  For example, Robert Half Technology Account Executives must develop and apply an in-depth understanding

of computer programming or database administration in order to match candidates to the orders that division receives from its clients.

9.     Accountemps Staffing Managers have three basic areas of responsibilities in managing the flow of services to Accountemps' clients: marketing and sales, desk, and recruiting.   In addition, Accountemps Staffing Managers have a fourth area of responsibility that involves dealing with human resource issues that arise during an assignment.  Local market conditions, which vary by geographic location, dictate the amount of time they spend on each area of responsibility.  They work in teams of varying sizes with other Staffing Managers, frequently sharing the responsibilities in a rotation.  Implementation of this rotation varies, based on the local unemployment rate, the nature of the business territory, and the volume and complexity of orders from new and existing clients.  For example, an Accountemps Staffing Manager in the Boston office may focus on his or her marketing and sales responsibilities for one week, followed by one week on desk duty, followed by one week of recruiting duty.  A Staffing Manager in the Westborough office, however, may spend a greater portion of his or her time on recruiting if local market conditions have produced an excess of orders relative to the number of available candidates.

10.     Even the number of phases in the rotation varies from office-to-office and from time-to-time.  The Accountemps divisions in some offices use a three-phase rotation, while divisions in other offices group the desk and recruiting functions and use a two-phase rotation. Some offices operate without any rotation of responsibilities.

11.     Accountemps Staffing Managers work together with other local managers to assess prevailing market conditions and allocate resources to best adapt to those conditions.  As a result of such market assessments, the rotation implemented within a particular office may be

adjusted on a regular basis. Thus, the distribution of Accountemps Staffing Managers' job duties may vary within each office and between offices in a given region or district.

12.     While performing the marketing and sales responsibilities of their position, Accountemps Staffing Managers research and analyze the market and contact client company hiring authorities to secure orders for temporary accounting and finance services provided by RHI's service professionals ("candidates"). This process differs from the manner in which Staffing Managers, Account Executives, and Account Managers in other divisions may perform the same responsibilities, because each division tailors its sales and marketing efforts to the substantive field and market in which it operates. For example, Accountemps Staffing Managers may develop and cultivate clients by participating in accounting professional organizations. By contrast, Account Managers in The Creative Group often rely on specific candidates' portfolios of work to promote the division's marketing, advertising and creative services, and demonstrate how the Company can meet each individual client's needs.

13.     While on desk duty, Accountemps Staffing Managers use their knowledge and experience in the accounting field to identify the best candidate to fill each order for temporary accounting services in accordance with the client's unique requirements. Often, Accountemps' clients do not meet or interview the candidate before the assignment begins, but instead rely upon the Staffing Managers to make an appropriate selection based on their experience and expertise.

14.     The Staffing Managers, Account Executives, or Account Managers in RHI's other divisions must use the distinctions unique to the subject matter in which they specialize in matching candidates to clients' orders for services. These differences, in turn, may lead to different approaches to filling job orders. For example, some Account Executives in the Robert

Half Technology division will often arrange an Initial Client Meeting to ensure that the candidate's specialized skills match the client's specific needs.

15.     The recruiting duty of the Accountemps Staffing Manager position involves interviewing and assessing prospective candidates who possess the appropriate professional skill sets and work experience for use in filling accounting assignments with client companies.  When interviewing prospective candidates, they rely on their expertise and experience in the finance and accounting field to evaluate each prospective candidate's skills, determine the precise services he or she is qualified to perform, and, ultimately, decide whether to include each prospect in the Company's database of candidates.

16.     The avenues by which Accountemps Staffing Managers pursue candidates and the techniques they use to interview candidates vary from office-to-office and from district-to-district, based on local customs, local management preferences, and market conditions.

17.     The approach to recruiting also differs considerably from division-to-division because each division must use techniques appropriate to the industry or field in which it specializes.  For example, some Account Executives in the Robert Half Technology division utilize a multi-dimensional "matrix" to catalogue and evaluate candidates' skills and experience in the highly-specialized technology field.

18.     Each Accountemps Staffing Manager is also responsible on a continuing basis for managing the candidate assignments they have made and dealing with human resource issues that arise during an assignment.  They regularly verify that the clients' expectations are being met and ensure the candidates' satisfaction with their assignments.  Accountemps Staffing Managers also address issues such as attendance and tardiness, proper dress, failure to perform assigned tasks adequately, or excessive personal telephone calls.

19.    Accountemps Staffing Managers also intervene if candidates complain about harassment or discrimination, need a reasonable accommodation for a disability, or are asked to do something inappropriate.

20.    The amount of time Staffing Managers, Account Executives, and Account Managers spend managing candidates on assignment and performing human resources functions varies between the divisions and from office-to-office, based on the nature and number of clients and candidates managed by each individual.  For example, a Staffing Manager who handles a single, large volume client may devote as much as 50% of his or her time to this task and less time to marketing activities.  Another Staffing Manager who has a single candidate placed with a number of small employers for short-term assignments may need to devote less time to managing candidates' performance and human resources issues.

Signed under the pains and penalties of perjury this 24th day of June, 2005.

Ken Gitlin

BO1 15721621.2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR, AND STACEY MOORE, on behalf of themselves and others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION<br><br>Defendants. | )<br>)<br>)<br>)<br>)   CIVIL ACTION NO.  04-CV-12719 NMG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF LINDA BLANDFORD-BERINGSMITH

I, Linda Blandford-Beringsmith, being duly sworn, hereby depose and state as follows:

1.    I submit this Affidavit in support of Defendants' Opposition to Plaintiffs' Renewed Motion to Facilitate §216(b) Notice.

2.    In my capacity as Director, Human Resources for Robert Half International Inc. ("RHI" or the "Company"), I am familiar with RHI's CHOICE Time Off ("CTO") policy.  The CTO benefit includes vacation days, sick days, and other personal days off.  The Company maintains CTO "banks" that track accrued days off for employees.  RHI employees accrue CTO leave on an incremental basis throughout the year according to a schedule.

3.    Each employee's manager makes an individualized decision as to how the time off is recorded and whether any CTO is deducted from a particular employee's bank.  In this way, each manager exercises his or her discretion in determining how to

1

apply the CTO policy in individual circumstances. For example, a manager may allow an employee to take time off for personal reasons without any deduction from his or her CTO bank. Partial-day deductions from CTO are not permitted under the policy. Generally, an exempt employee who leaves work because of illness after working a substantial part of the day is not required to use CTO for that time.

4.    If approved by the employee's individual supervisor, an exempt employee may borrow up to five days of CTO, which are only advanced in full-day increments, before the time is actually earned. If the Company allows an employee to borrow CTO time and the employee terminates before earning the CTO, the Company may deduct the amount owed from the employee's final paycheck, subject to the manager's discretion.

5.    RHI has more than 260 branch offices throughout the United States, and has at least one office in 43 of the 50 states. RHI has employed many thousands of employees in salaried positions during the previous three years.

6.    RHI's exempt workforce includes a diverse group of employees including positions ranging from Division Directors and Branch Managers to corporate Vice Presidents and high-level company officers.

Signed under the pains and penalties of perjury this first day of May 2006.

Linda Blandford Beringsmith

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IAN O'DONNELL AND DAVID JOLICOEUR, on behalf of themselves and others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION<br><br>Defendants. | CIVIL ACTION NO.  04-CV-12719 NMG |

## AFFIDAVIT OF WILLIAM T. HAYES

I, William T. Hayes, being duly sworn, hereby depose and state as follows:

1.      I am the District Director for Robert Half International Inc.'s ("RHI" or the "Company") New England District.  I have held that position since April 1, 2001.  In my current position, I am responsible for conducting strategic planning for the New England District, supervising the Regional Managers who oversee the 17 offices in the District, and managing and monitoring compensation, human resources, and other administrative matters for the District.  I exercise direct oversight over all of RHI's Connecticut, Massachusetts, New Hampshire, and Rhode Island offices.  In this role, I regularly observe the activities and responsibilities of numerous Staffing Managers, Account Managers, and Account Executives working in the Company's various divisions.

2.      I am familiar with Ian O'Donnell's ("O'Donnell") employment history with RHI.  RHI hired O'Donnell to work as a Staffing Manager in the Accountemps division in the Company's Danbury, Connecticut office on or about January 3, 2002.  He transferred to the

Company's Westborough, Massachusetts office on or about July 1, 2002, where he retained the position of Staffing Manager and continued to work in the Company's Accountemps division. On or about February 1, 2003, O'Donnell transferred to RHI's Boston, Massachusetts office, where he again retained the title of Staffing Manager and continued to work in RHI's Accountemps division. O'Donnell resigned his employment with RHI on or about August 16, 2003.

3.     I am also familiar with David Jolicoeur's ("Jolicoeur") employment history with RHI. RHI hired Jolicoeur to work as a Staffing Manager in the Company's Boston office and Accountemps division on or about July 22, 2002. Jolicoeur was promoted to the position of Senior Staffing Manager on or about July 16, 2003, and continued to work in RHI's Boston office and Accountemps division. Jolicoeur resigned his employment with RHI on or about September 20, 2003.

4.     Neither O'Donnell nor Jolicoeur ever worked in any RHI office outside of the New England District. They have, therefore, had no opportunity to observe the job duties and responsibilities of Staffing Managers, Account Managers, or Account Executives in any RHI office outside of the New England District.

Signed under the pains and penalties of perjury this 23rd day of June, 2005.

William T. Hayes

William T. Hayes

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IAN O'DONNELL, DAVID JOLICOEUR, )
AND STACEY MOORE, on behalf of )
themselves and others similarly situated )
)
)    CIVIL ACTION NO.  04-CV-12719 NMG
Plaintiffs, )
)
v. )
)
ROBERT HALF INTERNATIONAL INC. )
AND ROBERT HALF CORPORATION )
)
Defendants. )

## THIRD AFFIDAVIT OF WILLIAM T. HAYES

I, William T. Hayes, being duly sworn, hereby depose and state as follows:

1.      I submit this Third Affidavit in support of Defendants' Opposition to Plaintiffs' Renewed Motion to Facilitate §216(b) Notice.

2.      In my capacity as District Director for Robert Half International Inc. ("RHI"), I am familiar with Stacey Moore's ("Moore") employment history with RHI. RHI hired Moore to work as an Account Manager in the Creative Group division in the Company's Boston, Massachusetts office on or about May 19, 2003.  Moore resigned her employment with RHI on or about February 2, 2004.

Signed under the pains and penalties of perjury this 27 day of April 2006.

_____
William T. Hayes

1



Wage and Hour Division
United States Department of Labor

Opinion Letter
Fair Labor Standards Act (FLSA)
October 6, 2004

***

     This is in response to your question regarding the application of the Fair Labor
Standards Act (FLSA) to the vacation policy of one of your clients. Under your
client's plan, employees earn paid vacation hours each pay period. The longer the
employee works for the firm, the more vacation hours are earned. The employer
permits employees to take up to two weeks of advanced vacation prior to accruing
vacation hours. An employee who takes vacation prior to accrual incurs a negative
leave balance that is reduced as the employee continues to accrue vacation. If the
employee leaves the company before he or she has accrued sufficient vacation time to
correct this negative leave balance, your client deducts the amount of the unearned
vacation time from the employee's final paycheck. You ask whether this is
permissible if the deduction reduces the employee's rate of pay below the minimum
wage in the final paycheck.

     You have identified two sources that you are concerned appear to provide
conflicting advice on such a situation. The Wage and Hour Division (WHD) Opinion
Letter No. 834 (10/11/84) that you cite states, in part, that "[i]t has been our
longstanding position that where an employer makes a loan or an advance of wages to
an employee, the principal may be deducted from the employee's earnings even if such
deduction cuts into the minimum wage or overtime pay due the employee under the
FLSA."

     You also cite the BNA Wage and Hour Manual at 91:512, which deems improper
employer attempts to deduct money for losses, such as damage to employer equipment.
This, however, may be viewed more properly as an employer expense of doing business,
not as a bona fide employee loan.

     The position expressed in the WHD Opinion Letter may be applied to your client's
situation. Employees have presumably been informed in advance of the unearned
vacation time policy: the employer will deduct from their pay the cost of such
vacation time if they leave the company prior to earning sufficient vacation time to
eliminate the vacation deficit. If this is the case, the amount of wages advanced as
paid vacation time falls into the same category as a bona fide loan or cash advance
to which the employee has voluntarily agreed. As such, the employer may deduct the
amount advanced for the vacation hours from the employee's final paycheck,
regardless of whether overtime hours were worked in the final week or whether the
deduction brings the employee's pay below the applicable minimum wage. See Field
Operations Handbook ¶ 30c10; opinion letters dated March 20, 1998 and November 16,
1977 (enclosed). The employer may not, however, make any assessment for
administrative costs or charge any interest payment that brings the employee below
the minimum wage. Moreover, the hourly rate of pay deducted from the final paycheck
must be the rate the employee was paid at the time of the advanced paid vacation,
rather than a higher rate of pay the employee may earn at the time he or she leaves
employment with your client. Please be aware, however, that although such a
deduction may be permissible under the FLSA, there may be state statutes under which
such a deduction would not be permitted.

     This opinion is based exclusively on the facts and circumstances described in your
request and is given on the basis of your representation, explicit or implied, that
you have provided a full and fair description of all the facts and circumstances
which would be pertinent to our consideration of the question presented. Existence
of any other factual or historical background not contained in your request might

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3177901                                                      Page 2
2004 WL 3177901 (DOL WAGE-HOUR)

require a different conclusion than the one expressed herein. You have represented
that this opinion is not sought by a party to pending private litigation concerning
the issue addressed herein. You have also represented that this opinion is not
sought in connection with an investigation or litigation between a client or firm
and the Wage and Hour Division or the Department of Labor.

  We trust that the above information is responsive to your inquiry.

Sincerely,

Barbara R. Relerford

Office of Enforcement Policy

Fair Labor Standards Team

Enclosures

 2004 WL 3177901 (DOL WAGE-HOUR)

END OF DOCUMENT

      ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2005 WL 330606                                                          Page 1
2005 WL 330606 (DOL WAGE-HOUR)


                          Wage and Hour Division
                       United States Department of Labor

                             Opinion Letter
                      Fair Labor Standards Act (FLSA)
                               FLSA2005-7
                            January 7, 2005


***

    This is in response to your request for an opinion concerning whether an employer
may deduct from an exempt employee's Paid Time Off Bank (PTO) for absences of less
than a day due to personal reasons, accident, or illness, as well as whether it is
acceptable for the employer to reduce an employee's salary for absences of one or
more full days due to illness or injury when the employee's PTO bank has been
exhausted.

    As you know, section 13(a)(1) of the FLSA provides a complete minimum wage and
overtime pay exemption for any employee employed in a bona fide executive,
administrative, or professional capacity as those terms are defined in Regulations,
Part 541. See copy enclosed. An employee may qualify for exemption if all of the
pertinent tests relating to duties, responsibilities, and salary, as discussed in
the appropriate section of the Regulations, are met. One such test requires that an
otherwise exempt employee be paid on a salary basis, as described in section 541.602
of the final Regulations. [FN1]

    An employee will be considered to be paid on a salary basis if he or she [2]
"regularly receives each pay period on a weekly, or less frequent basis, a
predetermined amount constituting all or part of the employee's compensation, which
amount is not subject to reduction because of variations in the quality or quantity
of the work performed." 29 C.F.R. 541.602(a).

    Deductions from salary may be made, however, when the employee is absent from work
for one or more full days for personal reasons, other than sickness or disability.
Thus, if an employee is absent for two full days to handle personal affairs, the
employee's salaried status will not be affected if deductions are made from the
salary for two full-day absences. However, if an exempt employee is absent for one
and a half days for personal reasons, the employer can deduct only for the one full-
day absence. 541.602(b)(1).

    Deductions from salary may also be made for absences of one or more full days
occasioned by sickness or disability (including work-related accidents), if the
deductions are made "in accordance with a bona fide plan, policy or practice of
providing compensation for loss of salary occasioned by such sickness or
disability." Thus, if the employer's particular plan provides compensation for such
absences, deductions for absences of one or more full days because of sickness or
disability "may be made before the employee has qualified under the plan, policy or
practice, and after the employee has exhausted the leave allowance thereunder."
541.602(b)(2).

    To respond to your specific concern about whether or not an exempt employee's
accrued PTO leave bank may be reduced for partial day absences, the answer is yes.
Where an employer has a benefits plan (e.g., vacation time, sick leave), it is
permissible to substitute or reduce the accrued leave in the plan for the time an
employee is absent from work, whether the absence is a partial day or a full day,
without affecting the salary basis of payment, if the employee nevertheless receives
in payment his or her guaranteed salary. Payment of the employee's guaranteed salary
must be made, even if an employee has no accrued benefits in the leave plan and the
account has a negative balance, where the employee's absence is for less than a full
day. See opinion letters dated February 16, 2001, May 27, 1999; and December 4, 1998

           ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 330606                                                        Page 2
2005 WL 330606 (DOL WAGE-HOUR)

(enclosed).

   As stated above, the one or more full-day deduction requirement applies to
deductions from an employee's salary, as opposed to a leave bank. Moreover, such
deductions due to absences related to sickness or disability may only be made,
without violating the salary basis of payment requirement, where the employer has a
bona fide sick leave plan. Id. Wage and Hour has found that a plan that has defined
sick leave benefits which have been communicated to eligible employees, and that
operates as described in the plan, will in general qualify as bona fide. In
addition, to be bona fide, the plan must be administered impartially, and its design
should not reflect an effort to evade the requirement that exempt employees be paid
on a salary basis. Whether a particular plan is bona fide would, however, be based
upon the actual design of and practices applicable under the plan. Significantly, a
PTO plan may qualify as bona fide even though it is not exclusively for use during
sickness or disability. Assuming that a bona fide plan exists, an employer may make
deductions from an employee's salary for absences of one or more full days because
of sickness or disability before the employee has qualified under the plan and after
the PTO/sick leave has been exhausted. Of course, an employer is not required to
establish a paid sick leave plan.

   This opinion is based exclusively on the facts and circumstances described in your
request and is given on the basis of your representation, explicit or implied, that
you have provided a full and fair description of all the facts and circumstances
which would be pertinent to our consideration of the question presented. Existence
of any other factual or historical background not contained in your request might
require a different conclusion than the one expressed herein. You have represented
that this opinion is not sought by a party to pending litigation concerning the
issue addressed herein. You have also represented that this opinion is not sought in
connection with an investigation or litigation between a client or firm and the Wage
and Hour Division or the Department of Labor.

   We trust that the above information is responsive to your inquiry.

Sincerely,

Alfred B. Robinson, Jr.

Acting Administrator

Enclosures

FN1. As you are aware, the Department of Labor has published revised Part 541
regulations that took effect on August 23, 2004; see 69 FR 22122. The old rule
addressed the issues you have raised at 29 CFR §  541.118. This opinion cites to the
final regulations, but is applicable under both the old and the revised FLSA
regulations, as there have been no changes in the specific areas about which you
have inquired.

  2005 WL 330606 (DOL WAGE-HOUR)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



```
2005 WL 3308612                                                      Page 1
2005 WL 3308612 (DOL WAGE-HOUR)
```

                         Wage and Hour Division
                     United States Department of Labor

                             Opinion Letter
                    Fair Labor Standards Act (FLSA)
                             FLSA2005-41
                           October 24, 2005

*** [FNa1]

    This is in response to your request for an opinion concerning the application of
the Fair Labor Standards Act (FLSA) to leave taken by exempt employees, or leave
directed by the employer, during situations where inclement weather occurs (such as
heavy snow or other types of disasters).

    As you know, section 13(a)(1) of the FLSA provides a complete minimum wage and
overtime pay exemption for any employee employed in a bona fide executive,
administrative, or professional capacity, as those terms are defined in 29 C.F.R.
Part 541. An employee may qualify for exemption if all of the pertinent tests
relating to duty, salary level and salary basis, as discussed in the appropriate
section of the regulations, are met. One such test requires that an otherwise exempt
employee be paid on a salary basis, as described in 29 C.F.R. § 541.602. Please note
that revisions to 29 C.F.R. Part 541 were published as a final rule in the Federal
Register on April 23, 2004 (69 FR 22122) and became effective on August 23, 2004
(copy enclosed).

    An employee will be considered to be paid on a salary basis within the meaning of
the regulations if under the employee's employment agreement the employee "regularly
receives each pay period on a weekly, or less frequent basis, a predetermined amount
constituting all or part of his compensation, which amount is not subject to
reduction because of variations in the quality or quantity of the work performed."
29 C.F.R. § 541.602(a).

    Section 541.602(b) details the limited exceptions to the general rule of the
salary basis requirement prohibiting deductions from pay. Deductions may be made
when the employee is absent from work for one or more full days for personal
reasons, other than sickness or accident. Thus, if an employee is absent for one or
more full days to handle personal affairs, the employee's salaried status will not
be affected if deductions are made from the employee's salary for such absences. See
§ 541.602(b)(1). However, if an employee is "ready, willing and able to work,
deductions may not be made for time when work is not available." 29 C.F.R. §
541.602(a).

    Deductions may also be made for absences of one or more full days occasioned by
sickness or disability if the deductions are made in accordance with a bona fide
plan, policy or practice of providing compensation for loss of salary occasioned by
both sickness or disability. Thus, if the employer's particular plan, policy or
practice provides compensation for such absences, deductions for absences of one or
more full days because of sickness or disability may be made before an employee has
qualified under such plan, policy or practice and after the employee has exhausted
the leave allowance thereunder. See 29 C.F.R. § 541.602(b)(2).

    You present three questions for which our responses follow:
    1. During office closures due to inclement weather or other disasters, may a
private employer direct exempt staff to take vacation (or leave bank deductions) or
leave without pay without jeopardizing the employees' exempt status?

    The FLSA does not require employer-provided vacation time. Where an employer has
proposed a bona fide benefits plan, it is permissible to substitute or reduce the
accrued leave in the plan for the time an employee is absent from work, even if it

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is less than a full day, without affecting the salary basis of payment, if the
employee still receives in payment an amount equal to the employee's guaranteed
salary. See Opinion Letters dated April 15, 1995; March 30, 1994; and April 14,
1992. However, an employee will not be considered to be paid "on a salary basis" if
deductions from the predetermined compensation are made for absences occasioned by
the employer or by the operating requirements of the business. See 29 C.F.R. §
541.602(a). Thus, if the employer closes the office due to inclement weather or
other disasters for less than a full workweek, the employer must pay the employee's
full salary even if: (1) the employer does not have a bona fide benefits plan; (2)
the employee has no accrued benefits in the leave bank; (3) the employee has limited
accrued leave benefits and reducing that accrued leave will result in a negative
balance; or (4) the employee already has a negative balance in the accrued leave
bank.

   Since employers are not required under the FLSA to provide any vacation time to
employees, there is no prohibition on an employer giving vacation time and later
requiring that such vacation time be taken on a specific day(s). Therefore, a
private employer may direct exempt staff to take vacation or debit their leave bank
account in the situation presented above, whether for a full or partial day's
absence, provided the employees receive in payment an amount equal to their
guaranteed salary. In the same scenario, an exempt employee who has no accrued
benefits in the leave bank account or has a negative balance in the leave bank
account still must receive the employee's guaranteed salary for any absence(s)
occasioned by the employer or the operating requirements of the business.
   2. If the private employer's offices remain open during inclement weather or
other types of disaster, can exempt staff be directed to take vacation (or leave
deductions) or leave without pay if they fail to report to work without jeopardizing
the employees' exempt status?

   As stated earlier, either leave bank or salary deductions may be made when the
employee is absent from work for a day or more for personal reasons, other than
sickness or accident. Thus, if an employee is absent for one or more full days for
personal reasons, the employee's salaried status will not be affected if deductions
are made from the employee's salary for such absences. An absence due to inclement
weather does not constitute an absence due to sickness or accident. Therefore, an
employee who is absent due to inclement weather, such as because of transportation
difficulties, is absent for personal reasons. In the situation described above, a
private employer may require an exempt employee who fails to report to work to take
vacation or make leave bank deductions without jeopardizing the employee's exempt
status. When the office is open, an exempt employee who has no accrued benefits in
the leave bank account does not have to be paid (i.e., may be placed on leave
without pay) for the full day(s) s/he fails to report to work due to such
circumstances as a heavy snow day.
   3. If the private employer's employees are probationary or have used all of
their accrued vacation (or leave bank) time, can the employer choose not to pay them
for time not worked without jeopardizing the employee's exempt status? When asked to
clarify, you stated that in this example an exempt employee chooses to stay home for
a half day due to inclement weather.

   Deductions from salary for less than a full day's absence are not permitted under
the regulations. Therefore, where the employee's absence is for less than a full
day, payment of an amount equal to the employee's guaranteed salary must be made
even if the employee has no accrued vacation or other leave benefits. However, as
stated in response to question #2, a deduction from an employee's leave bank or
salary may be made for absences of one or more full days for personal reasons, other
than sickness or accident. You may want to review the provisions in 29 C.F.R. §
541.603, which address the effect of improper deductions from salary. An employer
will lose the exemption if it has an actual practice of making improper deductions
that demonstrates it did not intend to pay employees on a salary basis. See 29
C.F.R. § 541.603(a). On the other hand, isolated or inadvertent deductions do not
result in loss of the exemption if the employer reimburses the employees for the
improper deductions. See 29 C.F.R. § 541.603(c). Moreover, if an employer has a
clearly communicated policy prohibiting improper deductions that includes a
complaint mechanism, reimburses employees for any improper deductions and makes a

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

good faith commitment to comply in the future, the employer will not lose the exemption unless it willfully violates the policy by continuing to make improper deductions after receiving employee complaints. See 29 C.F.R. § 541.603(d).

   This opinion is based exclusively on the facts and circumstances described in your request and is given based on your representation, express or implied, that you have provided a full and fair description of all the facts and circumstances that would be pertinent to our consideration of the question presented. Existence of any other factual or historical background not contained in your letter might require a conclusion different from the one expressed herein. You have represented that this opinion is not sought by a party to pending private litigation concerning the issue addressed herein. You have also represented that this opinion is not sought in connection with an investigation or litigation between a client or firm and the Wage and Hour Division or the Department of Labor. This opinion is issued as an official ruling of the Wage and Hour Division for purposes of the Portal-to-Portal Act, 29 U.S.C. § 259. See 29 C.F.R. § § 790.17(d), 790.19; Hultgren v. County of Lancaster, 913 F.2d 498, 507 (8th Cir. 1990).

   We trust that this letter is responsive to your inquiry.

Sincerely,

Alfred B. Robinson, Jr.

Deputy Administrator

Enclosure: 29 C.F.R. Part 541

FNa1. Note: The actual name(s) was removed to preserve privacy in accordance with 5 U.S.C. 552 (b)(7).

  2005 WL 3308612 (DOL WAGE-HOUR)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2001 WL 1558766                                                          Page 1
2001 WL 1558766 (DOL WAGE-HOUR)


                        Wage and Hour Division
                    United States Department of Labor

                          Opinion Letter
                   Fair Labor Standards Act (FLSA)
                        February 16, 2001


***

   This is in response to your request for an opinion as to whether paid time off
(PTO) plans qualify as bona fide sick leave plans under the Fair Labor Standards Act
(FLSA).

   The PTO is a leave accrual bank, similar to a sick leave plan. With a PTO plan,
the time accrued may be taken for any reason, including vacation, illness, or
personal reasons. You state that many employers are concerned about the trend toward
more flexible employment schedules which has led them to opt for PTO plans in place
of sick leave plans. PTO plans provide employees with a more comprehensive and a
more equitable benefits package. You also state that PTO plans are good for
employers because they would substantially ease the recordkeeping burden of tracking
sick time, vacation time and other personal leave time taken by employees. With
regard to exempt employees, you specifically request an opinion as to whether the
PTO plans qualify as bona fide sick leave as discussed in section 541.118 of
Regulations, 29 CFR, Part 541 (copy enclosed).

   Section 13(a)(1) of the FLSA provides a complete minimum wage and overtime pay
exemption for any employee employed in a bona fide executive, administrative,
professional, or outside sales capacity. In order to qualify for exemption under
this section, an employee must meet all of the tests relating to duties,
responsibilities, and salary that are contained in the appropriate section of the
Regulations.

   An employee will be considered to be on a salary basis within the meaning of the
Regulations if under his or her employment agreement he or she regularly receives
each pay period on a weekly, or less frequent basis, a predetermined amount
constituting all or part of his or her compensation, which amount is not subject to
reduction because of variations in quality or quantity of the work performed.

   As you know, deductions may be made, however, when the employee is absent from
work for a day or more for personal reasons, other than sickness or accident. Thus,
if an employee is absent for one or more full days to handle personal affairs, his
or her salaried status will not be affected if deductions are made from his or her
salary for such absences.

   Deductions may also be made for absences of a day or more occasioned by sickness
or disability (including industrial accidents) if the deductions are made in
accordance with a bona fide plan, policy or practice of providing compensation for
loss of salary occasioned by both sickness or disability. Thus, if the employer's
particular plan, policy or practice provides compensation for such absences,
deductions for absences of one or more full days because of sickness or disability
may be made before an employee has qualified under such plan, policy or practice and
after he or she has exhausted his or her leave allowance thereunder.

   Where an employer has proposed a bona fide benefit plan, such as the PTO described
in your letter, it is permissible to substitute or reduce the accrued leave in the
plan for the time an employee is absent from work even if it is less than a full day
without affecting the salary basis of payment, if by substituting or reducing such
leave the employee receives in payment an amount equal to his or her guaranteed
salary. Payment of an amount equal to the employee's guaranteed salary must be made
even if the employee has no accrued benefits in the leave bank account, and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2001 WL 1558766                                                        Page 2
2001 WL 1558766 (DOL WAGE-HOUR)

account has a negative balance where the employee's absence is for less than a full
day.

   Based on the information you have provided, it is our opinion that the proposed
PTO plans for exempt employees would qualify as a bona fide sick leave plan as
outlined in section 541.118(a)(3).

   This opinion is based exclusively on the facts and circumstances described in your
request and is given on the basis of your representation, explicit or implied, that
you have provided a full and fair description of all the facts and circumstances
which would be pertinent to our consideration of the question presented. Existence
of any other factual or historical background not contained in your request might
require a different conclusion than the one expressed herein. You have also
represented that this opinion is not sought on behalf of a client or firm which is
under investigation by the Wage and Hour Division, or which is in litigation with
respect to, or subject to the terms of any agreement or order applying, or requiring
compliance with, the provisions of the FLSA.

   We trust that the above information is responsive to your inquiry.

Sincerely,

Barbara Relerford

Office of Enforcement Policy

Fair Labor Standards Team

Enclosure

 2001 WL 1558766 (DOL WAGE-HOUR)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IAN O'DONNELL AND DAVID JOLICOEUR, on behalf of themselves and others similarly situated | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO.  04-CV-12719 NMG |
| v. | ) ) | |
| ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION | ) ) ) | |
| Defendants. | ) ) ) | |

### SUPPLEMENTAL AFFIDAVIT OF WILLIAM T. HAYES

I, William T. Hayes, being duly sworn, hereby depose and state as follows:

1.      I submit this Supplemental Affidavit in support of Defendants' Surreply in Further Opposition to Plaintiffs' Motion to Facilitate §216(b) Notice.

2.      In my capacity as District Director for Robert Half International Inc. ("RHI"), I am familiar with RHI's Danbury, Connecticut, office in which Ian O'Donnell ("O'Donnell") worked from approximately January 3, 2002, until approximately July 1, 2002.  Since January 2002, the Company has maintained only Accountemps and OfficeTeam divisions in the Danbury office.  At the time O'Donnell began working as a Staffing Manager in the Danbury office, he was the only staffing professional employed in that office.  There are currently a total of two staffing professional positions in the Danbury office.

3.      I am also familiar with RHI's Westborough, Massachusetts, office in which O'Donnell worked from approximately July 1, 2002, until approximately February

1, 2003. Since July 2002, the Company has maintained only Accountemps and OfficeTeam divisions in its Westborough office. At the time O'Donnell was employed as a Staffing Manager in the Westborough office, there were a total of approximately eight staffing professional positions in that office. There are currently a total of eleven staffing professional positions in the Westborough office.

4.    Some of the other RHI offices under my supervision are larger and house a greater number of divisions and staffing professionals than the Danbury or Westborough offices. For example, the Boston, Massachusetts, office currently houses seven divisions and forty-five staffing professionals. Similarly, the Burlington, Massachusetts, office currently houses five divisions and fifteen staffing professionals.

Signed under the pains and penalties of perjury this *30* day of November, 2005.

William T. Hayes

2



Slip Copy                                                                                                    Page 1
Slip Copy, 2006 WL 752831 (M.D.Fla.)
**(Cite as: Slip Copy)**


Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,M.D. Florida.
Christopher M. RODGERS, on behalf of himself and
others similarly situated, Plaintiff,
v.
CVS PHARMACY, INC., Defendant.
**No. 8:05-CV770T-27MSS.**


March 23, 2006.


Gregory Keith Showers, Ryan D. Barack, Kwall,
Showers & Coleman & Barack, P.A., Clearwater, FL,
for Plaintiff.
Aaron Jarett Reed, Littler Mendelson, P.C., Miami,
FL, Andrew J. Voss, Littler Mendelson, Chicago, IL,
Lisa A. Schreter, Littler Mendelson, PC, Atlanta, GA,
for Defendant.


*ORDER*
WHITTEMORE, J.
*1 BEFORE THE COURT are Plaintiff's Motion to
Conditionally Certify Collective Action, to Facilitate
Notice (Dkt.11) and Defendant's Opposition
(Dkt.23). Upon consideration, the Court having
conducted a hearing, and being otherwise fully
advised in the premises, Plaintiff's Motion to
Conditionally Certify Collective Action, to Facilitate
Notice (Dkt.11) is DENIED.


FN1. Also before the Court are Plaintiff's
Notice of Supplemental Authority (Dkt.37)
and Defendant's Response (Dkt.40).


*Factual Background*

On April 20, 2005, Plaintiff, Christopher M. Rodgers,
filed this action against Defendant, CVS Pharmacy,
Inc., alleging failure to pay overtime compensation in
violation of the Fair Labor Standards Act ("FLSA"),
29 U.S.C. § § 201, et seq. (Dkt.1, Compl.). Plaintiff's
suit is brought individually and on behalf of others
similarly situated who are and were employed by
Defendant during the three years preceding this
lawsuit. (Dkt.1). To date, two individuals have filed
notices of consent to join the collective action: Sherry
Sherer (Dkt.4) and Francisco Lopez (Dkt.17).

Plaintiff alleges that Defendant violated the FLSA by
"shaving" employees' time to avoid paying overtime
wages. (Dkt.1, ¶ ¶ 2-3). Plaintiff alleges that
Defendant did this through its managers, who would
use a "manager override" feature to change time
records on cash register "clock-in" systems. (Dkt.1, ¶
¶ 18-21). Plaintiff asserts that Defendant's hourly
employees with the following job titles are similarly
situated:
Customer Service: Responsible for customer service,
cash handling, merchandising activities, light
maintenance and any additional tasks specific to each
position.
Beauty Advisor: Responsible for customer service
and cosmetic merchandising activities.
Photo Lab: Responsible for customer service, photo
finishing, cash handling and general equipment
maintenance.
Shift Supervisor: Responsible for customer service,
employee supervision, cash handling and
merchandising activities.
Pharmacy Technician: Our Service Associates are
responsible for ringing out prescriptions, answering
telephones, and pharmacist referrals. Our Certified
Technicians are responsible for customer service and
prescription order processing, as well as problem
resolution and inventory management.

(Dkt. 11, p. 2; Dkt. 11-3;
http://www.cvs.com/corpInfo/careers/stores_
hourly.html).

Plaintiff filed the instant motion seeking conditional
certification of a collective action, expedited
discovery responses, and authorization for notice to
potential collective action plaintiffs. (Dkt.11).
Specifically, Plaintiff requests certification of a
collective class consisting of "all current and former
hourly non-management employees of Defendant
during the three (3) years prior to the filing of this
action." (Dkt.11, p. 10). Plaintiff also requests
approval of the proposed notice to the class (Dkt.11-
9) and consent form (Dkt.11-10) and authorization
for Plaintiff's counsel to mail notices to potential opt-
in plaintiffs. (Dkt.11, pp. 10-11). Plaintiff also
requests expedited discovery, including an
interrogatory to Defendant seeking the names,
addresses, telephone numbers, dates of employment,
and job titles of all potential opt-in plaintiffs (Dkt.11-
11). (Dkt.11, p. 13).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2
Slip Copy, 2006 WL 752831 (M.D.Fla.)
**(Cite as: Slip Copy)**

**\*2** In opposition, Defendant argues that Plaintiff has failed to satisfy the requirements for conditional certification of a FLSA class. (Dkt.23, pp. 2-3). Specifically, Defendant argues that Plaintiff has failed to provide sufficient evidence that potential opt-in plaintiffs are interested in joining the action, and even if he has, the potential opt-in plaintiffs are not similarly situated. (Dkt.23, p. 2). Defendant further argues that the proposed opt-in class is too large and would consist of over 250,000 current and former CVS employees, regardless of their job title, store location, full-time or part-time status, or the identity of their supervisor/manager. (Dkt.23, pp. 2-3). Defendant maintains that litigating with such a large class would violate its due process rights and would not meet the required goal of judicial economy and efficiency. (Dkt.23, p. 3).

> FN2. Defendant argues that the evidence offered by Plaintiff is insufficient because it is based on irrelevant and anonymous newspaper articles, unauthenticated Department of Labor reports, conclusory allegations and inadmissible hearsay. (Dkt.23, pp. 10-11).

*Discussion*

I. Applicable Law

Pursuant to 29 U.S.C. § 216(b), certification of collective actions in FLSA cases is based on a theory of judicial economy, by which "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Courts utilize a two-tiered approach in making collective action certification determinations under the FLSA:

> FN3. The FLSA provides in pertinent part: Any employer who violates the provisions of section 206 [the minimum wage statute] or section 207 [the overtime pay statute] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.... An action to recover the liability prescribed ... may be maintained

> against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.
> 29 U.S.C. § 216(b).

The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision-usually based only on the pleadings and any affidavits which have been submitted-whether notice of the action should be given to potential class members. Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question.

*Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1218 (11th Cir.2001) (*quoting Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995)); *see also Cameron-Grant v. Maxim Healthcare Servs., Inc.,* 347 F.3d 1240, 1243 n. 2 (11th Cir.2003).

At the notice stage, the court must initially determine whether: 1) there are other employees "who desire to opt in" to the action; and 2) the employees who desire to opt in are "similarly situated." *Dybach v. State of Fla. Dep't of Corrs.,* 942 F.2d 1562, 1567-68 (11th Cir.1991). This determination is made using a fairly lenient standard. *Cameron-Grant,* 347 F.3d at 1243 n. 2. However, the plaintiff must offer "detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996) (*internal quotations and citation omitted* ). Ultimately, the district court must satisfy itself that there are other employees who are similarly situated and who desire to opt in. *Dybach,* 942 F.2d at 1567-68.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                 Page 3
Slip Copy, 2006 WL 752831 (M.D.Fla.)
**(Cite as: Slip Copy)**

I. Other Employees Who Desire to Opt In

**\*3** "[P]laintiffs have the burden of demonstrating a reasonable basis for crediting their assertions that aggrieved individuals exist[ ] in the broad class that they proposed." *Haynes v. Singer Co., Inc.,* 696 F.2d 884, 887 (11th Cir.1983). Evidence of other employees who desire to opt in may be based on affidavits, consents to join the lawsuit, or expert evidence on the existence of other similarly-situated employees. *Davis v. Charoen Pokphand (USA), Inc.,* 303 F.Supp.2d. 1272, 1277 (M.D.Ala.2004). A plaintiff's or counsel's belief in the existence of other employees who desire to opt in and "unsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify" certification of a collective action and notice to a potential class. *Mackenzie v. Kindred Hosps. East, L.L.C.,* 276 F.Supp.2d 1211, 1220 (M.D.Fla.2003) (*citing Haynes,* 696 F.2d at 887; *Horne v. United Servs. Auto. Ass'n,* 279 F.Supp.2d 1231, 1236-37 (M.D.Ala.2003). Certification of a collective action and notice to a potential class is not appropriate to determine *whether* there are others who desire to join the lawsuit. *Mackenzie,* 276 F.Supp.2d at 1220 (*citing Dybach,* 942 F.2d at 1567-68) (*emphasis added* ). Rather, a showing that others desire to opt in is required before certification and notice will be authorized by the court. *Id.*

FN4. *See also Tyler v. Payless Shoe Source, Inc.,* 2005 WL 3133763, \*3 (M.D.Ala. Nov.23, 2005) (three to five consents to join were sufficient to establish that others desired to opt in); *Pendlebury v. Starbucks Coffee Co.,* 2005 WL 84500, \*3 (S.D.Fla. Jan.3, 2005) (plaintiff's allegations and four affidavits by employees indicating that others desired to opt in were sufficient); *Bell v. Mynt Entm't, LLC,* 223 F.R.D. 680, 683 (S.D.Fla.2004) (affidavits from seven plaintiffs indicating others desired to opt in and detailing allegations of wage violations were sufficient); *Hill v. CVS Rx Servs, Inc.,* Case No. CV00-HGD-3355-S, at 4-5 (N.D.Ala. July 27, 2001) (plaintiff's affidavit and six consents to join were sufficient); *Harper v. Lovett's Buffet, Inc.,* 185 F.R.D. 358, 362-63 (M.D.Ala.1999) (fifteen affidavits by employees with specific allegations of wage violations were sufficient).

In support of his argument that there are other employees who desire to opt in to this action, Plaintiff submits his own declaration in which he avers, "I am aware that other employees had changes made to their time sheets by CVS management using the 'manager override' feature to remove time from their payrolls records. This resulted in them not being paid properly for all hours worked." (Dkt. 11-5, Dec. of Christopher M. Rodgers, at ¶  9). Plaintiff further avers, "I believe that if other current and former employees of CVS became aware of this lawsuit they would choose to join in." (Rodgers' Dec. at ¶  22). Plaintiff's declaration does not identify any individuals who desire to join this lawsuit.

In addition, Plaintiff offers the declarations of two former CVS employees, both of whom have filed notices of consent to join this lawsuit. (Dkt. 11-4, Dec. of Sherry Sherer; Dkt. 17-3, Dec. of Francisco Lopez). Sherry Sherer, who worked at a CVS in Florence, South Carolina, and Francisco Lopez, who worked at a CVS in Miami Beach, Florida, describe Defendant's failure to pay overtime compensation and "shaving time" by management. (Sherer's Dec. at ¶¶ 2, 5, 7-8, 11, 13, 16, 17; Lopez's Dec. at ¶¶ 2, 5-8, 10-11). Sherer and Lopez allege that their co-workers had similar experiences, and as a result, they "believe" that if other employees were aware of this lawsuit, they would choose to participate. (Sherer's Dec. at ¶  18; Lopez's Dec. at ¶  12). In their declarations, neither Sherer nor Lopez identify other employees who desire to join this lawsuit.

**\*4** As further evidence that there are other employees who may desire to join the action, Plaintiff offers documents received from the Department of Labor which purport to show other employees have complained of alleged wage violations by Defendant. (Dkts. 11-6, 28, and 35). However, the complaints referenced in these documents relate to different types of wage violations and were made by employees with different job titles and descriptions who worked at CVS locations across the county. Although the documents indicate complaints of wage violations were made and investigated, none of the documents establish that any of these individuals desire to join this lawsuit. Similarly, Plaintiff argues that Defendant's involvement in a prior lawsuit alleging FLSA violations based on paycheck deductions (not time shaving) serves as evidence of wage violations in this case and/or that individuals who would desire to join this lawsuit. (Dkt.11-8). Again, even assuming the other lawsuit involved similar claims of wage violations, similarly situated employees, and allegations not barred by the statute of limitations, its mere existence does not provide

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence that other individuals desire to join this lawsuit.

> FN5. Of the six investigations referenced in the Department of Labor documents, only two resulted in findings of violations of a different type than those alleged in this case. (Dkts. 11-6, 28, and 35). After an investigation of the one complaint involving time shaving that took place from February 19, 2001 through February 19, 2003, the Department of Labor found no violation based on a lack of documentation. (Dkt.11-6). Plaintiff argues that the individuals who filed this complaint would want to join this case "because a discovery request for their original time records would be able to support their assertions." (Dkt.11, p. 8). However, even assuming these employees could be identified, were similarly situated, and desired to opt in, the wage violations they complained of occurred sometime prior to February, 2001 when the investigation began, which places their claims outside of the statute of limitations.

Plaintiff also offers two newspaper articles in support of his motion. (Dkts. 11-2 and 11-7). The *New York Times* article merely addresses "shaving time" by other national retailers and is not relevant to a determination of whether other individuals desire to join this lawsuit. (Dkt.11-2). The *Washington City Paper* article criticizes the CVS drugstore chain for everything from mistakes made by the pharmacy to dirty and cluttered stores. (Dkt.11-7). In the twelve page article, there is one reference to CVS's wage practices, wherein an anonymous former employee of a "northeast" CVS store states that management "expected us to work unpaid overtime." (Dkt.11-7, p. 5). The anonymous source does not allege his or her time was shaved. (Dkt.11-7). This vague reference to a wage violation made by an anonymous former employee who worked at an undisclosed location is insufficient to support Plaintiff's motion.

In contrast, Defendant has submitted thirty one affidavits by current employees who worked with Plaintiff, Sherer and Lopez and who indicate that they do not desire to participate in this lawsuit. (Dkt.23, Exs.3(a)-(n), 4(a)-(I), and 5(a)-(h)). These affiants deny that their work time has been "shaved" or that they have been denied overtime compensation. (Dkt. 23, Exs. 3, 4 and 5 inclusive).

> FN6. Specifically, Defendant has provided affidavits from fourteen employees from Plaintiff's store, nine employees from Sherer's store, and eight employees from Lopez's store. (Dkt. 23, Exs. 3, 4 and 5 inclusive).

> FN7. For purposes of the instant motion, Defendant's affidavits are relevant only to a determination of whether Plaintiff has demonstrated a "reasonable basis" for crediting his assertions that aggrieved employees exist in the class he proposes. *Haynes,* 696 F.2d at 887.

Upon consideration, Plaintiff has failed to provide sufficient evidence that there are other employees who desire to opt in to this action, other than the two who have filed consents. In the year since this lawsuit was filed, Plaintiff has only been able to identify those two individuals. The significance of this number is drastically minimized when compared to the 250,000 hourly employees who worked for Defendant in the last three years at 5,375 stores in 36 states. (Dkt. 23-2, Aff. of Mark Griffin, at ¶ ¶ 6-7). Moreover, Plaintiff, Sherer and Lopez's averments that they "believe" other employees would opt in are speculative, vague and conclusory. They have failed to identify any other employees who desire to join or who have expressed an interest in joining this action. Plaintiff's unsupported beliefs and expectations that others *may* desire to opt in are insufficient to justify certification of a collective action and notice to a potential class. *See Mackenzie,* 276 F.Supp.2d at 1220 (certification and notice are not appropriate to determine *whether* others desire to opt in).

> FN8. *See also Wombles v. Title Max of Ala., Inc.,* 2005 WL 3312670, *3 (M.D.Ala. Dec.7, 2005)* (two consents to opt in and five nearly identical affidavits by plaintiffs indicating that they "believe" others desire to join the lawsuit were insufficient to establish that others desired to opt in); *Davis,* 303 F.Supp.2d at 1277 (plaintiff's testimony that twelve other employees "were unhappy with" Defendant's policies and would join the suit, without supporting affidavits or consents to join, were insufficient); *Slaughter v. CVS Rx Servs., Inc.,* Case No. CV03-CO-01403-S, at 12-13 (N.D.Ala. Nov. 1, 2004) (thirteen plaintiffs and one affidavit by an employee who

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 752831 (M.D.Fla.)
**(Cite as: Slip Copy)**

desired to join was insufficient); *Horne, 279 F.Supp.2d at 1236* (plaintiff's own affidavit indicating he "believed" others desire to opt in was insufficient); *Mackenzie, 276 F.Supp.2d at 1220* (plaintiff's failure to provide evidence of other individuals who desired to join the lawsuit and plaintiff's admission that he did not know of any individuals who desired to opt in was insufficient); *Smith v. Tradesmen Int'l, Inc., 289 F.Supp.2d 1369, 1372 (S.D.Fla.2003)* (three identical affidavits by employees with different job titles and job responsibilities who worked in different geographic locations were insufficient).

**\*5** Plaintiff has not demonstrated a reasonable basis for crediting his assertions that other aggrieved employees exist in the class he proposes. *See Haynes, 696 F.2d at 887.* The three declarations offered by Plaintiff do not provide detailed allegations that engage Defendants' thirty one affidavits to the contrary. *See Grayson, 79 F.3d at 1097; Wombles, 2005 WL 3312670, at \*3* (plaintiffs' affidavits and two consents to join were not sufficient to engage defendant's forty six affidavits to the contrary). Accordingly, Plaintiff has failed to demonstrate to the Court's satisfaction that there are other employees who desire to opt in to this lawsuit.

### II. Similarly Situated Employees

Even if Plaintiff's motion was sufficient to demonstrate the existence of individuals who desire to opt in, he has not shown that he is similarly situated to Sherer, Lopez, or any other potential class plaintiffs. In determining whether employees are similarly situated, the court must consider whether the employees are similar with respect to their job requirements and pay provisions and the commonality of their claims. *Dybach, 942 F.2d at 1567-68; Horne, 279 F.Supp.2d at 1234.* Plaintiffs must only demonstrate that their positions are similar, not identical, to the positions of the potential class plaintiffs. *Grayson, 79 F.3d at 1096.* Although the similarly situated standard is not a stringent one, a showing of similarity requires more than unsupported and generalized allegations. *Hipp, 252 F.3d at 1219* (*citing Grayson, 79 F.3d at 1097); Haynes, 696 F.2d at 887.*

In his motion, Plaintiff argues that all of Defendant's hourly, non-management employees are similarly situated with respect to their job requirements and pay provisions, including customer service, beauty advisor, photo lab, shift supervisor, and pharmacy technician employees. (Dkt.11, pp. 2, 9-10). Plaintiff maintains that these employees utilize the same computer system to clock in and out (the same computers that allegedly allow managers to shave time) and share the same job functions, including core duties to provide customer service and cash handling. (Dkt.11, pp. 2, 9).

Despite these allegations, Plaintiff has not shown he is similarly situated with Sherer, Lopez or other potential class plaintiffs with regard to their job requirements. In their declarations, Plaintiff, Sherer and Lopez do not describe their job requirements and/or job descriptions to allow for an evaluation of similarities. Plaintiff's reliance on the Defendant's descriptions of the positions on the company website, without more, is not sufficient to allow for a comparison of job requirements. Moreover, Lopez's job title and job requirements are not provided in the record.

FN9. Plaintiff, Sherer and Lopez were hourly employees. (Griffin's Aff. at ¶ 9; Sherer's Dec. at ¶ 3; Lopez's Dec. at ¶ 3). For purposes of the instant motion, it is undisputed that their pay provisions were similar.

FN10. Plaintiff was a night shift supervisor, and Sherer was a pharmacy technician. (Griffin's Aff. at ¶¶ 9-11). Although all of the five positions described on the website involve customer service, three of them involve cash handling (customer service, photo lab, and shift supervisor) and two do not (beauty advisor and pharmacy technician). (Dkt. 11, p. 2; Dkt. 11-3). Accordingly, based on these job descriptions, Plaintiff's argument that he shares core duties with Sherer is without merit.

Although Plaintiff, Sherer and Lopez clocked in and out on the company computer, the fact that their respective stores are located in three different cities (and two states) and are run by different managers precludes a finding of similarity on this basis. Further, although Plaintiff alleges that he and Sherer share core duties, such as customer service and cash handling, he has not provided any evidence to support this allegation. Because Plaintiff has not even provided Lopez's job title or job requirements, the

Slip Copy                                                                                          Page 6
Slip Copy, 2006 WL 752831 (M.D.Fla.)
**(Cite as: Slip Copy)**

Court cannot determine whether Plaintiff and Lopez share *any* similar duties, core or otherwise. Even assuming that Plaintiff shares core duties with Sherer and Lopez, he has not established that involvement in customer service and cash handling similarly situates them to Defendant's 250,000 hourly employees.

> FN11. Defendant argues that Plaintiff has not shown a common policy or plan resulting in wage violations. (Dkt.23, pp. 13-16). Although this type of evidence is not required, evidence of "a unified policy, plan, or scheme" may be sufficient to establish similarity of the putative class. *Grayson,* 79 F.3d at 1095. Plaintiff suggests that by requiring employees to clock in and out on company computers, Defendant allows it managers to override the time records and shave time. Despite Plaintiff's allegations that time shaving has affected three employees at three different stores, the allegations do not overcome Defendant's affidavits to the contrary. Again, Defendant has offered affidavits from multiple employees at each of those stores who deny that their time was shaved.

**\*6** Although Plaintiff is not required to demonstrate that his position is identical to the putative class plaintiffs, he must demonstrate similarity based on more that generalized allegations. *See Hipp,* 252 F.3d at 1219; *Grayson,* 79 F.3d at 1096-97. Plaintiff has failed to do so. Therefore, Plaintiff has failed to demonstrate to the Court's satisfaction that there are other similarly situated employees who desire to opt in to this action.

> FN12. Defendant also argues that Plaintiff has failed to show commonality between his claims and the claims of the putative class. In support, Defendant argues that Plaintiff, Sherer and Lopez assert divergent theories about how their rights to overtime were violated. Sherer asserts that her manager improperly designated time worked as sick time, deducted time for lunch breaks not taken, and reduced scheduled hours. (Sherer's Dec. at ¶ ¶ 11, 13, 16, 17). Lopez asserts he was required to "work off the clock" and was not paid for the first two weeks of his employment. (Lopez's Dec. at ¶ ¶ 5, 7, 11). Despite the different types of wage violations alleged, Plaintiff, Sherer

and Lopez each assert that their managers shaved their time. (Plaintiff's Dec. at ¶ 5; Sherer's Dec. at ¶ 5; Lopez's Dec. at ¶ 5). The allegations of time shaving establish a commonality between Plaintiff, Sherer and Lopez's claims. Nevertheless, Plaintiff has not provided sufficient evidence of a commonality between these claims and the claims of the putative class.

Accordingly, it is

ORDERED AND ADJUDGED that Plaintiff's Motion to Conditionally Certify Collective Action, to Facilitate Notice (Dkt.11) is DENIED.

DONE AND ORDERED in chambers this *22nd* day of March, 2006.

M.D.Fla.,2006.
Rodgers v. CVS Pharmacy, Inc.
Slip Copy, 2006 WL 752831 (M.D.Fla.)

Briefs and Other Related Documents (Back to top)

• 8:05cv00770 (Docket) (Apr. 20, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.