## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

IAN O'DONNELL, DAVID JOLICOEUR, )
and STACEY MOORE, on behalf of )
themselves and all others similarly situated, )
                                                  )
                     Plaintiffs, )      CIVIL ACTION NO.:
                                                    )      04-12719 NMG
v. )
                                                    )
ROBERT HALF INTERNATIONAL INC. )
and ROBERT HALF CORPORATION, )
                                                    )
                     Defendants. )
_____ )

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR RENEWED MOTION TO FACILITATE § 216(B) NOTICE

In this case, Plaintiffs have presented striking evidence that the policies that they challenge under the FLSA salary basis test are policies applicable on their face to all potential class members (all exempt employees), by showing that they are spelled out in Defendants' own Employee Handbook.  Plaintiffs' allegations under the salary basis test are premised on Defendants' policies as they are actually written, not based on anecdotal evidence of how individual class members were treated.  It is quite a stretch for Defendants to suggest that the plaintiffs are not similarly situated to all other putative class members (all of whom are covered by the same Employee Handbook) by arguing, as they do, that in practice, their policies are not always applied as written.[1]

_____

[1] Although Defendants may ultimately attempt to defend themselves in this lawsuit by showing that managers actually exercised discretion in the way they handled requests for, or actual, partial day absences (and thus did not follow the written policies as set forth in the Employee Handbook), this argument could not possibly undermine the appropriateness of conditional certification at the outset of the case for notice purposes.  Whether or not such discretion occurred, or instead whether or not the written policies were followed, is an issue common to the entire class (who are facially bound by Defendants' policies), and, thus, conditional certification is clearly warranted under Plaintiffs' salary basis test argument.  Following discovery, of course, Defendants are free to move for decertification if they believe they have by that point successfully defeated the presumption that their written policies are followed as written.

In addition, Defendants' claim that the lack of opt-in plaintiffs to date in this case somehow signals that there is a lack of interest in this case--and that potential class members should therefore not be notified of the pendency of this case and the opportunity to opt-in--is absurd.  It is irrelevant whether putative class members have by chance heard of the litigation (before notice has issued) and decided to opt in.  Indeed, Plaintiffs' counsel have patiently and respectfully refrained from contacting potential class members until this court approves notice, as courts in the First Circuit have directed.  Plaintiffs should not be penalized for following courts' cautioning counsel to wait for Court approval before sending opt-in notice to potential class members.

All that is necessary at this point in order for Plaintiffs to obtain court-approved notice in this FLSA case is for Plaintiffs to produce "minimal evidence" of an allegedly unlawful policy or practice that applies to all putative class members.  After  that showing, prospective class members should be given the option to make an informed, not happenstance, decision as to whether to join the case.

**ARGUMENT**

**I.    PLAINTIFFS ARE SIMILARLY SITUATED TO PUTATIVE CLASS MEMBERS BECAUSE THEY CHALLENGE THE VALIDITY OF DEFENDANTS' CHOICE TIME OFF (CTO) POLICY, WHICH ON ITS FACE APPLIES TO ALL EXEMPT EMPLOYEES.**

**A.    Defendants' Employee Handbook establishes a policy applicable to all employees classified as exempt.**

In arguing that Plaintiffs have not met their burden of establishing that they are similarly situated to putative class members, Defendants attempt to avoid the fact that the policy of which Plaintiffs complain appears in Defendants' own Employee Handbook.[2]  Plaintiffs' claim does not depend on individualized evidence of how the

---

[2]        FLSA cases in which a class of employees challenges a company policy often focus on factual disagreements between the parties about whether an unwritten policy was actually a companywide

CHOICE Time Off policy works in practice or actual deductions from final paychecks for negative leave time balances.  The claim is based on Defendants' policies as written, and any individualized evidence Plaintiffs have presented so far is simply illustrative.[3]

At this stage, Plaintiffs need do nothing more than present the allegedly unlawful policies, as spelled out in Defendants' own Employee Handbook, together with their cogent argument as to how these policies are a facial violation of the FLSA exemption requirements.  As such, Defendants' arguments about the lack of evidence as to individual employees are red herrings and are belied by the clear language of Defendants' policies themselves.  Indeed, as to every aspect of Defendants' challenged policies for which Defendants argue that Plaintiffs have failed to present evidence, the Employee Handbook itself clearly spells out that portion of the policies.  Namely:

- Defendants argue that Plaintiffs have presented no evidence that Plaintiff O'Donnell ever had a full day deducted from his CHOICE Time Off bank when he worked a partial day.  Defs.' Mem. at 10.  However, Defendants' own Employee Handbook states that "personal business that results in an absence from work of more than 2 hours" will be counted as a full day of CHOICE Time Off.  Pls.' Renewed Mot., Ex. D at 148.

- Defendants also argue that there is no evidence that there was a deduction from Plaintiff Moore's final paycheck.  Defs.' Mem. at 10.  Once again, Defendants' own policy states repeatedly that unearned CHOICE Time Off leave time "will be owed back to [Defendants] and deducted from the final paycheck or other amounts

---

practice.  Here, Plaintiffs have the best evidence possible that the challenged practices are companywide – precisely because they are spelled out in the Handbook.  Thus, Plaintiffs have met their burden, for the conditional certification stage, to point to a common policy they are challenging.

[3]     When plaintiffs have presented evidence of a common challenged policy through a company handbook, courts have granted conditional class certification.  *See Kalish v. High Tech Institute, Inc.*, 2005 WL 1073645, at *3 (D. Minn. Apr. 22, 2005) (conditionally certifying class of 400 to 600 instructors in seventeen locations in twelve states hen plaintiffs presented evidence, *inter alia*, that "[a]ll instructors are subject to the same employee handbook, policies, and procedures"); *Johnson v. TGF Precision Haircutters, Inc.*, 319 F. Supp. 2d 753, 755 (S.D. Tex. 2004) (granting conditional class status because that "the affidavits and employee handbook submitted by Plaintiff constitute sufficient evidence that putative class members were the victims of a common policy violating the FLSA"); *cf. Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir. 1993) (in certifying class under the stricter Rule 23 standard, court concluded that use of the same employee handbook at two facilities sufficed to establish commonality and typicality).

payable to the employee."  Pls.' Renewed Mot., Ex. D at 137, 148; Ex. E, at 105, 115.[4]

- Finally, Defendants argue that Plaintiffs have presented no evidence that Defendants require employees who are willing to work a partial day to be absent for a full day. Defs.' Mem. at 12.  However, because Defendants require employees to take a full day of leave, even if their personal business would only require a partial-day absence, Pls.' Renewed Mot., Ex. D at 148, it is unavoidable as a matter of logic that they are making employees choose between working the rest of the day without pay and taking a full day off.

Similarly, Defendants' argument that individual managers have discretion about whether and how to apply the CHOICE Time Off policy is unavailing—Defendants would have the Court believe that their own written policies should be ignored.  At this stage, Defendants cannot escape the clear language of their own Employee Handbook.

> **B.    Because Defendants' CHOICE Time Off policy subjects all employees to potential pay deductions, all putative class members are similarly situated with respect to this policy.**

Defendants' argument that putative class members are not similarly situated with respect to the CHOICE Time Off policy unless those employees actually had full-day deductions made from their leave bank and had deductions taken from their pay because of negative leave time balances is based on a misconstruction of the FLSA's salary basis test.  The salary basis test is violated if an exempt employee is "subject to" full-day leave time deductions for partial-day absences and is "subject to" pay reductions because of leave time.  29 CFR § 541.602(b)(1).  The Supreme Court has explained that actual deductions from pay are not necessary, so long as there is "a clear and particularized policy—one which 'effectively communicates' that deductions will be

---

[4]      Notably, as another illustration of this policy, Plaintiffs did submit evidence that Plaintiff O'Donnell's unearned CHOICE Time Off balance of 28 hours was deducted from his final paycheck, and Defendants have not disputed this.  Pls.' Renewed Mot., Ex. F, 32, 34, 42, 44.

made in specified circumstances."[5]  *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also O'Brien v. Town of Agawam*, 350 F.3d 279, 293 (1st Cir. 2003).

In other words, if there is a policy that would even put employees at risk of full-day leave time deductions for partial-day absences or salary deductions because of leave time (whether or not it actually happened to specific employees), then the exemption is lost for the entire class of employees who could be "subject to" such deductions.  Here, there can be no question that all employees classified as exempt are similarly situated with respect to Defendants' CHOICE Time Off policy, because all exempt employees are "subject to" the requirements in the Employee Handbook that (1) "personal business that results in an absence from work of more than 2 hours" will be counted as a full day of leave time, Pls.' Renewed Mot., Ex. D at 148, and (2) unearned leave time "will be owed back to [Defendants] and deducted from the final paycheck or other amounts payable to the employee."  Pls.' Renewed Mot., Ex. D at 137.[6]

## II.    PLAINTIFFS HAVE MADE A SUFFICIENT SHOWING OF SIMILARLY SITUATED INDIVIDUALS WHO MAY DECIDE TO OPT IN TO THE CLASS, WHICH IS ALL THAT IS REQUIRED UNDER THE FLSA.

---

[5]    The Department of Labor opinion letter cited by Defendants is not to the contrary, as it applies only to leave policies that do not affect employees' salary.  Defs.' Mem. at 11.  Indeed, the letter explicitly states:  "Payment of the employee's guaranteed salary must be made, even if an employee has no accrued benefits in the leave plan and the account has a negative balance, where the employee's absence is for less than a full day."  DOL Op. Ltr., Defs.' Mem., Ex. F.  Under Defendants' policy, employees' guaranteed salary is *not* made if they leave Defendants' employ with a negative balance, in violation of the salary basis test.

[6]    Defendants also argue that the CHOICE Time Off policy does not violate the FLSA because it requires full-day, not half-day, deductions.  Defs.' Mem. at 10-13.  However, as discussed in Plaintiffs' renewed motion, the FLSA only permits full-day deductions from pay for full-day *absences* from work.  Pls.' Renewed Mot. at 9 (citing 29 C.F.R. § 541.602(b)(1)).  By its express language, Defendants' policy provides for full-day deductions from leave time, even where the employee has only been absent for part of the day.  *See* Pls.' Renewed Mot., Ex. D at 148 ("To the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours, [Defendants' practice is that the day will be considered a full day of CTO.").  In this way, Defendants' reduction applies to partial-day *absences*, in violation of the FLSA.  Pls.' Renewed Mot. at 9-11.  Indeed, it is absurd for Defendants to suggest that, by penalizing employees for partial-day absences more severely by counting them as full-day absences, Defendants have somehow complied with the FLSA's prohibition against deductions for partial-day absences.

Plaintiffs respectfully submit that Defendants are simply incorrect that, in order to be entitled to conditional certification, Plaintiffs must show that some putative class members have somehow by chance heard of this litigation and have already decided to opt in, despite the fact that opt-in notice has not yet been issued.  In fact, Defendants' argument is contrary to clear precedent in the First Circuit holding that plaintiffs' attorneys may not even contact potential plaintiffs until after the court has authorized providing the potential class with opt-in notice.  *See Melendez Cintron v. Hershey Puerto Rico, Inc.*, 363 F. Supp. 2d 10, 17-18 (D.P.R. 2005) (striking opt-in notices filed by plaintiffs before court's notice order because "the **trial court must first authorize whether the alleged class should be provided with notice**") (citing *Reeves v. Alliant Techsystems, Inc.*, 77 F. Supp. 2d 242, 246 (D.R.I. 1999) (holding that trial court must first authorize notice before putative class may be contacted); *Kane v. Gage Merchandising Services, Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001) (holding that "the trial court must first decide whether the potential class should receive notice of the action")); *see also Woods v. New York Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982) (once suit was filed, it would not have been proper for plaintiff's counsel to solicit FLSA class members without reaching agreement with defense counsel or getting court approval as to form of opt-in notice.).

Plaintiffs should not be penalized for having followed the law by not actively soliciting opt-ins before the Court authorizes notice.  Indeed, before a determination may be made about putative class members' interest in opting in to this case, those individuals must be made aware of their right to opt in pursuant to Court-approved notice under § 216(b).  At this point, the fact that potential class members have not

spontaneously contacted Plaintiffs' counsel demonstrates nothing more than that they are unaware of the pendency of the action.[7]

Here, where Plaintiffs have diligently and respectfully refrained from contacting potential class members without the Court's permission, they are entitled to conditional certification if they can show that there are other individuals who have been affected by the same unlawful policy and may decide, when given an informed opportunity, to opt in to the class. *See Garner v. G.D. Searle Pharmaceuticals & Co.*, 802 F. Supp. 418, 422 (M.D. Ala. 1991) (granting conditional certification when plaintiffs showed that there were numerous other employees who "could make out" a violation and "may decide to opt-in if notified of this action"); *see also Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991) (noting that it is enough if "there are a number of employees of the department-employer who are 'similarly situated' and *who may desire* to 'opt-in'") (emphasis added). As discussed in Section I, *supra*, Plaintiffs have made that showing by presenting evidence of Defendants' common policies as set forth in their Employee Handbook.[8]

## III.    IN THIS CASE, COLLECTIVE ACTION IS BY FAR THE MOST EFFICIENT METHOD OF PROCEEDING UNDER THE FLSA.

Defendants' argument that the potential for individualized damages inquiries somehow makes this case inappropriate for certification is a nonstarter. Nearly every class action under the FLSA will involve individual damages inquiries. Where, as here, there are substantial issues of law that are common to the class relating to employees'

---

[7]    Indeed, it would be of very little significance if fifteen or twenty additional people had heard about the case by chance and sought out Plaintiffs' counsel about joining the action. To acquire any significant number of putative class members, Plaintiffs will have to provide notice of the litigation to Defendants' former and current employees, for which they have properly been awaiting Court approval.

[8]    Defendants also argue that it is "ludicrous" to suggest that "senior level officers" would opt in to the class. Defs.' Mem. at 18. However, it should be up to those management-level employees to decide for themselves whether to opt in to the case, and it is not unlikely that at least former senior level officers may be interested in opting in.

exempt status and Defendants' obligation to comply with FLSA overtime requirements,

class certification is nevertheless proper. *See, e.g., McLaughlin v. Liberty Mut. Ins. Co.*,

224 F.R.D. 304, 310-11 (D. Mass. 2004) (certifying a class although the "amount of

damages for each individual class member will ultimately require some individual proof.

. .").  Indeed, FLSA class certification is particularly appropriate here, where many

employees may have only minimal damages and would not otherwise individually

pursue their claims in court.  For those employees, allowing the possibility of a class

would be the only way, as a practical matter, to hold Defendants responsible for their

FLSA violations and thereby realize "the fundamental purpose of the FLSA:  to protect

the general well-being of workers."  *Dooley v. Liberty Mut. Ins. Co.*, 307 F. Supp. 2d

234, 252 (D. Mass. 2004).[9]

Indeed, if Defendants have only to fear claims raised by a handful of determined

employees, they can easily (and without great risk) litigate or pay off those claims with

no real incentive to comply with all of the "technical" requirements of the FLSA.[10]

Indeed, as another court in this district has recently recognized, without the class action

---

[9]     Defendants appear to contradict themselves, arguing both that Plaintiffs have not demonstrated any interest in the opt-in class and that the potential class is "massive."  Defs.' Mem. at 15-18.  In any event, Plaintiffs submit that class certification is particularly superior to individual actions where, as here, the potential class is large.  One collective action to decide the identical liability issues that are presented as to all putative class members is far more efficient than thousands of individual cases and limits the risk of inconsistent judgments.  Moreover, because FLSA classes are "opt in," the Court will know exactly how many class members are involved.  Other courts have conditionally certified FLSA classes of more than a thousand potential class members, because "the ends of justice would not be served by allowing employers to avoid 'accountability for their pay practices simply because of the magnitude of their unlawful conduct.'"  *Geer v. Challenge Financial Investors Corp.*, 2005 WL 2648054, at *4 (D. Kan. Oct. 17, 2005) (certifying FLSA class of 1,300 current and former employees); *see also, e.g., Casas v. Conseco Finance Corp.*, 2002 WL 507059, at *1-3 (D. Minn. Mar. 31, 2002) (FLSA class of 2,900 individuals); *Thiebes v. Wal-Mart Stores, Inc.*, 2002 WL 479840, at *1 (D. Or. Jan. 9, 2002) (conditionally certifying potential FLSA class of more than 15,000 current and former employees).

[10]     Defendants argue in their opposition that, if they violated the FLSA, it was at most a "technical" violation.  Clearly, this is no defense.  Indeed, this argument runs contrary to the purpose behind the FLSA.  *See, e.g., Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319, 1323-24 (1st Cir. 1992) (imposing substantial damages against employer for "technical" violation of the FLSA, on the ground that courts must strictly apply wage laws, even if the court finds such an application to be "unfair"); *Skirchak et al. v. Dynamics Research Corp.*, D. Mass. Civil Action No. 05-11362-MEL, Mem. & Ord. at 11-12, dated April 6, 2006, attached as Exhibit A (court held plaintiffs should have opportunity to pursue claims on a classwide basis where similar "technical" violation of salary basis test was alleged).

mechanism for FLSA wage claims, employers have no "incentive. . . to avoid the type of conduct that might lead to class action litigation in the first instance." *Skirchak et al. v. Dynamics Research Corp.*, D. Mass. Civil Action No. 05-11362-MEL, Mem. & Ord. at 11, dated April 6, 2006 (attached here as Exhibit A).

## IV.    PLAINTIFFS' PROPOSED NOTICE IS APPROPRIATE, AND THE REQUESTED DISCOVERY IS NECESSARY.

Defendants raise a variety of arguments as to why Plaintiffs' proposed notice form is inappropriate.  Plaintiffs note that the form they submitted is based on the one used in *Kane v. Gage Merchandising Services, Inc.*, 138 F. Supp. 2d 212 (D. Mass. 2001).  However, if this Court grants Plaintiffs' motion, Plaintiffs are willing to work cooperatively with Defendants to make any mutually agreeable revisions to the proposed form, and only bring to the Court any unresolved disputes regarding the form or method of notice.[11]

With respect to Defendants' argument that the notice should be limited to a two-year statute of limitations class, Plaintiffs note that other courts have recognized that, since Plaintiffs need not prove their case at the notice stage, notice should be issued to a three-year class.[12]  Indeed, the fact that Defendants have attempted to evade the

---

[11]    Plaintiffs are not necessarily opposed to the use of a third party to facilitate notice (especially, as Defendants have offered, at their own expense), but would want an opportunity to work out the particulars.  Plaintiffs note here only that Defendants' argument that counsel's contact with potential class members should be limited is contradicted by their argument that they have somehow been remiss in not already having reached out to potential class members to demonstrate their interest in opting in.  *See* Defs.' Mem. at 15-17, 20 n.19.

[12]    *See, e.g., Romero v. Producers Dairy Foods, Inc.*, __ F.R.D. __, 2006 WL 1030222, at *6 (E.D.Cal. April 19, 2006) ("[F]or the purpose of conditional certification, the three-year statute of limitations applies."); *Recinos-Recinos v. Express Forestry, Inc.*, 233 F.R.D. 472, 477 (E.D. La. 2006) (conditionally certifying FLSA class of workers employed by defendants for previous three years and ten months); *Pivonka v. Board of County Com'rs of Johnson County, Kansas*, 2005 WL 1799208, at *1, n.1 (D. Kan. July 27, 2005) (conditionally certifying class of all employees within last three years because complaint alleged willful FLSA violation); *Vaicaitiene*, 2005 WL 1593053, at *7. ("[I]n the interest of reaching all similarly situated potential plaintiffs, the notice should extend to those employed up to three years prior to this Opinion."); *Vaicaitiene v. Partners in Care, Inc.*, 2005 WL 1593053, at *7 (S.D.N.Y. July 6, 2005) ("Whether Defendants violated the FLSA, and whether they acted willfully, are issues involving the merits of the action, which cannot be resolved at this stage.").

FLSA's requirement that no deductions be taken for partial-day absences by requiring full-day leave for partial-day absences is alone a sufficient basis on which Plaintiffs may allege willfulness at this stage.[13]

## CONCLUSION

In their renewed motion, Plaintiffs have presented concrete evidence that all putative class members are similarly situated as to Defendants' CHOICE Time Off policy, as stated in Defendants' own Employee Handbook.  Plaintiffs' presentation of that evidence more than satisfies the "lenient" standard for conditional class certification under the FLSA.  Moreover, conditional class certification would serve the purposes of the FLSA as it would ensure that all potential class members have the informed opportunity to decide whether to participate in this litigation, it would lead to efficient resolution of the common liability issues in this case, and it would prevent Defendants from obtaining all-too-easy escape from being held potentially liable, if Plaintiffs are correct, for their widespread violations of the FLSA.  Accordingly, Plaintiffs respectfully request that the Court conditionally certify a class of Defendants' salaried employees.

Respectfully submitted,
IAN O'DONNELL et al.,
By their attorneys,

 s/Shannon Liss-Riordan_____
Shannon Liss-Riordan, BBO #640716
Hillary Schwab, BBO #(pending)
PYLE, ROME, LICHTEN, EHRENBERG,
& LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108
Dated:  May 25, 2006          (617) 367-7200

---

[13]     Defendants also argue that the opt-in period should be limited to a "short window."  Defs.' Mem. at 22.  Again, Plaintiffs hope that the parties can reach an agreement on this issue but submit that the thirty-day period suggested by Defendants is much too short to ensure that all potential plaintiffs receive § 216(b) notice with adequate time to respond.  For example, some addresses may be outdated, some names may have changed, and it may take some time to locate all putative class members.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2006, I caused a copy of this document to be served by electronic filing on all counsel of record.

<u>  s/Shannon Liss-Riordan      </u>
Shannon Liss-Riordan, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
JOSEPH SKIRCHAK and BARRY L.    )
ALDRICH,                        )
        Plaintiffs,             )
                                )
        v.                      )         05-CV-11362-MEL
                                )
DYNAMICS RESEARCH CORPORATION,)
INC.,                           )
        Defendant.              )
_____)
```

MEMORANDUM AND ORDER

LASKER, D. J.

Plaintiffs Joseph Skirchak and Barry L. Aldrich sue
Dynamics Research Corporation, Inc. ("DRC") pursuant to the Fair
Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and M.G.L.
c. 151. The Complaint alleges that DRC willfully failed to pay
the named plaintiffs, and all other similarly situated employees
categorized as "exempt", time-and-a-half their regular pay rate
for time worked in excess of forty hours per week.

DRC moves to dismiss the Complaint and to compel
compliance with its Dispute Resolution Program ("DRP" or "the
Program"). The central question for decision is whether an
arbitration agreement that bars class actions is unconscionable
in the context of this FLSA claim.

I. Relevant Facts

The Dispute Resolution Program at issue came into

1

effect on December 1, 2003.  The Program applies to all DRC
employees, including managers and executive officers, and
requires them to submit any work-related dispute[1] to binding
arbitration, rather than seeking redress in a court of law.  The
Program is intended to create an exclusive procedural mechanism
for the final resolution of legal disputes between DRC employees
and the company.

        DRC first informed all employees of the pending
implementation of the Program through a company-wide email
message on November 25, 2003.  The subject line of the email read
"Employee Dispute Resolution Program".  The text of the email
indicated that: "On December 1, 2003, a new Policy entitled the
'Dispute Resolution Program' will take effect."  The email then
described the new policy as something that "expands upon" and
"enhances" DRC's then-existing Problem Resolution Policy by
including the "additional and more formal processes" of mediation
and arbitration.  The email further stated that once effective,
the Program would apply to all workplace disputes.  Finally, the
email informed employees that: "The program does not limit or
change any substantive legal rights of our employees, but it does
require that you seek resolution of such rights and complaints by

---

[1]Disputes that an employee desires to bring before the Equal
Employment Opportunity Commission, the Massachusetts Commission
Against Discrimination, or the Board of Industrial Accidents are
excluded from the scope of the Program.

2

following the procedures of the program."

In addition to the text, the email contained a link to
a DRC website on which the Dispute Resolution Program was posted.
In order to view the actual provisions of the DRP, an employee
would need to click the link in the email message to open the
website, and then read the available information.  The DRP itself
is a 33 page document containing three appendices.  Rule 12 of
Appendix A, entitled "Dynamics Research Corporation's Dispute
Resolution Program Rules", is the focus of the Court's inquiry.
Entitled "Authority", that rule provides: "The Arbitrator shall
have no authority to consider class claims or join different
claimants or grant relief other than on an individual basis to
the individual employee involved.  The right of any party to
pursue a class action for any Dispute subject to the Program
shall be waived to the fullest extent permitted by law."

Prior to the company-wide email of November 25, 2003,
DRC sent a similar email, with the subject "Dispute Resolution
Program", to its general managers on November 14, 2003.  In
contrast to the email of November 25, however, the email sent to
the general managers stated that the Program would be "mandatory"
and "non-discretionary".

Finally, subsequent to the DRP's implementation on
December 1, 2003, DRC reminded its employees of the Program's
existence and terms through its monthly internal newsletter.  The

front page articles in the January and February 2004 editions, as
well as an article in the November 2004 edition, were dedicated
to the DRP.  The January 2004 article essentially repeated the
substance of the November 25, 2003 email.  It further stated that
the Program took effect on December 1, 2003, applied to "all
workplace disputes", and "required that you seek resolution of
such rights and complaints by following the procedures of the
program."  The February 2004 article discussed the mandatory
nature of the Program by informing employees that "a suit brought
in court that should have been addressed under the [Program] will
be subject to a motion to remove the dispute from the court and
have it placed under the [Program] for resolution."

## II. The Federal Arbitration Act

        The Federal Arbitration Act ("FAA") provides that pre-
dispute arbitration agreements "shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity
for the revocation of any contract."  9 U.S.C. § 2.  The FAA
applies to arbitration agreements, like the one at issue in this
case, that cover employment-related claims.  See Circuit City
Stores v. Abrams, 532 U.S. 105, 121 (2001).  The Supreme Court
has stated that the purpose of the FAA is "to reverse the
longstanding judicial hostility to arbitration agreements... and
to place [them] upon the same footing as other contracts."
Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991).

Accordingly, "generally applicable contract defenses, such as
fraud, duress, or unconscionability, may be applied to invalidate
arbitration agreements."  <u>Doctor's Assocs., Inc. v. Casarotto</u>,
517 U.S. 681, 687 (1996).  However, due to the strong presumption
in favor of arbitration, a party seeking to invalidate an
arbitration agreement bears the burden of proof.  <u>Gilmer</u>, 500
U.S. at 26.

III. The Fair Labor Standards Act

          Congress' principal purpose in enacting the FLSA was to
protect workers from substandard wages, oppressive working hours,
and labor conditions that are detrimental to maintenance of
minimal standards of living necessary for the health, efficiency,
and well-being of workers.  29 U.S.C. § 202(a).  Nothing in the
text, legislative history, or purpose of the FLSA indicates that
Congress intended to confer a non-waivable right to class actions
under the statute.  <u>See</u> <u>Kuehner v. Dickinson & Co.</u>, 84 F.3d 316,
319-20 (9th Cir. 1996).  Nevertheless, Congress did contemplate
and provide for collective actions under the FLSA.  29 U.S.C. §
216.  In so doing, Congress implicitly recognized that because
each employee's damages may be insubstantial, employees may lack
the financial incentive or resources to bring suit individually,
and that absent a mechanism for class actions there would be a
substantial risk that FLSA violations would not be redressed.
<u>See, e.g.</u>, <u>Deposit Guaranty Nat'l Bank v. Roper</u>, 445 U.S. 326,

5

339 (1980) ("Where it is not economically feasible to obtain
relief within the traditional framework of a multiplicity of
small individual suits for damages, aggrieved persons may be
without any effective redress unless they may employ the class-
action device."); see also Phillips Petroleum Co. v. Shutts, 472
U.S. 797, 809 (1985); Eisen v. Carlisle & Jacquelin, 417 U.S.
157, 161 (1974).  By encouraging private civil actions on behalf
of groups of affected employees, class actions under the FLSA
therefore serve the public interest.  Allowing private attorneys
to prosecute such actions in the aggregate effectively ensures
enforcement of the wage laws by motivating employers to comply or
face potentially large-scale litigation, and by providing counsel
with an incentive to pursue such claims.  See Amchem Products,
Inc. v. Windsor, 521 U.S. 591, 617 (1997).

### IV. Unconscionability

        The plaintiffs argue that the provision of the Dispute
Resolution Program which bars class actions cannot be enforced
because it is unconscionable, and that this provision should
accordingly be severed from the agreement.

        In evaluating the validity of an arbitration agreement,
courts apply ordinary state law principals governing contract
formation.  First Options of Chicago, Inc. v. Kaplan, 514 U.S.
938, 944 (1995).  Accordingly, this Court looks to Massachusetts
law, under which unconscionability "must be determined on a case-

by-case basis, with particular attention to whether the
challenged provision could result in oppression and unfair
surprise to the disadvantaged party and not to allocation of risk
because of 'superior bargaining power'."  Waters v. Min. Ltd.,
412 Mass. 64, 68 (1992); Zapatha v. Dairy Mart, Inc., 381 Mass.
284, 292-93 (1980).  The Supreme Judicial Court has recognized
two types of unconscionability: (1) procedural unconscionability,
meaning the circumstances surrounding the adoption of the
arbitration agreement, and (2) substantive unconscionability,
meaning the fairness of the arbitration provision itself.
Waters, 412 Mass. at 67-68; Zapatha, 381 Mass. at 293-95.  As the
First Circuit has summarized, to establish unconscionability a
plaintiff must demonstrate "both a lack of meaningful choice
about whether to accept the provision in question, and that the
disputed provisions were so onesided as to be oppressive."
Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, 170 F.3d 1,
17 (1st Cir. 1999) (quoting Seas v. John Nuveen & Co., Inc., 146
F.3d 175, 184 (3d Cir. 1998)).

## A. Procedural Unconscionability

The context in which DRC adopted the Dispute Resolution
Program compels the conclusion that the class action provision is
procedurally unconscionable.  There is evidence that DRC
management was aware that it was in violation of the wage laws
and rushed to implement the Program in an attempt to protect

7

itself from potential liabilities.  (Skirchak Aff., ¶ 6; Aldrich
Aff., ¶ 8.)  In so doing, DRC failed to follow its usual
procedure for implementing personnel changes, which often
included holding meetings with employees, conducting manager
training about the new policy, requiring employees to acknowledge
their awareness and understanding of a new policy, or sending
information to employees' homes.

Moreover, DRC's use of email as the primary means to
inform employees about the implementation of such a drastic
change in policies governing the disposition of employee
grievances created significant notice problems such that the
plaintiffs can not be held to have knowingly agreed to waive
their right to pursue class actions.  In this case, neither the
subject line nor the content of the November 14 and 25, 2003
emails indicated that the Program was of critical importance and
would alter employees' rights.  The emails did not state that
acceptance of the Program was a condition of continued employment
or that by returning to work on December 1, 2003, an employee
thereby accepted the terms of the DRP and waived his rights to
pursue class actions.  DRC did not track whether employees had
opened the email about the DRP and followed the link to the
Program's website to view its contents, nor did DRC request a
signature or even an email reply to verify consent to be bound by
the Program.  Finally, the articles about the Program in DRC's

internal newsletter did not appear until after the Program's
implementation, and cannot be deemed to create an agreement
encompassing the terms of the DRP.

In sum, plaintiffs Skirchak and Aldrich were not aware
of the DRP's implementation on December 1, 2003, and therefore
had no meaningful choice as to whether to accept the waiver of
class actions.  (Skirchak Aff., ¶4; Aldrich Aff., ¶8.)  Although
"continuing to work with the knowledge that a dispute resolution
program has been implemented and is a mandatory condition of
employment can constitute acceptance...an employee's knowledge of
the offer is obviously a necessity for the inference of an
acceptance to hold."  Campbell v. General Dynamics Government
Systems Corp., 321 F.Supp.2d 142, 148 n.3 (D. Mass. 2004), aff'd
Campbell v. General Dynamics Government Systems Corp., 407 F.3d
546, 558 (1st Cir. 2005).  In the instant case, the plaintiffs
had no meaningful choice about whether to accept the Program's
terms because it bound them by default, and without their
knowledge, when they arrived for work on the day of its
implementation.  Moreover, because the plaintiffs had no actual
knowledge of the ramifications of the DRP, they had no meaningful
opportunity to decline to be bound by it.  Finally, the text of
the DRP is written in a sufficiently confusing and technical
style that a reasonable or average employee would not have been
able to understand the significance of its terms.  For these

reasons, I find that the class action provision of the Program is
procedurally unconscionable.

*B. Substantive Unconscionability*

Turning to the question of substantive
unconscionability, I conclude that the class action provision of
the DRP is so one-sided as to be oppressive.  <u>See</u> <u>Rosenberg</u>, 170
F.3d at 17; <u>Ingle v. Circuit City Stores, Inc.</u>, 328 F.3d 1165,
1177 (9th Cir. 2003) ("We find that this bar on class-wide
arbitration is patently one-sided, and conclude that it is
substantively unconscionable.").  An arbitration agreement that
eliminates the right to a class-wide proceeding may have "the
'substantial' effect of contravening the principle behind class
action policies and 'chilling the effective protection of
interests common to a group'."  <u>Id.</u> at 1176, n.13.  Requiring
employees prospectively to waive their statutory rights to sue in
order to obtain or maintain their employment is utterly
inconsistent with the FLSA's purpose of protecting the class of
employees that possesses the least bargaining power in the
workforce: "the unprotected, unorganized and lowest paid of the
nation's working population."  <u>Brooklyn Sav. Bank v. O'Neil</u>, 324
U.S. 697, 707 n.18 (1945).  In this case, the imposition of a
waiver of class actions may effectively prevent DRC employees
from seeking redress of FLSA violations.  The class action
provision thereby circumscribes the legal options of these

10

employees, who may be unable to incur the expense of individually
pursuing their claims.  In this respect, the class action waiver
is not only unfair to DRC employees, but also removes any
incentive for DRC to avoid the type of conduct that might lead to
class action litigation in the first instance.  The class action
clause is therefore substantively unconscionable.

<u>V. Conclusion</u>

For the reasons outlined above, I conclude that the
Dispute Resolution Program's purported waiver of class action
rights is unconscionable and unenforceable.  Accordingly, the
plaintiff's claims may proceed on a class basis before an
arbitrator.

It is so ordered.


Dated:      April 6, 2006
            Boston, Massachusetts      <u>/s/ Morris E. Lasker</u>
                                              U.S.D.J.