## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR, AND STACY MOORE, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION <br><br> Defendants. | CIVIL ACTION NO.: 04-12719 NMG |

### PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR CROSS MOTION SUMMARY JUDGMENT AND STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.     Plaintiffs' Rule 56.1 Statement in Support of Their Motion for Summary Judgment**

Pursuant to Local Rule 56.1, Plaintiffs Ian O'Donnnell, David Jolicoeur, and Stacey Moore hereby submit the following statement of material facts about which there is no genuine issue to be tried.

1.     Defendants own and operate a large specialized staffing firm with 16 offices in New England alone. Affidavit of William T. Hayes ¶ 1, attached as Ex. C to Defs. Mot. for Partial Summ. Judg.

2.     Plaintiff Ian O'Donnell worked as a staffing manager at Defendants' offices in Danbury, Connecticut, and Westborough and Boston, Massachusetts,

1

from January 2002 to August 2003. O'Donnell Aff. ¶ 2 (attached as Exhibit A).

3      Plaintiff David Jolicoeur worked as a staffing manager at Defendants' Boston office from June 2002 to August 2003. Jolicoeur Aff. ¶ 2 (attached as Exhibit B).

4.     Plaintiff Stacey Moore worked as an account manager in the Creative Group Division in Defendants' Boston office from May 2003 to February 2004. Moore Aff. ¶ 2 (attached as Exhibit C).

5.     Robert Half regularly required Plaintiffs to work in excess of forty (40) hours in a work week. O'Donnell Aff. ¶ 5; Jolicoeur Aff. ¶ 5; Moore Aff. ¶ 5.

6.     Defendants classified Plaintiffs as exempt employees, paid them on a salary basis, and did not pay them overtime wages. O'Donnell Aff., ¶ 4; Jolicoeur Aff., ¶ 4; Moore Aff., ¶ 4.

7.     Defendants maintain an Employee Handbook to acquaint their employees with their policies and benefits, and they provide their employees with this employee handbook as a reference guide to their employment policies and practices. Exhibit D at Bates Nos. 119, 123.

8.     The Employee Handbook sets forth "Employee Classifications" "[f]or purposes of salary administration and eligibility for overtime payments and employee benefits," and one of these classifications is defined as follows: "Exempt Employees are employees in positions which are exempt from legal overtime pay requirements.  Exempt employees are expected to work whatever hours are necessary to do their jobs properly." Ex. D at Bates No. 129.

9.     The Employee Handbook sets forth Defendants' "CHOICE Time Off

(CTO)" policies, which provide "employees with paid time away from the job for such things as vacation, outside activities, illness, personal business and family matters" and which explicitly apply to both "Exempt and Non-Exempt" employees of Defendants. Ex. D at Bates No.137.

10.    Defendants' "policy is to record time off in full day increments for exempt employees." Ex. D at Bates Nos.147-48; Affidavit of Linda Blandford-Beringsmith ¶ 3 (attached as Ex. A to Defs. Mot. for Summ. Judg.).

11.    Pursuant to Defendants' CTO policies, "CTO may be taken before it is actually earned," but "[s]hould employment end before used CTO has been earned, that time will be owed back to [Defendants] and deducted from the final paycheck or other amounts payable to the employee." Ex. D at Bates No.137.

12.    Defendants' CTO policies also provide that "[t]o the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours, [Defendants'] practice is that the day will be considered a full day of CTO." Ex. D at Bates No. 148.

13.    Defendants' CTO policies further provide that "[u]p to 5 days for exempt employees or ... may be taken in advance of earning the time off. However, if [employees] terminate before [they] have earned the CHOICE Time Off [they] have taken, the amount [they] owe the company will be deducted from [their] final paycheck[s] or any other amounts payable to [them]." Ex. D at Bates No. 148.

14.    Defendants' policy of deducting unearned CTO from exempt employees' final paychecks is listed in the Employee Handbook, as quoted

above, but also repeated on Defendants' "Corporate Employee Exempt Absence Record" (time sheet), which requires exempt employees to sign under the statement, "If your employment terminates while you have a negative CTO balance, the amount you owe the company will be deducted from your final paycheck or any other amounts payable to you." Ex. E  at Bates No. 105.

15.    Defendants' policy of deducting unearned CTO from exempt employees' final paychecks is also listed in Defendants' "Exempt Employee Time Off Request" form, which requires exempt employees to sign under the affirmation, "I understand that if my employment terminates when I have negative CHOICE Time Off balance, the amount I owe the company will be deducted from my final paycheck." Exhibit E at Bates No. 115.

16.    Defendants have an actual practice of deducting negative CTO balances from employees' final paychecks. Their final paychecks and termination worksheets direct Defendants' payroll employees to make these deductions. Plaintiff Ian O'Donnell's termination documents show that his unearned CTO balance of 28 hours (equivalent to $484.62 in gross salary) was deducted from the total amount due on his final paycheck.  Exhibit F at Bates Nos. 32, 34, 42, 44.

17.    Defendants urged exempt employees who wished to take partial days off to take the entire day off. Moore Aff., Ex. C, ¶ 23.

18.    As a result, employees were discouraged from taking any time off at all. *Id.*

## II.  Plaintiffs' Statement of Facts in Response to Defendants' Rule 56.1 Statement

Pursuant to Rule 56.1, Plaintiffs hereby respond to Defendants' Rule 56.1 Statement. As explained in Plaintiffs' Accompanying Memorandum of Law, many of Defendants' factual assertions, even if true, are legally irrelevant and do not entitle them to judgment as a matter of law. Further, Plaintiffs state that any facts admitted herein are admitted solely for purposes of this motion, and note that these responses are being provided before any discovery has taken place.

1.    Admitted.

2.    Admitted.

3.    Denied. The written policy is mandatory and does not provide an exception for managerial discretion. Pl. Ex. D at Bates Nos. 137, 148; Pl. Ex. E. at Bates Nos. 105, 115.

4.    Admit the first sentence. Admit the second sentence, except clarify that an employees who leave work for more than two hours for reasons other than illness are required to take a full day of CTO time. Pl. Ex. D at Bates No. 148 (¶ 8).

5.    Admitted.

6.    Denied. The written policy is mandatory and does not provide and exception for managerial discretion. Pl. Ex. D at Bates Nos. 137, 148; Pl. Ex. E. at Bates Nos. 105, 115.

7.    Admitted, except Plaintiffs deny that such payments had the purpose or effect of offseting the mandatory deductions for unpaid leave time. Plaintiffs further clarify that Defendants do not contend that deductions for unpaid

5

leave time were not made when no salary continuation was provided, or when the amount of the salary continuation was less than the amount of the deduction. Def. Ex. B ¶ 3.

     8.     Admitted.

     9.     Admit the first sentence.  Admit the second sentence insofar as Mr. Jolicoeur's last paycheck apparently includes two days' salary plus two days' "salary continuation," but deny that the paycheck submitted demonstrates that Mr. Jolicoeur "received his full salary for his final period of employment."  Admit the third sentence.

     10.     Admitted.

     11.     Admit the first sentence.  Admit the second sentence insofar as Ms. Moore's last paycheck apparently includes one day's salary plus two days' "salary continuation" and does not include deductions other than standard withholding for taxes and the like, but deny that the paycheck submitted demonstrates that Ms. Moore "received her full salary for her final pay period of employment." Admit the third sentence.

     12.     Admit the first sentence.  Admit the second sentence.  Admit the third sentence. Admit the fourth sentence insofar as Mr. O'Donnell's last paycheck apparently includes four days' salary plus seven days' "salary continuation," but deny that the paycheck submitted demonstrates that Mr. O'Donnell was "paid his regular salary through August 15, 2003."

     13.     Admit the first sentence. Admit the second sentence insofar as it states that Mr. O'Donnell received an amount classified as "salary continuation,"

but deny that such a salary continuation had the purpose or effect of offseting the deductions that was taken for overdrawn leave time.

14.     Denied.  Mr. O'Donnell's weekly salary was decreased by $484.62, the value of 28 hours of overdrawn leave time. Defs. Ex B, attachment 4. For each week in which any of these hours was charged to Mr. O'Donnell's CTO bank, he received less than his full salary for that week.

15.     Admit only that the records that Defendants have submitted from these periods do not show a deduction, and note that Defendants do not contend that Ms. Moore was never charged for a full leave day for being absent for part of the day.

16.     Admit only that the records that Defendants have submitted from these periods do not show a deduction, and note that Defendants do not contend that Ms. Moore was never charged for a full leave day for being absent for part of the day.

Respectfully submitted,

IAN O'DONNELL, DAVID JOLICOEUR, and STACEY MOORE, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, By their attorneys,

  s/Shannon Liss-Riordan
Shannon Liss-Riordan, BBO #640716
PYLE, ROME, LICHTEN, EHRENBERG
           & LISS-RIORDAN, P.C.
18 Tremont Street, Ste. 500
Boston, MA 02108
(617) 367-7200

Dated:  June 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2007, I caused a copy of this document to be served by electronic filing on all counsel of record.

s/Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.

<u>Exhibit A</u>

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN O'DONNELL and DAVID JOLICOEUR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>              Plaintiffs,<br><br>v.<br><br>ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION<br><br>              Defendants. | CIVIL ACTION NO.: 04-12719 NMG |

## AFFIDAVIT OF IAN O'DONNELL

Pursuant to 28 U.S.C. § 1746, I, Ian O'Donnell, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. My name is Ian O'Donnell. I reside at 27 Willow Drive, Easton, Pennsylvania. I am over the age of eighteen (18) and otherwise competent to testify. All statements in this declaration are made solely for use in this litigation. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2. I worked as a staffing manager in Defendants' Danbury, Connecticut, and Westborough and Boston, Massachusetts, offices from January 2002 until August 2003.

3. I make this affidavit in support of Plaintiffs' Motion to Facilitate 216(b) Notice.

4.    The Defendants classified staffing managers as exempt employees and paid

them on a salary basis.  Thus, I did not receive overtime compensation for

hours worked in excess of forty (40) hours in a work week.

5.    While employed by Defendants as a staffing manager, I regularly worked

more than forty (40) hours in a work week.

6.    My primary duty as a staffing manager, known as the "sales function," was to

sell the Company's staffing services.  I was required to make between 25 and

30 sales connections per day, and I regularly made approximately 100

outbound sales calls per day.

7.    I spent at least 85 percent of my time telephoning businesses at the direction

of the Company to inquire about their staffing needs and make a sales pitch

regarding the Company's personnel-placement service.  The Company gave

me specific lists of companies to call in a specified geographic area.  The

Company also told me to whom I should direct each call within each business

(e.g., the human resources department, line manager, etc.).

8.    My branch manager also provided me with additional lists of companies to

call that were not on my original Company-provided list.

9.    I exercised little, if any, discretion or independent judgment in making my

sales calls.  I exercised little, if any, discretion with respect to how I chose to

spend my time.

10.   The Company planned my day such that I arrived at the office at 7:45 a.m.,

planned my morning calls until 8 a.m., and made outbound sales calls non-

stop from 8 a.m. until 11 a.m.  From 11 a.m. to 12 noon, I sent out marketing

materials from the morning's calls and took a bathroom break.  From 12 noon

to 12:30 p.m., I ran out to get lunch, which I ate at my desk. From 1 p.m. to 4 p.m., I made outbound sales calls non-stop. From 4 p.m. to 5 p.m., I sent out marketing materials from the afternoon's calls and took a bathroom break. From 5 p.m. to 6 p.m., I planned out my next day's calls. From 6 p.m. to 7 p.m., I tried to call CFOs and other high-level managers at the Company's current and prospective clients.

11.    The Company instructed me as to what I should be working on at every moment of the day, on an hour-by-hour and sometimes minute-by-minute basis.

12.    The activities I performed during any given day were entirely prescribed by the Company. My division director, branch manager, and/or regional director planned my daily work activities. The Company held two daily and two weekly meetings and sent e-mails setting my daily activities, including the length of time of my breaks. I had no discretion to deviate from this schedule. Every afternoon, I was told to print out my daily activity report and report to the group how many calls and connects I made, as well as any success stories. Once a month, I would meet with my Division Director and branch manager to review my monthly activity. This meeting was known as a sales activity report. I was told whom to call in each company and asked why I did not get business from companies that I marketed on a regular basis. At the end of the meeting, I was given tasks to complete for the next meeting. The Company sent a detailed 2-3 page written sales report to all managers.

13.    I did not have the authority to formulate, affect, interpret, or implement management policies or operating practices.

3

14.   I did not carry out major assignments in conducting the operations of the business.

15.   I did not perform work that affected business operations to a substantial degree.

16.   I did not have the authority to waive or deviate from established policies and procedures.

17.   I did not provide consultation or expert advice to management.

18.   I was not involved in planning business objectives of any kind.

19.   I did not investigate or resolve matters of significance on behalf of management.

20.   I am familiar with other current and former employees of the Company who are not listed as named plaintiffs in this case but who have stated that they would be interested in participating in this litigation.  These current and former employees work or worked in similar positions with similar duties and did not receive overtime compensation for hours worked in excess of forty (40) hours in a work week despite regularly working in excess of forty (40) hours in a work week.

21.   Throughout my employment with the Company, at each of the three offices of the Company where I worked, other employees in positions similar to mine stated that they were extremely dissatisfied with their level of compensation. Many of these employees stated that they believed that they should receive overtime pay because of the nature of their jobs and the long hours they worked.  I believe that many of these current and former employees of the Company would be interested in participating in this litigation.

4

May-04-2005  09:09am    From-TAX AND TREASURY MM MARS                    19736913777              T-240   P.006/006   F-867

Signed under pains and penalties of perjury, this 4th day of ___May___, 2005.

_____
Ian O'Donnell

# Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IAN O'DONNELL and DAVID JOLICOEUR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION )<br><br>Defendants. ) | CIVIL ACTION NO.: 04-12719 NMG |

## AFFIDAVIT OF DAVID JOLICOEUR

Pursuant to 28 U.S.C. § 1746, I, David Jolicoeur, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.   My name is David Jolicoeur. I reside at 195 Park Ridge Drive in Easton, Pennsylvania. I am over the age of eighteen (18) and otherwise competent to testify. All statements in this declaration are made solely for use in this litigation. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2.   I worked as a staffing manager in Defendants' Boston office from June 2002 until August 2003.

3.   I make this affidavit in support of Plaintiffs' Motion to Facilitate 216(b) Notice.

4.    The Defendants classified staffing managers as exempt employees and paid them on a salary basis. Thus, I did not receive overtime compensation for hours worked in excess of forty (40) hours in a work week.

5.    While employed by Defendants as a staffing manager, I regularly worked more than forty (40) hours in a work week.

6.    My primary duty as a staffing manager, known as the "sales function," was to sell the Company's staffing services. I was required to make between 20 and 25 sales connections per day, and I regularly made approximately 100 outbound sales calls per day.

7.    I spent at least 85 percent of my time telephoning businesses at the direction of the Company to inquire about their staffing needs and make a sales pitch regarding the Company's personnel-placement service. The Company gave me specific lists of companies to call in a specified geographic area. The Company also told me to whom I should direct each call within each business (e.g., the human resources department, line manager, etc.).

8.    My branch manager also provided me with additional lists of companies to call that were not on my original Company-provided list.

9.    I exercised little, if any, discretion or independent judgment in making my sales calls. I exercised little, if any, discretion with respect to how I chose to spend my time.

10.   The Company planned my day such that I arrived at the office at 7:45 a.m., planned my morning calls until 8 a.m., and made outbound sales calls non-stop from 8 a.m. until 11 a.m. From 11 a.m. to 12 noon, I sent out marketing materials from the morning's calls and took a bathroom break. From 12 noon

2

to 12:30 p.m., I ran out to get lunch, which I ate at my desk. From 1 p.m. to 4

p.m., I made outbound sales calls non-stop. From 4 p.m. to 5 p.m., I sent out

marketing materials from the afternoon's calls and took a bathroom break.

From 5 p.m. to 6 p.m., I planned out my next day's calls. From 6 p.m. to 7

p.m., I tried to call CFOs and other high-level managers at the Company's

current and prospective clients.

11.    The Company instructed me as to what I should be working on at every

moment of the day, on an hour-by-hour and sometimes minute-by-minute

basis.

12.    The activities I performed during any given day were entirely prescribed by

the Company. My division director, branch manager, and/or regional director

planned my daily work activities. The Company held at least one or two

weekly meetings and sent e-mails setting my daily activities, including the

length of time of my breaks. I had no discretion to deviate from this schedule.

Every afternoon, I was told to print out my daily activity report and report to

the group how many calls and connects I made, as well as any success stories.

Once a month, I would meet with my Division Director and branch manager

to review my monthly activity. This meeting was known as a sales activity

report. I was told whom to call in each company and asked why I did not get

business from companies that I marketed on a regular basis. At the end of the

meeting, I was given tasks to complete for the next meeting. The Company

sent a detailed 2-3 page written sales report to all managers.

13.    I did not have the authority to formulate, affect, interpret, or implement

management policies or operating practices.

3

14. I did not carry out major assignments in conducting the operations of the business.

15. I did not perform work that affected business operations to a substantial degree.

16. I did not have the authority to waive or deviate from established policies and procedures.

17. I did not provide consultation or expert advice to management.

18. I was not involved in planning business objectives of any kind.

19. I did not investigate or resolve matters of significance on behalf of management.

20. I am familiar with other current and former employees of the Company who work or worked in similar positions with similar duties and regularly worked in excess of forty (40) hours in a work week. I believe that many of these individuals would be interested in participating in this litigation, because while I worked at the Company alongside many of these current and former employees, I frequently heard them complain that we were all working too many hours without being sufficiently compensated for them.

Signed under pains and penalties of perjury, this 10 day of May, 2005.

David Jolicoeur

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| IAN O'DONNELL and DAVID JOLICOEUR, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, ) ) ) ) | **NOV 21 2005** |
| Plaintiffs, ) ) | |
| v. ) ) | CIVIL ACTION NO.: 04-12719 NMG |
| ROBERT HALF INTERNATIONAL INC. and ROBERT HALF CORPORATION ) ) ) | |
| Defendants. ) ) ) ) ) ) | |

---

## AFFIDAVIT OF STACEY MOORE

Pursuant to 28 U.S.C. § 1746, I, Stacey Moore, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.  My name is Stacey Moore. I reside at 69-81 108th Street in Forest Hills, New York. I am over the age of eighteen (18) and otherwise competent to testify. All statements in this declaration are made solely for use in this litigation. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2.  I worked as an Account Manager in the Creative Group division in Defendants' Boston office from May 2003 until February 2004.

3.  I make this affidavit in support of Plaintiffs' Renewed Motion to Facilitate 216(b) Notice.

4. Defendants classified Account Managers as exempt employees and paid them on a salary basis. I did not receive overtime compensation for hours worked in excess of forty (40) hours in a work week.

5. While employed by Defendants as an Account Manager, I regularly worked more than forty (40) hours in a work week.

6. My primary duty as an Account Manager, known as the "sales function," was to sell Defendants' staffing services. I was required to make between 20 and 25 sales connections per day, and I regularly made approximately 50 outbound sales calls per day.

7. Although my work day was supposedly between 8 a.m. and 6 p.m., I was expected to "plan my sales calls for the day" between 7 a.m. and 7:30 a.m., and then at around 8 a.m. and 5 p.m., the "Desk person" would lead our division (The Creative Group) in daily board meetings, and I often stayed later than 6 p.m. to fill jobs. These hours were typical for other Account Managers and similar employees in other divisions in the Boston office, which I knew because the employees from all divisions housed in the Boston office had to attend a daily staff meeting each day at 8 a.m. I could also see that the other Account Managers and similar employees in other divisions stayed as late as I did.

8. I spent at least 85 percent of my time telephoning businesses at the direction of Defendants to inquire about their staffing needs and make a sales pitch regarding Defendants' personnel-placement service. Defendants gave me specific lists of companies to call in a specified geographic area. Defendants also told me to whom I should direct each call within each business (e.g., the human resources department, line manager, etc.).

2

9.   My branch manager also provided me with additional names of companies to call that were not on the original list.

10.  I exercised little, if any, discretion or independent judgment in making my sales calls. I exercised little, if any, discretion with respect to how I chose to spend my time.

11.  Defendants planned my day such that I arrived at the office at or before 7:30 a.m., planned my morning calls until 8 a.m., attended the daily sales meeting at 8 a.m., and then made outbound sales calls non-stop until 11 a.m. From 11 a.m. to 12 noon, I sent out marketing materials from the morning's calls and took a bathroom break. From 12 noon to 12:30 p.m., I ran out to get lunch, which I ate at my desk. From 12:30 p.m. to 4 p.m., I made outbound sales calls or visited clients non-stop. From 4 p.m. to 5 p.m., I sent out marketing materials from the afternoon's calls and visits and took a bathroom break. From 5 p.m. to 6 p.m., I planned out my next day's calls. From 6 p.m. to 7 p.m., I tried to call CFOs and other high-level managers at Defendants' current and prospective clients.

12.  Defendants instructed me as to what I should be working on at every moment of the day, on an hour-by-hour and sometimes minute-by-minute basis.

13.  The activities I performed during any given day were entirely prescribed by the defendants. My division director, branch manager, and/or regional director planned my daily work activities. Defendants sent e-mails setting my daily activities, including the length of time of my breaks. I had no discretion to deviate from this schedule. My daily activity report of how many calls and connects I made, as well as any success stories, was monitored on Micro-J (software we used to track Account Managers' and other staffing employees'

3

sales activity) on a daily basis by my branch/division manager. Once a month, I would meet with my Division Director and branch manager to review my monthly activity. This meeting was known as a sales activity report. I was told whom to call in each company and asked why I did not get business from companies that I marketed on a regular basis. At the end of the meeting, I was given tasks to complete for the next meeting.

14.    Our supervisors watched us very carefully to make sure that we were at our desks and working as much as possible. If I went and got a coffee and lingered in the kitchen or stopped on the way back to chat with someone, my division director or branch manager would notice and give me a verbal warning for not being at my desk. I often saw this happen with other Account Managers and employees in similar positions with other divisions.

15.    I did not have the authority to formulate, affect, interpret, or implement management policies or operating practices.

16.    I did not carry out major assignments in conducting the operations of the business.

17.    I did not perform work that affected business operations to a substantial degree.

18.    I did not have the authority to waive or deviate from established policies and procedures.

19.    I did not provide consultation or expert advice to management.

20.    I was not involved in planning business objectives of any kind.

21.    I did not investigate or resolve matters of significance on behalf of management.

22.    I am familiar with other current and former employees of Defendants who work or worked in similar positions with similar duties and regularly worked in excess of forty (40) hours in a work week. I could see that employees in similar

4

positions in other divisions were doing the same sort of work as I was. I believe that some of these individuals would be interested in participating in this litigation, because while I worked for Defendants alongside many of these current and former employees, I frequently heard them complain that we were all working too many hours without being sufficiently compensated for them.

23.     Whenever I would ask to take part of a day off, my supervisors would urge me to take the whole day off, and this usually discouraged me from taking any time off at all. In or about July 2003, I moved, and during the move, I wanted to work half days for a couple of days, working in the morning and moving in the afternoons. I requested this time off, and my supervisors said something to the effect that I "should just take both days off" and charge them to my paid leave. I didn't want to use that much vacation time, and I was ready, willing, and able to go to work in the morning on those days. Even though my supervisors strongly insisted that I take both whole days off, I recall that I took the two half days off and worked during the mornings and that one full day of leave was subtracted from my accrued paid leave for that pay period.


Signed under pains and penalties of perjury, this 15th day of November, 2005.

_____
Stacey Moore

<u>Exhibit D</u>



# EMPLOYEE HANDBOOK
### YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

**Robert Half International Inc.**
**Mission Statement:**

To be the premier provider of specialized staffing services in all markets we serve while adhering to the highest professional standards.

---

### IMPORTANT NOTICE OF DISCLAIMER CONCERNING THIS HANDBOOK

All employees of Robert Half International Inc. or its subsidiaries ("RHI" or "the Company") are employed "at-will," which means that either you or RHI may terminate your employment at any time, with or without cause and with or without prior notice or discipline.

RHI has provided you this Employee Handbook as a reference guide to its employment policies and procedures. The Employee Handbook is for informational purposes only and contains no promise of any kind. Except for the policy on at-will employment, RHI reserves the right to change, amend, delete, or adopt any employment policy, benefit or practice at any time with or without prior notice. RHI also reserves the right to depart from policies or procedures set forth in this Employee Handbook or elsewhere at its sole discretion. Nothing contained in the Employee Handbook or any other policy of RHI restricts the Company's absolute right to end your employment at any time, with or without cause and with or without prior notice.

No supervisor, department head or other employee has any authority to enter into individual agreements with employees of RHI or to make any representations or promises concerning the terms and conditions of employment that differ materially from RHI policies, benefits or practices.

This Employee Handbook, and the policies contained herein, supersede and replace any and all prior handbooks, policies, procedures and practices of RHI, whether documented or undocumented.

---

**Table of Contents**

RHI 0000119



# EMPLOYEE HANDBOOK
## YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

GENERAL · COMPENSATION · EMPLOYEE BENEFITS · SUPPLEMENT · FAQS · CHOICE BENEFITS

MAX MESSMER LETTER · INTRODUCTION · TABLE OF CONTENTS

# TABLE OF CONTENTS

### Max Messmer Letter
Letter From Max Messmer

### Introduction
Company Background

### General
Equal Employment Opportunity
Disability Accommodations
Non-Discrimination Pledge
Policy Against Harassment
Policy Against Sexual Harassment
Corporate Compliance / Financial Controls Hotline
Professional Standards of Conduct
Conflicts of Interest/Vendor Gifts
Inside Information
Employee-Incurred Business Expenses
Substance Abuse
Smoking
Hours of Business
Employee Classifications
• Regular Full-Time Employees
• Regular Part-Time Employees
• Temporary, Contract Employees and Consultants
• Exempt Employees
• Non-Exempt Employees
Service Date
Non-Competition and Trade Secret Agreements
Immigration Law
Performance Reviews
Discipline
Exit Interviews
Prohibited Items
Policy Against Workplace Violence
Safe Work Environment
Company Transfers
Employee Reference Requests
Media Calls
Open Door Policy
Personnel Records
Company Resources
E-mail and Internet Protocols

### Compensation
Overtime
Salary Administration
Direct Deposit
Salary Review and Bonuses
Field Sales Compensation
• Eligibility
• Timing of Commission and Bonus Payments
• Termination
• Management Discretion

### Employee Benefits
Health and Life Benefits
• Employee Assistance Program (EAP)
• Dependent Care Reimbursement Account (DCRA)
• Adoption Assistance
• Open Enrollment
• Family Status Changes
• Continuation of Health Benefits - COBRA
401(k) Plan
Deferred Savings Plan
StockPLUS Program
Time Away from Work Benefits
• CHOICE Time Off (CTO)
• Holidays
• Bereavement
• Leaves of Absence
• Jury Duty and Court Summons
Employee Development
• RHI University (RHIU)
• Professional Memberships/Continuing Education

### Supplement
CHOICE Time Off (CTO)
"Stars" Employee Referral
Tuition Assistance
Non-Standard Work Schedules
On-Call Pay
Domestic Violence Absence Policy

### Handbook FAQs

### Choice Benefits
CHOICE Time Off FAQs
Delayed Impact Explanation
Floating Holiday Schedule and Procedures
Holiday FAQs
Bereavement FAQs

RHI 0000120

Employee Handbook: Table of Contents

Tuition Assistance FAQs
Non-Standard Work Schedules FAQs
On-Call Pay FAQs

**CHOICE Time Off Forms**
Exempt Employee Time Off Request
Non-Exempt Employee Time Off Request
Exempt Employee Absence Record
Non Exempt Employee Time Sheet

RHI 0000121



**EMPLOYEE HANDBOOK**
YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

( GENERAL ⊔ COMPENSATION ⊔ EMPLOYEE BENEFITS ⊔ SUPPLEMENT ⊔ FAQS ⊔ CHOICE BENEFITS )
( MAX MESSMER LETTER ⊔ INTRODUCTION ⊔ TABLE OF CONTENTS )

## MAX MESSMER LETTER



As an employee of RHI, you are part of the world's first and largest specialized staffing firm. We're glad to have you as a member of our elite team!

Our company is built upon powerful principles: attract top talent, give them the tools to excel, provide opportunities for advancement and reward outstanding performance.

We've invested substantial resources into harnessing the tremendous power of technology and the Internet to our business advantage. This commitment extends to the hands-on tools you use on a daily basis. For example, we offer web access at every desktop and a state-of-the-art on-line corporate university, RHIU. In addition, our placement professionals use leading-edge technology to source candidates through the Internet and to tap into our extensive client and candidate database, while our Corporate Services employees also enjoy the benefits of state-of-the-art business systems.

RHI is known as the industry's employer of choice. As a result, job candidates and clients want to work with us, and we offer them superior service in return. But we also strive to be the employer of choice for each of you by providing the best possible work environment and career advancement opportunities.

I hope you'll take some time to consider your professional development within our organization and encourage you to take advantage of the many resources and programs available to you. A good starting point for your development is this handbook. Please read it and if you have any questions or need clarification, please contact your supervisor.

I wish you all the best in your career with us.

Sincerely,

*Max Messmer*

Max Messmer
Chairman and Chief Executive Officer

RHI 0000122



## INTRODUCTION

Robert Half International Inc. and its subsidiaries ("RHI" or the "Company") have prepared this handbook to acquaint you with our policies and benefits. It is for informational purposes only, and is not intended to create or confer specific legal rights, nor should any of the statements be construed to be contractually binding. This handbook is a summary intended to highlight certain benefits and policies. Variations in some policies may occur if necessary to comply with state or local law. Many of the benefits described are provided by independent insurers or other providers. Therefore, RHI often cannot control the terms and conditions of those benefits. Should a question arise about group benefits, the actual contracts and plan provisions will govern. Since a booklet such as this cannot encompass all possible situations, questions regarding policies or procedures, or situations not covered by this handbook, should initially be referred to your supervisor.

**No permanent regular employment or employment for any term is intended or can be implied by any statement in this handbook. This employment at-will policy shall not be modified by any other employment handbook or other company materials or statements of a manager provided to our employees in connection with employment at RHI.**

**RHI reserves the right to change, modify or terminate any benefits or policies at any time, for any reason, without prior notice and without amending this handbook.**

**The policies in this handbook do not apply to temporary consultants, temporary employees, or contract employees employed by any division of RHI, unless otherwise stated. The information in this handbook supersedes all other handbooks, policies and related materials previously distributed.**

To the extent any policies or procedures contained in this handbook are contrary to applicable state or local law or regulation, the state or local law or regulation shall control. Changes to the handbook may be communicated via e-mail and posted on the RHI Intranet, BobNet. It is your responsibility to read and keep abreast of changes posted on BobNet.

All Full-Time Consultants and Salaried Financial Executives need to contact their supervisor for BobNet information (when necessary) as referenced in this handbook.

## COMPANY BACKGROUND

Founded in 1948, Robert Half International Inc. (NYSE symbol: RHI) is the world's leading specialized staffing firm and the first to provide placement services for accounting, finance and information technology professionals.

Robert Half International has several specialized business units, each serving distinct markets: **Accountemps®, Robert Half® Finance & Accounting and Robert Half® Management Resources,** for temporary, full-time and project professionals, respectively, in the fields of accounting and finance; **OfficeTeam®,** for highly-skilled temporary administrative support; **Robert Half® Technology ,** for information technology professionals; **Robert Half® Legal,** for temporary, project and full-time staffing of attorneys and specialized support personnel within law firms and corporate legal departments; and **The Creative Group®,** for creative, advertising, marketing and web design professionals on a project basis.

RHI is the industry's leading resource on hiring and employment issues. Firms of all sizes look to us for

should consult the rules in place in their local office concerning smoking breaks and designated areas for smoking.

## Hours of Business

As a general rule, RHI offices are open Monday through Friday from 8:30 a.m. to 5:30 p.m. as normal operating hours and phones are answered from 7:30 a.m. to 6:00 p.m. Local managers may adjust the office hours to reflect the needs of the individual office. In those locations with non-traditional work schedules, the hours of work will be circulated to the staff and appropriate employee schedules developed.

## Employee Classifications

For purposes of salary administration and eligibility for overtime payments and employee benefits, RHI classifies its employees as follows:

- **Regular Full-Time Employees** are employees regularly scheduled to work 30 hours per week or more with the understanding that no specific time period has been established for the duration of their employment. Continued employment is always subject to RHI's at-will employment policy and contingent upon satisfactory performance and business needs. Such employees may be "exempt" or "non-exempt" as defined below.

- **Regular Part-Time Employees** are employees regularly scheduled to work fewer than 30 hours per week with the understanding that no specific time period has been established for the duration of their employment. Continued employment is always subject to RHI's at-will employment policy and contingent upon satisfactory performance and business needs. Such employees may be "exempt" or "non-exempt" as defined below.

- **Temporary, Contract Employees and Consultants** are employees engaged to work full-time or part-time on RHI's payroll (usually RHI's temporary payroll) with the understanding that their employment is temporary. Such employees may be "exempt" or "non-exempt" as defined below. If a temporary or contract employee or consultant becomes a regular employee of RHI, the employee's start of service date and benefits eligibility qualification period will begin on the date that their status changes from temporary to regular.

- **Exempt Employees** are employees in positions which are exempt from legal overtime pay requirements. Exempt employees are expected to work whatever hours are necessary to do their jobs properly.

- **Non-Exempt Employees** are employees in positions which are covered by legal overtime pay requirements. Non-exempt employees will, for the most part, be assigned to work during normal office hours. However, hours may be assigned which fall outside of these hours. If overtime is required, it will be paid according to governing laws.

At the time of hire, or if you should change positions, you will be informed of your classification.

## Service Date

Your service date is the date you first become a regular employee. Eligibility for certain Company benefits depends on the employee's "service date" and length of service thereafter. Service ceases under any of the following circumstances:

- Resignation
- Dismissal
- Retirement
- Failure to return from a leave

The service date of a rehired RHI employee for such benefits is the date of re-employment, unless reinstated within 30 days of termination, in which case the original hire date is used.

RHI 0000129

Benefit changes outside of Open Enrollment or initial new employee enrollment may be made only when a family status change occurs. A few examples of family status changes are marriage, birth or adoption of a child, divorce, death of a dependent, or when a dependent child reaches the maximum age limit of 25 years. A Benefits Enrollment Change Form must be received in the Benefits Operations Department within 31 days of the family status change event, in order for you to make a change in your benefits elections. Benefit changes must be consistent with the qualifying family status change event. For example, if your qualified family status change is the adoption of a child, you may add your newly adopted child to your medical coverage, but you cannot, for instance, drop medical coverage for your spouse or switch medical plans at the same time.

- **Continuation of Health Benefits - COBRA**
  If your employment terminates for any reason except gross misconduct, or if you reduce your work hours from regular full-time to regular part-time, you may continue your group health coverage for up to 18 months under the Consolidated Omnibus Budget Reconciliation Act (COBRA). Your dependents may also continue their coverage under certain circumstances if they also participated in your group health coverage. Should you elect to continue group health coverage, you will be responsible for the entire premium, including the portion which was previously Company paid, as well as a 2% administration fee.

## 401(k) Plan

All regular employees are eligible to participate in the RHI 401(k) Plan upon meeting eligibility requirements. See the Plan document for details about eligibility and the Plan. Employees can make pre-tax contributions to the Plan through payroll deductions. If your prior year's earnings with RHI exceed the IRS-defined amount for "highly compensated employees," you are not eligible to participate in the RHI 401(k) Plan. Instead, you may contribute pre-tax amounts to our Deferred Savings Plan.

## Deferred Savings Plan

If your prior year's earnings with RHI exceed the IRS defined amount for "highly compensated employees," you are eligible to participate in the Deferred Savings Plan for Highly Compensated Employees. You can elect to make pre-tax contributions to the Deferred Savings Plan through payroll deductions. See the Plan document for details about eligibility and the Plan.

## StockPLUS

The company offers a unique ownership opportunity to provide employees with stock ownership through the StockPLUS program. This innovative program provides you, our valued employees, the opportunity to benefit financially from the business you help build and develop. Details are included on BobNet and in the prospectus of the program.

## Time Away from Work Benefits

RHI recognizes that employees have different needs and priorities. Our generous time off benefits provide substantial choice and flexibility when you need or want time off from work.

- **CHOICE Time Off (CTO)**
  CHOICE Time Off (CTO) provides employees with paid time away from the job for such things as vacation, outside activities, illness, personal business and family matters. Instead of earning vacation, paid sick time and/or Paid Time Off separately, all regular full-time employees will earn CTO on a semi-monthly basis throughout the calendar year based on length of service.

  Time Off Requests (Exempt and Non-Exempt) for planned CTO must be in writing and submitted in advance to your supervisor for approval. Effort will be made to accommodate requests, subject to the business needs of RHI.

  If approved by the supervisor, CTO may be taken before it is actually earned. However, in no event may an employee borrow more than 5 days or 40 hours of CTO. Should employment end before used CTO has been earned, that time will be owed back to RHI and deducted from the final paycheck or other amounts payable to the employee. See the supplement in this

RHI 0000137

handbook for more details on the CTO program.

Unplanned absences may be disruptive to the work group. Accordingly, if you take CTO on an unplanned basis due to illness or other emergency, you must call the office prior to your normal start time and speak to your supervisor regarding the need for your absence. If an unplanned absence extends longer than one day you must remain in contact with your supervisor regarding your expected date for return to work.

CHOICE Time off FAQs

- **Holidays**
  All regular full-time employees are eligible to receive ten paid holidays per year. Holidays are a combination of scheduled and floating holidays. A schedule of holidays will be posted in December with the actual dates of observance for the coming year. All office locations will observe the following core holiday schedule:

  - New Year's Day
  - Memorial Day
  - Independence Day
  - Labor Day
  - Thanksgiving Day
  - Christmas Day

  Regular part-time employees are paid for holidays that fall on their regularly scheduled workdays. They will be paid for the number of hours they normally work on that day. If a regular schedule does not exist, the employee will be paid for the number of hours worked on an average work day for that individual.

  If an employee is required to work on a scheduled holiday, a substitute day of equivalent time will be given. If a holiday occurs during an employee's CHOICE Time Off, it will be considered a holiday and not counted against CHOICE Time Off.

  If an employee is absent from work and is not being paid during the absence, the employee will not be paid for a holiday that falls during the absence unless the employee receives pay on the working days immediately before and after the holiday.

  Both the Corporate and Field Offices may schedule additional office holidays at management's discretion. The schedule is announced annually and is available on BobNet. (See links below.) The remaining holidays will be floating holidays. Floating holidays may be taken at any time during the year, subject to management approval. Employees hired after the first of the year will receive an adjustment to their floating holidays. See prorated holiday schedule.

  For accounting purposes, apply your floating holidays to your paid time off records prior to recording CHOICE Time Off taken.

  Holiday FAQs
  Corporate Holiday Schedule
  Field Holiday Schedule

- **Bereavement**
  All regular employees may take up to two days paid time off as a result of a death in the family. For the purposes of this policy, the employee's family includes:

  - Parents
  - Spouse
  - Children
  - Grandchildren
  - Sister or Brother
  - Grandparents
  - In-laws (Mother, Father, Sister, Brother, Daughter and Son)

  The employee's supervisor must approve Bereavement Leave. If additional days are needed, you may apply other paid time off, such as CHOICE Time Off or floating holidays, and/or request an unpaid personal leave, subject to the approval of your supervisor.

RHI 0000138



**EMPLOYEE HANDBOOK**
YOUR PRIMARY RESOURCE FOR RHI'S PERSONNEL POLICIES

GENERAL | COMPENSATION | EMPLOYEE BENEFITS | SUPPLEMENT | FAQS | CHOICE BENEFITS
MAX MESSMER LETTER | INTRODUCTION | TABLE OF CONTENTS

# CHOICE BENEFITS

## CHOICE Time Off FAQs

### Earning CHOICE Time Off

1. **How is CHOICE Time Off earned?**
   CHOICE Time Off is earned in equal, pro-rata portions with each semi-monthly payroll period. The rate at which an employee earns CHOICE Time Off is determined by years of service to the Company. (See applicable CHOICE Time Off Earning Schedule)

   Examples:
   - An exempt employee who has completed three years of service would earn 23/24 day of CTO, resulting in a total of 23 days earned for working the full year between the third and fourth anniversaries.

   - A non-exempt employee who has completed three years of service would earn 6.33 hours of CTO each semi-monthly pay period, resulting in a total of 152 hours earned for working the entire service year.

2. **What is the maximum CHOICE Time Off balance I can have before I stop earning additional time?**
   Accrual levels are capped at 1.5 times of each employee's respective CHOICE Time Off earning level. Once these amounts are reached, no additional CHOICE Time Off is earned. After some of the unused CHOICE Time Off is used, the employee will begin to earn CHOICE Time Off, subject to the foregoing limits.

3. **At what rate do full-time employees who work between 30 to 39 hours earn CTO?**
   Full-time employees who work less than 40 hours a week earn CTO on a prorated basis based upon their standard work schedule. For example, an employee with a standard work schedule of 30 hours per week would earn 75 percent of the earnings rate of an employee with a standard work schedule of 40 hours per week.

### Tracking and Recording CHOICE Time Off

4. **How is CHOICE Time Off tracked?**
   It is each individual supervisor's responsibility to manage and track all paid time off. CHOICE Time Off is tracked by calendar year.

5. **Is there a form to complete when requesting CHOICE Time Off?**
   All time off requests should be made on a Time Off Request Form (Exempt or Non-Exempt), which is available on BobNet. Both the employee and manager should keep a signed copy for their records.

6. **How do I record CHOICE Time Off that I use?**
   Exempt employees record CHOICE Time Off on the Exempt Employee Absence Record. Non-exempt employees record CHOICE Time Off on the Non-Exempt Employee Time Sheet. Both forms are available on BobNet.

7. **Why do non-exempt employees record time off in 15-minute increments and exempt employees record time off in full day increments?**
   In adherence with governing laws, our policy is to record time off in full day increments for

RHI 0000147

exempt employees.

8. **What should an exempt employee who works less than a full day record as time off?**
Exempt employees who have personal business that can be accomplished in two hours or less in a standard eight-hour day may take the necessary time off without being charged for a day of CTO. Of course, time off must be approved by their manager and scheduled in such a way as to not interfere with ongoing business.

Managers need to look at the individual circumstances and apply judgment as to when to apply greater flexibility. The situation at hand and the employee's record of contribution and past use of time off all should be considered when determining if greater flexibility is needed.

To the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours our practice is that the day will be considered a full day of CTO. Eight hours of CTO should be recorded for payroll records. As with any employee on CTO, there is no requirement that the employee be present in the office for any part of that day. The employee can use the opportunity to address a variety of personal needs on that day

Employees who have questions on how to record their time should consult with their manager, who will look at the individual circumstances and apply judgment as to how to record the time.

9. **Do exempt employees have to record a full day of CTO if they leave work early due to illness?**
Generally, an exempt employee who works a substantial part of the day and then goes home ill is not required to use CTO for that time

## Unused CHOICE Time Off

10. **Can unused CHOICE Time Off be carried forward to the next calendar year?**
RHI encourages employees to use their CTO each year. Choice Time Off must be taken during the year it is earned. Except in certain states, as described below, unused CTO may not be carried over from one calendar year to the next. Such unused CTO expires without compensation to the employee. RHI's CTO policy complies with the state law of the state in which an employee works. In the states that require carryover of CTO [California, Illinois, Colorado, Tennessee, Oklahoma, South Carolina, Arkansas] accrual levels are capped at 1.5 times of the employees' respective CTO earning level. Once these amounts are reached, no more CTO is earned. After some of the unused CTO is used, the employee will begin to earn CTO, subject to the foregoing limits on accrual.

## CHOICE Time Off Before It is Earned

11. **Can CHOICE Time Off be taken in advance of actually earning the time?**
Yes. Up to 5 days for exempt employees or 40 hours for non-exempt employees, with manager approval, may be taken in advance of earning the time off. However, if you terminate before you have earned the CHOICE Time Off you have taken, the amount you owe the company will be deducted from your final paycheck or any other amounts payable to you.

## Exempt/Non-Exempt Differences

12. **Why is there a difference in the rate at which CHOICE Time Off is earned between exempt and non-exempt employees?**
We provide a comprehensive, market-driven package for all employees. In reviewing market practices, we found competitive practice is different across these two employee groups.

### Exempt Employees Earnings Schedule

RHI 0000148

| Years of Service | Total Number of CTO Days That Would Be Earned by Working an Entire Year (A pro-rata portion earned with each semi-monthly pay period) | Days and Fractions Thereof Employee Earns of CTO Per Pay Period | Maximum CTO Accrual In Days |
| --- | --- | --- | --- |

Exhibit E

## ROBERT HALF INTERNATIONAL, INC.
# CORPORATE EMPLOYEE EXEMPT ABSENCE RECORD

☐ Employee on LOA
☐ Final Absence Record
☐ Revised Absence Record

| Last Name, First Name, MI | Dept. # | Empl. ID | Period Beginning | Period Ending |
|---|---|---|---|---|
|  |  |  |  | #N/A |

| **Staff Payroll Use Only** | | | | | | |
|---|---|---|---|---|---|---|
|  | ADJ | BER | CTO | FLT | CAL | AMT |
|  | 0.00 | 0.00 | 0.00 | 0.00 | - | $ - |
|  |  |  |  |  |  |  |

### *Only complete the days for which actual time off has been taken*

| Date | Day of Week | Desc. | Hours | Total | On Call | Amt |
|---|---|---|---|---|---|---|
| 01/00/00 | Saturday |  |  | 0.00 |  | $ - |
| 01/01/00 | Sunday |  |  | 0.00 |  | $ - |
| 01/02/00 | Monday |  |  | 0.00 |  | $ - |
| 01/03/00 | Tuesday |  |  | 0.00 |  | $ - |
| 01/04/00 | Wednesday |  |  | 0.00 |  | $ - |
| 01/05/00 | Thursday |  |  | 0.00 |  | $ - |
| 01/06/00 | Friday |  |  | 0.00 |  | $ - |
| 01/07/00 | Saturday |  |  | 0.00 |  | $ - |
| 01/08/00 | Sunday |  |  | 0.00 |  | $ - |
| 01/09/00 | Monday |  |  | 0.00 |  | $ - |
| 01/10/00 | Tuesday |  |  | 0.00 |  | $ - |
| 01/11/00 | Wednesday |  |  | 0.00 |  | $ - |
| 01/12/00 | Thursday |  |  | 0.00 |  | $ - |
| #N/A | #N/A |  |  | 0.00 |  | $ - |
| #N/A | #N/A |  |  | 0.00 |  | $ - |
| #N/A | #N/A |  |  | 0.00 |  | $ - |
|  |  |  |  | 0.00 |  |  |

*If your employment terminates while you have a negative CTO balance, the amount you owe the company will be deducted from your final paycheck or any other amounts payable to you. By signing this absence record, you authorize any such deductions.*

| Employee Signature | Date | Supervisor Signature | Date |
|---|---|---|---|
|  |  |  |  |

RIH 0000105

Revised 01/13/05

## Staff Payroll
## Corporate Employee-Exempt Absence Record

*Be sure that you obtain a new absence record each pay period from BOBNet to ensure that you are using the most recent version of the absence record.*

*Your absence record must be signed and submitted to your Manager no later than the 1st day after the end of the pay period. Absence records must be submitted each pay period time is taken and must not be held on to for any reason.*

1. Employee on LOA/Final Absence Record/Revised Absence Record check boxes
   a. Employee on LOA-If this is your last absence record before going out on LOA, check this box.
   b. Final Absence Record-If this is your final absence record before ending your employment with RHI, check this box.
   c. Revised Absence Record-If this absence record is going to replace one previously submitted due to corrections, check this box. *Be sure that the period beginning date you select is for the period of the time sheet you are revising.*
2. Last Name, First Name, MI-Type your name in the following order:
   a. Last Name
   b. First Name
   c. Middle Initial if applicable
3. Department ID-Enter the 5 digit ID of the office you work in.
4. Employee ID-Enter your 6 digit employee ID.
5. Period Beginning-Select the pay period beginning date for which you are completing the absence record. For example, you are completing your absence record for the period ending 04/15/2003; you will need to select the pay period beginning date of 04/01/2003.
6. Desc.-Use this column (column E) if you have taken time off from work. Select the applicable code from the drop down menu:
   a. BER-Select for bereavement time taken. See the Benefits section of your employee handbook for guidelines.
   b. CTO-Select for CTO time taken. See the Benefits section of your employee handbook for guidelines.
   c. FLT- Select for an approved floating holiday. See the Benefits section of your employee handbook for guidelines.
   d. JUR-Select to receive Jury Duty pay. See the Benefits section of your employee handbook for guidelines.
   e. MIL-Select for time away from work to serve your military duty. See the Benefits section of your employee handbook for guidelines.
   f. UTO-Select for Unpaid Time Off. This code is only to be used when you have exhausted all of your available CTO time. The days indicated here will be docked from your next check.
7. Hours-This field (column F) is to be used in conjunction with the "Desc." column outlined in step 6 above. For each code you select from the drop down menu in the "Desc." column, you must indicate the number of hours used for the code selected. Remember that you may only enter time in full day increments; in most cases, this will be 8.
8. On Call-This field (column H) is to be used by those employees who qualify for the On Call plan. For each day you are on call, enter a 1 in this column. If you are unsure if you qualify for this plan, see your
9. Print your absence record, sign and date it, and submit to your Manager for approval.

RHI 0000106

Revised 02/17/04

Microsoft Excel - Time Sheet Exempt-Corp.xls

Enter time taken in full day increments

Incorrect entry for time taken

Enter On Call Days in increments of 1

| Date | Day of Week | Desc. | Hours | Total | On Call | Amt |
|------|-------------|-------|-------|-------|---------|-----|
| 06/16/03 | Monday | CTO | 8.00 | 8.00 | | $ - |
| 06/17/03 | Tuesday | | | 0.00 | 1 | $ 50.00 |
| 06/18/03 | Wednesday | | | 0.00 | | $ - |
| 06/19/03 | Thursday | BER | 8.00 | 8.00 | | $ - |
| 06/20/03 | Friday | BER | 8.00 | 8.00 | | $ - |
| 06/21/03 | Saturday | | | 0.00 | | $ - |
| 06/22/03 | Sunday | | | 0.00 | | $ - |
| 06/23/03 | Monday | FLT | 8.00 | 8.00 | 1 | $ 50.00 |
| 06/24/03 | Tuesday | CTO | 4.00 | 4.00 | | $ - |
| 06/25/03 | Wednesday | | | 0.00 | | $ - |

Exempt Absence Record / Absence Record Instructions

RHI 0000108

Revised 02/17/04

# ROBERT HALF INTERNATIONAL INC.
## EXEMPT EMPLOYEE TIME OFF REQUEST

Name: _____    Department/Location: _____    Employee Number: _____    Date Submitted: _____

CTO Available _____

Floating Holiday Available _____

**Select:** Month and Pay Period ▼

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|-------|
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | |

**Select:** Type of Request ▼

Your request has been: ☐ Approved   ☐ Denied

0.0

*Time off without pay is subject to management approved based on business needs, it is not a guarantee.*

**Select:** Month and Pay Period ▼

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|-------|
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | |

**Select:** Type of Request ▼

Your request has been: ☐ Approved   ☐ Denied

0.0

*Time off without pay is subject to management approved based on business needs, it is not a guarantee.*

**Select:** Month and Pay Period ▼

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Total |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|-------|
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | |

**Select:** Type of Request ▼

Your request has been: ☐ Approved   ☐ Denied

0.0

*Time off without pay is subject to management approval based on business needs, it is not a guarantee.*

I understand that if my employment terminates when I have negative CHOICE Time Off balance, the amount I owe the company will be deducted from my final paycheck, bonus check or any other amounts payable to me. I authorize any such deductions at the time of my termination by signing this Time Off Request.

Employee's Signature _____    Date _____

Manager's Signature _____    Date _____

Robert Half International Inc. 2004, all rights reserved.

(rev. 02/04)

RHII 000115

# ROBERT HALF INTERNATIONAL INC.
## EXEMPT EMPLOYEE TIME OFF REQUEST

| Step: | Completed By: |
|---|---|
| Initiate Time Off Request by accessing form. | Employee |
| Fill in box identifying available CTO/Floating Holiday. | Employee |
| Fill in your name, department, ID number. | Employee |
| Select the specific Pay Period of the requested time off by using the Period Beginning drop-down menu.  The Period Ending date will automatically populate. | Employee/Form |
| Select the type of time off requested and enter the number of hours to be taken for that specific pay period.  (Note: only one type of request can be used per line.  For example, if you are using a floating holiday and CTO each type of request requires a separate entry.) | Employee |
| Exempt time is recorded and tracked in full-day increments. | Employee |
| Form will automatically calculate totals for each line request. | Form |
| Submit form to your manager/supervisor for approval. | Employee |
| Manager/Supervisor approves request by checking the approved/denied box located at the bottom of the form (under the total time requested box). | Manager/Supervisor |
| Manager/Supervisor signs the form and returns to employee. | Manager/Supervisor |
| Employee retains form.  When time off has been taken, employee completes Exempt Absence Record. | Employee |

Robert Half International Inc. 2004, all rights reserved.

RHI 0000116

Exhibit F

**Robert Half International, Inc.**
720 Stoneridge Drive, Suite 3
Pleasanton CA 94588

| | | |
|---|---|---|
| Pay Group: | SAL-Salaried Employees | Check #: 0053747 |
| Pay Begin Date: | 08/16/2003 | Check Date: 08/20/2003 |
| Pay End Date: | 08/31/2003 | • On-line Check • |

| | Employee ID: 100548 | TAX DATA: | Federal | MA State |
|---|---|---|---|---|
| Ian E O'Donnell | Department: 02100-Boston, MA | Marital Status: | Single | Single |
| 1521 Washington St Apt #7 | Location: MA BOSTON | Allowances: | 2 | 0 |
| Boston MA 02118 | Pay Rate: $36,000.00 Annual | Addl. Pct.: | | |
| | | Addl. Amt.: | | |
| SN: 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 | | | | |

### HOURS AND EARNINGS

| | | Current | | YTD | | TAXES | | |
|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD |
| Choice Time Off Payout | 17.307692 | 28.00 | 484.62 | 28.00 | 484.62 | Fed Withholding | 73.61 | 3,428.22 |
| Salary | | | 553.85 | 1,072.00 | 19,061.55 | Fed MED/EE | 13.88 | 360.00 |
| Salary Continuation-Term Only | | | 946.15 | | 946.15 | Fed OASDI/EE | 59.35 | 1,624.83 |
| Expense | | | 81.21 | | 366.38 | MA Withholding | 46.86 | 1,327.69 |
| Floating Holiday | | | 0.00 | 16.00 | 276.92 | | | |
| Bonus-US Monthly Field | | | 0.00 | | 4,653.22 | | | |
| Choice Time Off | | | 0.00 | 128.00 | 3,215.38 | | | |

| Total: | | 28.00 | 1,096.59 | 1,188.00 | 27,034.98 | Total: | 193.70 | 6,760.74 |
|---|---|---|---|---|---|---|---|---|

### BEFORE-TAX DEDUCTIONS / AFTER-TAX DEDUCTIONS / TAXABLE BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Pre-Tax Med-HMO | 42.00 | 336.00 | | | | GTL Basic Life | 0.00 | 2.40 |
| Pre-Tax Dental | 14.00 | 112.00 | | | | | | |
| Pre-Tax Vision | 2.00 | 16.00 | | | | | | |

| Total: | 58.00 | 464.00 | Total: | | 0.00 | 0.0 | Total: | 0.00 | 2.40 |
|---|---|---|---|---|---|---|---|---|---|

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 1,096.59 | 957.38 | 193.70 | 58.00 | 844.89 |
| YTD: | 27,034.98 | 26,207.00 | 6,760.74 | 464.00 | 19,810.24 |

**NET PAY DISTRIBUTION**

| Check #0053747 | $844.89 |
|---|---|
| Total: | 844.89 |

☒ THIS DOCUMENT HAS MULTIPLE SECURITY FEATURES TO DETER FRAUD AND COUNTERFEITING INCLUDING AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW ☒

**Robert Half International, Inc.**
720 Stoneridge Drive
Suite 3
Pleasanton CA 94588

64-1378/0611    BANK OF AMERICA
Bank of America Customer Connection
Bank of America, N.A.
Atlanta, DeKalb Co. GA

Check No.
53747

Date: 08/20/2003    Pay Amount: $844.89 *******

Pay ****EIGHT HUNDRED FORTY-FOUR AND 89/100 DOLLARS****

To The
Order Of

Ian E O'Donnell
1521 Washington St Apt #7
Boston, MA 02118

Department ID: 02100 Boston, MA

Signature Required for Check Over $10,000.00

⑈053747⑈ ⑆061112788⑆ 3299797045⑈

RHI 0000032

## Term Worksheet
### Final Check/Overpayment

**Personal Information**

| Emp ID | 100548 | Hire Date | 01/03/02 |
| Name | IAN O'DONNELL | Term Date | 08/15/03 |
| Annual Rate | $36,000.00 | Last Day | 08/06/03 |
| Semi Monthly | $1,500.00 | | |
| Hourly | $17.307692 | | |
| Standard Weekly Hours | 40 | SCT | 7 |

**One Time Deductions**

| Type | Amount | | Type | Amount |
|---|---|---|---|---|
| Medical | $42.00 | | 401K | $0.00 |
| Dental | $14.00 | | 401KLOAN | |
| Vision | $2.00 | | ADVPMT | |
| VLIFE1 | | | HCLUB | |
| PAIA2 | | Deduction Totals | EARN | |
| | | $58.00 | | |

### Earnings

**Salary**

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Worked | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 4 | $553.85 |
| | | $138.46 | | |
| Total Payline Entry for SAL ———>>> | | | | $553.85 |

**Salary Continuation/Severance**

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Covered | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 7 | $946.15 |
| | | $138.46 | 0 | $0.00 |
| Total Payline Entry for SCT/SEV ———>>> | | | | $946.15 |

**CPY Payroll**

| Payroll End Date | Description | Total Hours | Total Amount Due |
|---|---|---|---|
| 07/31/03 | P/S Leave Accrual | -34.67 | |
| 08/15/03 | Accrual Amount | 6.67 | |
| | Accrual Amount | | |
| | Hours on Final T/S | | |
| Total CPY Hours Due ———>>> | | -28.00 | ($484.62) |

| PROCESSOR: | MADELINE |
| DATE: | 8/13/03 |

**One Time Adjustments**

| Payroll End Date | Adjustment Code | Hours | Rate | Total Amount |
|---|---|---|---|---|
| | ADJ | | $17.31 | $0.00 |
| | FLT | | $17.31 | $0.00 |
| | OVT | | $25.96 | $0.00 |
| 08/15/03 | EXP | 81.21 | $34.62 | $0.00 |
| | B01 | | $17.31 | $0.00 |
| | | | Total | $1,018.38 |

1096·59

NOTES:

RHI 0000034

34

Online Check Results

Home > Compensate Employees > Manage Payroll Process > Inquire > Online Results   New Window

## Online Results

| | | | | | |
|---|---|---|---|---|---|
| O'Donnell, Ian E | | ID: 100548 | | Page: | 56 |
| Company: | 005 | Earnings: | 1,096.59 | Empl Rcd#: 0 | Line: 1 |
| Pay Group: | SAL | Taxes: | 193.76 | Check #: | |
| Pay Period End Date: | 08/15/2003 | Deductions: | 58.00 | Form ID: | |
| | | Net Pay: | 844.83 | | On-line |

[ Confirm & Print ]    [ Delete ]    [ Review Content ]    [ Change Data ]

### Earnings

Find | View 1    |< 1-4 of 4 >|

| | | | | | | |
|---|---|---|---|---|---|---|
| Begin Date: | 08/01/2003 | End Date: | 08/15/2003 | | Hourly Rate: | 17.30769 |
| | Rate Code   Hours | | Rate | Earnings | FLSA Rate: | |
| Regular: | | | | | Shift/Rate: | N   / |
| Overtime: | | | | | State: | MA |
| Reg Earns: | | | | | Locality: | |
| Rate Used: | Hourly Rate | | | | | |

Other Earnings    Find | View All    |< 1 of 1 >|

| Code | Description | Rate Code | Hours | Comp Rate Used | Amount |
|---|---|---|---|---|---|
| SAL | Salary | | | | 553.85 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 08/01/2003 | End Date: | 08/15/2003 | | Hourly Rate: | 17.30769 |
| | Rate Code   Hours | | Rate | Earnings | FLSA Rate: | |
| Regular: | | | | | Shift/Rate: | N   / |
| Overtime: | | | | | State: | MA |
| Reg Earns: | | | | | Locality: | |
| Rate Used: | Hourly Rate | | | | | |

Other Earnings    Find | View All    |< 1 of 1 >|

| Code | Description | Rate Code | Hours | Comp Rate Used | Amount |
|---|---|---|---|---|---|
| CPY | Choice Time Off Payout | | -28.00 | 17.307692 | -484.62 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 08/01/2003 | End Date: | 08/15/2003 | | Hourly Rate: | 17.30769 |
| | Rate Code   Hours | | Rate | Earnings | FLSA Rate: | |
| Regular: | | | | | Shift/Rate: | N   / |
| Overtime: | | | | | State: | MA |
| Reg Earns: | | | | | Locality: | |
| Rate Used: | Hourly Rate | | | | | |

Other Earnings    Find | View All    |< 1 of 1 >|

| Code | Description | Rate Code | Hours | Comp Rate Used | Amount |
|---|---|---|---|---|---|
| EXP | Expense | | | | 81.21 |

| | | | | |
|---|---|---|---|---|
| | 08/01/2003 | End Date: | 08/15/2003 | |

RHI 0000042

**Term Worksheet**
**Final Check/Overpayment**

### Personal Information / One Time Deductions

| Emp ID | 100548 | Hire Date | 01/03/02 | Type | Amount | | Type | Amount |
|---|---|---|---|---|---|---|---|---|
| Name | IAN O'DONNELL | Term Date | 08/15/03 | Medical | $21.00 | | 401K | $0.00 |
| Annual Rate | $36,000.00 | Last Day | 08/06/03 | Dental | $7.00 | | 401KLOAN | |
| Semi Monthly | $1,500.00 | | | Vision | $1.00 | | ADVPMT | |
| Hourly | $17.307692 | | | VLIFE1 | | | HCLUB | |
| Standard Weekly Hours | 40 | SCT | 7 | PAIA2 | $29.00 | Deduction Totals | GARN | |

### Earnings

**Salary**

| Payroll End Date | Number of Days In Payroll | Daily Rate | Number of Days Worked | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 4 | $553.85 |
| 08/15/03 | 11 | $138.46 | -11 | $1,500.00 |
| Total Payline Entry for SAL----->>> | | | | ($946.15) |

**Salary Continuation / Severance**

| Payroll End Date | Number of Days in Payroll | Daily Rate | Number of Days Covered | Amount |
|---|---|---|---|---|
| 08/15/03 | 11 | $138.46 | 7 | $946.15 |
| | | $138.46 | 0 | $0.00 |
| Total Payline Entry for SCT/SEV----->>> | | | | $946.15 |

### CPY Payouts

| Payroll End Date | Description | Total Hours | Total Amount Due |
|---|---|---|---|
| 07/31/03 | P/S Leave Accrual | -34.67 | |
| 08/15/03 | Accrual Amount | 6.67 | |
| | Accrual Amount | | |
| | Hours on Final T/S | | |
| Total CPY Hours Due------>>> | | -28.00 | ($484.62) |

| PROCESSOR: | MADELINE |
|---|---|
| DATE: | 8/13/03 |

### Other / Adjustments

| Payroll End Date | Adjustment Code | Hours | Rate | Total Amount |
|---|---|---|---|---|
| | ADJ | | $17.31 | $0.00 |
| | FLT | | $17.31 | $0.00 |
| | OVT | | $25.96 | $0.00 |
| | EXP | | $34.62 | $0.00 |
| | B01 | | $17.31 | $0.00 |
| | | | Total | ($484.62) |

NOTES:

RHI 0000044