# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR, AND STACEY MOORE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.  04-CV-12719 NMG<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' MOTION FOR LEAVE TO FILE REPLY BRIEF IN SUPPORT OF THEIR MOTION TO STAY PLAINTIFFS' MOTION FOR CERTIFICATION OF A MASSACHUSETTS CLASS PURSUANT TO FED. R. CIV. P. 23

Pursuant to Local Rule 7.1(B)(3), Defendants Robert Half International Inc. and Robert Half Corporation (together "RHI" or the "Company") move for leave to file a succinct reply brief in response to Plaintiffs' Opposition to Defendants' Motion to Stay Plaintiffs' Motion for Certification of a Massachusetts Class Pursuant to Fed. R. Civ. P. 23 (docket entry no. 77) ("Opposition").  In support of this motion, Defendants state that Plaintiffs' Opposition contains several misrepresentations of law, and Defendants believe that their proposed Reply will assist the Court in adjudicating their Motion to Stay by clarifying the issues of law presented by the motion.

Defendant's proposed Reply Memorandum is attached hereto as Exhibit 1.

Respectfully submitted,

ROBERT HALF INTERNATIONAL INC.
AND ROBERT HALF CORPORATION
By their Attorneys,

/s/ C.J. Eaton
Richard L. Alfred (BBO # 015000)
Krista G. Pratt (BBO # 644741)
Barry J. Miller (BBO # 661596 )
C.J. Eaton (BBO # 660726)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800
DATED:  August 24, 2007          Telecopier:    (617) 946-4801

---

CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Court's ECF system and that a true copy of the above document was served on Shannon Liss-Riordan, an attorney for Plaintiffs, Pyle, Rome, Lichten, Ehrenberg, & Liss-Riordan, 18 Tremont Street, Suite 500, Boston, MA 02109, by first class mail on August 24, 2007.

/s/ C.J. Eaton
C.J. Eaton

---

BO1 15863742.2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR, AND STACEY MOORE, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO.  04-CV-12719 NMG |
| v. | ) ) | |
| ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION, | ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PLAINTIFFS' MOTION FOR CERTIFICATION OF A MASSACHUSETTS CLASS PURSUANT TO FED. R. CIV. P. 23

Defendants Robert Half International Inc. and Robert Half Corporation (together "RHI" or the "Company") submit this Reply in response to Plaintiffs' Opposition to Defendants' Motion to Stay Plaintiffs' Motion for Certification of a Massachusetts Class Pursuant to Fed. R. Civ. P. 23 ("Opposition").  In their Opposition, Plaintiffs illogically argue that, by filing their Motion to Stay, Defendants have missed the deadline for opposing Plaintiffs' Motion for Certification of a Massachusetts Class Pursuant to Fed. R. Civ. P. 23 ("Motion for Certification") and that the Court should grant the Motion for Certification without making the requisite inquiries into whether Plaintiffs in fact meet the requirements of Fed. R. Civ. P. 23 ("Rule 23").  Plaintiffs fail to provide any authority for their specious arguments, and the Court therefore should disregard those arguments and grant Defendants' Motion to Stay.

First, the very point of Defendants Motion to Stay is that Defendants' should not be required to assume the burden and expense of responding to Plaintiffs' Motion for Certification because that motion is based solely on claims that are the subject of Defendants' currently

pending Motion for Summary Judgment, and, if the Motion for Summary Judgment is granted, Plaintiffs' Motion for Certification will be moot. Plaintiffs suggest that Defendants were required to file an opposition to the Motion for Certification <u>in addition to and at the same time as</u> their Motion to Stay – a motion which seeks to have the Court rule that an opposition is not required at this time. Such a requirement would be illogical and would serve only to further waste the resources and time of this Court and the Defendants – the exact outcome that Defendants sought to avoid by filing the Motion to Stay.

In addition, in their Motion to Stay, Defendants specifically seek to reserve their right to file an opposition in the event that the Court denies the motion. *See* Motion to Stay, n. 1 ("Defendants reserve all arguments in opposition to the Motion for Certification, and request that the Court permit them the opportunity to submit an opposition in the event that the instant Motion to Stay is denied."). The Court has previously allowed Defendants to reserve the right to oppose a motion until such time as the Court ruled on a motion to stay <u>in this very matter</u>. *See* Defendants' Motion to Stay Plaintiffs' "Renewed" Motion to Facilitate § 216(b) Notice, n. 1 (docket entry no. 41); *O'Donnell, et al. v. Robert Half Int'l, Inc., et al.*, 429 F. Supp. 2d 246, 253 (D. Mass. 2006) (allowing motion to stay "insofar as Defendants thirty (30) days from the date of this Order to file their opposition to Plaintiffs' Renewed Motion to Facilitate § 216(b) Notice").

Plaintiffs also suggest that, because of Defendants alleged failure to oppose their Motion for Certification, the Court should simply "grant Plaintiffs' motion as unopposed." Opposition, p. 1. This suggestion ignores both the plain language of Rule 23 itself and the wealth of case law applying the rule, both of which clearly require that the Court independently determine that Plaintiffs meet the requirements of Rule 23 prior to certifying a class under the rule. *See, e.g.,* 7AA Wright & Miller: Federal Prac. & Proc. s 1785 (2007); *Smilow v. Southwestern Bell Mobile*

*Sys., Inc*., 323 F.3d 32, 38 (1st Cir. 2003); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 257 (D.Mass. 2005).  Indeed, if the Court determines that Plaintiffs have not met all of the requirements of Rule 23(a) and at least one of the three categories of Rule 23(b), the Court <u>must</u> decline to certify a class.  *See, e.g.,* 7AA Wright & Miller: Federal Prac. & Proc. s 1785 (2007); *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982); *Smilow*, 323 F.3d at 38; *Swack*, 230 F.R.D. at 257.  The Court's obligation to conduct this inquiry is not alleviated or altered if a motion to certify a class under the rule is unopposed.  *See, e.g., Grider v. Keystone Health Plan Central, Inc.*,  2004 WL 902367, *5 (E.D. Pa.)  ("even if all defendants agreed to the certification of a class . . . it is still incumbent on the court to determine whether a class should be certified").

In addition to Plaintiffs' weak and illogical arguments described above, Plaintiffs continue to argue that the Motion for Certification should be ruled upon prior to or simultaneously with the parties' motions for summary judgment.  As explained in Defendants' Motion to Stay, Plaintiffs' argument, and the case law they rely upon, is outdated.  The Federal Judicial Center – the federal government agency created by Congress specifically to provide guidance to federal judges on complex issues and to promote efficiency in the federal courts – counsels that, as a matter of practice, courts should rule on dispositive motions <u>before</u> ruling on class certification.  *See* Rothstein & Willging, "Managing Class Action Litigation: A Pocket Guide for Judges" (Federal Judicial Center, 2005) (attached as Exhibit A).  In their opposition, Plaintiffs fail to address the Federal Judicial Center's advice or to cite any authority for their request that the Court ignore the agency's counsel.

<u>CONCLUSION</u>

RHI respectfully asks that the Court grant Defendants' Motion to Stay Plaintiffs' Motion for Certification, and all related discovery, pending the Court's rulings on Plaintiffs' Motion for Reconsideration and on the parties' cross motions for summary judgment.

Respectfully submitted,

ROBERT HALF INTERNATIONAL INC.
AND ROBERT HALF CORPORATION
By their Attorneys,

 /s/ C.J. Eaton
Richard L. Alfred (BBO # 015000)
Krista G. Pratt (BBO # 644741)
Barry J. Miller (BBO # 661596 )
C.J. Eaton (BBO # 660726)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:    (617) 946-4800
DATED:  August 24, 2007                    Telecopier:    (617) 946-4801

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the Court's ECF system and that a true copy of the above document was served on Shannon Liss-Riordan, an attorney for Plaintiffs, Pyle, Rome, Lichten, Ehrenberg, & Liss-Riordan, 18 Tremont Street, Suite 500, Boston, MA 02109, by first class mail on August 24, 2007.

 /s/ C.J. Eaton
C.J. Eaton

BO1 15874418.1

# EXHIBIT A

# Managing Class Action Litigation:
# A Pocket Guide for Judges

Barbara J. Rothstein & Thomas E. Willging

Federal Judicial Center
2005

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

this page left blank to facilitate two-sided printing

# Contents

Preface, v

Introduction, 1

I. Selection of counsel, 4

    A. Single-lawyer model, 4

    B. Private ordering, 4

    C. Selection by the judge, 5

    D. Empowered plaintiff model, 5

    E. Competitive bidding, 5

II. Timing and significance of class certification, 6

    A. Timing, 6

    B. Class certification, 6

    C. Defining the class, 7

    D. Multiple class actions, 7

III. Settlement review: risks and issues, 8

    A. Judge's role, 8

    B. Obtaining information about the settlement, 9

    C. Hot button indicators, 12

    D. Preliminary review of proposed settlement, 16

    E. Notice issues, 18

    F. Fairness hearing, 20

IV. Attorney fee issues, 22

    A. "Mega" cases, 22

    B. Monetary results achieved for class, 23

    C. Evaluating nonmonetary results, 23

    D. Role of government actors, 24

    E. Objectors, 24

    F. Methods of calculating fees, 24

V. Role of government actors, 25

VI. Coordination with state judges, 27

VII. Use of special masters and court-appointed experts, 28

Conclusion, 28

Bibliography, 29

About the Federal Judicial Center, 30

this page left blank to facilitate two-sided printing

# Preface

This pocket guide is designed to help federal judges manage the increased number of class action cases expected as a result of the Class Action Fairness Act of 2005. The new legislation expresses congressional confidence in the abilities of federal judges to "assure fair and prompt recoveries for class members with legitimate claims" and to provide appropriate "consideration of interstate cases of national importance under diversity jurisdiction." CAFA, sec. 2(b).

The Act also calls on the judiciary to develop and implement "best practices" for ensuring that settlements are fair to class members and that class members are the primary beneficiaries of any settlement. This guide is part of a continuing effort of the federal judiciary to achieve those goals.

Amendments to Rule 23 that went into effect in December 2003 anticipated the statutory charge, as did the Center's publication of its *Manual for Complex Litigation, Fourth* in 2004. Those involved in producing the rules and manual, particularly Judge Lee H. Rosenthal (S.D. Tex.), deserve recognition for their efforts.

A note of appreciation should also go to Judge D. Brock Hornby (D. Me.) for his detailed suggestion and outline of topics which served as a catalyst and roadmap for this publication.

I hope you find this guide useful in meeting the challenges Congress has entrusted to us in managing class action litigation.


Barbara Jacobs Rothstein
Director, Federal Judicial Center

v

this page left blank to facilitate two-sided printing

# Introduction

Class actions often attract a great deal of public attention.* Rulings by state and federal judges in class actions have become the subject of a highly polarized public debate. This debate has focused on perceived abuses of class action by the parties and their attorneys that have affected both defendants and class members. In the Class Action Fairness Act of 2005 (CAFA) (Pub. L. No. 109-2, 119 Stat. 4 (2005)), Congress responded to the debate by shifting many class actions to federal court and assigning new responsibilities to federal judges. This guide can assist you in discharging those responsibilities. The guide distills many of the most important practices for managing class actions found in the *Manual for Complex Litigation, Fourth* (MCL 4th) and provides cites to cases decided after publication of the MCL 4th to illustrate many points. For your convenience, cross-references to the MCL 4th are also provided in the guide.

CAFA begins with the finding that "class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties . . . ." Such claims might otherwise evade legal enforcement. Class actions may also help regulators control conduct that threatens to harm various markets. Securities and other consumer class actions serve to enforce regulatory standards designed to control or deter fraudulent marketplace conduct that might otherwise escape regulation. Members of Congress and others who assert class actions' general utility also point, however, to abuses that threaten to undermine their usefulness. Critics single out cases in which the benefits accruing to the class as a whole and to the public seem minimal.

---

*The Federal Judicial Center has devoted considerable attention to class actions in educational programs for judges and has performed extensive empirical work for the Judicial Conference's Advisory Committee on Civil Rules. The Center's *Manual for Complex Litigation, Fourth* (MCL 4th) devotes hundreds of pages to the subject in a general chapter on class actions (chapter 21) and a chapter on attorney fees (chapter 14), and discussions of class actions in mass tort (section 22.7), securities (section 31.5), and employment discrimination (section 32.42) contexts. This guide highlights some of the practices endorsed in the manual and cross-references major provisions of the manual. Other resources, including an outline and videotape of a Federal Judicial Television Network program on the Class Action Fairness Act (Rothstein et al. (2005) in the Bibliography) are available on the Center's sites on the judiciary's intranet and Internet and through the Center's Information Services Office.

Class actions demand that judges play a unique role. There is no such thing as a simple class action. Every one has hidden hazards that can surface without warning. Your role includes anticipating the consequences of poorly equipped class representatives or attorneys, inadequate class settlement provisions, and overly generous fee stipulations. The high stakes of the litigation heighten your responsibility, and what's more, you cannot rely on adversaries to shape the issues that you must resolve in the class context. Indeed, you have to decide first which adversaries on the plaintiff side—class representatives and class counsel—can represent the class adequately and whom you should appoint to do so. And, once the adversaries agree on a settlement, you must decide—largely without any clash of views from class counsel, class representatives, or the defendant—whether that settlement is fair, reasonable, and adequate to satisfy the interests of the class as a whole. This guide attempts to clarify the standards that inform those decisions. It is designed to help you use accumulated judicial experience to determine when class representatives and counsel are "adequate" and whether a settlement's terms are "fair" to the class as a whole, "reasonable" in relation to the class's legitimate claims, and "adequate" to redress class members' actual losses.

Now that CAFA is on the books and Federal Rule of Civil Procedure 23 has been amended, you can expect to encounter the following class action responsibilities:

- applying CAFA's new federal jurisdiction rules, such as its $5 million amount in controversy for the class as a whole, minimum diversity of citizenship between class members and defendants, and complex set of rules regarding cases in which the primary defendants are local citizens (*see* Rothstein et al. (2005) in the Bibliography);
- ruling on remand motions;
- appointing counsel who have the professional skills, legal support staff, and financial resources needed to provide the class with adequate representation;
- managing discovery and pretrial motions practice with the object of separating meritorious claims from meritless ones while keeping expenses to a reasonable level and moving the case toward resolution;
- determining when and how to decide class certification motions;

*Class Action Pocket Guide*

- reviewing notice plans and notices to the class to ensure the best notice practicable;
- coordinating with state and federal judges the management of competing and overlapping class actions;
- evaluating the merits of proposed settlements to determine whether they are fair, reasonable, and adequate for class members; and
- assessing reasonable attorney fees for counsel for the class by ensuring that fee awards are commensurate with the value of the results to the class as a whole.

In Part I of this guide, we consider the matter of selecting counsel, and in Part II, we touch on the timing and significance of decisions about whether to certify a class. In Part III, we focus extensively on both procedural and substantive elements of reviewing a class settlement, generally the most important challenge you will face in managing class action litigation. Part IV concerns reviewing requests for attorney fees. In Part V, we discuss the role of government actors; in Part VI, coordination with state judges; and in Part VII, the use of special masters and court-appointed experts.

*Class Action Pocket Guide*

# I. Selection of Counsel

Attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class action device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.

There are at least five approaches to selection of counsel in class action litigation. Note that in multidistrict litigation (MDL), the transferee judge has the authority to appoint lead and liaison counsel regardless of whether class claims are involved. *See* MCL 4th § 10.22. Whatever approach you use, it is important to make clear to counsel at the outset the content and form of records you require to support applications for awards of fees and expenses or for a lodestar cross-check. *See* "Attorney Fee Issues," *infra* Part IV, and MCL 4th § 14.21. You may find it useful to instruct class counsel that all lawyers should submit fee and expense requests in a similar format—one that will be accessible by the court.

## A. Single-lawyer model

In the typical class action, the lawyer who filed the case will be the only logical choice for appointment as class counsel. That lawyer may have investigated the case independently or may have spoken with government regulators, investigative journalists, or other public information sources. In those cases, the task of selecting counsel consists of assuring yourself that the filing attorney satisfies Rule 23(g) standards, that is, has the requisite knowledge of the substantive law, class action legal experience, and financial and staff resources to represent the class adequately. That attorney, of course, must not have a conflict of interest with the class.

## B. Private ordering

In high-stakes, high-profile class action litigation, entrepreneurial plaintiff attorneys often compete to play the lead role. This competition may be heightened when the case piggybacks on a case investigated and perhaps litigated or prosecuted by a governmental entity. Nonetheless, substantial resources may be necessary to finance the expenses of the litigation. Most often, attorneys in such cases

attempt to resolve the competition by "private ordering," that is, by agreeing to divide the labor, expenses, and fees. To safeguard the interests of the class and to prevent unnecessary litigation and over-staffing, you may want to review those agreements (which will be subject to disclosure upon settlement in any event). MCL 4th § 21.272.

## C. Selection by the judge

In the absence of private ordering, you will have to select among competing counsel by reviewing submissions based on the factors identified in Rule 23(g)(1)(C). Rule 23(g)(2)(C) explicitly permits you to include in the order of appointment "provisions about the award of attorney fees or nontaxable costs." Few judges have unilaterally imposed strict limits on fees in the order of appointment. Consider, however, requesting that counsel submit ex parte or under seal a proposed budget for fees in the case. The budget would serve as an *ex ante* record of the projected time and expense the case might require; judicial review of a proposed fee award at the end of the case would still be necessary, but would most likely be easier.

## D. Empowered plaintiff model

As mentioned earlier, Rule 23(g) presents explicit criteria and a procedure for appointing counsel to represent the class. For securities class actions, the Private Securities Litigation Reform Act (PSLRA) directs you to employ a special procedure for selecting an "empowered" lead plaintiff (presumptively one with sizable claims), who, in turn, has the right to select and retain class counsel, subject to your approval. *See In re Cendant Corp. Litigation,* 264 F.3d 201, 273–78 (3d Cir. 2001).

## E. Competitive bidding

In a very narrow set of cases, courts have used competitive bidding to select counsel. After an intensive study, a task force in the Third Circuit concluded that competitive bidding "should be an exception to the rule that qualified counsel can be selected either by private ordering or by judicial selection of qualified counsel . . . ." *Third Circuit Task Force Report on Selection of Counsel,* 74 Temp. L. Rev. 689, 741 (2001). *See also* Hooper & Leary (2001) in the Bibliography.

*Class Action Pocket Guide*

# II. Timing and Significance of Class Certification

## A. Timing

Rule 23 once urged attorneys to file and judges to rule on class certification motions "as soon as practicable." Local rules sometimes defined "practicable" as requiring a motion to be filed within 90, 120, or 180 days of the filing of the action. As experience with Rule 23 evolved, however, judges began to rule on motions to dismiss and even motions for summary judgment before turning to class certification. That approach seems to have several advantages. You need not waste time dealing with increasingly complicated class certification issues in meritless cases. Also, should you need to decide whether a class settlement is reasonable, you can use knowledge gained through your rulings on pretrial motions. And the parties can use information from early rulings on the merits to assess their prospects of success and to bargain or act accordingly.

A 1996 Center study (Willging, Hooper & Niemic in the Bibliography) documented that district courts often ruled on merits motions before class certification. Experience had overtaken formal rules, and the rulemakers took notice. The 2003 amendments to Rule 23(c)(1) give you more flexibility by allowing you to consider class certification "at an early practicable time." Considering this change, you should feel free to ignore local rules calling for specific time limits; they appear to be inconsistent with the federal rules and, as such, obsolete. *See* MCL 4th § 21.133.

## B. Class certification

Not all cases filed as class actions settle. Likewise, not all cases filed as class actions end up being certified as class actions. The great majority are dismissed or withdrawn. The 1996 and 2005 FJC studies cited in the Bibliography found that from 20% to 40% of all cases filed as class actions were certified as such. Those certified class actions almost always settled (90% of the time in the 2005 study). The combination of rulings on the merits and on class certification gives the parties ample information for predicting the likelihood of a class recovery. This suggests that the most important actions you can take to promote settlement are to rule on dispositive motions and then, if necessary, rule on class certification.

If the parties decide to talk about settlement before any ruling

on class certification, they may urge you to certify a class for settlement purposes only—a *settlement class*—as opposed to certifying a *litigation class* for a possible trial. *See infra* section III.C.7; *see also* MCL 4th § 21.131–.132.

## C. Defining the class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled to notice in a Rule 23(b)(3) action. The definition must be precise, objective, and ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment with or who were employed by the defendant during a fixed period. *See* MCL 4th § 21.222. Your certification order should specify those excluded from the class, such as residents of particular states, persons who have filed their own actions or are members of another class, and officers and directors of the defendants.

Consider also whether the class definition captures all individuals or entities necessary for the efficient and fair resolution of common questions of fact and law in a single proceeding. If the class definition fails to include a substantial number of persons with claims similar to those of the class members, it is questionable. A broader class definition or definition of a separate class might be more appropriate. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice. *See also* MCL 4th § 21.23.

*Issues classes* are classes certified for particular issues or elements of claims or defenses. Though controversial and subject to conflicting rules in different circuits, issues classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." MCL 4th § 21.24. The test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.

## D. Multiple class actions

Finally, consider class certification in the context of duplicative or overlapping class action litigation pending in other federal and state

courts. Be sure to "obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented." MCL 4th § 21.25. Communication and administrative coordination with other judges will often be necessary. Other things being equal, federal judges should exercise federal jurisdiction over classes of nationwide scope; actions limited to single states can be carved out of any national certification.

# III. Settlement Review: Risks and Issues

Reviewing proposed settlements and awarding fees are usually the most important and challenging assignments judges face in the class action arena. Unlike settlements in other types of litigation, class action settlements are not an unmitigated blessing for judges. Rule changes, precedent, recent legislation, and elemental fairness to class members direct you not to rubber-stamp negotiated settlements on the basis of a cursory review. Current rules, particularly the 2003 amendments to Rule 23, unambiguously place you in the position of safeguarding the interests of absent class members by scrutinizing settlements approved by class counsel. Be aware that the adversarial clashes usually end with the settlement. Indeed, most settlements preclude the parties and attorneys from opposing the settlement's provisions, especially the stipulations about attorney fees. Thus, you need to take independent steps to get the information you'll undoubtedly need to review a settlement agreement.

## A. Judge's role

The judge's assigned task of approving or disapproving a class settlement presents exceptional challenges. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002).

Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, you need to critically examine the class certification elements, the proposed settlement

terms, and the procedures set out for implementing the proposed settlement. *See* MCL 4th § 21.61. You need to identify possible sources of information about the settlement and use them to obtain, for example, documents of agreements or understandings among counsel, the views and experiences of objectors, and the complete terms of the settlement. The next subsection (III.B) discusses all of those sources.

Reviewing a proposed settlement calls for you to use your traditional judging skills. The central questions relate to the merits of the claims and defenses: What are the class claims? How strong are they? What is the range of values of a successful claim? How likely is the class to succeed on each claim in further litigation, including trial? You may decide to avoid a definitive statement on the merits lest the settlement fail and the case actually comes to trial. Nonetheless, it seems absolutely necessary to obtain information and arguments from the parties about their assessment of the probabilities of success and their projection of a realistic range of possible recoveries. *Reynolds,* 288 F.3d at 284–85, discusses this approach further. While party submissions may influence your judgment about the merits, keep in mind that the parties have their own interests in supporting the settlement. You may need to look elsewhere for information that will allow you to take an independent and hard look at the merits of the claims and defenses.

### B. Obtaining information about the settlement

The key to reviewing a settlement is to obtain information about its terms, the merits of the class members' claims, and the reasons for settling those claims in exchange for the settlement's benefits to the class. We have a number of suggestions along those lines, starting with a provision from the new rule.

### 1. Rule 23(e)(2) agreements

Rule 23(e)(2) directs the parties to "file a statement identifying any agreement made in connection with the proposed settlement." Let the settling parties know that you expect them to provide the full settlement agreement as well as an informative summary of other agreements, such as settlement agreements for claims similar to those of class members; side understandings about attorney fees; and agreements about filing future cases, sealing of discovery, and the like. *See* MCL 4th § 21.631 and Committee Note to Rule 23(e)(2).

The idea is to identify documents that directly or implicitly suggest the attorneys' perceptions of the value of the class claims and that may point to funds, including attorney fees or payments to objectors, that might otherwise be available to compensate the class.

Consider directing the parties to provide additional information to aid your assessment of the settlement. Often, information about related parallel and overlapping cases, including amounts paid to individual plaintiffs or claimants, will shed light on the value of the class's claims. If prior settlements were confidential, direct the parties to provide information for you to review in camera. Pressing the parties to provide objective information about the merits and value of the underlying claims should advance the effort. Make sure the parties identify and justify any differences in treatment of various types of class members. Expert evaluations of the costs and present monetary value of all aspects of the settlement to the class may be available. What information did the parties use to exercise their own "due diligence" reviews?

### 2. Preliminary approval hearing

Holding a preliminary approval hearing will afford you another opportunity to obtain information. If you are deciding whether to certify a class at this stage, direct the parties to give you all the information and arguments needed to apply the Rule 23(a) and (b) criteria (except for manageability, which can be assumed in the settlement context). How numerous is the class? What are the common questions of law and fact, and do they predominate? Why is the class action superior to other forms of adjudication?

### 3. Class certification papers

Information gleaned from reviewing class certification papers should also inform you about any need for subclasses to represent separate interests. *See* MCL 4th § 21.23. The preliminary approval hearing is usually the last practical opportunity to create subclasses. Appointing counsel for subclasses often means sending the parties back to the negotiating table to deal with the interests of the new subclasses.

### 4. Expert appraisal

At or after the preliminary approval hearing and after reviewing the sources of information discussed above, consider whether you need an expert's appraisal of the value of nonmonetary (or deferred mon-

etary) components of the settlement. If so, this is the time to appoint an expert, special master, magistrate judge, or other judicial adjunct to evaluate the proposal before the fairness hearing (*see infra* Part VII). As a practical matter, your waiting for objections or for the settling parties' presentations at the fairness hearing will be too late. *See* MCL 4th § 21.644.

### 5. Information from objectors

Before and during the fairness hearing, you might receive written objections and testimony from objectors. Objectors might contribute to your review in various ways. Attorneys who represent competing or overlapping classes, such as those in state actions, may have useful information on the value of the underlying claims. Similarly, attorneys representing individual claimants who seek a better recovery for their alleged injuries may help you identify the strengths and weaknesses of the settlement and the trade-offs that led to the agreement. Be sure to monitor any agreements to settle the claims of these objectors. If they settle for the same per capita amount as the class, that tends to validate the settlement (assuming that other factors are equal). If they settle for more than the class members, ask the settling parties to justify the differential. A higher settlement for objectors with similar damage claims might signify that the class members did not receive full value for their claims. Institutional objectors may bring a different perspective. Watch out, though, for "'canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests.'" *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 (E.D. Pa. 2003) (quoting *Shaw v. Toshiba American Information Systems,* 91 F. Supp. 2d 942, 973 (S.D. Tex. 2000)). Rule 23 gives you authority to scrutinize as part of the overall class settlement any side agreements to "buy out" such objectors.

Generally, government bodies such as the Federal Trade Commission or state attorneys general, or nonprofit entities have class-oriented goals of ensuring that class members receive fair, reasonable, and adequate compensation for any injuries suffered. They tend to pursue those objectives by policing abuses in class action litigation. Consider giving those entities an opportunity to seek specific information through discovery when necessary. Consider also allowing them to participate actively in the fairness hearing. *See* MCL 4th § 21.643.

## C. Hot button indicators

Some settlement terms—"hot button indicators"—show their potential unfairness on their face. At the preliminary approval stage, signaling your concerns about a proposal with one or more such indicators may allow you and the parties to create a notice and hearing process that will correct any deficiencies without the need for multiple hearings. Hot button indicators include any remedy to which you cannot confidently assign a cash value.

### 1. Coupons

Determine whether the proposed coupons are transferable; whether they have a secondary market in which they can be discounted and converted to cash (*see In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 809–10 (3d Cir. 1995)); whether they compare favorably with bargains generally available to a frugal shopper (*see, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292 F. Supp. 2d 184, 186–88 (D. Me. 2003)); whether class members are likely to redeem them (*see id.*); and whether attorney fees are being calculated on the face value of the coupons. CAFA calls for judicial scrutiny of coupon settlements and restricts the use of unredeemed coupons in calculating fees for class counsel. *See* 28 U.S.C. § 1712 (2005). Coupon settlements were rare even before the passage of CAFA. They will be even less likely to occur now. Note that under the proper conditions (e.g., with transferability, a secondary market, and/or a class of repeat users of a low-cost product), coupons might serve both the class and the defendant and thereby increase the overall value of a settlement (*see, e.g., In re Mexico Money Transfer Litigation,* 267 F.3d 743, 748 (7th Cir. 2001) (finding that in-kind transferable coupons useful to a class of repeat consumers had an estimated value of 10%–15% of their face value)).

### 2. Cy pres relief ("fluid recovery")

The term "cy pres" has migrated from the trust field into the less appropriate realm of class action litigation. Literally, it means "as near as possible," and in the class action context, that means no recovery for individual class members, often because the class is so large and the recovery per class member so small that the costs of administration would exceed the benefit to individual members. Individual reimbursement for taxi fare overcharges are a classic ex-

ample. Cy pres relief must come as near as possible to the objective of the case and the interests of the class members. Question whether the class members might feasibly obtain a personal benefit. Look for evidence that "proof of individual claims would be burdensome or that distribution of damages would be costly." *Molski v. Gleich,* 318 F.3d 937, 954 (9th Cir. 2003). If individual recoveries do not seem feasible, examine the proximity or distance between the cy pres recipient's interests or activities and the particular interests and claims of the class members. *See, e.g., Powell v. Georgia-Pacific Corp.,* 119 F.3d 703 (8th Cir. 1997). When cy pres relief consists of distributing products to charitable organizations or others, press for information about whether the products in question have retained their face value or whether they might be out-of-date, duplicative, or otherwise of marginal value.

### 3. Restrictions on claims/reversion of unclaimed funds to defendants

Limits on the amount of recovery per claimant, strict eligibility criteria for claimants, or other procedural or substantive obstacles to honoring claims from class members may have the effect of reducing the apparent value of a settlement. Coupled with a provision that any unclaimed funds revert to the defendant at the end of the claims period (a provision that is generally disfavored, as discussed below), restrictions on eligibility are likely to substantially diminish the overall value of a settlement to the class. *See, e.g., Reynolds,* 288 F.3d at 283. Adding a "clear sailing" agreement (i.e., a stipulation that attorney fees based on the inflated settlement figure will not be contested) to an agreement with a reversion clause tilts the benefit of the settlement away from class members and toward class counsel. *See, e.g., Sylvester v. CIGNA Corp.,* 369 F. Supp. 2d 34, 47 (D. Me. 2005) ("the reverter clause and clear sailing clause raise a presumption of unfairness").

A reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to agree to an inflated settlement amount as a basis for counsel fees. Instead of approving a settlement with a reversion clause, consider encouraging the parties to use an alternative approach, such as prorating the total settlement amount among the class members who file claims. Prorating is a straightforward way to avoid the possibility of unclaimed funds and has become a standard practice in class settlements.

*Class Action Pocket Guide*

### 4. Indicia of "reverse auctions"

"Reverse auction" is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter; in other words, a reverse auction is the "sale" of a settlement to the lowest bidder among counsel for competing or overlapping classes. *See* MCL 4th § 21.61, text at n.952 and sources cited therein. Determining whether a reverse auction might have occurred requires information about all litigation, in state as well as federal courts, dealing with the subject of the dispute. Previous settlements between class counsel and defendant in unrelated cases may provide clues to the possibility of a collusive relationship.

A primary indicator of a collusive selection of settling counsel is an imbalance between the cash value of the settlement to the class as a whole and the amount of attorney fees in the agreement. For example, a settlement may include monetary and nonmonetary relief. If the attorneys receive the lion's share of the cash and the class receives primarily nonmonetary relief, including future warrants and the like, you should look for solid information to justify the imbalance. Likewise, you should scrutinize an agreement that provides that attorneys receive a noncontingent cash award and that class benefits are contingent on settlement approval and claims made. *See* MCL 4th § 21.71.

Another major indicator of a reverse auction is a difference between the apparent value of the class claims on the merits and the value of the settlement to class members. A typical element of a reverse auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement. Generally, the overpayment of the attorneys originates in an underpayment of what the class should receive based on an objective assessment of the merits of the class claims.

Sometimes, the settlement will be with an attorney who has not been involved in litigating the class claims that other attorneys have been pursuing, an especially suspicious circumstance.

### 5. Injunctive relief

Question whether injunctive relief will truly benefit class members in the case at hand. How much is the injunction worth to the class as a practical matter? What is the dollar value the relief might yield? What is the real cost to the defendant? Does the injunctive relief do more than restate the obligation that the defendant already has

under existing law or under a decree entered by a regulatory body? Are there viable damage claims that class counsel has not pursued? *See, e.g., Molski v. Gleich*, 318 F.3d at 953–54. Might an emphasis on injunctive relief and proposed certification of a Rule 23(b)(2) class amount to a tactical move to avoid the certification requirements and the notice and opt-out rights associated with a damages class under Rule 23(b)(3)? Consider whether you need independent expert advice to answer those questions (*see infra* Part VII).

### 6. Release of liability without remedy

A natural impulse on the part of settling parties is to attempt to expand the class and release claims of those on the periphery of the class, such as the spouses and children of class members, without providing any direct benefit to those individuals. At times a damages remedy may be released without any correlative payment to class members. *See, e.g., Reynolds,* 288 F.3d at 283–84. Claims not pleaded against parties that are not part of the original action (e.g., medical malpractice claims in a class action against a pharmaceutical manufacturer) are sometimes swept into the settlement. To the extent that these claims have value to class members or their families, the settlement should reflect that value. As a general rule, the release of claims by a subclass should be linked with specific remedies, such as payments to the subclass or increased payments to class members based, for example, on their family status.

### 7. Settlement class actions

"Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important." MCL 4th § 21.612. Parties frequently agree to settle class actions before a judge has decided that a class can be certified under Rule 23. The parties then jointly seek certification in the context of the settlement. Often, the parties' agreement that a class can be certified is conditioned on judicial approval of the settlement. The Supreme Court has ruled that, with the exception of one requirement, agreement of the parties does not lessen the need for a judge to determine whether all of Rule 23's certification standards have been met. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997); MCL 4th § 21.132.

You should determine during the preliminary fairness review whether the proposed class meets the standards of Rule 23(a) and (b). MCL 4th § 21.632. That way you can avoid wasting scarce judi-

cial and party resources to schedule a fairness hearing for a class that doesn't meet Rule 23 certification standards.

If you decide to certify the proposed class, be aware that courts, following the Supreme Court's lead in *Amchem*, have ruled that the settlement terms of a settlement class action need careful scrutiny. MCL 4th § 21.612. Often, such a settlement comes early in the litigation, so you may have to probe to uncover the strengths and weaknesses of the parties' claims and defenses as well as the character of their negotiations. There may be conflicts among groups within the proposed class. Question whether the claims of class members are homogeneous, and explore the possibility of creating subclasses and sending the parties back to renegotiate and take into account the differing interests of class members.

If you have doubts about any of the issues raised in this section, consider appointing an expert or special master to review and evaluate the proposed settlement. Also, consider seeking the active participation of lawyers engaged in competing or overlapping class actions involving the same subject matter. *In re Lupron Marketing and Sales Practices Litigation,* 345 F. Supp. 2d 135, 138 (D. Mass. 2004) (discussed *infra* section III.D).

### D. Preliminary review of proposed settlement

Judicial review of a proposed class settlement generally requires two hearings: one preliminary and one final. MCL 4th § 21.632. As mentioned above, if you haven't already certified a class, the preliminary approval hearing is the time to decide that issue. Preliminary review of the proposed settlement affords you an opportunity to express any concerns you may have about the "hot button issues" discussed above. You don't have the power to decide what must be in a settlement agreement, but you do have the opportunity to state your concerns about provisions—or the absence of provisions—that would make a difference in your decision about whether to approve a proposed settlement. If you have such concerns, consider allowing the parties some time to respond to them by renegotiating the settlement so that the class notice can refer as closely as possible to a final settlement. If you hold back your concerns and reject a settlement at the fairness hearing, the parties will most likely have to send new notice of any revised settlement to the class.

Consider seeking preliminary input into the fairness, reasonableness, and adequacy of the proposed settlement. For example, one judge permitted counsel pursuing independent state class actions against the same defendants to intervene as "an offsetting influence" to the loss of adversarial opposition from the parties. *In re Lupron,* 345 F. Supp. 2d at 138 n.5. Participation by such plaintiffs' counsel provided the judge with a unique opportunity to receive an informed assessment by nonsettling plaintiffs about the value of the case and the prospects for success at trial. Absent such an opportunity, consider asking the parties or others to provide preliminary information supporting the proposal.

Though not necessarily unfair, *conditional settlements* present a special problem to the class and the judge. Sometimes, a defendant resists settlement unless it can be assured that the number of class members opting out of the proposed settlement will not exceed a certain number that is specified but not widely disclosed. To avoid unduly delaying the settlement review, you may decide to press the parties to set a reasonable cutoff date for the defendant's decision about whether to proceed with the settlement, say thirty days after the end of the opt-out period. MCL 4th § 21.652. In any event, you should require the defendant to make an election before the fairness hearing.

Remember that your preliminary approval of the proposed settlement should not appear to be a commitment to approve the settlement in the end. Your preliminary finding is that the proposed settlement is within the range of reasonableness; that finding is not a final judgment that the proposal is fair, reasonable, and adequate as shown by evidence at the fairness hearing. Reserve that judgment and expect to be informed by counsel for the class and for the defendants (maybe in response to your pointed questions), and by class members, objectors, lawyers from similar litigation, or, perhaps, your own expert or special master. Bring an inquiring mind to the fairness hearing and, as noted above, seek out the information you need to decide whether the settlement is fair, reasonable, and adequate.

Once you are satisfied that the proposal warrants your preliminary approval, review the parties' proposed plan for notice and hearing. Generally, counsel will present the settlement proposal and a notice plan at the same time.

### E. Notice issues

*1. Notice to government regulators*

CAFA requires that within ten days after a proposed settlement is filed in court, each participating defendant must serve notice of specified settlement-related papers on (1) the U.S. Attorney General or, in the case of a depository institution, the primary federal regulatory official *and* (2) the primary state regulatory official (or, if none, the attorney general) of each state in which a class member resides. 28 U.S.C. § 1715 (2005). The idea is to encourage government regulators to participate in reviewing settlements and lend their expertise (and perhaps an adversarial note) to the fairness hearing. You may want to consider extending an express invitation to any regulatory body you have found to be effective in dealing with the subject matter in question.

The Federal Trade Commission (FTC) has extensive statutory authority and expertise in dealing with antitrust, unfair competition, and consumer protection matters. *See generally,* FTC, *Fulfilling the Original Vision: The FTC at 90* (April 2004), http://ftc.gov/os/2004/04/040402abafinal.pdf. CAFA does not specify the FTC as an agency that must receive notice, but consider adding the FTC to the notice list in consumer and trade practice litigation, including antitrust actions. The FTC has created a "Class Action Fairness Project," which channels FTC resources into reviewing proposed settlements as well as class counsel requests for attorney fees. Since defendants have made copies of—or electronic links to—the required settlement documents for other agencies, it will be no burden on them to send notice to the FTC or other consumer protection entities in appropriate cases. You may also decide to exercise your discretion to invite the FTC to participate in settlement and fee reviews as a friend of the court if the subject matter of the case makes this appropriate, but you may need to take steps to avoid delaying the proceedings, such as setting a firm deadline for government responses.

*2. Notice to the class*

Notices are usually the only way to communicate with unnamed class members and enable them to make informed decisions about whether to participate in a settlement. Your primary goals are that notice reach as many class members as possible, preferably by individual notification (*see* Rule 23(e)(1)(B) and MCL 4th § 21.312), and that the recipients notice it, recognize its connection to their

lives and self-interests, read it, and act on it. In a world in which junk mail and spam can easily drown out important messages, you may need to press the parties to look beyond the formal legal requirements and find a way to communicate the gist of a class action notice in an attention-getting and understandable format. Rule 23(c)(2)(B) commands that notices "concisely and clearly state in plain, easily understood language" the elements of class action notices.

The challenge is to give the class member a reason to read the notice. Boilerplate legal language almost never does the job. With help from linguists, communications specialists, and focus groups, the Federal Judicial Center prepared several illustrative notices. Go to www.fjc.gov and click on the "Class Action Notices Page."

The headline of the notice tells potential class members at a glance why they should—or should not—bother to read the notice. If the reader had, for example, "bought XYZ Corp. stock in 1999" he "could get a payment from a class action settlement." Or, if the reader had been "exposed to [an asbestos] product" she "may have a claim in a proposed class action settlement."

A picture of asbestos insulation products may trigger an association in the reader's mind. Those who recognize their own circumstances are likely to read on and perhaps contact a Web site or call an 800 number. Nonmembers of the class will have a good reason for adding it to the junk mail trash pile.

A short-form single-page (or shorter) notice with headlines can tell the reader how to get additional information. Formal case captions and legal terms of the settlement can be placed at the end of a Web-based notice, after plain language answers to questions the reader may have. Settlement administrators can supply scripted answers to callers' frequently asked questions and, if needed, information about how to examine the settlement on the Internet or at the courthouse.

"Plain English" may not be enough. Truly global settlements will include class members whose language is not English and who may not be citizens of an English-speaking country. Note that the FJC illustrative forms include an example of a Spanish language notice. Make sure the notice plan takes into account the cultural and language barriers to notifying class members. For example, the class actions involving assets of Holocaust victims demanded a far-reaching notice campaign to reach the many dispersed Jewish survivors as well as gays, Jehovah's Witnesses, and Romani ("gypsy") migrants.

The judge approved a "multifaceted plan" that included "worldwide publication, public relations (i.e., 'earned media'), Internet, and grass roots community outreach." *In re Holocaust Victims Assets Litigation,* 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000). As the judge was in the Holocaust victims' class actions, be alert to cultural differences that might affect the attention recipients will give to the proposed notices. A class of migrant farm workers, for example, might rely on radio more often than urban factory workers would. A class of people challenging searches and seizures as unreasonable might respond differently to official court notices than, say, people who have never been arrested.

## F. Fairness hearing

### 1. Participation rates: opt-outs

The typical class action settlement notice will most likely yield an apathetic response, and few objectors or opt-outs. Two empirical studies in the past decade (including one conducted by the FJC) found that about one in a thousand (0.1%) class members opted out of a proposed settlement. *See* Eisenberg & Miller (2004) and Willging, Hooper & Niemic (1996) in the Bibliography. Counsel may argue that a low percentage of opt-outs demonstrates class members' agreement with the settlement, but in some types of cases that argument seems misplaced. Opt-out rates vary according to the type of case and the amount of the individual recovery. Class members are considerably more likely to opt out of mass tort, employment, and commercial litigation, where individual recoveries are generally higher, and less likely to opt out of consumer cases, where individual recoveries are generally lower.

### 2. Participation rates: objections

Do not expect class representatives or other class members to attend the fairness hearing or file written objections. The 1996 FJC study (Willging, Hooper & Niemic in the Bibliography) found that only about a quarter to a half of the class representatives attended the fairness hearing.

The FJC study also found that in about half of the class actions, not a single member filed a written objection. Eisenberg and Miller found that objections occurred in less than one in a thousand class actions in which a published opinion was available. *See* Eisenberg & Miller (2004) in the Bibliography. Written objections documented

in the FJC study most frequently challenged the amount of the attorney fees requested. In second place was a related objection: that the settlement was inadequate to compensate class members for their losses. Next in line was the objection that the settlement favored some subgroups over others. These findings suggest that a substantial portion of the fairness hearing will focus on attorney fee issues.

### 3. Conducting the fairness hearing

It is essential to conduct a hearing even if no one other than the attorneys for the settling parties participates, because the hearing is your primary opportunity to focus on the terms of the settlement. You alone are charged with deciding whether the settlement is fair to the class members, reasonable in relation to the merits of their claims, and adequate to redress any injuries suffered. Rule 23 and the *Manual for Complex Litigation* call for the judge to "make an independent analysis of the settlement terms." MCL 4th § 21.61. Review the list of "hot button" settlement terms presented in section III.C *supra*, and be prepared to ask counsel hard questions about the value of the settlement to the class. In addition to the "hot button" items, the MCL 4th contains a checklist of fifteen more routine factors that might inform your decision about whether the settlement is superior to the primary option of continued litigation of the class claims. MCL 4th § 21.62. The manual also discusses benchmarks for applying the fifteen factors.

If objectors and unrepresented class members appear at the fairness hearing, it is important to permit them to fully voice their concerns. For class members who feel strongly enough about their injuries to appear, the fairness hearing is their "day in court." Judges in settlements involving tort claims such as the Agent Orange and silicone gel breast implant litigation held multiple days of hearings to accommodate the interests of class members. *See* MCL 4th § 21.634.

You will, of course, want to eliminate unnecessary repetition. Setting time limits is a must. Be sure to notify participants in advance about how much time they have. Note that having a group of class members gives you a chance to ask questions of all present, akin to conducting a voir dire of a jury venire. Such a group examination may be an efficient mechanism for getting a clear sense of the similarities and differences among class members' claims.

Finally, "Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements." MCL 4th § 21.635. In these times of heightened visibility of class action rulings, appellate review of settlements is not pro forma even when the court affirms the district court's findings and conclusions. *See, e.g., In re Cendant Corp. Litigation,* 264 F.3d 201 (3d Cir. 2001).

# IV. Attorney Fee Issues

As discussed in Part I *supra* ("Selection of Counsel"), Rule 23(g) requires you to appoint class counsel at an early stage of the litigation. The order appointing counsel can include express provisions about the standards and procedures you expect to use in reviewing requests for attorney fees and costs. Rule 23(g)(2)(C). At the least, you should inform counsel about whether to keep time records to support using a lodestar cross-check, as discussed below. In addition, appointing counsel gives you a natural opportunity to discuss any limits you might want to set for travel expenses, use of senior partners to do legal research, and the like. *See* MCL 4th § 14.21. Perhaps from the outset of the litigation, but at least at the fee determination stage, "the district judge must protect the class's interest by acting as a fiduciary for the class." *In re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 307 (3d Cir. 2005).

## A. "Mega" cases

In "mega" cases, be prepared to see attorney requests for truly huge amounts, up to hundreds of millions of dollars. In such cases, of course, the monetary recovery to the class typically is also in the hundreds of millions of dollars, even in the billions. *See, e.g., In re Prudential Insurance Co. of America Sales Practices Litigation,* 148 F.3d 283, 339–40 (3d Cir. 1998). In those cases, the percentage of recovery is generally far less than the typical range and may be as low as 4%. MCL 4th § 14.121. Generally, as the total recovery increases the percentage allocated to fees decreases.

## B. Monetary results achieved for class

The Committee Note to Rule 23(h) gives the following guidance for determining fees based on the creation of a monetary fund for the common benefit of the class (a "common fund": the "fundamental focus is the result actually achieved for class members"). In cases where the benefit to the class is nonmonetary, determining the final result requires looking behind the face value of nonmonetary or contingent benefits to determine their actual benefit to the class. In some cases, you might use expert valuations based on reliable, objective standards. In other cases, perhaps a majority of them, the only reliable test of benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip. *See* MCL 4th § 21.71; *see also* Class Action Fairness Act, 28 U.S.C. § 1712(a) (coupon settlements).

## C. Evaluating nonmonetary results

In cases dealing with nonmonetary benefits other than injunctive relief, consider two options, either of which links the payment of fees with the actual benefit to the class. The first approach, which appears to be more efficient, awards fees in the same coin both to the class and to counsel. For example, if the class is to be paid in the form of discount certificates, attorneys should receive their fees as a portion of the discount certificates. *See, e.g., In re Auction Houses Antitrust Litigation,* No. 00 Civ. 0648, 2001 WL 170792, at *3–*5, *15–17 (S.D.N.Y. Feb. 22, 2001). This approach gives an incentive to attorneys to help create a secondary market for the nonmonetary benefits and gives the court the efficiency of a single ruling on attorney fees.

  The second approach is simply to hold back the portion of any attorney fee awards that are linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the discount certificates can be established by calculating class members' actual use. *See, e.g., Bowling v. Pfizer,* 132 F.3d 1147, 1151–52 (6th Cir. 1998). This approach has the built-in inefficiency of requiring you to review fee issues more than once and may be unfair to counsel who have financed the litigation themselves.

## D. Role of government actors

In quantifying the risk undertaken by plaintiffs' counsel in bringing a class action, scrutinize the role of government actors (*see infra* Part V). Where a government body has obtained a guilty plea, criminal conviction, or civil judgment against a defendant, class counsel in a "piggyback" class action arising out of the same set of facts face a reduced risk of loss and a reduced risk or burden of discovery and trial. A reasonable attorney fee in such cases may be the value that class counsel adds to the settlement that would have been available to the class but for the counsel's work. *See, e.g., Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1272 (D.C. Cir. 1993). In some cases, the government actor might participate as an intervenor or as a friend of the court in addressing the attorney fee issues. *See, e.g., In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96, 98 (D.D.C. 2002).

On the other hand, private class action litigation may pave the way for government enforcement or serve as a substantial deterrent in its own right. In such cases, take into account in awarding attorney fees any groundbreaking work of plaintiffs' counsel. *See, e.g., In re Rite Aid Corp.,* 396 F.3d at 297, 304.

## E. Objectors

Objectors may qualify for fees because of their contribution to the common fund available to the class. By reducing attorney fees, objectors often increase funds available for the common fund for the class. *See*, *e.g., Bowling v. Pfizer,* 922 F. Supp. 1261, 1285 (S.D. Ohio 1996). The Committee Note to Rule 23(h) expressly recognizes the benefits that objectors may provide to the class. However, be wary of self-interested professional objectors who often present rote objections to class counsel's fee requests and add little or nothing to the fee proceedings.

## F. Methods of calculating fees

Debates about whether to calculate fees based on a lodestar (reasonable number of attorney or paralegal hours multiplied by market rate) or a percentage of the value of the settlement have for the most part been resolved in favor of the percentage-of-value method. However, while most courts of appeals now permit district courts to use the percentage-of-value method (MCL 4th § 14.121), their decisions often direct district courts in their circuit to supplement the

percentage method with a lodestar cross-check to see if the hourly rate is reasonable and to provide the appellate courts with a basis for reviewing the reasonableness of the fee award. The cross-check requires "neither mathematical precision nor bean-counting"; it allows you to "rely on summaries submitted by the attorneys and [you] need not review actual billing records." *In re Rite Aid Corp.,* 396 F.3d at 306–07.

Another type of cross-check involves examining the defendants' attorney fee records as a measure of what might be a reasonable number of hours or a total payment. The MCL 4th cites the Third Circuit's 2001 Task Force on Selection of Class Counsel's recommendation that judges avoid rigid adherence to a benchmark percentage and instead tailor their fee award to the realities of the class litigation.

In mega cases, consider using a sliding scale, by which the percentage decreases as the magnitude of the fund increases. MCL 4th § 14.21, text at nn.497–99; *see In re Rite Aid Corp.,* 396 F.3d at 302–03 (discussing the pros and cons of sliding scales). Note that asking attorneys at the outset of the litigation to maintain time records will be helpful in implementing a lodestar cross-check or a full lodestar review (*see supra* Part I).

# V. Role of Government Actors

Often in consumer or commercial class action litigation, government regulators such as the Federal Trade Commission (FTC), Securities and Exchange Commission (SEC), or a state or the federal attorney general's office will lay the groundwork for class action litigation. In some instances, though, private class action litigants lay the foundation for public enforcement efforts and even criminal prosecutions. *See, e.g., In re Rite Aid Corp.,* 396 F.3d at 297.

In pursuing public goals of advancing fair competition, protecting consumers, and policing the marketplace against false and misleading information, such agencies may invest substantial resources in investigating a defendant's alleged malfeasance. For example, in *In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96, 97 (D.D.C.

2002), the FTC "expended over 25,000 hours of investigators' time, obtained production of and reviewed some 400 boxes of documents produced in response to approximately 40 subpoenas, and conducted 20 investigational hearings and over 60 interviews."

Typically, public enforcement actions result in a consent decree, but the agency may have the statutory power to order rescission of agreements and restitution or disgorgement of illegally gotten gains, as the court recognized in *First Databank. See also, e.g., FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 571–72 (7th Cir. 1989). When an agency action or criminal prosecution against a business or its officers is successful, a private class action may well follow on its heels. In the context of an agency action, the class action device can be a vehicle for distributing monetary relief to the class. In *First Databank*, for example, the FTC got the defendant to agree to a $16–19 million figure for the disgorgement remedy. Private plaintiffs increased the undisputed amount of the FTC's settlement by an additional $8 million, and the final disgorgement figure was "expressly declared to be 'for the purpose of settling the [private] class action lawsuits.'" *In re First Databank,* 209 F. Supp. 2d at 98. The court limited the private plaintiff attorneys' fee to a percentage of the value the attorneys added to the FTC's proposed settlement.

When a government regulator has sought a monetary remedy for a class, examine the description of the intended beneficiaries of the government's action and decide whether you should define the class to be certified in the same way. Aligning the class definition with the description of the victims in the governmental action will most likely produce efficiencies in notifying the class, reviewing the settlement, distributing the proceeds, and evaluating requests for fees. In addition, to gain the full picture on entitlement to fees, consider inviting the agency to participate in the fee proceedings as an intervenor in the class action or as a friend of the court. *See also supra* section III.E.1 for a discussion of the CAFA requirements for notifying appropriate federal and state officials about a class settlement.

# VI. Coordination with State Judges

CAFA will probably limit the need to coordinate class action litigation with state judges, because most class actions of any size and scope will have federal jurisdiction based on minimal diversity and will most likely be removed from state court. Coordination among federal courts will often but not always proceed through the MDL process, at least for major cases. After the passage of CAFA, some overlapping class actions may be filed in state courts (for example, in cases filed on behalf of a class of primarily in-state plaintiffs against an in-state defendant), but federal courts lack jurisdiction only in cases in which a primary or significant defendant is a citizen of the forum state. The first step is to ask the parties whether competing or overlapping proposed or certified class actions exist in other courts. Presumably, a defendant will be aware of any other litigation against it.

Judges have developed different models, with different levels of formality, for coordinating their efforts with their state judge counterparts. Informal models include personal meetings, telephone calls, and e-mail communications to exchange information about scheduling and to coordinate discovery, rulings on class certification, and other procedural matters. In more formal contexts, judges may share a special master with state judges, sit jointly and hear evidence and argument on motions, or even hold a national conference or set of meetings about the litigation. The Schwarzer et al. (1992) article in the Bibliography and MCL 4th § 20.312–.313 provide specific examples of state–federal coordination efforts.

Generally, state judges have responded to requests for coordination in a spirit of cooperation. The key is to identify the cases and judges and initiate communication. Coordination in areas like discovery should take into account the pressure a state judge might experience from state lawyers eager to present their cases at trial or, at a minimum, share in any common fund that their efforts help create. In the most formal and conflictual context, you may need to issue an injunction to protect federal jurisdiction, usually when you are seeking to insulate a national settlement from contrary rulings in competing or overlapping classes in state court. *See* MCL 4th §§ 21.42 and 20.32.

# VII. Use of Special Masters and Court-Appointed Experts

Special masters, court-appointed experts, and other judicial adjuncts with special expertise may be useful in a variety of contexts in class action litigation. Specifically, judges have appointed special masters to oversee discovery and resolve disputes in contexts where the number and complexity of documents might generate a large number of disputes. *See* MCL 4th § 11.424. Judges have also used magistrate judges, special masters, court-appointed experts, technical advisors, and other adjuncts to assist in evaluating class settlements (*see* MCL 4th § 21.651), and have appointed special masters or other adjuncts to administer settlements and participate in resolving claims via alternative dispute resolution (ADR) or other methods (*see* MCL 4th § 21.661).

Occasionally, judges have appointed special masters to devise trial plans. *See* MCL 4th § 21.141. In class actions involving disputed scientific evidence, you may wish to appoint an expert to present a perspective on disputed issues that is less adversarial than what the parties' experts present. *See, e.g.,* MCL 4th § 22.87. Federal Rules of Civil Procedure 23(h)(4) and 53(a)(1)(C) expressly authorize using special masters to review attorney fee requests. *See* MCL 4th § 21.727. In many class actions, however, the trial judge may find that the information learned in participating in pretrial matters, such as resolving discovery disputes, will greatly enhance the judge's ability to make an informed assessment of a class settlement.

# Conclusion

If this guide has served its purpose, it has helped you analyze and manage the major aspects of class action litigation. By anticipating and paying serious attention to reviewing settlements and requests for attorney fees, you should be able to fulfill your role as a fiduciary for a class whose counsel and representatives have decided to settle on a particular outcome.

*Class Action Pocket Guide*

# Bibliography

Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004).

Federal Judicial Center, Manual for Complex Litigation, Fourth (MCL 4th) (2004).

Deborah Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain (RAND Corp. 2000).

Alan Hirsch & Diane Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation (Federal Judicial Center 2d ed. 2005).

Laural L. Hooper & Marie Leary, Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study, 209 F.R.D. 519 (Federal Judicial Center 2001).

Barbara J. Rothstein, John Beisner, Elizabeth J. Cabraser & Jay Tidmarsh, The Class Action Fairness Act of 2005: An Overview of Legal and Case Management Issues (Federal Judicial Center Broadcast, April 1, 2005) (outline and videotape available from the Center's Information Services Office).

William W Schwarzer, Nancy E. Weiss & Alan Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Va. L. Rev. 1689 (1992).

Third Circuit Task Force, *Report on Selection of Class Counsel,* 74 Temp. L. Rev. 689 (2001).

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (Federal Judicial Center 1996); *see also* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges,* 71 N.Y.U. L. Rev. 74 (1996) (later version of same report with fewer tables and figures).

Thomas E. Willging & Shannon R. Wheatman, An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation (Federal Judicial Center 2005).

### The Federal Judicial Center

**Board**

The Chief Justice of the United States, *Chair*

Judge Bernice B. Donald, U.S. District Court for the Western District of Tennessee

Judge Terence T. Evans, U.S. Court of Appeals for the Seventh Circuit

Magistrate Judge Karen Klein, U.S. District Court for the District of North Dakota

Judge Pierre N. Leval, U.S. Court of Appeals for the Second Circuit

Judge James A. Parker, U.S. District Court for the District of New Mexico

Judge Stephen Raslavich, U.S. Bankruptcy Court for the Eastern District of Pennsylvania

Judge Sarah S. Vance, U.S. District Court for the Eastern District of Louisiana

Leonidas Ralph Mecham, Director of the Administrative Office of the U.S. Courts

**Director**

Judge Barbara J. Rothstein

**Deputy Director**

Russell R. Wheeler

### About the Federal Judicial Center

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The organization of the Center reflects its primary statutory mandates. The Education Division plans and produces education and training programs for judges and court staff, including satellite broadcasts, video programs, publications, curriculum packages for in-court training, and Web-based programs and resources. The Research Division examines and evaluates current and alternative federal court practices and policies. This research assists Judicial Conference committees, who request most Center research, in developing policy recommendations. The Center's research also contributes substantially to its educational programs. The two divisions work closely with two units of the Director's Office—the Systems Innovations & Development Office and Communications Policy & Design Office—in using print, broadcast, and online media to deliver education and training and to disseminate the results of Center research. The Federal Judicial History Office helps courts and others study and preserve federal judicial history. The International Judicial Relations Office provides information to judicial and legal officials from foreign countries and assesses how to inform federal judicial personnel of developments in international law and other court systems that may affect their work.