# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR, AND STACEY MOORE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO.  04-CV-12719 NMG<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CERTIFICATION OF A MASSACHUSETTS CLASS PURSUANT TO FED. R. CIV. P. 23

Defendants Robert Half International Inc. and Robert Half Corporation (together "RHI" or the "Company") hereby oppose Plaintiffs' Motion for Certification of a Massachusetts Class Pursuant to Fed. R. Civ. P. 23 ("Motion for Certification").  The Motion for Certification is Plaintiffs' <u>fourth</u> attempt in this case to obtain certification of a class based on the same flawed arguments and the same scant evidence.  Despite the fact that this Court has <u>repeatedly</u> denied their motions for certification under the more lenient standard imposed under 29 U.S.C. § 216(b) ("Section 216(b)"), Plaintiffs now seek certification of a class under the more stringent requirements of Fed. R. Civ. P. 23 ("Rule 23") without presenting any additional evidence whatsoever.  Instead, Plaintiffs again rely on the <u>mere existence</u> of the Company's CHOICE Time Off policy to demonstrate that they meet all of the requirements necessary to sustain class certification under Rule 23.  Evidence that fails to support even conditional certification under the modest requirements of Section 216(b) is grossly insufficient to satisfy the more rigorous requirements of Rule 23.  In addition, Plaintiffs cannot meet the requirements of Rule 23(a)

because they cannot demonstrate that there are questions of law or fact common to the class they

seek to represent.  Finally, as the Court previously noted, Plaintiffs cannot satisfy the

predominance and superiority requirements of Rule 23(b)(3) because the nature of Plaintiffs

claims and RHI's defenses calls for highly individualized proof, and, therefore, class treatment of

this case is improper and contrary to the interests of judicial economy.  Accordingly, the Court

should deny Plaintiffs' Motion for Certification.

PROCEDURAL BACKGROUND

Plaintiffs commenced this action on December 1, 2004, alleging violations of state and

federal laws "on behalf of themselves and all others similarly situated."  Since that time,

Plaintiffs have sought to have this Court certify a class on four separate occasions.  Plaintiffs

filed their first Motion to Facilitate § 216(b) Notice ("Initial Motion") on May 27, 2005.  On

November 30, 2005 – two days before the deadline for Defendants to file a surreply to the Initial

Motion – Plaintiffs filed a Renewed Motion to Facilitate § 216(b) Notice ("Renewed Motion").

On March 30, 2006, this Court denied Plaintiffs' Initial Motion, holding that Plaintiffs

had failed to meet their burden in demonstrating that the case should proceed as a collective

action.  *See O'Donnell, et al. v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 250-51 (D. Mass.

2006) ("*O'Donnell I*").  On May 10, 2007, the Court denied Plaintiffs' Renewed Motion, finding

that Plaintiffs failed "to overcome the deficiencies the Court found the last time around." *See*

May 10, 2007, Memorandum and Order, docket no. 60, p. 8 ("*O'Donnell II*").

Undeterred by the Court's repeated findings that Plaintiffs failed to meet their burden

with respect to class certification, on May 21, 2007, Plaintiffs filed their Motion for

Reconsideration, or in the Alternative, Certification to the Court of Appeals, and for Tolling

(docket no. 61) ("Motion for Reconsideration"), in a desperate attempt to have the Court revisit

2

the issue of class certification – yet again – based on the same allegations that failed to meet the requirements for certification in their previous attempts. On January 9, 2008, the Court denied Plaintiffs' Motion for Reconsideration and reaffirmed its denial of Plaintiffs' repeated motions for conditional certification of their Fair Labor Standard Act ("FLSA") claims as a collective action, holding that the Plaintiffs failed to meet even the modest burden under Section 216(b). According to the Court, Plaintiffs failed to demonstrate that the putative class members were similarly situated because the provisions of the handbook cited by Plaintiffs as constituting a common policy "do not . . . amount to an employment policy that creates a 'significant likelihood' of impermissible deductions" that would justify conditional certification. *See* January 9, 2008, Memorandum and Order, docket no. 80, p. 13 ("*O'Donnell III*"). In addition, the Court again stated that Plaintiffs had failed to meet their burden in demonstrating that other putative class members are interested in joining the litigation. *Id.*, p. 14. The Court also denied Plaintiffs' requests that the Court certify the question of conditional certification to the First Circuit Court of Appeals and toll the statute of limitations on their FLSA collective action claims. *Id.*, pp. 15-16.

On June 22, 2007 – while their Motion for Reconsideration was still pending – Plaintiffs filed their Motion for Certification, which seeks certification under Rule 23 of a class including all exempt RHI employees in Massachusetts, based only on Defendants' alleged violation of the "salary basis" test under Massachusetts law.

## FACTUAL BACKGROUND

### I.    RHI and Its Business

RHI is a specialized staffing company, providing services on a temporary, project, and full-time basis to its clients through several divisions. Accountemps, the only division in which

Plaintiffs Ian O'Donnell ("O'Donnell") and David Jolicoeur ("Jolicoeur") worked, provides experienced accounting and finance services on a temporary basis to client companies.  The Creative Group, the only division in which Plaintiff Stacey Moore[1] ("Moore") worked, provides creative, web, marketing, and advertising services on a freelance basis.

## II.    RHI's Choice Time Off Benefit

RHI's CHOICE Time Off ("CTO") benefit includes what are commonly referred to as vacation days, sick days, and other personal days off.  Affidavit of Linda Blandford-Beringsmith ("Blandford-Beringsmith Aff."), ¶ 2 (attached as Exhibit A).  RHI employees accrue CTO leave on an incremental basis throughout the year according to a schedule.  *Id.*  The Company maintains CTO "banks" for employees that track accrued days off.  *Id.*

Each employee's manager makes an individualized decision as to how time off is recorded and whether any CTO is deducted from an employee's bank for a particular absence.  Blandford-Beringsmith Aff., ¶ 3.  In this way, each manager exercises his or her discretion in determining how to apply the CTO Policy in individual circumstances.  *Id.*  For example, a manager may allow an employee to take time off for personal reasons without any deduction from the employee's CTO bank.  *Id.*  When a manager elects to apply CTO time to an employee's absence, RHI makes a deduction from the employee's leave bank in full-day increments; partial-day deductions from CTO are not permitted under the policy.  *Id.*

Generally, an exempt employee who leaves work after working a substantial part of the day does not use any CTO for the time away from work.  *Id.*  If approved by the employee's individual supervisor, an exempt employee may borrow up to five days of unearned CTO, which are advanced only in full-day increments.  Blandford-Beringsmith Aff., ¶ 4.  If the Company

---

[1] Moore was added as a plaintiff upon the filing of Plaintiffs' Second Amended Complaint.

allows an employee to borrow CTO time and the employee's employment is terminated before

he or she earns the borrowed CTO, the Company may, in certain circumstances, deduct the

amount owed from the employee's final paycheck, subject to the employee's manager's

discretion.  *Id*.

<u>**ARGUMENT**</u>

It is well-settled that the standard for certification under the collective action provisions

of the FLSA is substantially more lenient than the standard for class certificate under Rule 23.

*See, e.g., Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (holding that

"similarly situated" standard is considerably less stringent than Rule 23(b)(3) class action

standards) (citing *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir. 1996)); *Guerra v. Big*

*Johnson Concrete Pumping, Inc.,* 2006 WL 2290512, *3 (S.D. Fla.) (similarly situated standard

more elastic and less stringent than Rule 23 standard); *Goldman v. RadioShack Corp.*, 2006 WL

336020, *6 (E.D. Pa.) (same).[2]  Therefore, evidence that falls short of meeting the "similarly

situated" requirement of Section 216(b) necessarily fails to meet the more stringent requirements

of Rule 23.   Indeed, Plaintiffs themselves have argued, again and again, that the standard under

Section 216(b) is lenient and have acknowledged that the requirements of Rule 23 are more

stringent than those of Section 216(b).  *See, e.g.,* Renewed Motion to Facilitate, p. 17.

---

[2] *See also Downer v. Franklin County*, 2003 WL 22319418, n. 1 (N.D.N.Y. 2003); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001) (noting that numerous courts have held that "similarly situated" standard is less stringent than requirement of Rule 23(b)(3)); *Perez v. RadioShack Corp.*, 2003 WL 21372467, *1 (N.D. Ill. 2003); *Stone v. First Union Corp*., 203 F.R.D. 532, 541 (S.D. Fla. 2001) (unlike Rule 23, "similarly situated" requirement does not require that all questions of law or fact be common or that common issues predominate); *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988) (the "similarly situated" requirement of Section 216(b) is "considerably less stringent" than requirement of Rule 23(b)(3) that common questions "predominate"); *Bayles v. Am. Med. Response of Colorado, Inc*., 950 F. Supp. 1053, 1059 (D. Colo. 1996);  *Flavel v. Svedala Indus., Inc.*, 875 F. Supp. 550, 553 (D. Wis.1994) (similarly situated standard considerably less stringent than predominance requirement of Rule 23(b)(3)); *Jackson v. New York Tel. Co.*, 163 F.R.D. 429, 432 (S.D.N.Y. 1995); *Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1042 (D. Minn. 1991); *Church v. Consol. Freightways, Inc*., 137 F.R.D. 294, 306 (N.D. Cal. 1991).

Plaintiffs have the burden of persuading the Court that it should certify a class. *See, e.g., Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001). To meet this burden, Plaintiffs must satisfy the requirements set forth in Rule 23. *Id.* First, under Rule 23(a), Plaintiffs must demonstrate that (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a). *See also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997). Failure to establish even one of the four elements defeats a motion for class certification. *See, e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 (3rd Cir. 2001).

Even if Plaintiffs could meet these four threshold requirements, they must also establish that the action qualifies under one of the three subsections of Rule 23(b). *See, e.g., Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). Here, Plaintiffs seek certification under subsection 23(b)(3). Therefore, Plaintiffs must demonstrate that (1) common questions of law or fact predominate over questions affecting only individual class members, <u>and</u> (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). *See also Amchem Prods.*, 521 U.S. at 615. Courts have broad discretion in determining whether to certify a class and must undertake a "rigorous analysis of Rule 23 prerequisites" before certifying a class. *Gen. Tel. Co. of Southwest*, 457 U.S. at 161.

The Court should deny certification of a class in this case because Plaintiffs cannot meet their burden of demonstrating that the case should proceed as a class action. As a preliminary matter, Plaintiffs continue to rely on the same evidence – or lack thereof – on which they relied

6

in their previous failed attempts for conditional certification under Section 216 (b).  Evidence

that fails to satisfy even the modest requirements of Section 216(b) cannot sustain certification of

a class under the more rigorous requirements of Rule 23.  In addition, Plaintiffs fail to meet the

requirements of Rule 23(a) because Plaintiffs have failed to demonstrate that there are questions

of law or fact common to the class.  Finally, Plaintiffs fail to satisfy the requirements for class

certification under Rule 23(b)(3) because they have not established – and cannot – that common

issues predominate over individual issues or that a class action is the superior method for the fair

and efficient adjudication of the case.  Accordingly, the Court should deny Plaintiffs Motion for

Certification.

**I.      Plaintiffs' Motion for Certification Is Based on the Same Failed Arguments as Their First Three Attempts to Obtain Certification Under Section 216(b)**

It is uncontroversial that the requirements of Rule 23 are more stringent than those of

Section 216(b).  *See, e.g., Hipp*, 252 F.3d at 1219 (11th Cir. 2001).  Plaintiffs recognized this

relationship between Section 216(b) and Rule 23 when they expressed an assumption that the

Court would deny their Motion for Certification.[3]  Yet despite this acknowledgment, in their

Motion for Certification under Rule 23, Plaintiffs continue to rely on the same failed arguments

and nonexistent evidence that they relied on in their three previous attempts at certification under

216(b).  This Court has <u>repeatedly</u> held that Plaintiffs' evidence simply does not support

conditional certification of a class in this case – and Plaintiffs have repeatedly ignored the

Court's rulings.  In moving for certification under Rule 23, Plaintiffs introduce no additional

evidence whatsoever to demonstrate that they meet the rigorous requirements of that rule.  If

---

[3] In their Motion for Reconsideration, Plaintiffs admitted that a decision on that motion "would be preferable, from a viewpoint of judicial economy . . . [to] having the plaintiffs next file their motion for class certification under Rule 23 for the Massachusetts subclass, for which Plaintiffs expect they would receive the same denial by the Court." Motion for Reconsideration, p. 7.

Plaintiffs cannot satisfy the requirements of Section 216(b) – and they have demonstrated time after time that they cannot – then they unquestionably cannot satisfy the requirements of Rule 23, and the Court therefore should deny Plaintiffs' Motion for Certification.

## II.     Plaintiffs Have Failed to Meet the Rule 23(a) Requirements for Class Certification

Plaintiffs cannot meet the requirements of Rule 23(a) because they cannot demonstrate that there are questions of law or fact common to the class.  In *O'Donnell III*, the Court noted that Plaintiffs may be able to satisfy the commonality requirement because in their Motion for Certification they contend that all RHI policies are subject to a common policy that violates the Massachusetts Wage Act.  This Court has already determined that the "common policy" upon which Plaintiffs rely – the CTO Policy – does not itself violate the law and that Plaintiffs' allegations regarding the policy are insufficient to justify certification of a class.  Therefore, the putative class members were <u>not</u> subjected to a common policy that violated the Massachusetts Wage Act, and to show that RHI violated that law as to any individual employee, Plaintiffs must establish that each employee was subjected to actual impermissible deductions from his or her salary.  This will require individualized inquiries into numerous facts surrounding the employment of <u>each</u> and <u>every</u> putative class member, as described in detail in Section III, *infra*. Plaintiffs' mere allegation that the handbook policy applied to all exempt employees is not enough to satisfy the commonality requirement of Rule 23(a), just as it was not enough to satisfy the "similarly situated" requirement of Section 216(b).  *See, e.g., Webb v. Merck & Co. Inc.*, 206 F.R.D. 399, 406 (E.D. Pa. 2002) (holding that simply making blanket allegation on behalf of broad class is insufficient to establish class).

Even if Plaintiffs could demonstrate an actual deduction, this would be insufficient to establish commonality for the entire class because a violation of the salary basis test on the only

remaining theory that Plaintiffs could plead – a pattern of actual impermissible deductions –

would not affect the exempt status of the entire class that Plaintiffs seek to represent.  The

regulations implementing the salary basis test states that "[i]f the facts demonstrate that the

employer has an actual practice of making improper deductions, the exemption is lost during the

time period in which the improper deductions were made for employees in the same job

classification working for the same managers responsible for the actual improper deductions."[4]

29 C.F.R. § 541.603(b).  The regulations further specify that "[e]mployees in different job

classifications or who work for different managers do not lose their status as exempt employees."

*Id*.  In this case, the Court has recognized that RHI's CTO Policy vests local, office-level

managers with substantial latitude to decide whether to deduct CTO time from an employee for a

given absence, whether to allow an employee to borrow CTO time, and whether to deduct

borrowed time from an employee's final pay.  Therefore, a single deduction, or even a pattern of

deductions, at one location would have no effect on staffing professionals in any other office.

Plaintiffs' bare allegation that some staffing professionals might have been subject to some

impermissible deductions is, therefore, insufficient to demonstrate that there are questions of law

or fact common to the entire class that they seek to represent.

## III.    Plaintiffs Fail to Meet the Rule 23(b)(3) Requirements for Class Certification Because They Cannot Show Predominance or Superiority

It is well-established that an action may be certified as a class action only if the court

finds that the questions of law or fact common to the members of the class will predominate over

any questions affecting only individual members.  *See, e.g., Amchem Prods.*, 521 U.S. at 621.

---

[4] The regulations also stipulate that [i]mproper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions."  *Id*.  Each inquiry as to whether any "improper deduction" was "isolated" or "inadvertent" similarly would be a fact specific anathema to the commonality requirement of Rule 23(a).

When individualized proof of liability or damages is required, common questions do not predominate over individual questions. *See, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003) (holding that where determination of whether plaintiffs had suffered damages would require individualized proof with regard to each plaintiff, questions affecting individual class members predominate over common questions of law or fact); *Schwartz v. Dana Corp./Parish Div.*, 196 F.R.D. 275, 282 (E.D. Pa. 2000) (finding that where "each member must prove liability and damages, individual issues will predominate over common issues of the litigation"); *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595, 608 (S.D.N.Y. 1982) (to certify class "would be to unleash a Frankenstein monster of unmanageability, weighted down with individual questions of law and fact which clearly predominate, to the potential disadvantage of the litigants, and to the certain prejudice of the orderly disposition" of the case). *See also Cupac, Inc. v. Mid-West Ins. Agency, Inc.*, 100 F.R.D. 440 (S.D. Ohio 1983). In addition, courts have held that the existence of such individualized assessments defeats the superiority requirements of Rule 23. *See Schwartz*, 196 F.R.D. 275, 285 (superiority requirement not met because little time could be saved by trying case as class action due to number of issues that would have to be addressed individually). Here, individualized proof is irrefutably required, and therefore, as the Court noted in *O'Donnell III*, class treatment of this case is improper and does not further the interests of judicial economy.[5]

---

[5] In *O'Donnell III*, the Court noted that Plaintiffs' arguments regarding their ability to satisfy the predominance and superiority requirements of Rule 23 were unconvincing. The Court stated that "plaintiffs' proposed class does not appear cohesive" because "the Handbook, on its own, does not demonstrate a violation of the salary basis test" and therefore "plaintiffs will have to present evidence with respect to how the policies in the Handbook were implemented." *O'Donnell III*, p. 21. The Court recognized that such evidence would necessarily "require individualized inquiries depending on the office where the employee worked, who managed the employee, and what position the employee held" and concluded that "[a]s a result of these individualized inquiries, common questions of fact or law do not appear to predominate nor does a class action appear to be the most efficient way to adjudicate the controversy." *Id.*

As they did in their failed motions for conditional certification under Section 216(b), Plaintiffs again rely on the <u>mere existence</u> of the Company's CTO Policy to demonstrate that they meet all of the requirements necessary to sustain class certification under Rule 23. Specifically, Plaintiffs argue that they meet the predominance requirement because "whether Plaintiffs and class members prevail on their claims depends solely, and in every case, on whether the policy that governed their employment violates the salary basis test" and because "there will be no need for individualized inquiries" in this case. Motion for Certification, p. 12. Plaintiffs' argument is grossly insufficient to meet their burden under Rule 23 for two reasons. First, their argument ignores the plain language of the CTO Policy itself, which provides that managers have discretion in determining whether, when, and how to apply the policy to individual employees, and the uncontradicted evidence showing the application of that discretion to Moore. Second, Plaintiffs' argument is in direct conflict with the Court's holding in *O'Donnell III* that the policy at issue does not violate the salary basis test and that liability will therefore rest on individual determinations of whether any actual impermissible deductions occurred in the various chains of command to which RHI's employees in Massachusetts are subject.

This Court has recognized that RHI's CTO Policy vests the Company's managers in each of RHI's offices with substantial discretion in deciding whether to charge CTO leave against each of an employee's absences, whether to allow an employee to "borrow" CTO leave, and whether to attempt to recoup a negative CTO balance incurred by a departing employee. However, in an effort to bolster their claims that the mere existence of a handbook policy satisfies the predominance requirement, Plaintiffs continue to portray the policy as mechanistic

and devoid of managerial discretion.[6]  These allegations are demonstrably false.  The language of

RHI's CTO Policy, itself, provides that the policy is to be administered subject to the exercise of

discretion by RHI's individual managers.  *See* CTO Policy (attached as Exhibit D to Affidavit of

Shannon Liss-Riordan ("Liss-Riordan Aff."), docket entry no. 74) ("Managers need to look at

the individual circumstances and apply judgment as to when to apply greater flexibility").  The

Company has also provided a substantial volume of undisputed evidence that reflects that

managerial discretion is a crucial component of RHI's implementation of its CTO Policy.  In

fact, the exercise of managerial discretion is so important to RHI's CTO Policy, that the

Company's Director, Employee Programs and Benefit Operations, issued a six-page

memorandum to RHI's supervisory employees explaining the importance of reasonable and

proper judgment in administering the policy.  *See* Clarification of Exempt Time Off Tracking

Memorandum (Exhibit A to the Second Affidavit of Linda Blandford-Beringsmith ("Second

Blandford-Beringsmith Aff."), attached as Exhibit B.

Ironically, Plaintiffs' own allegations serve to demonstrate the discretion vested in RHI's

office-level managers to implement the Company's CTO Policy in a flexible manner.  Plaintiff

Stacey Moore testified that she took two half-days off in order to move in July 2003.  Affidavit

of Stacey Moore ("Moore Aff."), ¶ 23 (attached as Exhibit C to Liss-Riordan Aff.).  Had her

supervisors applied RHI's CTO Policy in a rigid and formulaic manner, as Plaintiffs claim the

Company's supervisors must do, Moore would have been charged two full days of CTO time for

---

[6] For example, Plaintiffs state that "[i]t is undisputed that Defendants maintained a written policy of <u>requiring</u> exempt employees who were absent from work for part of the day to use their leave time to cover such absences." Plaintiffs' Memorandum in Support of Their Cross Motion for Summary Judgment, p. 5 (docket entry no. 68) (emphasis added).  Plaintiffs also repeatedly argue that "[t]he written policy is mandatory and does not provide an exception for managerial discretion."  Plaintiffs' Statement of Undisputed Material Facts in Support of Their Cross-Motion for Summary Judgment, ¶¶ 3, 6 (docket entry no. 69).  Plaintiffs further state that "[e]very member of the class is affected by this clear and unambiguous policy, which explicitly applies to all exempt employees and is repeatedly stated in mandatory terms."  Motion for Certification, p. 8.

these absences.  In fact, the Company's records unequivocally reflect that Moore's managers exercised their discretion and charged her <u>no</u> CTO time for these two half-day absences. Moore's allegations that <u>her supervisors</u> "would urge [her] to take the whole day off" when she asked for "part of a day off" also illustrates that the application of the policy depends on local management of RHI's numerous individual offices.[7]  *See* Moore Aff., ¶ 23.

There can therefore be no doubt that RHI's CTO Policy vests managers with substantial discretion.  Because of this discretion, as well as other factors that will necessarily differ from employee-to-employee,[8] the liability and damages assessments for Plaintiffs' claims will require individualized inquiries into the facts surrounding each claim as it applies to each putative class member to determine (1) whether liability under the salary basis test exists as to each employee in the class; (2) if liability exists as to some employees, whether each of those employee suffered damages (i.e., whether each employee ever worked more that forty hours in a workweek); and (3) for employees who suffered damages, the amount of damages due to each employee.  As described below, this process would require intensely fact-specific inquiries and would be extremely time-consuming, burdensome, and costly for the Court and the parties.

In order merely to determine liability, Plaintiffs' claims would necessarily require that the Court inquire into the application of the CTO Policy by each manager in each office, including "whether (1) particular managers had a practice of deducting full days from employees' CTO banks for partial day absences, (2) employees were required to borrow eight hours of CTO for partial day absences, or (3) employees were allowed to borrow CTO at all," as well as whether

---

[7] Neither O'Donnell nor Jolicoeur even allege that their managers deducted full days of CTO time for partial day absences.

[8] In *O'Donnell III*, the Court noted that Plaintiffs' claims will also require "individualized inquiries depending on the office where the employee worked, who managed the employee and what position the employee held." p. 21.

employees received deductions from final pay. *O'Donnell III*, p. 21. An improper deduction in, for example, RHI's Westborough office would have no bearing on the exempt status of RHI's employees in Boston or in any of the Company's other offices in Massachusetts.

In addition, if liability is present, the Court must then conduct individualized damage assessments to determine whether damages exist for each class member, and if so, the amount of damages due to each such employee. For each salaried employee who was deemed to be non-exempt, the Court would be required to examine the hours worked by each employee each week throughout his or her employment with RHI during the statute of limitations period to determine whether he or she ever worked more than forty hours in a workweek. Plaintiffs themselves acknowledge that the hours they worked were subject to the discretion of local management. *See* Affidavit of Ian O'Donnell, ¶ 12 (attached as Exhibit A to Liss-Riordan Aff.); Affidavit of David Joilceour, ¶ 12 (attached as Exhibit B to Liss-Riordan Aff.). Thus, the hours worked by putative class members – who worked in different offices, held dramatically different jobs, and reported to different managers – varied substantially. The existence and amount of damages will therefore vary greatly from employee-to-employee. Courts have recognized that cases requiring such individualized inquiries of liability and damages are not appropriate for class treatment. *See, e.g., Owner-Operator Indep. Drivers Ass'n,* 339 F.3d 1001; *Schwartz*, 196 F.R.D. 275.

For these reasons, Plaintiffs have not shown that a class action is superior to other available methods for the fair and efficient adjudication of this controversy. To the contrary, given the necessity of conducting countless individual inquiries, proceeding with this case as a class action would render the litigation extremely difficult – if not impossible – to manage, and would be an ineffective means of adjudicating any arguable common issue. Plaintiffs offer no evidence to justify the detailed analysis and individualized assessment of liability, the existence

of damages, and amount of damages that the Court and RHI would have to conduct were the class to be certified. Plaintiffs have, therefore, failed to show that common questions of law or fact predominate over questions affecting individual class members as required by Rule 23(b)(3), and the Court should deny Plaintiffs' Motion for Certification.

<u>**CONCLUSION**</u>

The Court should deny Plaintiffs' most recent attempt to certify a class in this matter because Plaintiffs have unquestionably failed to meet the requirements of Rule 23. In their motion, Plaintiffs rely on the same weak and tired arguments – and complete lack of evidence – previously set forth in their numerous failed attempts to certify a class under the substantially less stringent requirements of Section 216(b). Individual issues of liability and damages clearly predominate over any arguable common facts in this case, and the individualized fact-intensive inquiry that would be necessary to determine how the CTO Policy was applied in the case of each and every member of the putative class, not to mention the potential inquiry into the number of hours worked each week by each individual throughout each individual's employment with RHI, would create gross inefficiencies and intractable case management problems. Thus, certification of a class in this case would be a waste of economic and judicial resources and would impose a substantial burden on the Court and on RHI, and the Court should deny Plaintiffs' Motion for Certification.

WHEREFORE, for the foregoing reasons, RHI respectfully asks that the Court deny

Plaintiffs' Motion for Certification.

Respectfully submitted,

ROBERT HALF INTERNATIONAL INC.
AND ROBERT HALF CORPORATION
By their Attorneys,

/s/ C.J. Eaton
Richard L. Alfred (BBO # 015000)
Krista G. Pratt (BBO # 644741)
Barry J. Miller (BBO # 661596 )
C.J. Eaton (BBO # 660726)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
DATED:  January 31, 2008          Telephone:     (617) 946-4800
Telecopier:    (617) 946-4801

---

CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Court's ECF system
and that a true copy of the above document was served
on Shannon Liss-Riordan, an attorney for Plaintiffs, Pyle, Rome, Lichten,
Ehrenberg, & Liss-Riordan, 18 Tremont Street, Suite 500, Boston, MA 02109,
by first class mail on January 31, 2008.

/s/ C.J. Eaton
C.J. Eaton

---

16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR,<br>AND STACEY MOORE, on behalf of<br>themselves and others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT HALF INTERNATIONAL INC.<br>AND ROBERT HALF CORPORATION<br><br>Defendants. | )<br>)<br>)<br>)<br>)  CIVIL ACTION NO.  04-CV-12719 NMG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF LINDA BLANDFORD-BERINGSMITH

I, Linda Blandford-Beringsmith, being duly sworn, hereby depose and state as follows:

1.    I submit this Affidavit in support of Defendants' Opposition to Plaintiffs' Renewed Motion to Facilitate §216(b) Notice.

2.    In my capacity as Director, Human Resources for Robert Half International Inc. ("RHI" or the "Company"), I am familiar with RHI's CHOICE Time Off ("CTO") policy.  The CTO benefit includes vacation days, sick days, and other personal days off.  The Company maintains CTO "banks" that track accrued days off for employees.  RHI employees accrue CTO leave on an incremental basis throughout the year according to a schedule.

3.    Each employee's manager makes an individualized decision as to how the time off is recorded and whether any CTO is deducted from a particular employee's bank.  In this way, each manager exercises his or her discretion in determining how to

1

apply the CTO policy in individual circumstances. For example, a manager may allow an employee to take time off for personal reasons without any deduction from his or her CTO bank. Partial-day deductions from CTO are not permitted under the policy. Generally, an exempt employee who leaves work because of illness after working a substantial part of the day is not required to use CTO for that time.

4.    If approved by the employee's individual supervisor, an exempt employee may borrow up to five days of CTO, which are only advanced in full-day increments, before the time is actually earned. If the Company allows an employee to borrow CTO time and the employee terminates before earning the CTO, the Company may deduct the amount owed from the employee's final paycheck, subject to the manager's discretion.

5.    RHI has more than 260 branch offices throughout the United States, and has at least one office in 43 of the 50 states. RHI has employed many thousands of employees in salaried positions during the previous three years.

6.    RHI's exempt workforce includes a diverse group of employees including positions ranging from Division Directors and Branch Managers to corporate Vice Presidents and high-level company officers.

Signed under the pains and penalties of perjury this first day of May 2006.

Linda Blandford Beringsmith

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IAN O'DONNELL, DAVID JOLICOEUR, AND STACEY MOORE, on behalf of themselves and others similarly situated ⟩<br><br>Plaintiffs, ⟩<br><br>v. ⟩<br><br>ROBERT HALF INTERNATIONAL INC. AND ROBERT HALF CORPORATION ⟩<br><br>Defendants. ⟩ | CIVIL ACTION NO.  04-CV-12719 NMG |

### SECOND AFFIDAVIT OF LINDA BLANDFORD-BERINGSMITH

I, Linda Blandford-Beringsmith, being duly sworn, hereby depose and state as follows:

1.      I submit this affidavit in support of Defendants' Opposition to Plaintiffs' Cross Motion for Summary Judgment.

2.      In my capacity as Vice President Human Resources for Robert Half International Inc. ("RHI" or the "Company"), I am familiar with RHI's CHOICE Time Off ("CTO") policy.  RHI's CTO policy vests substantial discretion in the Company's managers to implement the policy.

3.      On July 13, 2000, when I was Director, Employee Programs and Benefit Operations, I circulated a memorandum to RHI's managers and supervisors entitled "Clarification of Exempt Time Off Tracking."  A true and accurate copy of that document is attached as Exhibit A.  The purpose of the memorandum was to remind

1

managers to use their own judgment and discretion in applying the CTO policy to exempt employees.

4.      In my current role, I am also familiar with the payroll practices of RHI.  I have reviewed the documents attached as Exhibit F to Plaintiffs' Statement of Undisputed Material Facts.  These documents were prepared by the Payroll Department.  The documents do not provide any "instructions" to anyone in payroll to make deductions from employees' final paychecks, nor do they "instruct" anyone else to take any specified action.


        Signed under the pains and penalties of perjury this 18th day of June 2007.


                                        __/s/ Linda Blandford-Beringsmith___
                                        Linda Blandford-Beringsmith

# EXHIBIT A


**Robert Half International Inc.**

5720 Stoneridge Drive, Suite Three Pleasanton, CA 94588
(925) 598-8000    Fax  (925) 598-8999

---

## Memorandum

**To:**        U.S. Managers and Supervisors

**From:**      Linda Blandford-Beringsmith

**Date:**      July 13, 2000

**Subject:**   Clarification of Exempt Time Off Tracking

---

Questions have arisen on recording Choice Time Off (CTO) for exempt employees who have personal business that requires them to be out of the office less than a full day. **Please communicate the following clarification to your staff immediately and ensure that your payroll records are submitted accordingly.**

In order to preserve the exempt status of our exempt employees, it is necessary that they be given flexibility from time to time to attend to personal matters without recording CTO, so long as they can accomplish their job responsibilities.  That does not mean, however, that exempt employees are entitled to take a significant part of the day off without being charged CTO.

For payroll records, exempt employees record CTO in 8-hour increments.  We recognize that exempt employees may often work significantly more hours than 8 hours per day.  We also recognize that from time to time, exempt employees need to attend to personal matters during their regularly scheduled work hours.

Exempt employees who have personal business that can be accomplished in two hours or less in a standard eight-hour day may take the necessary time off without being charged for a day of CTO. Of course, time must be scheduled in such a way as to not interfere with ongoing business. Further, any employee who abuses this benefit may be subject to appropriate employment action.

To the extent that an exempt employee has personal business which results in an absence for a period of more than two hours in a standard eight-hour day, our practice is that the day will be considered a full day of CTO.   As with any employee on CTO, there is no requirement that the employee be present in the office for any part of that day.  If an exempt employee has no accrued CTO, the employee will be permitted to "borrow" a day of CTO from as yet unaccrued CTO.  The employee will not be "docked" pay.

C:\TEMP\exempt CTO memo-rev 5-19.doc
07/14/00 10:42 AM

As a manager, it is your job to apply the company's business rules fairly and reasonably. When enforcing the CTO tracking rules, consider the specifics of each situation and use good judgment and common sense to ensure fair and reasonable treatment of your employees. The situation at hand and the employee's record of contribution and past use of time off all should be considered.

In managing CTO, it is important to remember that Robert Half International is an equal opportunity employer. Consequently, management of CTO, like other employment decisions, must be made without regard to race, color, religion, sex, age, handicap, national origin, marital status or veteran status.

Additionally, it is very important for managers to keep track of CTO. Managers are responsible for the accuracy of the on-going CTO record keeping. Each month the Payroll Department prepares the "Choice Time Off Report" which is the official corporate time off record system for CTO. The Choice Time Off Report should be reviewed closely and reconciled with individual time off records to ensure that it is accurate, as it is used to determine the CTO balance payable to employees upon termination.

To assist you with questions you may receive from employees, attached are Manager Guidelines and FAQs specific to this practice. If you have any questions, contact the Benefits Operations Department at (888) 677-6613 or e-mail benefits@rhii.com.

# MANAGER GUIDELINES AND
# FREQUENTLY ASKED QUESTIONS

## Manager Guidelines

As a manager, you have to apply good judgment and understand the impact on the culture and morale of your people when managing CTO. You need to apply common sense and manage fairly and reasonably. There may be times when recording a full day of CTO for an absence of 2 hours is too much, when work missed can be made up or schedules can be adjusted to allow greater flexibility. You must take into account the situation at hand and the employee's record of contribution and past use of time off. The following examples demonstrate some areas where you should apply judgment.

- An employee who habitually is late to work may impact productivity and morale of the whole group and may require employment action. However, it may be appropriate to apply flexibility for a good performer who regularly meets obligations to coworkers and clients.

- Recognize that unplanned personal issues also require your judgment. Personal catastrophe and unscheduled time off due to a car accident, a child's injury at school, or burst pipes at home should be treated with consideration for the overall situation.

- An employee may approach you and ask for flexibility in their schedule for a particular situation. Consider whether they are able to modify their schedule and complete their required work later that day or on another day that week.

Mismanagement of CTO – either too lenient or too harsh – can heavily damage your workgroup's culture and morale. Good management of CTO will enhance the culture and morale of your workgroup.

In managing CTO, it is important to remember that Robert Half International is an equal opportunity employer. Consequently, management of CTO, like other employment decisions, must be made without regard to race, color, religion, sex, age, handicap, national origin, marital status or veteran status.


## Frequently Asked Questions

- **Why bother to track and report CTO?**

  If CTO is not tracked, it can lead to different records of the CTO balance. This can create an employee relations issue and a payment liability for the company. For example, if an employee takes CTO but it is not reported, there is no record in Payroll and a full CTO balance remains in the payroll records. If that employee terminates, you would not have a record of the true CTO balance to be paid in the final check, so Payroll would use their records and pay the full CTO balance. In effect, the employee could get paid a second time for CTO already taken and your profit sheet would suffer.

- **What should an exempt employee who works less than a full day record as time off?**

  Exempt employees who have personal business that can be accomplished in two hours or less in a standard eight-hour day may take the necessary time off without being charged for a day of CTO. Of course, time off must be approved by their manager and scheduled in such a way as to not interfere with ongoing business.

  Managers need to look at the individual circumstances and apply judgment as to when to apply greater flexibility. The situation at hand and the employee's record of contribution and past use of time off all should be considered when determining if greater flexibility is needed.

  To the extent that an exempt employee has personal business that results in an absence from work of more than 2 hours our practice is that the day will be considered a full day of CTO. Eight hours of CTO should be recorded for payroll records. As with any employee on CTO, there is no requirement that the employee be present in the office for any part of that day. The employee can use the opportunity to address a variety of personal needs on that day.

  Employees who have questions on how to record their time should consult with their manager, who will look at the individual circumstances and apply judgment as to how to record the time. **(Note: this FAQ is included in the CHOICE Time Off FAQs on "Bob")**

- **How do I manage an exempt employee who continually works only 6 hours per day?**

  You should examine the employee's history of use and/or abuse of CTO. An employee who abuses CTO may be subject to employment action.

- **Why do non-exempt employees record time off in 15-minute increments and exempt employees record time off in full day increments?**

  In adherence with governing laws, our policy is to record time off in full day increments for exempt employees.
  **(Note: this FAQ is included in the CHOICE Time Off FAQs on "Bob")**

- **I have an employee who worked significantly more than 40 hours for the entire week, yet they worked less than 6 hours one day during the week. Should the employee record a full day of CTO for the day they worked less than 6 hours?**

  In order to preserve the exempt status of our exempt employees, it is necessary that they be given flexibility from time to time to attend to personal matters without recording CTO, so long as they can accomplish their job responsibilities.

  You need to determine if the employee was able to get their work done for the time period in question. If they did, then you have the discretion to tell the employee not to record CTO for the time off from work.

- **Do exempt employees have to record a full day of CTO if they leave work early due to illness?**

  Generally, an exempt employee who works a substantial part of the day and then goes home ill is not required to use CTO for that time.  In consideration for the health of the other employees in the work group, they should be encouraged to evaluate their situation before returning to work.
  **(Note: this FAQ is included in the CHOICE Time Off FAQs on "Bob".)**

- **I have an employee with a regularly scheduled medical appointment who is absent more than 2 hours on the days of the appointment.  How should the employee record CTO?**

  We recognize that employees need flexibility to take some time off from time to time to attend to personal matters.    Employees should be encouraged to schedule their personal appointments at times that minimize their time away from the office and in such a way as to not interfere with ongoing business.

  In the case of an ongoing required medical treatment schedule that regularly results in an absence of more than 2 hours, laws governing disabilities may impact the situation.  Check with Benefits Operations at benefits@rhii.com or at (888) 677-6613 to confirm procedures.

- **How should exempt employees with a standard work schedule of 30 to 39 hours per week record time off if they are absent for a portion of the day?**

  As with all exempt employees, it is necessary that they be given flexibility from time to time to attend to personal matters without recording CTO, so long as they can accomplish their job responsibilities.

  As a guideline, if an exempt employee with a standard work schedule of 30 to 39 hours per week has personal business that results in an absence of more than 25% of their standard work day, our practice is to consider it a day of CTO.  They should record a full day of CTO based upon their standard work schedule.

- **If an exempt employee needs to attend a personal appointment but does not have any accrued CTO, will their pay be docked?**

  Employees are able to "borrow" up to five (5) days CTO from their as yet unaccrued CTO.  If an exempt employee needs time off and has no accrued CTO, the employee will be permitted to "borrow" a day of CTO.  The employee will not be "docked" pay.
  **(Note: this FAQ is included in the CHOICE Time Off FAQs on "Bob")**

- **Some exempt employees previously submitted CTO in less than full day increments. Will their CTO balance be adjusted?**

  The Payroll Department will not process CTO in less than full day increments for exempt employees. CTO reported to Payroll in less than full day increments for an exempt employee will not be processed or subtracted from the employee's CTO earnings and is therefore not reflected in the monthly Choice Time Off Report generated by Payroll. Managers should check their local records to reconcile them to this report.

  To the extent that there are differences between local time records and Payroll records, it is at the manager's discretion to determine if adjustments to the CTO record are necessary.